UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                          :
In re:                                    :    Chapter 11
                                          :
FILMED ENTERTAINMENT INC.,                :
                                          :    Case No. 15-_____(   )
                          Debtor.[1]      :
                                          :
------------------------------------------------------------X

**FIRST DAY AFFIDAVIT OF GLENN LANGBERG
PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY
RULES FOR THE SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW JERSEY          )
                             ) ss.:
COUNTY OF ESSEX              )

      Glenn Langberg, being duly sworn, deposes and says:

      1.     I am an independent director of Filmed Entertainment Inc., a corporation organized under the laws of the state of Delaware and the debtor and debtor in possession ("FEI" or the "Debtor" or the "Company") in the above-captioned chapter 11 case.  I have served in this capacity since November 1, 2014, and prior to becoming an independent director I had provided strategic consulting services to the Debtor commencing May 1, 2014.  In these capacities, I have become generally familiar with the day-to-day operations, business and financial affairs of the Debtor.

      2.     I am the founder and Chief Executive Officer of GRL Capital Advisors, a firm providing consulting and financial services to, *inter alia*, distressed and underperforming entities.  I have a Bachelor of Arts degree from Brandeis University, where I am currently a

---

[1]    The last four digits of the debtor's federal tax identification number are 3867.

Fellow.  I have more than 25 years of experience as a corporate executive in finance and real

estate and more than 16 years of specific financial restructuring experience.  I have served in a

variety of capacities for troubled entities in both in-court and out-of-court scenarios, including,

as chief executive officer, chief restructuring officer and director.[2]  In certain of these roles and

on behalf of such entities, I have appeared before various courts, including the United States

Bankruptcy Courts for the District of Delaware and the District of New Jersey.

3.      I submit this affidavit (the "Affidavit") pursuant to Rule 1007-2 of the

Local Rules for the United States Bankruptcy Court for the Southern District of New York (the

"Local Rules") in support of the Debtor's petition for relief under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code"), filed on August 10, 2015 (the "Petition Date"), and

the Debtor's various first day applications and motions contemporaneously filed herewith (the

"First Day Pleadings").  I have reviewed the Debtor's petition and the First Day Pleadings, and it

is my belief that they are true and accurate to the best of my knowledge, and the relief sought

therein is essential to ensure the uninterrupted operation of the Debtor's business while it seeks

to administer this case, sell substantially all of its assets and wind down its affairs pursuant to a

chapter 11 plan for the benefit of its estate.

4.      Except as otherwise indicated, the facts set forth in this Affidavit are based

upon my personal knowledge, my review of relevant documents, information provided to me by

officers  and  directors  of  the  Debtor,  professionals  retained  by  the  Debtor  (including,

---

[2]   I have specific experience with companies, including:  Strauss Auto, Big M, Inc., Kids Brands Inc., dELiA*s,
DOTS, LLC, Tandy Brands Accessories, Inc., Admiral Wine and Liquor, Inc., FSJ Imports, LLC, Frederick's
of Hollywood Group, Inc., and Scott Kay, Inc.  I have been directly involved with trademark, licensing and
royalty matters for the following brands:  Disney Consumer Products, Osh Kosh B'Gosh, The Timberland
Company, Perry Ellis International, Kenneth Cole Productions, Inc., Andrew Marc, Steve Madden, Ltd., Calvin
Klein Inc., and Sperry Top-Sider, Inc.

PricewaterhouseCoopers ("PwC") and Griffin Hamersky P.C.) and third-party vendors to the Debtor, or my opinion based upon experience, knowledge, and information concerning the operations of the Debtor and its industry as a whole. I am authorized to submit this Affidavit on behalf of the Debtor, and if called upon to testify, I would testify competently to the facts set forth herein. Unless otherwise indicated, the financial information contained in this Affidavit is unaudited.

5.    The Affidavit is divided into four parts. Part I offers a discussion of the Debtor's history, capital structure, business operations and certain related key vendor agreements, and significant prepetition indebtedness. Part II addresses the events leading to the filing of the Debtor's chapter 11 case, including the decline in its business, the cause for such decline, and efforts made by the Debtor's management to stabilize and restructure its financial and operational affairs. Part III sets forth information required by Local Rule 1007-2 to the extent not otherwise provided herein. Part IV discusses the relevant relief sought in the Debtor's First Day Pleadings and the grounds for such relief.

## I.
## The Debtor's Business

**A.    Company Overview**

6.    FEI owns and operates the "Columbia House DVD Club," a direct-to-customer distributor of movies and television series in the United States. The Debtor conducts its business through physical catalogues and through its website at www.columbiahouse.com. The Debtor was historically active in the musical compact disc business, but exited the music business in 2010.

7.    The business has been in decline for approximately two decades, driven by the advent of digital media and resulting declines in the recorded music business and the home-

entertainment segment of the film business. Revenues of The Columbia House Company ("Columbia House") peaked in 1996 at approximately $1.4 billion (excluding shipping & processing) and declined in almost every year since then. In 2014, the Company's net revenues were $17 million.

**B.**   **Company History**

8.    Columbia House was founded in 1955 as a division of CBS Inc. Columbia House initially sold phonorecordings (e.g. vinyl records and cassette tapes). In 1982, Columbia House expanded beyond music and entered the movie business selling videotapes. In 1988, the Sony Corporation ("Sony") acquired Columbia House as part of its purchase of CBS Music, and a year later partnered with Warner Bros. Entertainment Inc. ("Warner") to operate the business and its music club (the "Columbia House Music Club").

9.    Columbia House launched the Columbia House DVD Club in 1997. In 2002, an affiliate of the Blackstone Group ("Blackstone"), a global investment and advisory firm, acquired an 85% stake in Columbia House.[3] In 2005, the Debtor, which was then known as BMG Direct and was owned at the time by Bertelsmann Inc. ("Bertelsmann"), acquired 100% of Columbia House from Blackstone, Sony and Warner. (The BMG Direct business was a competitor to Columbia House in the music club business line. BMG Direct was originally founded in the 1960s as the RCA Victor Music Club. Bertelsmann acquired the club, then known as RCA Music Service, as part of its 1986 acquisition of RCA Records.)

10.    Following the acquisition, the combined company was renamed BMG Columbia House.[4] Columbia House's Music Club members were combined with the Debtor's

---

[3]    Sony and Warner retained the remaining 15% stake in Columbia House on an equal percentage basis.

[4]    BMG Columbia House ultimately, through a series of name changes, became FEI in 2013.

"BMG Music Service". The DVD club continued to operate under the Columbia House DVD Club name.

11. In 2008, FEI was acquired by JMCK Corp., a wholly owned subsidiary of Najafi Companies, a private investment firm. In 2010, the Debtor wound down the BMG Music Service and exited the music business, leaving DVDs (including Blu Ray discs) as the Debtor's remaining product line.[5] In December 2012, a subsidiary of Pride Tree Holdings, Inc. acquired FEI.

C.     **The Debtor's Capital Structure**

12. FEI is a wholly owned subsidiary of DVD Direct Acquisition, LLC, a Delaware limited liability company ("DVD Direct"). DVD Direct in turn is a wholly owned subsidiary of Pride Tree Holdings, Inc., a Delaware corporation ("Pride Tree").

D.     **The Debtor's Business Operations**

The DVD Club Model

13. The Columbia House DVD Club functions under a "club model" consisting typically of three components: (a) an up-front offer for consumers to join the club (e.g., "Buy one DVD get one Free"); (b) members' participation in a "negative option cycle;"[6] and (c) members' obligation to purchase a specified number of DVDs at full price over a certain

---

[5]  The reasons for the Debtor's exit from the music service business are discussed in greater detail in Section II.A below.

[6]  The "negative option cycle" begins when a member is notified that the club has selected one or more movies or television series to be featured as the "Director's Selections" for that cycle. Members receive information about the Director's Selections either via email or via physical catalogues. The member then has a specified number of days to decline the Director's Selections for that cycle; if a member does not respond by the specified date, the club automatically ships the Director's Selections to the member and invoices him or her. The negative option cycle is offered to members up to 21 times per year.

period of time.  Club membership can be cancelled at any time after this purchase obligation is fulfilled.[7]

14.     Additionally, during the time members remain active, they can purchase DVDs at their discretion from a wide selection of titles.  Such purchases are commonly referred to as "positive orders," and comprise a substantial amount of the club's sales.

The Debtor's Licensing Agreements

15.     The Debtor is able to offer its movies and television series titles through licensing arrangements (the "Licenses") with major film studios and smaller independent film studios.  Under these Licenses, the Debtor is granted rights to sell the studios' existing catalogs and new release titles for a specific term.   These Licenses typically include two types of payments to the studio: (a) purchasing of DVDs on a cost basis; plus (b) payment of a royalty for each unit sold, which is calculated quarterly.  The Licenses often result in product costs that are less than what traditional retailers pay under a wholesale model.  The arrangement effectively permits the Debtor to offer movies and television series to its members at favorable pricing.

16.     Significantly, however, the Licenses also contain various restrictions on how and when the Debtor may sell certain titles (including a general restriction that titles may only be sold under the club model, and not at retail).  Further, the Debtor's licensing rights only cover physical DVDs and do not include the rights to digital movie formats.

E.     **The Debtor's Administrative Services, Order Processing and Product Fulfillment Services and Customer Service Functions**

17.     The Debtor currently does not have any employees.[8]  Over the last several years, the Company has outsourced its operational functions to several important third-party

---

[7]     The Columbia House DVD Club currently has 110,000 members (i.e., members that have purchased product within the last year).

vendors under service agreements.    These arrangements allowed the Debtor to reduce its overhead expenses by approximately eighty percent (80%) over the last three years.    A brief overview of important third-party vendors is set forth below.

18.    The Debtor's administrative functions (including accounting, tax, treasury, legal, human resources, risk management, inventory and non-inventory purchasing), marketing functions (including creative, production, lettershop, promotional and strategic marketing, and list management), technology functions (including information technology, website and email operations and telecommunications), order processing functions (including transaction and payment processing, member account management, and invoicing) and certain other functions are performed by Bookspan LLC ("Bookspan"), pursuant to that certain Services Agreement between the Debtor and Bookspan, dated January 1, 2014, as amended from time to time (the "Bookspan Services Agreement").    Bookspan is indirectly owned by Pride Tree and is therefore an affiliate of the Debtor. The fees charged by Bookspan under the Bookspan Services Agreement are at rates considered to be reasonable by the Debtor.

19.    The Debtor's transaction processing and remittance processing services are performed by CDS Global, Inc. ("CDS"), pursuant to a Master Services Agreement between the Debtor and CDS, dated August 1, 2012 and related exhibits thereto (the "CDS Services Agreement").    Pursuant to the CDS Services Agreement, CDS provides, on behalf of the Debtor: (i) transaction processing of paper-based materials for Columbia House DVD Club members including, but not limited to, "Member Reply Forms" (order forms), certificates, coupons,

---

[8]    As of December 2012, when the Debtor was acquired, FEI had approximately 520 employees.  As part of its cost saving initiatives the Company terminated approximately 320 employees and transferred the remaining 200 employees to affiliates from the end of 2012 to October 2014.

sweepstakes, enrollments, imaging of customer correspondence, returns, requests for removal from mailing lists; and (ii) remittance processing services for processing paper-based remittances including, but not limited to, checks, money orders, paper-based credit card transactions, electronic checks, and pass-through payment files for payments made by Columbia House DVD Club members.

20.     The Debtor's customer relations and call center services are performed by Mercantile Adjustment Bureau ("MAB"), pursuant to a Master Services Agreement between the Debtor and MAB, dated September 27, 2013 (the "MAB Services Agreement").  Pursuant to the MAB Services Agreement, MAB provides, on behalf of the Debtor, various customer service and call center services to Columbia House DVD Club members including, among other things: (i) responding to inquiries received from members of the Columbia House DVD Club regarding their accounts, orders, payments, membership programs and operations, etc., which are received by MAB, on the Debtor's behalf by incoming phone calls to their call center, white mail and email contacts; (ii) administering member surveys for the Debtor; and (iii) providing the Debtor with qualitative and quantitative reporting on inquiries received.

21.     Finally, the Debtor's product fulfillment services are performed by Totally Awesome Warehouse LLC ("TAW") pursuant to that certain Fulfillment Services Agreement between the Debtor and TAW, dated January 1, 2015, as amended from time to time (the "TAW Services Agreement").  Pursuant to the TAW Services Agreement, TAW provides, among other functions: (i) invoicing, packing, shipping and processing returns of merchandise ordered by customers; (ii) inventory storage and maintenance; and (iii) delivering excess inventory to the Debtor's inventory liquidators for sale or as otherwise directed by the Debtor for disposal (the "TAW Services").   TAW is indirectly owned by Pride Tree and is therefore an affiliate of the

Debtor.  The fees charged by TAW for TAW Services are at rates considered to be reasonable by the Debtor.

22.     The Bookspan Services Agreement, the CDS Services Agreement, the MAB Services Agreement, and the TAW Services Agreement (collectively the "Services Agreements") are all necessary and critical for the smooth and orderly operation of the Debtor's business.

**F.      The Debtor's Prepetition Indebtedness**

23.     The Debtor does not have any institutional financial debt.  The Debtor has a secured obligation of $800,000 as of August 7, 2015 stemming from a settlement agreement with HCL America, Inc. ("HCL"), and a related confession of judgment.

24.     In addition, the Debtor has approximately $7 million in unsecured current liabilities, including trade payables and royalty licensing amounts due to movie studios, and approximately $56 million in legacy liabilities reflected on its balance sheet.  The Debtor's actuarial consultants have advised that, as of May 2015, the Debtor has approximately $20.1 million of long-term qualified pension liability.  There is also $10.2 million of long-term non-qualified pension liability.

**II.**
**Circumstances Leading to These Chapter 11 Filings**

**A.      Decline in Financial Performance**

25.     The Columbia House business peaked in 1996, when revenues were approximately $1.4 billion (excluding shipping & processing).  By 2005, when Debtor acquired Columbia House, Columbia House revenues had declined precipitously to $522 million (excluding shipping and processing).  In 2014, revenues were $17 million.

26.     This decline is directly attributable to a confluence of market factors that substantially altered the manner in which consumers purchase and listen to music, as well as the way consumers purchase and watch movies and television series at home.

### B.     Decline of the Compact Disc Market

27.     In the late 1990's, a systematic disruption of the CD market began with the rapid rise of the "mp3" digital file format.  Mp3s first gained popularity on peer-to-peer file sharing sites, such as Napster, which allowed users to download and share music files without paying the owners of the intellectual property. (In 2001, Napster was shut down following a decision by the United States Court of Appeals for the Ninth Circuit, but piracy continued to remain an issue for years afterwards.)  This digital format allowed listeners to share music files - in many cases illegally without paying for such files.  This new trend of acquiring and listening to music, often without charge, had an adverse impact on the BMG Direct Music Service and the Columbia House Music Club (subsequently BMG Columbia House).

28.     In late 2001, Apple Inc. ("Apple") launched the iPod portable music player and the iTunes online music store.  The iPod and iTunes, together, provided users with a legal, fully integrated digital music platform.  In addition to allowing music to become truly portable and purchasable instantly at any time, the new platform allowed consumers to purchase a single song rather than an entire album.  This latter feature proved particularly compelling to music consumers who had long chafed at being forced to purchase an entire album in order to obtain the single song they sought.  Indeed, the growth of the digital download market severely affected CD sales, serving as a significant contributing factor for a number of major brick-and-mortar retail chains, which sold compact discs, to either exit that business line or seek bankruptcy relief, including, for instance, Tower Records in 2006, Sam Goody/Musicland in

2006, Circuit City in 2008 and Virgin Megastore US in 2009.[9]   Ultimately, for the Debtor, the impact of the digital download market on its music CD business was severe.   Tellingly, the Columbia House CD music business peaked in 1995 at approximately $838 million in sales (excluding shipping & processing), and declined steadily thereafter.   In 2001, Columbia House determined not to renew its license agreement with Universal Music, the largest recorded music company, significantly curtailing its product offerings.   The decision not to invest in a Universal Music license at that time signaled Columbia House's apparent intention to de-emphasize and "harvest" its music business. In fact, as of 2002 – 2003, Columbia House itself, before its acquisition by the Debtor, did begin to "harvest" its music business by means of significantly reducing new member acquisition investment. The Debtor ultimately exited the music business in 2010.   This constituted a heavy strategic blow to the Debtor since the Debtor had been most closely associated with music by consumers since its inception.

### C.   Disruption and Decline in the DVD Market

29.   During the same general time period that the CD market was declining, three primary industry forces led to the deterioration of Columbia House's DVD  business: (a) strong competition from new eCommerce entrants; (b) the proliferation of mass merchandiser locations; and (c) the decrease of the overall DVD market as consumers shifted to digital consumption of filmed entertainment.

---

[9]   I understand that the digital download market grew in sales every year from 2001 to 2013, ultimately reaching sales of $3 billion in 2013. Conversely, according to the Record Industry Association of America, the U.S. compact disc market peaked in 2000 at approximately $13 billion, and declined thereafter, to reach $2 billion in 2013.  The strong competitive advantages and market leadership of Apple, including owning the top player and the top online store, made competing in digital downloads exceedingly difficult for all other participants, and Apple continued to dominate the digital download market during this time period.

30.     Beginning in the late 1990s, several new eCommerce entrants brought competitive pressure to bear on Columbia House.  Notably, in 1998, Amazon.com entered the DVD market after selecting DVDs as its third major product category (after books and music).  Also in 1998, eBay Inc. completed an initial public offering, and within several years expanded beyond its initial focus on collectibles to include a wide assortment of consumer products, including new and used DVDs.  Finally, in 1999, NetFlix launched a new DVD rental model that allowed consumers to watch an "unlimited" number of movies at home for a fixed monthly price by using and returning DVDs through the post office.  Since a NetFlix subscription was typically priced at $19.99 per month, and purchasing a single DVD often cost between $19.99 and $24.99, the NetFlix model quickly became popular, and Netflix's customer base grew to 4.2 million subscribers by 2005.  Because Amazon.com, eBay and NetFlix essentially provided direct-to-home distribution and a discount-based consumer value proposition, their rapid growth in DVDs materially eroded the competitive positioning of Columbia House's "club model."

31.     Additionally, during this time period, big-box merchandisers expanded significantly, putting a larger number of U.S. consumers in close proximity to one or more stores.  During the years 2000 to 2014, for instance, Wal-Mart grew from 2,647 stores to 4,203 stores, Target grew from 977 to 1,793 stores, Best Buy grew from 419 to 1,055 stores, and CostCo grew from 264 to 468 stores.  These mass merchandisers often priced DVDs very inexpensively (sometimes even as "loss leaders") in order to drive incremental foot traffic to stores.  Moreover, in 2004, RedBox entered the market with a new, convenient and inexpensive DVD rental offering based on local automated kiosks, many of which were located within or nearby other large retailers.  By 2014, Redbox had approximately 44,000 kiosks and reported sales from DVD rentals of $2 billion.

32.     At the same time as new eCommerce entrants and mass merchants were whittling away Columbia House's competitive positioning in DVDs, in 2006 the overall DVD market began to decline.  According to SNL Kagan, a financial information firm, the U.S. DVD market peaked in 2006 at approximately $22 billion, and declined steadily thereafter, to reach $11 billion in 2013 (including Blu-Ray discs).  Until this time, technical limitations related to the large file size associated with full-length video files, combined with a strong competitive response by the movie studios, had preserved the DVD market even as the CD market had been falling for five years.  However, in 2006, Apple's iTunes store began selling full-length feature films via electronic download.

33.     Further, between 2003 and 2005, cable providers such as Comcast and Verizon launched on-demand services.  In 2007, NetFlix launched its digital streaming service, which grew rapidly to a current base of approximately 37 million domestic subscribers. Additionally, in 2007, Amazon.com launched its Video on Demand service (later renamed Amazon Instant Video), which currently offers a wide selection of titles and allows Amazon.com's 20 million "Prime" members to stream some movies for no additional cost.  Most tellingly, according to SNL Kagan, between 2007 and 2014, the digital download and streaming markets grew to $5 billion, largely cannibalizing the DVD market.

34.     Simply stated, the challenging industry dynamics described above substantially contributed to the decline of sales in the Columbia House DVD Club.

D.     **Efforts to Adapt the Club Business Model**

35.     Over the years, the Debtor has pursued numerous efforts (whether through evaluation, testing or implementation) to adapt its business model to the changing competitive landscape.

36.     For instance, in 2008, the Company launched a simplified version of the club as "ch.com", which offered lower shipping and handling costs.  In 2011, the Company launched "yourmovies.com", a subscription service in which consumers selected and received at least one DVD per month for a low fixed cost of $14.99.  Neither of these models gained strong consumer adoption.  Multiple other models have been evaluated over time, but many of these concepts were hampered by various restrictive provisions contained in the Company's Licenses.

37.     In 2014, the Company tested streaming digital movies to members via its website.  However, entering the digital movie business required negotiating new license agreements with the major studios.  Also, intense competition from large and established participants such as Apple, Amazon.com, Netflix and video-on-demand services offered by major cable companies, presented substantial challenges to such an undertaking.

38.     In 2014, the Company evaluated the opportunity to re-enter the music business with a digital streaming service.  Market research commissioned and evaluated by the Company in 2014 confirmed that the Columbia House brand name is still highly recognized by consumers.  However, competitive dynamics in digital music are challenging, including strong competition from large participants such as Apple, Spotify, Pandora, Clear Channel's "iHeartRadio", Sirius/XM, and online video sites such as Youtube and Vevo.

## E.     Cost Reduction Initiatives

39.     Over time, the Debtor has implemented various cost reduction measures to offset deteriorating market conditions.  For example, in 2010, the Company successfully restructured its major Licenses away from cash heavy "advance" deals, which in many cases had required $50 - $90 million in up-front payments from the Debtor, to "pay-as-you-go" royalty deals.  Without this new deal structure, the Debtor likely would have had to shut down in 2010.

40.     In fact, as early as 2007 and 2008, Bertelsmann had contemplated and planned to exit the Columbia House DVD business by 2010.  As the Company also wound down the music business in 2010, exiting the DVD business would have caused the Company to cease operations at that time.  Notwithstanding the Bertelsmann wind-down plan, management has succeeded in continuing operations of the DVD business through the present day by undertaking a number of major cost reduction initiatives.

41.     Importantly, management significantly reduced the Debtor's operating overhead expenses, with expenses being reduced from $24 million in 2012 to an annualized run rate of approximately $5 million during 2015.  Management accomplished these reductions through a number of major cost reduction initiatives, including: (a) reducing office locations and size; (b) reducing information technology expenses; (c) reducing personnel expenses; and ultimately (d) outsourcing its administrative, operational and customer service functions to third-party vendors under the Service Agreements.  These efforts have allowed the Debtor to continue operating while its revenue continues to decline.

42.     During this time, the Debtor's senior management also successfully negotiated settlements and workouts relating to various litigation, real estate, vendor, and other third-party liability matters.  Notably, over the last two years, these settlements collectively saved the Debtor approximately $27 million in costs. The Company has also engaged in extensive negotiations with certain other creditors with whom it was not able to conclude settlements, despite its efforts.

**F.     The Debtor's Restructuring Efforts and Sale Process**

43.     Notwithstanding major cost reduction efforts, and efforts to streamline the Company to make it more nimble and operationally efficient, given adverse market conditions, sales have continued to decline for many years.  The Debtor is continuing to lose cash at a rate

15

that would require it to cease operations at some point if it is unable to consummate the sale of its assets in a Court supervised transaction.

44.     In May 2013, the Debtor engaged the restructuring group of PwC to advise it with respect to a range of operational and financial initiatives.   In October 2014, with the assistance of PwC, the Debtor began a process to explore strategic alternatives, including for instance a sale of the business; minority and majority investments (either via debt, equity or both); refinancing; and joint venture arrangements.   Strategic parties contacted included physical and digital media companies.   Financial parties contacted included private equity firms, hedge funds, traditional lending institutions and specialty lenders.   After an extensive analysis of these alternatives, the Debtor, through PwC, contacted approximately 130 strategic and financial parties that they believed would be potentially interested in consummating one of the above-referenced restructuring transactions.

45.     As mentioned above, PwC sent "teasers" and non-disclosure agreements to 130 parties (the "Initial Parties").   Of the Initial Parties, approximately 20 expressed interest and signed non-disclosure agreements (the "Interested Parties").   The Interested Parties were provided access to a comprehensive data room, containing the Debtor's key financial and operational information, and all of its relevant organizational and corporate documents.   Of the Interested Parties, one party (the "Potential Buyer 1") engaged in specific negotiations with respect to entering into a transaction with the Debtor - specifically, investment and a going concern acquisition of substantially all of the Debtor's assets.

46.     Accordingly, in November 2014, the Debtor and Potential Buyer 1 began negotiating the terms of a going concern sale, with the parties exchanging term sheets outlining the prospective terms and conditions of an investment/acquisition.   The parties, however, were

unable to reach an agreement regarding a transaction.[10]    In addition to Potential Buyer 1, the Debtor has been in active discussions with another party ("Potential Buyer 2") regarding its potential acquisition of the Debtor's assets.    These discussions with Potential Buyer 2 remain ongoing as of the Petition Date.

47.    The Debtor continues to actively market its assets, and intends to re-contact all of the Interested Parties, among others.    The Debtor will seek authority from this Court to continue such marketing and to conduct a sale of its assets pursuant to a court-supervised process – including approval of, among other things, bidding and auction procedures and ultimately approval of the Debtor's asset sale.    Given the Debtor's continuing cash burn and considerable prepetition marketing of its assets, the Debtor will be proposing, in the short term, an expedited sale process.    The Debtor believes an expedited timeline is appropriate to effectuate a prompt, yet court supervised sale of the Debtor's assets as a going concern, and to maximize the value of the Debtor's assets for all parties in interest in this case.    It is logical and beneficial to creditors to continue to operate the business while a potential sale is concluded.    The valuable assets owned by the Debtor include, for instance, the trade name which has much goodwill associated with it,[11] the current member base, the list of prior members, content Licenses, and inventory of DVDs in the warehouse.

---

[10]    Despite not being able to reach an agreement with Potential Buyer 1, FEI remains in contact with this party and intends to maintain an open and active dialogue regarding the continued potential for a going concern sale.

[11]    The Debtor has a license to use the Columbia House trademark and other related licensed marks pursuant to that certain license agreement dated, June 21, 2002, as amended from time to time.

## III.
## Information Required by Local Rule 1007-2

48.     Pursuant to Bankruptcy Rule 1007(d) and Local Rule 1007-2, this affidavit provides the following information:[12]

49.     Set forth in the attached Schedule A is a list of the names and addresses and, where available, telephone numbers of the creditors holding the twenty largest unsecured claims against the Debtor, excluding insiders, and (where available) the name of the person familiar with the Debtor's account.   This list also includes the amount of each claim, and, if appropriate, an indication whether such claim is contingent, unliquidated, disputed, or partially secured, subject to the Debtor's rights to dispute the validity of any claims.

50.     Set forth in the attached Schedule B is a list of the names and addresses of the creditors holding the five largest secured claims against the Debtor.   The Debtor, however, has only one secured creditor.   This list includes the amount of such creditor's claim, a brief description of the type of collateral securing the claim, and whether the claim or lien is disputed, subject to the Debtor's rights to dispute the validity of the claim. The value of the collateral securing the claim remains undetermined.

51.     Set forth in the attached Schedule C is a summary of the assets and liabilities of the Debtor, as of May 31, 2015.

52.     Set forth in the attached Schedule D is a list of the number and classes of debt securities of the Debtor that is publicly held.   The Debtor does not have publicly held equity securities.

---

[12]    Local Rule 1007-2(3) requires disclosure of certain information regarding any committee organized prior to the order for relief in a chapter 11 case.  As no such committee was formed in this case, Local Rule 1007-2(3) is not applicable hereto.

53.     Set forth in the attached Schedule E is a list of the Debtor's property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor (other than bank accounts which may be subject to claims or setoff), or agent for any such entity.  All of the Debtor's property is in its possession.

54.     Set forth in the attached Schedule F is a list of the premises owned, leased, or held under other arrangement from which the Debtor operates its business.

55.     Set forth in the attached Schedule G is a list of the locations of the Debtor's substantial assets and books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

56.     Set forth in the attached Schedule H is a list identifying the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property, where a judgment against the Debtor or a seizure of it property may be imminent.

57.     Set forth in the attached Schedule I is a list of the names of the individuals who comprise the Debtor's existing senior management (including such management's affiliation with other non debtor entities), their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

58.     Set forth in the attached Schedule J is a list of the estimated cash receipts and disbursements, net cash gain or loss, and unpaid obligations and receivables expected to accrue but remaining unpaid (other than professional fees), for the thirty-day period following the Petition Date.

59.     Set forth in the attached Schedule K is a corporate organizational chart of the Debtor's relevant affiliates as of the Petition Date.

60.     Notwithstanding anything to the contrary contained in this Affidavit or any schedule attached to this Affidavit, nothing in this Affidavit or any schedule is intended to be, or should be construed as, an admission with respect to (i) the liability for, the amount of, the enforceability of, or the validity of any claim, or (ii) the existence, validity, enforceability or perfection of any lien, mortgage, charge, pledge or other grant of security for any claim, or (iii) the proper characterization of any transaction or financing as a sale or financing.   The Debtor specifically reserves the right to challenge any claim or any transaction or any alleged security for any claim on any and all bases.

## IV.
## First Day Pleadings and Orders

61.     Concurrently with the commencement of this chapter 11 case, the Debtor has filed a number of First Day Pleadings and, at the "first day" hearing, will seek orders approving those pleadings and associated proposed orders (collectively, the "First Day Orders"). I have reviewed each of the First Day Pleadings and Orders (including the exhibits attached thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  I believe that the relief sought in each of the First Day Pleadings and Orders (a) is vital to enable the Debtor to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to its business or loss of going concern value, and (b) constitutes a critical element in the Debtor achieving a successful sale and an orderly wind-down of its business.  I further believe that the requested relief is in the best interest of the Debtor's estate.

Creditor Consolidation Motion

62.     The Debtor requests that the Court authorize it: (a) to prepare a consolidated list of creditors in the format currently maintained in the ordinary course of

business in lieu of submitting any required mailing matrix; and (b) mail notices to creditors through Prime Clerk LLC ("Prime Clerk").

63.      The Debtor estimates that it has over 250 creditors. Contemporaneously with the filing of the motion, the Debtor has filed an application to retain Prime Clerk as its claims and noticing agent in this chapter 11 case.  The Debtor believes that using Prime Clerk for this purpose will maximize administrative efficiency in this chapter 11 case and reduce the administrative burdens that would otherwise fall upon this Court and the Office of the Clerk.

<u>Motion to Extend Time to File Schedules</u>

64.      The limited time and resources available to the Debtor to marshal the required information to complete the Schedules and SOFAs, necessitate an extension of the deadline for the Debtor to file those documents.  Indeed, as noted above, the Debtor does not have employees, but instead relies on the personnel of Bookspan under the Bookspan Services Agreement to provide many of its administrative functions.  As a result, the Debtor's books and records rest largely with Bookspan.  The Debtor is diligently working with Bookspan personnel to complete the information required to file the Schedules and SOFAS.

65.      I believe that a 14-day extension is necessary due to the coordination efforts with Bookspan personnel that will need to be undertaken to perform the required review of the Debtor's financial records and affairs, the numerous critical operational matters that the Debtor must address in the early days of this chapter 11 case, and the pressure incident to the commencement of this chapter 11 case.

66.      However, I believe that, working together with Bookspan, the Debtor will be able to file its Schedules and SOFA within the 14-day extension requested.

Claims and Noticing Agent Application

67.      The Debtor requests that Prime Clerk be appointed as the claims and noticing agent for the Debtor and this chapter 11 case, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the chapter 11 case.

68.      The Debtor has obtained and reviewed engagement proposals from three (3) other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, the Debtor submits that, based on all engagement proposals obtained and reviewed, Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

Cash Management Motion

69.      Prior to the Petition Date, the Debtor employed a cash management system to efficiently collect, transfer, and disburse the funds generated by its business operations (the "Cash Management System"). The Debtor maintains four (4) bank accounts (the "Bank Accounts") utilized as its Cash Management System at JPMorgan Chase & Co., an institution fully insured by the Federal Deposit Insurance Corporation.

70.      As part of the Cash Management System, the Debtor deposits (i) customer cash receipts and collection agency receipts relating to DVD sales into one depository account and (ii) customer cash receipts and collection agency receipts relating to CD sales into a separate depository account (collectively, the "Deposit Accounts").

71.      The Debtor maintains a centralized account for cash flows (the "Concentration Account"). The Concentration Account receives:  (i) funds swept from the Deposit Accounts; (ii) incoming ACH transfers for customer credit card receipts; and (iii)

transfers by check, wire and ACH relating to a variety of business receivables, including transfers from Bookspan and insurance rebates and adjustments.

72.    Funds from the Concentration Account are disbursed by wire or ACH transfer for a variety of business obligations, including professional fees, royalty payments, tax obligations and customer refunds.  Otherwise, funds are transferred from the Concentration Account to the zero-balance account maintained by the Debtor for disbursements relating to accounts payable obligations (the "Disbursement Account") in amounts sufficient to cover items presented for payment.

73.    The Disbursement Account is automatically funded from the Concentration Account as checks are presented for settlement; such checks are drawn on the Disbursement Account one to several times per week, as needed. The Debtor will continue to maintain records with respect to all transfers between and among the Bank Accounts so that all transactions are accurately recorded and readily ascertainable.  The Debtor is able to trace funds through the Cash Management System, and the Debtor is able to track and reconcile payments on its behalf.

Tax Motion

74.    Prior to the Petition Date, the Debtor in its ordinary course of business incurred various state and local sales and use tax liabilities (collectively, "Taxes").  Sales and use taxes accrue as the Debtor sells merchandise and are calculated on the basis of statutorily mandated percentages of the price at which the Debtor's merchandise is sold.

75.    As of the Petition Date, the Debtor was substantially current in the payment of assessed and undisputed Taxes; however, certain Taxes attributable to the prepetition period were not yet due.

76.    The continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtor's estate, thereby creating a greater recovery for creditors and stakeholders.  If such obligations are not timely paid, the Debtor will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each taxing authority's applicable laws, and whether penalties, interest, and attorneys' fees and costs can continue to accrue on a postpetition basis, and, if so, whether such penalties, interest, and attorneys' fees and costs are priority, secured or unsecured in nature.

77.    Finally, certain taxing authorities either have not been paid or have been sent checks for Taxes that may or may not have been presented or cleared as of the Petition Date. Similarly, in other cases, obligations have accrued or are accruing, or are subject to audit or review, but have not yet become due and payable.  Accordingly, the Debtor seeks authorization for its banks to honor prepetition checks issued by the Debtor to the taxing authorities in payment of prepetition Taxes that, as of the Petition Date, have not cleared. In addition, to the extent the Debtor has not yet sought to remit payment to the taxing authorities with respect to certain Taxes, the Debtor seeks authorization to issue checks or provide for other means of payment to the taxing authorities as necessary to pay the Taxes.

### Motion to Confirm Protections of Automatic Stay and *Ipso Facto* Provisions

78.    The Debtor has many creditors and counterparties to contracts that may not be well versed in the restrictions of the Bankruptcy Code.  Many of these creditors do not transact business on a regular basis with companies that have filed for chapter 11, or are unfamiliar with the scope of a debtor in possession's authority to conduct its business.  These creditors may be unfamiliar with the operation of the automatic stay and other provisions of the Bankruptcy Code.

79.     Thus, various interested parties may attempt to seize assets to the detriment of the Debtor, its estate, and creditors, or take other actions in contravention of the automatic stay of section 362 of the Bankruptcy Code.  In addition, upon learning of the Debtor's bankruptcy, counterparties to leases and executory contracts may attempt to terminate those leases or contracts pursuant to *ipso facto* provisions in contravention of section 365 of the Bankruptcy Code.  Accordingly, the Debtor seeks an order enforcing and restating the automatic stay and *ipso facto* provisions of the Bankruptcy Code.

<u>Administrative Expense Motion</u>

80.     In the ordinary course of its business, the Debtor relies on third-party vendors (collectively, the "Vendors") to provide it with the goods and services necessary to satisfy customer orders. As of the Petition Date, the Debtor has certain outstanding purchase orders with these Vendors for the delivery of merchandise, as well as other goods and services that are necessary for the ordinary operation of the Debtor's business (the "Prepetition Orders").

81.     The Debtor seeks an order (i) granting administrative expense priority status to all undisputed obligations of the Debtor arising from the postpetition delivery of goods and services on account of Prepetition Orders; and (ii) authorizing, but not directing, the Debtor to pay such obligations in the ordinary course of business.

82.     Without the requested relief, Vendors may refuse to ship such goods, recall current shipments, or not perform services promised under Prepetition Orders.

83.     At best, such action would delay the delivery of goods and services until the issuance of new purchase orders by the postpetition Debtor.  At worst, certain Vendors could refuse to deliver altogether.

84.     Further, the requested relief will ensure that Vendors remain willing to do business with the Debtor going forward.  These Vendor relationships are crucial to maintaining

the enterprise value of the Debtor's business for a value maximizing asset sale, and ultimately, to the success of this chapter 11 case.

### Customer Programs Motion

85.     The Debtor seeks relief to (i) continue to operate club programs, and a related customer rewards program, with its members (the "Customer Programs"), including the authority to continue, renew, replace, and/or terminate one or more Customer Programs and implement new Customer Programs, in each case, as the Debtor deems appropriate in the ordinary course of business; and (ii) honor prepetition obligations owed to customers on account of, without limitation, purchases, shipments, returns, refunds, credits, exchanges, and promotions (collectively, the "Customer Obligations").

86.     Significantly, certain of the Debtor's customers hold contingent claims against the Debtor in connection with the Customer Programs for refunds, returns, exchanges, credit balances and account adjustments relating to goods – namely, DVDs – sold to customers through the Club in the ordinary course of business prior to the Petition Date (collectively, the "Customer Claims").

87.     The success and viability of the Debtor's business during this chapter 11 case – particularly, pending an asset sale - are dependent upon the patronage and loyalty of its customers. In this regard, the Debtor's Customer Programs are critical, and any delay in honoring the Debtor's obligations thereunder will severely and irreparably impair customer relations.  Any failure to honor the Customer Obligations, including the Customer Claims, for even a brief time, may well drive away valuable customers, thereby harming the Debtor's estate. Accordingly, the Debtor seeks authority to continue the Customer Programs and honor Customer Obligations.

Cash Collateral Motion

88.     The Debtor seeks authority to use cash collateral, as that term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), that may be subject to a certain settlement agreement between the Debtor and HCL, entered into on July 22, 2014, as amended on August 15, 2014 (the "Settlement Agreement").   As of the Petition Date, the Debtor's outstanding obligation to HCL is $800,000.

89.     Without access to the Cash Collateral, the Debtor will have insufficient liquidity to continue to operate its business and pay restructuring costs associated with this chapter 11 case.  The Debtor's access to the Cash Collateral is necessary to ensure that it has sufficient working capital and liquidity to operate its business and thus preserve and maintain the going concern value of its estate while the Debtor seeks to consummate a sale of its assets. Thus, the need for the immediate use of Cash Collateral is paramount.  The Debtor and its estate will suffer irreparable harm if such use is not immediately authorized.

90.     HCL's Cash Collateral will be used to sustain the Debtor's business operations, while it seeks the sale of its assets for the benefit of its estate and creditor constituencies.  Indeed, the Debtor's inability to use Cash Collateral could potentially result in a piecemeal liquidation of its assets leading to severely diminished recoveries for parties in interest in this chapter 11 case.  The use of Cash Collateral, therefore, will protect HCL's security interest by preserving the value of its collateral.

91.    The foregoing is true and correct to the best of my knowledge and belief.

Dated:    New York, New York
          August 5, 2015


                                   /s/ Glenn Langberg
                                  Glenn Langberg


SWORN TO before me this
5th day of August, 2015

 /Anne Guarino
Notary Public, State of New Jersey
Qualified in Essex County
Commission Expires on March 04, 2017

# EXHIBIT A

## EXHIBIT A

### List of Creditors Holding of the Twenty (20) Largest Unsecured Claims

As required under Local Bankruptcy Rule 1007-2(a)(4), the following lists information relevant to the twenty (20) largest unsecured claims. The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.  Moreover, nothing herein shall affect any rights of the Debtor to challenge the amount or characterization of any claim at a later date.[1]

---

[1]     Seven former executives of the Columbia House Company are participants under one or more of the: (i) Columbia House Company's Supplemental Executive Retirement Plan, effective January 8, 1991 (as amended from time to time);  (ii) Columbia House Company's Excess Benefit and Supplemental Executive Plan, effective January 8, 1991 (as amended from time to time); and (iii) Columbia House Company's Non-Qualified Supplemental Retirement Plan, effective January 8, 1991 (as amended from time to time), (collectively, the "Supplemental Executive Plans").  These Supplemental Executive Plans were assigned to the Debtor as part of its acquisition of Columbia House Company in 2005.  Based on the Debtor's books and records, it is current with respect to its payment obligations to participants under the Supplemental Executive Plans. It is anticipated that future unliquidated amounts will not be paid since the Supplemental Executive Plans will likely, by virtue of necessity, be terminated during this Chapter 11 Case

| Rank | Creditor Name | Creditor Address | Nature of debt | Whether the claim is contingent, unliquidated, disputed, partially secured or subject to setoff | Unsecured Amount |
|---|---|---|---|---|---|
| 1 | Pension Benefit Guaranty Corporation | 1200 K Street, N.W. Washington, DC 20005-4026 Attn: Michael Strollo, Financial Analyst Corporate Finance & Restructuring Department Ph: 202-326-4000 x4907 Email: strollo.michael@pbgc.gov | Qualified Pension Contribution | Unliquidated | $1,829,462 |
| 2 | Bookspan LLC | 2 Park Ave New York, NY 10016 Attn: Blake Orlandi Chief Operating Officer Ph: (212) 596-2248 Email: Blake.orlandi@bookspan.com | Trade | | $1,150,000 |
| 3 | Universal Studios Home Entertainment LLC | 10 Universal City Plaza, 4th Floor Universal City, CA 91608 Attn: Jed Lackman Sr. VP, Business Affairs Ph: 818-777-4380 Email: jed.lackman@nbcuni.com | Trade | | $1,016,279 |
| 4 | Verizon Business Network Services, Inc. on behalf of Cybertrust, Inc. | 22001 Loudon County Parkway Ashburn, VA 20147 Email: notice@verizonbusiness.com | Trade | Disputed | $800,000 |
| 5 | Cognizant Technology Solutions U.S. Corp. | 500 Frank W. Burr Blvd., Suite 50 Teaneck, NJ 07666 C/O John C. Scalzo, Esq. Reed Smith LLP 599 Lexington Avenue New York, NY 10022 Ph: (212) 521-5400 Email: jscalzo@reedsmith.com | Trade | Disputed | $492,000 |
| 6 | Warner Home Entertainment, Inc. | 4000 Warner Blvd. Burbank, CA 91522 Attn: Michael Rweyemamu SVP Global Digital Sales Ph: (818) 977-6836 Email: Michael.Rweyemamu@warnerbros.com | Trade | Disputed | $290,894 |

| 7 | Lions Gate Films, Inc. | 2700 Colorado Ave.<br>Santa Monica CA 90404<br>Attn: Ron Schwartz<br>EVP & General Manager<br>Email: rschwartz@lionsgate.com | Trade | | $167,598 |
|---|---|---|---|---|---|
| 8 | Paramount Home Entertainment Inc. | 5555 Melrose Avenue<br>Hollywood, CA 90038-3197<br>Attn: Margie Pacacha<br>EVP, Business Affairs & Legal<br>Email:<br>Margie_Pacacha@Paramount.com | Trade | | $146,019 |
| 9 | Najafi Companies | 2525 E Camelback Rd,<br>Suite 850<br>Phoenix, AZ 85016<br>Attn: Tina Rhodes-Hall<br>Chief Financial Officer<br>Ph: (602) 476-0604<br>Email: tina@najafi.com | Legal Settlement | | $137,500 |
| 10 | The Bank of New York Mellon | BNY Mellon General Services &<br>Corporate Real Estate<br>P.O. Box 223457<br>Pittsburgh, PA 15251-2457<br>C/O CBRE Lease Administration<br>5100 Poplar Avenue, Suite 1000<br>Memphis, TN 38137<br>Attn: Nick Jamison<br>Analyst, Portfolio Services<br>Ph: (901) 620-3217<br>Fax: (901) 620-3211<br>Email: nick.jamison@cbre.com | Rent | | $127,731 |
| 11 | Avalara, Inc. | 100 Ravine Lane NE<br>Suite 220<br>Bainbridge Island, WA 98110<br>Ph: (877) 780-4848<br>Email:<br>AccountsReceivable@avalara.com | Trade | Disputed | $115,600 |
| 12 | Anchor Bay Entertainment, LLC | 9242 Beverly Blvd., Suite 20<br>Beverly Hills, CA 90201<br>Attn: Dan Beaton<br>VP of Sales<br>Ph: (802) 879-1674<br>Email: dan.beaton@starz.com | Trade | | $96,862 |
| 13 | Avaya Inc. | 14400 Hertz Quail Spring Parkway<br>Oklahoma City, OK 73134<br>Ph: (800) 328-7833 | Trade | Disputed | $79,000 |

| 14 | Sony Pictures Home Entertainment, Inc. | 10202 West Washington Boulevard Culver City CA 90232 Attn: Karyn Filek Executive Director, Special Market Sales Ph: (310) 244-4000 Email: Karyn_Filek@spe.sony.com | Trade | | $64,778 |
|---|---|---|---|---|---|
| 15 | Equinix, Inc. | One Lagoon Drive, 4th Fl. Redwood City, CA 94065 Ph: (650) 598-6000 | Trade | Disputed | $61,048 |
| 16 | Level 3 Communications, LLC | 1025 Eldorado Blvd. Broomfield, CO 80021 C/O Keith Lewis, Esq. Baker, Govern & Baker Inc. 7771 West Oakland Park Blvd. Suite 240 Atrium West Bldg. Ft. Lauderdale, FL 33351 Ph: (954) 749-6944 Email: klewis@bgnbusa.com | Trade | Disputed | $51,000 |
| 17 | RLJ Entertainment, Inc., successor-in-interest to Image Entertainment, Inc. | The Trillium – East Tower 6320 Canoga Avenue, 8th Floor Woodland Hills, CA 91367 Attn: Jess De Leo VP, Legal & Business Affairs Ph: (818) 534-9305 Email: JDeleo@rljentertainment.com | Trade | | $42,265 |
| 18 | Summit Distribution, LLC | 1601 Cloverfield Boulevard, Suite 200 South Tower Santa Monica, CA 90404 Attn: Ron Schwartz EVP & General Manager Email: rschwartz@lionsgate.com | Trade | | $41,158 |
| 19 | CBS Home Entertainment Inc. | 1700 Broadway, 33rd Fl. New York, NY 10019 Attn: Kenneth L. Ross EVP & General Manager Email: klross@cbs.com | Trade | | $36,623 |
| 20 | Highwinds Network Group, Inc. | 807 Morse Blvd. Ste.101 Winter Park, FL 32789 Attn: Nick Kauten West Coast Director of Strategic Partnerships Ph: (407) 215-9176 Email: nick.kauten@highwinds.com | Trade | Disputed | $32,000 |

# EXHIBIT B

**EXHIBIT B**

**Holder of the Largest Secured Claim**

As required under Local Bankruptcy Rule 1007-2(a)(5), the below list includes the Debtor's only secured claim.[1]

| Creditor's Name, Mailing Address (including the number, street, apartment or suite number, and zip code, if not included in the post office address) and Telephone Number | Total amount of the claim | Description of collateral | Estimated value of the collateral | Whether claim or lien is disputed |
|---|---|---|---|---|
| HCL America Inc.<br>330 Potrero Avenue<br>Sunnyvale, CA 94085<br><br>Archer & Greiner, P.C.<br>Court Plaza South – West Wing<br>21 Main Street, Suite 353<br>Hackensack, NJ 07601<br>Attn:  Patrick Papalia, Esq.<br><br>P: (201) 342-6000<br><br>F: (201) 342-6611 | **$800,000** | All assets, personal and fixture property of the Debtor | Unknown | Undisputed |

---

[1]    The amount set forth on this Exhibit represents the estimated amount as of the Petition Date and shall not constitute an admission of liability with respect to the priority, extent or validity of such amount, nor is it binding on the Debtor.

# EXHIBIT C

**Statement of Assets and Liabilities**
**as of May 31, 2015**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a summary of the Debtor's assets and liabilities:

| Balance Sheet as of May 31, 2015 Pro Forma Unaudited ($ in thousands) | |
|---|---|
| **Assets** | **Amount** |
| *Current Assets* | |
| Cash (includes outstanding checks) | $368 |
| Accounts Receivable - Net | 1,203 |
| Inventory - Net | 412 |
| Prepaid Expenses/Other Assets | -6 |
| *Long Term Assets* | |
| PP&E - Net | 59 |
| Total Assets | $2,035 |
| | |
| **Liabilities & Equity** | **Amount** |
| **Liabilities** | |
| *Current Liabilities* | |
| Accounts Payable | $6,557 |
| Accrued Royalties | 17,228 |
| Other Payable/Liabilities | 14,202 |
| Due To/Due From | |
| *Long Term Liabilities* | |
| Pension & Post Retirement Benefits | 24,627 |
| Total Liabilities | $62,614 |
| **Equity** | |
| Net Equity | ($60,579) |
| Total Liabilities & Equity | $2,035 |

# EXHIBIT D

## EXHIBIT D

**Publicly Held Securities**

As required under Local Bankruptcy Rule 1007-2(a)(7), the Debtor has no publicly held securities.

# EXHIBIT E

## <u>EXHIBIT E</u>

**Property Not In Debtor's Possession**

As required under Local Bankruptcy Rule 1007-2(a)(8), the Debtor is in possession of all property.

# EXHIBIT F

## EXHIBIT F

**Debtor's Premises**

As required under Local Bankruptcy Rule 1007-2(a)(9), the following lists the premises owned, leased or held under other arrangement from which the Debtor operates its business as of the Petition Date.

| Property Address | City | State | ZIP Code | Description |
|---|---|---|---|---|
| 2 Park Avenue, 10th Floor | New York | NY | 10016 | Office (Utilized Pursuant to Service Agreement) |
| 63 Madison Avenue, 8th Floor | New York | NY | 10016 | Office (Sublease – Currently subject to a further third-party sub-sublease) |
| 501 Ridge Avenue | Hanover | PA | 17331 | Warehouse Facility (Utilized Pursuant to Service Agreement) |
| 348 Poplar Street | Hanover | PA | 17331 | Warehouse Facility (Utilized Pursuant to Service Agreement) |

# EXHIBIT G

## EXHIBIT G

**Location of Debtor's Substantial Assets and Books and Records,
and Nature and Location of Debtor's Assets Outside of the United States**

As required under Local Bankruptcy Rule 1007-2(a)(10), the following lists the location of the Debtor's substantial assets, the location of its books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

Location of Debtor's substantial assets:

| Description of Asset | Location of Asset |
|---|---|
| Inventory (DVDs) | 501 Ridge Avenue<br>Hanover, Pennsylvania 17331-9051 |
| Inventory (DVDs) | 348 Poplar Street<br>Hanover, Pennsylvania 17331-9051 |
| Various URLs associated with the Debtor's operations | 2 Park Avenue<br>New York, New York 10016 |

The Debtor's books and records are located at 2 Park Avenue, New York, New York 10016

Nature, location, and value of any assets held by the Debtor outside the territorial limits of the United States:

| Description of Asset | Location of Asset | Value of Asset |
|---|---|---|
| N/A | N/A | N/A |

# EXHIBIT H

**Exhibit H**

**Summary of Litigation Actions or Proceedings**

| | Case Name | Case No. | Plaintiff(s) | Defendant(s) | Court Where Pending | Litigation Type |
|---|---|---|---|---|---|---|
| 1 | Filmed Entertainment Inc. f/k/a Direct Brands, Inc. v. Cognizant Technology Solutions U.S. Corp. | 651269/2014 | Filmed Entertainment, Inc. | Cognizant Technology Solutions U.S. Corp. | Supreme Court of the State of New York, County of New York | Filmed Entertainment Inc.suit alleges, *inter alia*, breach of contract on October 7, 2014 seeking damages of no less than $580,348. |
| 2 | HCL America, Inc. v. Filmed Entertainment Inc. | 653561/2013 | HCL America, Inc. | Filmed Entertainment Inc. | Supreme Court of the State of New York, County of New York | Suit alleged breach of contract.  Settled on September 1, 2014.  Settlement payments ongoing. |
| 3 | StyleOwner, Inc. v. Filmed Entertainment Inc., *et. al.* | 653931/2012 | StyleOwner, Inc. | Filmed Entertainment Inc. *et. al.* | Supreme Court of the State of New York, County of New York | Suit alleges violation of a confidentiality agreement, misappropriation of confidential information and trade secrets, and fraud. Suit seeks compensatory damages of $24 million and punitive damages of $90 million.  Litigation dormant as of 2012. |
| 4 | SIR Properties Trust v. Filmed Entertainment Inc., *et. al.* | C.A. No. 9149-VCG | SIR Properties Trust | Filmed Entertainment Inc., *et. al.* | Court of Chancery of the State of Delaware | Suit seeks refund by Filmed Entertainment Inc. for "management fees" totaling $6 million paid by Bookspan to Filmed Entertainment Inc.  The payments made by Bookspan to Filmed Entertainment Inc. were for services performed by Filmed Entertainment Inc. pursuant to an Intercompany Services Agreement. |

# EXHIBIT I

<u>**EXHIBIT I**</u>

**Senior Management of the Debtor**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following lists the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

| Director/Officer | Position | Responsibilities & Experience |
|---|---|---|
| John Lippman | Director and President & Chief Executive Officer | John Lippman holds the positions of Director and Chief Executive Officer of Filmed Entertainment Inc. Mr. Lippman has been associated with the Company since December 2012. Mr. Lippman has over 15 years of professional experience in the finance and media/entertainment fields, including both advisory and operational roles. He began his career at Lehman Brothers in Private Equity and Mergers & Acquisition. He holds an MBA from Harvard Business School. |
| Glenn Langberg | Independent Director | Prior to being appointed as an Independent Director of the Debtor on November 1, 2014, Mr. Langberg provided strategic consulting services to the Debtor. He is the founder and Chief Executive Officer of GRL Capital Advisors, a firm providing consulting and financial services to, *inter alia*, distressed and underperforming entities. Mr. Langberg has a Bachelor of Arts degree from Brandeis University, where he is currently a Fellow. He has more than 25 years of experience as a corporate executive in finance and real estate and more than 16 years of specific financial restructuring experience, having served in a variety of capacities for troubled entities in both in-court and out-of-court scenarios, including, as chief executive officer, chief restructuring officer and director. In certain of these roles and on behalf of such entities, Mr. Langberg has appeared before various courts, including the United States Bankruptcy Courts for the District of Delaware and the District of New Jersey. |
| Clifton Knight | Executive Vice President, Legal & Business Affairs, Chief Ethics & Compliance Officer, and Secretary | Mr. Knight's responsibilities include overseeing the legal representation of the Company. He began in 1975 with RCA Music Service, a Division of RCA Records. Filmed Entertainment Inc. is the ultimate successor to RCA Music Service through a series of ownership changes to the current time. Mr. Knight holds a JD from University of North Carolina School of Law and an MBA from New York University. |

**EXHIBIT I**
**Senior Management of Debtor's Relevant Affiliates**

| PRIDE TREE HOLDINGS, INC. | |
| --- | --- |
| **DE Corporation**<br>**EIN# (last four digits) - 4347** | |
| **Director:**<br>John Lippman | **Officers**:<br>John Lippman, President and CEO |

| BOOKS ACQUISITION LLC | |
| --- | --- |
| **DE Limited Liability Company**<br>**EIN# 80-0883479** | |
| **Manager:**<br>John Lippman | **Officers**:<br>None |

| BOOKSPAN LLC | |
| --- | --- |
| **DE Limited Liability Company**<br>**EIN# (last four digits) - 2208** | |
| **Manager:**<br>John Lippman | **Officers**:<br>John Lippman, President and CEO<br>Blake Orlandi, Chief Operating Officer<br>Clifton Knight, Executive Vice President,<br>Legal & Business Affairs and Secretary<br>Beth Agre, Assistant Secretary<br>Eileen Conboy, Assistant Secretary |

| DVD Direct Acquisition LLC | |
| --- | --- |
| **DE Limited Liability Company**<br>**EIN# (last four digits) - 8826** | |
| **Manager:**<br>John Lippman | **Officers**:<br>None |

| FILMED ENTERTAINMENT INC.  (f/k/a DIRECT BRANDS, INC.) | |
| --- | --- |
| **DE Corporation**<br>**EIN# (last four digits) - 3867** | |
| **Directors:**<br>John Lippman<br>Glenn Langberg | **Officers**:<br>John Lippman, President & CEO<br>Clifton Knight, Executive Vice President,<br>Legal & Business Affairs and Secretary |

| ACQUISITION HOLDINGS, INC. (f/k/a DOUBLEDAY DIRECT, INC.) NY Corporation EIN# (last four digits) - 3912 | |
|---|---|
| **Directors:** John Lippman | **Officers:** Clifton Knight, Executive Vice President, Legal & Business Affairs and Secretary Beth Agre, Assistant Secretary |

| INCREDIBLE WAREHOUSE HOLDING COMPANY LLC DE Limited Liability Company EIN# (last four digits) - 3172 | |
|---|---|
| **Manager:** John Lippman | **Officers:** None |

| TOTALLY AWESOME WAREHOUSE LLC DE Limited Liability Company EIN# (last four digits) - 6412 | |
|---|---|
| **Manager:** John Lippman | **Officers:** Joseph Mizrahi, Chief Executive Officer |

2

# EXHIBIT J

## EXHIBIT J

### Operations for Thirty (30) Day Period After Filing

Pursuant to Local Bankruptcy Rule 1007-2(b), the following lists information relating to operational and financial matters of the Debtor for the thirty (30) day period following the filing of it's chapter 11 petition.

**See Attached Schedule A**

**FILMED ENTERTAINMENT, INC**
**WEEKLY CASH FORECAST**

| Week Ending | | 8/14 | | 8/21 | | 8/28 | | 9/4 | | 9/11 |
|---|---|---|---|---|---|---|---|---|---|---|
| ***Cash Receipts:*** | | | | | | | | | | |
| **Total Cash Receipts** | $ | **126,704** | $ | **126,704** | $ | **126,704** | $ | **131,704** | $ | **126,704** |
| | | | | | | | | | | |
| ***Cash Disbursements:*** | | | | | | | | | | |
| Operating Disbursements (admin, distr., etc.) | $ | (24,750) | $ | - | $ | (24,750) | $ | (257,500) | $ | (24,750) |
| Royalties | | - | | - | | - | | - | | - |
| Other Operating Expenses, excl Prof Fees | | - | | (27,008) | | (27,008) | | (54,015) | | (54,015) |
| Bankruptcy/Restructuring Professional Fees | | (37,258) | | (37,258) | | (37,258) | | (36,768) | | (36,400) |
| Other Non-Operating Costs | | - | | - | | - | | 52,449 | | - |
| **Total Cash Disbursements** | $ | **(62,008)** | $ | **(64,266)** | $ | **(89,016)** | $ | **(295,834)** | $ | **(115,165)** |
| | | | | | | | | | | |
| **Net Cash Flow** | $ | **64,696** | $ | **62,438** | $ | **37,688** | $ | **(164,130)** | $ | **11,539** |
| | | | | | | | | | | |
| **Cash Balance** | | | | | | | | | | |
| Beginning Cash Balance | $ | 402,617 | $ | 467,313 | $ | 529,751 | $ | 567,439 | $ | 403,310 |
| Change in Cash | | 64,696 | | 62,438 | | 37,688 | | (164,130) | | 11,539 |
| **Ending Cash Balance** | $ | **467,313** | $ | **529,751** | $ | **567,439** | $ | **403,310** | $ | **414,848** |