GRIFFIN HAMERSKY P.C.
485 Madison Avenue, 7th Floor
New York, New York 10022
Telephone:  (212) 710-0338
Facsimile:  (212) 710-0339
Scott A. Griffin
Michael D. Hamersky

Proposed Counsel for the Debtor
and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                                             :
In re:                                                       :    Chapter 11
                                                             :
FILMED ENTERTAINMENT INC.,                                   :
                                                             :    Case No. 15-12244 (SCC)
                                    Debtor.[1]               :
                                                             :
-------------------------------------------------------------X

**DEBTOR'S MOTION FOR ENTRY OF:  (I) AN ORDER (A) APPROVING
BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTOR'S ASSETS, (B) SCHEDULING AN AUCTION AND A SALE HEARING
RELATED THERETO, AND (C) APPROVING THE FORM OF NOTICE OF THE
AUCTION AND SALE HEARING; AND (II) AN ORDER (A) APPROVING SUCH
SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN
CONNECTION WITH THE SALE, AND (C) GRANTING RELATED RELIEF**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

The debtor and debtor in possession in the above-captioned case (the "Debtor" or

"FEI" or the "Company") hereby moves this Court through a two-part request (the "Motion")[2]

pursuant to which the Debtor seeks to sell substantially all of its assets (collectively, the

---

[1]    The last four digits of the Debtor's federal tax identification number are 3867.

[2]    To the extent applicable, the Debtor requests that a consumer privacy ombudsman be appointed pursuant to
sections 332 and 363 of the Bankruptcy Code.

"Acquired Assets"). First, the Debtor moves for the entry of an order substantially in the form attached hereto as Exhibit "A" (the "Bidding Procedures Order"): (a) approving bidding procedures (the "Bidding Procedures") substantially in the form attached as Schedule "1" to the Bidding Procedures Order for the sale and auction (the "Auction") of the Debtor's Acquired Assets; (b) scheduling an Auction and a hearing to approve the sale of the Acquired Assets (the "Sale Hearing"); and (c) approving the form and manner of the Notice of the Auction and Sale Hearing substantially in the form attached as Schedule "2" to the Bidding Procedures Order (the "Sale Notice").

Second, the Debtor moves for entry of an order, substantially in the form attached hereto as Exhibit "B" (the "Sale Order"): (a) approving a sale of the Acquired Assets, free and clear of all liens, claims, encumbrances, security interests and other interests, except as expressly assumed in the Modified Purchase Agreement (as defined below), to a successful bidder (the "Successful Bidder") at the Auction, if any, as determined by the Bidding Procedures; (b) approving certain procedures related to the assumption and assignment of certain executory contracts and unexpired leases related to the Acquired Assets (the "Assignment Procedures"), and fixing the Cure Amounts (as defined below) for those executory contracts and unexpired leases; and (c) granting related relief.

In support of this Motion, the Debtor relies upon and incorporates by reference the *Affidavit of Glenn Langberg*, filed under Local Bankruptcy Rule 1007-2 in support of the Debtor's chapter 11 petition and various first day applications and motions (the "Affidavit") [Dkt. No. 2]. In further support of this Motion, the Debtor respectfully represents:

**Preliminary Statement**

As discussed in greater detail in the Affidavit, the Debtor's business consists of its ownership and operation of the Columbia House DVD Club,[3] a business line that traces its origins back to the 1950s, and to CBS Inc.'s Columbia House Company's ("Columbia House") music division.  Indeed, the Columbia House music and filmed entertainment brands have been household names for decades, with thousands of consumers participating as members in the company's music CD, and movie and television DVD clubs.  These were profitable business lines until tremendous changes began to occur in the music and filmed entertainment industries in the middle to late 1990s – changes that transformed the manner in which consumers purchased and listened to music, as well as the manner in which many of those same consumers purchased and watched movies and television series.

For music, this sea change occurred when consumers obtained the ability to share and listen to music files through the "MP3" digital format – often without paying for such music – and continued with the enormous growth of the digital downloading market and downloading platforms offered by companies such as Apple Inc. ("Apple").  These market forces have led to an overall marked decline in CD music sales - a decline that crippled the Debtor's Columbia House CD Club business and ultimately forced its exit from the music business line.

The Debtor's Columbia House DVD Club business was also severely impacted by the sweeping changes in the filmed entertainment industry, which specifically affected the DVD markets for movies and television series titles.   Notably, strong competition from new e-commerce entrants, such as Amazon.com, eBay and Netflix, along with the saturation of mass merchandiser locations from retailers such as Walmart, Target, BestBuy, and CostCo, and

---

[3]     The Debtor also operated the Columbia House CD Club before exiting the business line in 2010.

automated DVD kiosk rental providers, such as Redbox, have had a devastating effect on the Debtor's Columbia House DVD Club business. Additionally, digital downloading and streaming services for movies and television series offered by a number of the above entities and cable service providers have caused even further declines in the Debtor's Columbia House DVD Club membership.

To address these significant market changes, the Debtor's senior management considered and, in many cases, implemented various business initiatives and cost-saving measures aimed at turning around the Debtor's business and shepherding it back to the path of prosperity. Notwithstanding these efforts, the Debtor's business has continued to decline. For the last 11 months, the Debtor, with the assistance of its financial advisors, PricewaterhouseCoopers ("PwC"), has explored various restructuring alternatives, and contacted numerous third parties regarding potential investments in, the financing of, joint venture arrangements with, and/or the acquisition of, the Debtor. Significantly, prior to, and following, the commencement of this chapter 11 case (the "Chapter 11 Case"), the Debtor and PwC have had discussions with a number of parties regarding a potential acquisition of the Debtor's assets. Many of these discussions remain ongoing.

The Debtor now seeks to continue the further marketing of its assets under a Court-approved sale process. The Debtor believes that a sale of its assets as a going concern under the provisions of the Bankruptcy Code will provide it with the best opportunity to maximize value for its estate and to orderly wind up its affairs under a chapter 11 plan.

## Jurisdiction and Venue

1.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this Chapter 11 Case and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a) 363(b), (d) and (f), 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 6004-1, 6006-1 and 9006-1 of the Local Rules of the Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules"), and General Order M-383 of the Bankruptcy Court for the Southern District of New York ("General Order M-383").

## Background

### The Chapter 11 Case

3.      On August 10, 2015 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtor continues to manage and operate its business as a debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.

5.      On August 18, 2015, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") pursuant to section 1102 of the Bankruptcy Code. [Dkt. No. 34].

6.      The factual background regarding the Debtor, including its operations, its capital and debt structure, and the events leading to the filing of this Chapter 11 Case, is set forth in detail in the Affidavit.[4]

---

[4]   Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in the Affidavit.

<u>The Debtor's Business</u>

*History of the Debtor's Business*

7.        As noted above, Columbia House, was founded in 1955 as a division of CBS Inc.  Columbia House initially sold phonorecordings (e.g. vinyl records and cassette tapes). In 1982, Columbia House expanded beyond music and entered the movie business when it began selling videotapes.  In 1988, the Sony Corporation ("Sony") acquired Columbia House as part of its purchase of CBS Music, and a year later partnered with Warner Bros. Entertainment Inc. ("Warner") to operate the business and its music club (the "Columbia House Music Club").

8.        Columbia House launched the Columbia House DVD Club in 1997.  In 2002, an affiliate of the Blackstone Group ("Blackstone"), a global investment and advisory firm, acquired an 85% stake in Columbia House.[5]  In 2005, the Debtor, which was then known as BMG Direct and was owned at the time by Bertelsmann Inc. ("Bertelsmann"), acquired 100% of Columbia House from Blackstone, Sony and Warner.  (The BMG Direct business was a competitor to Columbia House in the music club business line.  BMG Direct was originally founded in the 1960s as the RCA Victor Music Club.  Bertelsmann acquired the club, then known as RCA Music Service, as part of its 1986 acquisition of RCA Records.)

9.        Following the acquisition, the combined company was renamed BMG Columbia House.[6]  Columbia House's Music Club members were combined with the Debtor's "BMG Music Service."  The DVD club continued to operate under the Columbia House DVD Club name.

---

[5]      Sony and Warner retained the remaining 15% stake in Columbia House on an equal percentage basis.

[6]      Through a series of names changes, BMG Columbia House ultimately became FEI in 2013.

10.    In 2008, FEI was acquired by JMCK Corp., a wholly owned subsidiary of Najafi Companies, a private investment firm.  In 2010, the Debtor wound down the BMG Music Service and exited the music business, leaving DVDs (including Blu Ray discs) as the Debtor's remaining product line.  In December 2012, a subsidiary of Pride Tree Holdings, Inc. ("Pride Tree") acquired FEI.

*The Debtor's Capital Structure and Indebtedness*

11.    FEI is a wholly owned subsidiary of DVD Direct Acquisition, LLC, a Delaware limited liability company ("DVD Direct").  DVD Direct in turn is a wholly owned subsidiary of Pride Tree, a Delaware corporation.

12.    The Debtor does not have any institutional financial debt.  The Debtor has a secured obligation of $775,000 as of September 1, 2015 stemming from a settlement agreement with HCL America, Inc. ("HCL"), and a related confession of judgment.  In addition, the Debtor has approximately $7 million in unsecured current liabilities, including trade payables and royalty licensing amounts due to movie studios, and approximately $56 million in legacy liabilities reflected on its the balance sheet.  The Debtor's actuarial consultants have advised that, as of May 2015, the Debtor has approximately $20.1 million of long-term qualified pension liability.  The Debtor also has approximately $10.2 million of long-term non qualified pension liability.

*The Debtor's Business Operations*

13.    The Debtor's Columbia House DVD Club functions under a "club model" consisting typically of three components: (a) an up-front offer for consumers to join the club

(e.g., "Buy one DVD get one Free"); (b) members' participation in a "negative option cycle;"[7] and (c) members' obligation to purchase a specified number of DVDs at full price over a certain period of time. Club membership can be cancelled at any time after this purchase obligation is fulfilled.

14.    Additionally, during the time members remain active, they can purchase DVDs at their discretion from a wide selection of titles. Such purchases are commonly referred to as "positive orders," and comprise a substantial amount of the club's sales.

*The Debtor's Licensing Agreements*

15.    The Debtor is able to offer its movies and television series titles through licensing arrangements (the "Licenses") with major film studios and smaller independents. Under these Licenses, the Debtor is granted rights to sell the studios' existing catalog and new release titles for a specific term. These Licenses typically include two types of payments to the studio: (a) purchasing of DVDs on a cost basis, plus (b) payment of a royalty for each unit sold which is calculated quarterly. The Licenses often result in product costs that are less than what traditional retailers pay under a wholesale model. The arrangement effectively permits the Debtor to offer movies and television series to its members at favorable pricing.

16.    Significantly, however, these Licenses contain various restrictions on how and when the Debtor may sell certain titles (including a general restriction that titles may only be sold under the club model, and not at retail). Further, the Debtor's licensing rights only cover physical DVDs and do not include the rights to digital movie formats.

---

[7]    The "negative option cycle" begins when a member is notified that the club has selected one or more movies or television series to be featured as the "Director's Selections" for that cycle. Members receive information about the Director's Selections either via email or via physical catalogues. The member then has a specified number of days to decline the Director's Selections for that cycle; if a member does not respond by the specified date, the club automatically ships the Director's Selections to the member and then invoices the member. The negative option cycle is offered to members up to 21 times per year.

*The Debtor's Administrative Services, Order Processing and*
*Product Fulfillment Services and Customer Service Functions*

17.    The Debtor currently does not have any employees.  Over the last several years, the Company has outsourced its operational functions to several important third-party vendors under service agreements.  These arrangements have allowed the Debtor to reduce its overhead expenses by approximately eighty percent (80%) over the last three years.  A brief overview of important third-party vendors is set forth below.

18.    The Debtor's administrative functions (including accounting, tax, treasury, legal, human resources, risk management, inventory and non-inventory purchasing), marketing functions (including creative, production, lettershop, promotional and strategic marketing, and list management), technology functions (including information technology, website and email operations and telecommunications), order processing functions (including transaction and payment processing, member account management, and invoicing) and certain other functions are performed by Bookspan LLC ("Bookspan"), pursuant to that certain Services Agreement between the Debtor and Bookspan, dated January 1, 2014, as amended from time to time (the "Bookspan Services Agreement").

19.    The Debtor's transaction processing and remittance processing services are performed by CDS Global, Inc. ("CDS"), pursuant to a Master Services Agreement between the Debtor and CDS, dated August 1, 2012, and related exhibits thereto (the "CDS Services Agreement").  Pursuant to the CDS Services Agreement, CDS provides, on behalf of the Debtor: (i) transaction processing of paper-based materials for Columbia House DVD Club members including, but not limited to, "Member Reply Forms" (order forms), certificates, coupons, sweepstakes, enrollments, imaging of customer correspondence, returns, requests for removal from mailing lists; and (ii) remittance processing services for processing paper-based remittances including, but not limited to, checks, money orders, paper-based credit card transactions,

electronic checks, and pass-through payment files for payments made by Columbia House DVD Club members.

20.     The Debtor's customer relations and call center services are performed by Mercantile Adjustment Bureau ("MAB"), pursuant to a Master Services Agreement between the Debtor and MAB, dated September 27, 2013 ("MAB Services Agreement").   Pursuant to the MAB Services Agreement, MAB provides, on behalf of the Debtor, various customer service and call center services to Columbia House DVD Club members including, among other things: (i) responding to inquiries received from members of the Columbia House DVD Club regarding their accounts, orders, payments, membership programs and operations, etc., which are received by MAB, on the Debtor's behalf by incoming phone calls to its call center, white mail and email contacts; (ii) administering member surveys for the Debtor; and (iii) providing the Debtor with qualitative and quantitative reporting on inquiries received.

21.     Finally, Totally Awesome Warehouse LLC ("TAW") provides the Debtor with product fulfillment services pursuant to that certain Fulfillment Services Agreement between the Debtor and TAW, dated January 1, 2015, as amended from time to time (the "TAW Services Agreement").   Pursuant to the TAW Services Agreement, TAW provides, among other functions: (i) invoicing, packing, shipping and processing returns of merchandise ordered by customers; (ii) inventory storage and maintenance; and (iii) delivering excess inventory to the Debtor's inventory liquidators for sale or as otherwise directed by the Debtor for disposal (the "TAW Services").[8]

---

[8]     TAW and Bookspan are indirectly owned by Pride Tree and are therefore affiliates of the Debtor.

*The Decline of the Debtor's Business and Cost Reduction Initiatives*

22.     The Columbia House business peaked in 1996, when revenues were approximately $1.4 billion (excluding shipping & processing).  By 2005, when the Debtor acquired Columbia House, Columbia House revenues had declined precipitously to $522 million (excluding shipping and processing).  By 2012, revenues had declined to $52 million.  In 2014, revenues were $17 million.

23.     Over time, the Debtor has implemented various cost reduction measures to offset deteriorating market conditions.  For example, in 2010, the Company successfully restructured its major studio licensing agreements away from cash heavy "advance" deals, which in many cases required the Debtor to make up-front payments of $50 - $90 million, to "pay-as-you-go" royalty deals.  Without this revised payment structure, the Columbia House DVD line likely would have had to shut down in 2010.

24.     Additionally, management significantly reduced the Debtor's operating overhead expenses, with expenses being reduced from $24 million in 2012 to an annualized run rate of approximately $5 million during 2015.  Management accomplished these reductions through a number of major cost reduction initiatives, including: (a) reducing office locations and size; (b) reducing information technology expenses; (c) reducing personnel expenses; and ultimately (d) outsourcing its administrative, operational and customer service functions to third-party vendors under the Service Agreements.  These efforts have allowed the Debtor to continue operating while its revenue continues to decline.

25.     During this time, the Debtor's senior management also successfully negotiated settlements and workouts relating to various litigation, real estate, vendor, and other third party liability matters.  Notably, over the last two years, these settlements collectively saved the Debtor approximately $27 million in additional costs.

*The Debtor's Restructuring Efforts and Sale Process*

26.    Notwithstanding major cost reduction efforts, and efforts to streamline the Company to make it more nimble and operationally efficient, sales continue to decline.   The Debtor is continuing to burn cash at a rate that would require it to cease operations at some point in the very near future if it is unable to consummate the sale of its assets in a Court supervised transaction.

27.    In May 2013, the Debtor engaged PwC to advise and assist it with respect to a range of operational and financial initiatives.  In October 2014, with the assistance of PwC, the Debtor began a process to explore strategic alternatives, including, but not limited to, a sale of the business; minority and majority investments (either via debt, equity or both); refinancing; and joint venture arrangements.  In conjunction with these efforts, the Debtor and PwC contacted approximately 130 strategic and financial parties that they believed would be potentially interested in consummating one of the above-referenced restructuring transactions.[9]

28.    Prior to the Petition Date, PwC sent "teasers" and non-disclosure agreements to the 130 parties referenced above (the "Initial Parties").  Of the Initial Parties, approximately 20 signed non-disclosure agreements (the "Interested Parties").  The Interested Parties were provided access to a comprehensive data room, containing the Debtor's key financial and operational information, and all of its relevant organizational and corporate documents.  Of the Interested Parties, one party (the "Potential Buyer 1") engaged in specific negotiations with respect to entering into a transaction with the Debtor - specifically, investment and a going concern acquisition of substantially all of the Debtor's assets.

---

[9]    The Debtor and PwC contacted numerous (i) strategic parties, including physical and digital media companies, and (ii) financial parties, including private equity firms, hedge funds, traditional lending institutions and specialty lenders.

29.     Accordingly, in November 2014, the Debtor and Potential Buyer 1 began
negotiating the terms of a going concern sale, with the parties exchanging term sheets outlining
the prospective terms and conditions of an investment/acquisition.  The parties, however, were
unable to reach an agreement regarding a transaction.[10]

30.     Since the Petition Date, the Debtor continues to actively market the
Acquired Assets and has been in contact with 11 additional parties, which have expressed an
interest in acquiring a portion or all of the Debtor's assets, with one such party indicating a
preliminary interest in serving as a stalking horse bidder.[11]  Of these 11 parties, 9 (the "Initial
Postpetition Potential Buyers," together with Potential Buyer 1, the "Initial Potential Buyers")
have executed non-disclosure agreements and have been granted access to the Debtor's data
room.  The Debtor and PwC are actively assisting all of the Initial Potential Buyers by, *inter alia*,
responding to inquiries that the parties may have regarding the data room, the Acquired Assets,
and the Debtor's business business operations.

### Relief Requested

31.     This Motion encompasses a two-part request pursuant to which the Debtor
is seeking to sell the Acquired Assets to the Successful Bidder, subject to this Court's approval.
Specifically, under the first part of this Motion, the Debtor is requesting entry of the Bidding
Procedures Order, substantially in the form of Exhibit "A" hereto, approving, among other
things:  (i) the Bidding Procedures; (ii) the time, date, and place for the Auction of the Acquired

---

[10]   Despite not being able to reach an agreement with Potential Buyer 1, FEI remains in contact with this party and
       intends to maintain an open and active dialogue regarding the continued potential for a going concern sale.

[11]   As of the filing of the Motion, the Debtor and the potential stalking horse bidder were still in discussions
       regarding the terms of the bidder's initial offer for the Acquired Assets.

Assets and the Sale Hearing; and (iii) the Sale Notice, annexed as Schedule "2" to the Bidding

Procedures Order (the "Bidding Procedures Motion").[12]

32.     Pursuant to the second part of this Motion, the Debtor seeks entry of the

Sale Order, substantially in the form of Exhibit "B," approving, among other things, at the

conclusion of the Sale Hearing:  (a) the sale of the Acquired Assets, free and clear of all liens,

claims, encumbrances, and other interests, with such liens, claims and encumbrances and other

interests attaching to the proceeds of such sale; and (b) the assumption and assignment of the

Assigned Contracts (as defined below) to the Successful Bidder at the Auction, as may be

allowed by the Court (the "Sale" or "Sale Transaction").

<u>The Proposed Sale and Related Purchase Agreement</u>

*The Sale Transaction*

33.     To avoid the continuing losses associated with its business and to

maximize value for its bankruptcy estate, the Debtor proposes to sell the Acquired Assets to the

Successful Bidder.  Absent an expeditious sale, the Debtor's operations will continue to lose

revenue leading to further financial distress, ultimately leaving the Debtor with no real

alternative but to cease operations and liquidate its assets on a piecemeal basis.  The Debtor

believes that a Sale of the Acquired Assets on a going-concern basis – rather than a piecemeal

liquidation – will provide it with the greatest opportunity to maximize value for the benefit of the

various parties in interest in this Chapter 11 Case.  Accordingly, pursuant to this Motion, the

Debtor seeks to sell the Acquired Assets in conjunction with a Court-approved solicitation and

Auction process to obtain the highest and best offer for such assets.

---

[12]    Because, the Debtor does not currently have a stalking horse bidder for the Acquired Assets, it does not request
or seek approval, at this time, of a break-up fee or expense reimbursement in connection with the Sale
Transaction (as defined below).  The Debtor, however, reserves the right to seek such bidding protections
should subsequent circumstances warrant obtaining such relief.

*The Purchase Agreement*

34.     To facilitate the sale process and to set a "floor" of terms to assist potential

bidders, the Debtor has prepared a form asset purchase agreement (the "Purchase Agreement"), a

copy of which is attached hereto as Exhibit "C," to be marked by bidders in connection with their

offers for the Acquired Assets.    The following is a summary of the material terms of the

Purchase Agreement:[13]

- <u>Purchase Price</u>.   The Successful Bidder shall provide Seller with aggregate consideration to be determined by the parties prior to the Sale Hearing, plus the Cure Amounts.

- <u>Deposit</u>.   The Successful Bidder shall provide a cash deposit of $50,000.   The Debtor shall be permitted to retain the Deposit to be applied as liquidated damages in the event the Successful Bidder breaches its obligations under the Purchase Agreement.

- <u>Acquired Assets</u>.   The assets being sold to the Successful Bidder as listed on Schedule 2.1.  Schedule 2.1 includes any claims or causes of action under Chapter 5 of the Bankruptcy Code, which will be purchased and released pursuant to a general release that the Successful Bidder will execute upon closing of the Sale.

-  <u>Excluded Assets</u>.   Property excluded from the Sale includes:   (i) Seller's accounts receivable accruing prior to the Closing;  (ii) all cash, cash equivalents, bank deposits and similar items; (iii) the Excluded Contracts; (iv) all organizational documents, corporate records and minute books of Seller; (v) all causes of action related to excluded assets (the "Excluded Assets"); and (vi) all claims or causes of action related to the Assigned Contracts and/or Seller's Business related to the Acquired Assets arising prior to the Closing Date.

- <u>Assumed Liabilities</u>.   The Successful Bidder has agreed to assume liabilities of the Seller that are owed solely under (i) the Assigned Contracts, but only to the extent they accrue from and after the Closing Date and relate solely to

---

[13]     The summary contained below is intended to provide the Court and parties in interest with the salient terms of the Purchase Agreement, to the extent there are any inconsistencies between the summary description of the Purchase Agreement contained herein and the actual terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control.  Capitalized terms contained in the summary description of the Purchase Agreement that are not defined herein shall have the meanings ascribed to them in the Purchase Agreement.

dates of service from and after the Closing Date; and (ii) the Cure Amounts relating to the Assigned Contracts.

- <u>Excluded Liabilities</u>.  The Successful Bidder is assuming only the Assumed Liabilities, and the Successful Bidder shall not have any obligation with respect to any other Liabilities of Seller, regardless of whether such obligation arises before, on or after the Closing Date.

- <u>Warranties</u>.  Except as expressly set forth in the Purchase Agreement, neither Seller nor any of its respective affiliates make any representation or warranty, express or implied, at law or in equity, as to the accuracy or completeness of any information regarding the Seller, the Business, the Acquired Assets, or Liabilities (including the Assumed Liabilities), or the transactions contemplated by the Agreement, and shall not have any liability to the Successful Bidder for the distribution of such information.

- <u>As Is Transaction</u>.  Except as otherwise expressly warranted and represented by Seller in the Purchase Agreement, Seller is transferring and the Successful Bidder shall accept the Acquired Assets at the Closing "as is, where is" as of the Closing Date.

- <u>Closing Conditions Required by Successful Bidder</u>.  Other than any approvals required under applicable non-bankruptcy law, the Successful Bidder's closing conditions include, among other things:  (i) the accuracy of the Seller's representations and warranties; (ii) compliance by the Seller with all of its covenants and agreements under the Purchase Agreement in all material respects through the Closing; (iii) no Material Adverse Change shall have occurred with respect to Seller; (iv) no order shall have been entered or applicable law passed that would prohibit the consummation of the Closing; (v) Seller and the Successful Bidder shall have received all required regulatory approvals from Government Authorities, if any, ("Regulatory Approvals"); (vi) the Bankruptcy Court shall have entered the Sale Order, which shall have become a Final Order; (vii) the Successful Bidder shall have received all of the Closing Documents in Section 3.4(a) of the Purchase Agreement; and (viii) the Bankruptcy Court shall have approved and authorized Seller's assignment of the Assigned Contracts to, and the assumption thereof by, the Successful Bidder.

- <u>Closing Conditions Required by the Debtor</u>.  Other than any approvals required under applicable non-bankruptcy law, the Debtor's closing conditions will be limited, among other things, to:  (i) the accuracy of the Successful Bidder's representations and warranties; (ii) compliance by the Successful Bidder with all of its covenants and agreements under the Purchase Agreement in all material respects through the Closing; (iii) no order shall have been entered or applicable law passed that would prohibit the consummation of the Closing; (iv) Seller and the Successful Bidder shall have received all Regulatory Approvals, if any; (v) the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order;

(vi) Seller shall have received all of the Closing Documents described in Section 3.4(b) of the Purchase Agreement; and (vi) the Successful Bidder shall have paid, or shall pay simultaneously with the Closing, or shall have made arrangements to pay, any and all Cure Amounts with respect to the Assigned Contracts.

- <u>Termination of the Purchase Agreement</u>.  The Purchase Agreement may be terminated upon, including, but not limited to, the occurrence of the following events:  (i) by mutual agreement of the Parties; (ii) dismissal or conversion of the Chapter 11 Case or the appointment of a Chapter 11 trustee, examiner or other person with expanded powers in the Chapter 11 Case; (iii) granting of relief from the automatic stay to permit foreclosure or the exercise of other remedies on the material assets of the Debtor; (iv) Debtor's modification or consent to any modification of the Purchase Agreement, in each case, without the prior agreement of the Successful Bidder; (v) by the Successful Bidder if (A) there is a Material Adverse Effect; (B) if there is a material breach by Seller of any of the provisions of the Purchase Agreement; or (C) if the conditions to the Successful Bidder's closing become incapable of fulfillment; (vi) by Seller if (A) there is a material breach by the Successful Bidder of any of the provisions of the Purchase Agreement; or (B) the conditions to Seller's closing become incapable of fulfillment; and (vii) by Seller or the Successful Bidder, if Seller consummates an Alternative Transaction.

<u>The Proposed Bidding Procedures and Auction</u>

*Summary of the Bidding Procedures*

35.    In order to ensure that the maximum potential value for the Acquired Assets is obtained, the Debtor seeks entry of the Bidding Procedures Order and approval of the Bidding Procedures.  The Debtor believes that the solicitation procedures and Auction contemplated pursuant to the Bidding Procedures will maximize the value of the Acquired Assets.  The Bidding Procedures (annexed as Schedule "1" to the Bidding Procedures Order) provide, in relevant part, as follows:

(a)    <u>Qualified Bidders</u>:  In order to participate in the bidding process and to have a bid considered by the Debtor, each potential bidder (a "Potential Bidder") must deliver a written, irrevocable offer, for all or a portion of the Acquired Assets, satisfying the below criteria.  A "Qualified Bidder" is a Potential Bidder that delivers a binding bid that, in the Debtor's discretion, in consultation with the Creditors' Committee, satisfies the following conditions (a "Qualified Bid"):

- <u>Bid Deadline</u>.  Each Bid Package (as defined below) must be delivered in written form to:  (i) counsel for the Debtor, Scott A. Griffin, Esq., Griffin

Hamersky P.C., 485 Madison Avenue, 7th Floor, New York, NY 10022; (ii) counsel to the Creditors' Committee, Lowenstein Sandler LLP, Attn: S. Jason Teele, Esq., 65 Livingston Avenue, Roseland, New Jersey 07068; and (iii) the U.S. Trustee, in each case so as to actually be received no later than 4:00 p.m. (New York Time) on October 15, 2015 (the "Bid Deadline").

- <u>Bid Package</u>.  Each bid must include (collectively, the "Bid Package"): (i) a written and signed irrevocable offer stating that (x) the bidder offers to consummate a sale transaction, for all or a portion of the Acquired Assets, on terms and conditions no less favorable than in the Purchase Agreement and in an amount at least equal to the Minimum Bid (as defined below), (y) confirming that the bid will remain irrevocable until the earlier of (a) ninety (90) days following entry of the final Sale Order (as defined below), or (b) closing with the Successful Bidder, and (z) a statement indicating that the Bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence, has relied solely upon its own independent review and investigation and did not rely on any written or oral representation except as expressly provided in the Modified Purchase Agreement (as defined below); (ii) an executed copy of the Purchase Agreement as modified by the bidder in accordance with its bid (the "Modified Purchase Agreement"); and (iii) an electronic markup of the Purchase Agreement clearly showing the revisions in the Modified Purchase Agreement (formatted as a Microsoft Word document or such other word processing format acceptable to the Debtor).  The Debtor, in consultation with the Creditors' Committee, shall determine whether any Modified Purchase Agreement that modifies the Purchase Agreement in any respect beyond the identity of the purchaser and the purchase price under the agreement is a Qualified Bid.

- <u>Minimum Bid</u>.  The amount of the purchase price in such bid must provide for net cash (or cash equivalent) that is at least in the amount of:  $50,000 more than the base price contained in the Purchase Agreement (the "Minimum Bid").

- <u>Financial Information</u>.   The Bid Package must contain such financial wherewithal and other information that will allow the Debtor to make a determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement, including any proposed conditions to Closing and adequate assurance of such bidder's ability to perform under any Assigned Contracts and to pay all Cure Amounts required to assume and assign any such Assigned Contracts.

- <u>Bid Protections</u>.  The bid must not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment.

- Identity of Bidders.  Each Potential Bidder must fully disclose the identity of each entity that will be bidding for the Acquired Assets, as well as disclose the organization, form and the business conducted by each entity and what, if any, connection the Potential Bidder has with the Debtor, its affiliates, parents, subsidiaries, predecessors, successors, or any other related entities.  Potential Bidders shall be required to provide such additional information as the Debtor may require regarding a bidder's ability to satisfy the requirements of the transaction contemplated by the Modified Purchase Agreement.

- Due Diligence.  The bid must not contain any contingencies of any kind, including, among others, obtaining (i) financing; (ii) shareholder, board of directors or other approval; or (iii) the outcome or completion of due diligence.  Each Potential Bidder must also affirmatively acknowledge that the Potential Bidder (i) had an opportunity to conduct due diligence regarding the Acquired Assets prior to making its offer and does not require further due diligence; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith except as expressly stated in these Bidding Procedures.

- Consents.  Each Potential Bidder must represent that it obtained all necessary organizational approvals to make its competing bid and to enter into and perform the Modified Purchase Agreement.

- Deposit.  A Potential Bidder must deposit $50,000 with the Debtor in the form of a certified check or wire transfer on or before the Bid Deadline (the "Deposit").  The Potential Bidder or the Backup Bidder (defined below) shall forfeit the Deposit if (i) the Potential Bidder or the Backup Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein before the Bankruptcy Court approves the Debtor's selection of the Successful Bidder; or (ii) the bidder is a Successful Bidder and (x) modifies or withdraws the bid without the Debtor's consent before the consummation of the sale contemplated by the bid, or (y) breaches any of the provisions of the Modified Purchase Agreement.  The Deposit shall be returned to the bidder (i) as soon as practicable if the bidder is determined not to be a Qualified Bidder; or (ii) no later than five (5) business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder.  The Debtor will maintain any Deposit in a non-interest bearing Debtor account.

- As Is, Where Is.  Any Modified Purchase Agreement must provide that the Sale will be on an "as is, where is" basis and without representations or warranties of any kind except and solely to the extent expressly set forth in the Modified Purchase Agreement of the Successful Bidder.  Each Qualified

Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its bid and that it has relied solely upon its own independent review and investigation in making its bid.

- Debtor's Considerations.  The Debtor, after consultation with the Creditors' Committee, will have the right to determine that a bid is not a Qualified Bid if the terms of the bid are materially more burdensome or conditional than the terms of the Purchase Agreement and are not offset by a material increase in purchase price, which determination may take into consideration, among other factors:  (i) whether the bid requires any indemnification of such Qualified Bidder; (ii) whether the bid does not provide for payment of cure costs or other cash costs of the transaction; (iii) whether the bid includes a non-cash instrument or similar consideration that is not freely marketable; or (iv) any other factors the Debtor, after consultation with the Creditors' Committee, may deem relevant.

(b)    Sale.  If only one Qualified Bid is submitted by the Bid Deadline, the Debtor shall not hold the Auction, but may proceed with the Sale Hearing and seek approval of the Modified Purchase Agreement and the transactions contemplated thereby relating to such bid.  In the event that no Qualified Bids are submitted, the Debtor, in consultation with the Creditors' Committee, reserves all rights with respect to the Sale, including withdrawing the Motion to approve the Sale.

(c)    Auction.  In the event that the Debtor timely receives more than one Qualified Bid by the Bid Deadline for all or any portion of the Acquired Assets, the Debtor shall conduct the Auction with respect to the Acquired Assets.  The Auction will take place at the offices of counsel to the Debtor, Griffin Hamersky P.C., 485 Madison Avenue, 7th Floor, New York, NY 10022 on October 16, 2015, starting at 10:00 a.m. (New York Time), or at such other later date and time or other place, as may be determined by the Debtor, in consultation with the Creditors' Committee, at or prior to the Auction.  The Auction shall be governed by the following procedures:

- Participation.  Only the Qualified Bidders that have submitted a Qualified Bid and provided a Deposit will be eligible to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction (and any attorney or other advisor for a Qualified Bidder may appear at the Auction at the discretion of the Qualified Bidder).  In the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith.  The Debtor, in consultation with the Creditors' Committee, will evaluate all Qualified Bids received and will select the Qualified Bid that reflects the highest and/or best offer for all or any portion of the Acquired Assets, and otherwise complies with the bid requirements set forth herein, as the "Starting Auction Bid."  The Debtor may consider a variety of factors to determine the Starting Auction Bid including changes to the Purchase Agreement and the Qualified Bidder's ability to consummate the Sale.  At the Auction, the Debtor

shall announce the material terms of each overbid and the basis for calculating the total consideration offered in each such overbid.

- <u>Bidding</u>. Bidding at the Auction shall commence at the amount of the Starting Auction Bid. Qualified Bidders may then submit successive bids in increments of $50,000 (the "Bid Increment"); <u>provided, however</u>, that the Debtor, in consultation with the Creditors' Committee, shall retain the right to modify the Bid Increment at the Auction. Any bid submitted after the conclusion of the Auction shall not be considered for any purpose.

- <u>Higher and/or Better</u>. The Debtor reserves the right, in consultation with the Creditors' Committee, to determine whether any bid is better, if not higher, than another bid submitted during the Auction. The Debtor may consider a variety of factors in making this decision, including without limitation, whether the bid is materially more burdensome than the terms of the Purchase Agreement or a Modified Purchase Agreement (as applicable), any proposed conditions to closing, whether the bid includes any non-cash components, the timing of closing of the proposed transaction, and any other factors deemed relevant.

- <u>Successful Bid</u>. The Auction shall continue until there is only one collective offer or separate offers for the Acquired Assets, that the Debtor, in consultation with the Creditors' Committee, determines, subject to Court approval, is (or are) the highest or otherwise best offer(s) from among the Qualified Bids submitted at the Auction (the "Successful Bid(s)") and the Debtor announces that the Auction is closed. The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder(s)," and shall have such rights and responsibilities of the Buyer, as set forth in the Modified Purchase Agreement. Within one business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Successful Bidder(s) shall complete and execute a Modified Purchase Agreement, and all contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid(s) was made.

- <u>Anti-Collusion</u>. At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with any other Qualified Bidder or potential bidder with respect to the bidding or the sale contemplated by the Purchase Agreement (the "Sale").

- <u>Conduct of Auction</u>. The Auction may be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid or the Debtor or its counsel may meet privately with any Qualified Bidder to negotiate the terms of its bid. The Debtor, in consultation with the Creditors' Committee, may adopt other rules for the conduct of the Auction at the Auction which, in its judgment, will better promote the goals of the Auction.

▪ Backup Bid.  At the conclusion of the Auction, the Debtor will also announce the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "Backup Bid").  The Qualified Bidder submitting such Backup Bid shall become the "Backup Bidder," and subject to the rights of the Successful Bidder, shall have such rights and responsibilities of the Buyer, as set forth in the Modified Purchase Agreement. The Backup Bid shall remain open and irrevocable until the earlier of (x) ninety (90) days following entry of the Sale Order and (y) closing of the Sale. The Backup Bidder's Deposit will be returned by the Debtor upon consummation of the Sale of the Acquired Assets to the Successful Bidder or will be otherwise applied or forfeited as provided in the Bid Procedures, if the Backup Bidder is determined to be the Successful Bidder.

▪ Extensions/Adjournment.  The Debtor reserves its rights, in the exercise of its judgment, in consultation with the Creditors' Committee, to modify any non-material provisions of the Bidding Procedures at or prior to the Auction, including, without limitation, extending the deadlines set forth in the Auction procedures, modifying bidding increments, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice consistent with the Purchase Agreement and Bid Procedures Order.

Auction and Sale Hearing Notice

36.    Within three (3) days after entry of the Bidding Procedures Order, the Debtor will cause to be served copies of the Bidding Procedures Order, the Bidding Procedures, and the Sale Notice (annexed as Schedule "2" to the Bidding Procedures Order) on (a) counsel to the Creditors' Committee, Lowenstein Sandler LLP; (b) counsel to the Debtor's secured creditor, Archer & Greiner, P.C.; (c) the U.S. Trustee; (d) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002 (the "2002 Parties"); (e) all counter-parties to any executory contracts and unexpired leases; (f) the following governmental authorities:  (i) the United States Attorney for the Southern District of New York, (ii) the PBGC; (iii) the Internal Revenue Service; and (iv) the New York State Department of Taxation and Finance; (g) counsel to the Successful Bidder; (h) all parties who are known to assert a Lien on the Acquired Assets; and (i) all parties identified by the Debtor as potentially having an interest in acquiring the Acquired Assets (collectively, the "Notice Parties"), all creditors of the Debtor who are listed on the Schedules filed by the Debtor or who have filed proofs of claim against the Debtor's estate (the

"Scheduled and Filed Creditors") and the 2002 Parties.  As soon as practicable after entry of the Bidding Procedures Order, the Debtor will submit the Sale Notice to be published once in the New York Times (National Edition).

<u>Objections to Bidding Procedures and Sale</u>

37.     The Debtor proposes that objections, if any:  (i) to the Bidding Procedures shall be filed with this Court, so as to be received no later than 4:00 p.m. (New York Time) seven days prior to the Bidding Procedures Hearing (the "Bidding Objection Deadline"); and (ii) to the Sale Motion shall be filed with this Court, so as to be received no later than 4:00 p.m. (New York Time) seven days prior to the Sale Hearing (the "Sale Objection Deadline"), and shall be served on:  (a) the U.S. Trustee, Attn: Andrea B. Schwartz, Esq., U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014; (b) counsel to the Debtor, Griffin Hamersky P.C., 485 Madison Avenue, 7th Floor, New York, New York, 10022, Attn:  Scott A. Griffin, Esq.; and (c) counsel to the Creditors' Committee, 65 Livingston Avenue, Roseland, New Jersey 07068, Attn: S. Jason Teele, Esq.

<u>Sale Hearing</u>

38.     The Successful Bid and Backup Bid will each be subject to entry of the Sale Order after the Sale Hearing that the Debtor proposes take place on or around October 20, 2015.  The Sale Hearing may be adjourned, in consultation with the Creditors' Committee, from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court.  Upon approval of the Backup Bid by the Court, the Backup Bid shall remain open and irrevocable until the consummation of the Successful Bid.

Assigned Contracts

39.     Section 365 of the Bankruptcy Code provides in relevant part, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the Debtor." 11 U.S.C. § 365(a).  In connection with the Sale of the Assets, the Debtor may seek to assume and assign to the Successful Bidder, pursuant to section 365 of the Bankruptcy Code and in accordance with the procedures set forth herein (the "Assignment Procedures"), certain executory contracts and/or unexpired leases designated by the Successful Bidder under the Modified Purchase Agreement.

40.     In connection with such proposed assumption and assignment, the Debtor will file a schedule of the Assigned Contracts (the "Assumption Schedule") no later than five (5) business days following the Sale Hearing, and concurrently serve notice of such filing upon all counter-parties to the Assigned Contracts and the Creditors' Committee.  The Assumption Schedule will include any amount the Debtor believes is required to be paid pursuant to section 365(b) of the Bankruptcy Code to cure any defaults under the agreements listed on the Assumption Schedule (the "Cure Amounts").  Subject to the terms of the Purchase Agreement, the Successful Bidder will be fully responsible for satisfying the requirements of section 365(b), including payment of the Cure Amounts and establishing adequate assurance of future performance.

41.     Counter-parties to the Assigned Contracts will have fifteen (15) days following service of the Assumption Schedule to file an objection to the proposed assumption and assignment of any Assigned Contract or any Cure Amount.  Any such objection must set forth with specificity the basis for the objection (including appropriate documentation in support) and, if applicable, any counter-proposed Cure Amount.

42.     The Debtor, with the consent of the Successful Bidder, shall have the right to amend the Assumption Schedule at any time prior to ten (10) business days before the Closing Date to add or remove an Assigned Contract.  In such event, the Debtor shall file and serve an applicable notice of amendment (the "Amendment Notice"), reflecting appropriate changes to the Assumption Schedule, including changes to any proposed Cure Amounts, on all counter-parties to the Assigned Contracts removed or added to, or otherwise modified by, the amendment to the Assumption Schedule and the Creditors' Committee.  All affected parties shall thereafter have fifteen (15) days to file an objection (the "Assumption Objection") to the Amendment Notice.

43.     If an Assumption Objection is filed, and is not consensually resolved, the Debtor proposes the Court hold a hearing on the objection on a date specified by the Court.  To the extent the objection relates solely to a proposed Cure Amount, the Debtor proposes that it have the right to have the Assigned Contract assumed and assigned to the Successful Bidder, as applicable, with an appropriate amount being held in escrow for payment of the Cure Amount pending the resolution of the Assumption Objection by the parties or the Court.  The Debtor further requests that the parties be authorized to settle, compromise or otherwise resolve any disputed Cure Amounts without the need for further Court Order or notice to other parties, other than notice to the Creditors' Committee.

44.     If no Assumption Objection is timely filed and served, and subject to entry of an Order by this Court at the Sale Hearing approving the Sale and proposed assumption and assignment of the Assigned Contracts in connection therewith, the Cure Amounts set forth in the Assumption Schedule, as may be amended, shall be controlling, notwithstanding anything to the contrary in such Assigned Contracts, and the non-debtor parties shall be barred from asserting

against the Debtor or the Successful Bidder any other claim arising from the applicable Assigned Contracts.

45.     The effective date of the assumption and assignment of any Assigned Contract shall be the closing of the Sale.  All Cure Amounts will be paid by the Successful Bidder either prior to, upon, or promptly after the closing of the Sale, or as otherwise agreed upon between the parties to the Assigned Contracts.

## **Basis for Relief**

### The Bidding Procedures Order Should Be Entered

#### *The Bidding Procedures Should Be Approved*

46.     The Bidding Procedures, which are standard for the sale of assets in chapter 11 cases, will ensure that the Debtor's estate receives the greatest benefit available from the Sale of the Acquired Assets.  The Bidding Procedures have been structured to attract the maximum number of Qualified Bids for the Acquired Assets while allowing the Debtor the flexibility to select the bid or bids that provide the greatest overall value to the Debtor's estate. Finally, the Bidding Procedures set out a time frame that will allow any potential purchasers sufficient time to construct and submit informed Qualified Bids, while still providing for the expeditious sale of the Acquired Assets.

47.     The Debtor submits that the Bidding Procedures are reasonably designed to ensure that the Debtor's estate receives the maximum benefit available from the Sale of the Acquired Assets, and therefore warrant Court approval.

### The Auction and Sale Hearing Notice Should Be Approved

48.     Pursuant to Bankruptcy Rules 2002(a) and 6004, the Debtor is required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) provides that such notice must include the time and place of any

auction, the sale hearing, and the time fixed for filing objections to the sale.  The Sale Notice sets forth all the information a potential bidder and any other party in interest should require about the bidding process for the Acquired Assets, including:  notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the time, date and location of the Sale Hearing.

49.   The Debtor submits that the Sale Notice as proposed complies with Bankruptcy Rule 2002 and General Order M-383, and constitutes good and adequate notice of the sale and the proceedings with respect thereto.  Because the Debtor is providing notice of this Motion, the Bidding Procedures and the Auction to the Notice Parties, the Scheduled and Filed Creditors, and the 2002 Parties, the Debtor submits that the notice requirements of Bankruptcy Rules 2002 and 6004 are satisfied.  The Debtor also proposes to publish the Auction and Sale Notice in The New York Times (National Edition) pursuant to Bankruptcy Rule 2002. Therefore, the Debtor respectfully requests that the Court approve the Auction and Sale Notice and the notice procedures proposed above.

### The Sale Order Should Be Entered

*Sales Outside the Ordinary Course of Business*

50.   Section 363(b) of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules govern the sale of assets outside the ordinary course of business.   Section 363(b)(1) provides, in relevant part, that a debtor in possession may, after notice and hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate."  See 11 U.S.C. § 363 (b)(1) and (f).

51.   The terms of such sale are generally within the sound discretion of the debtor.  See In re Ionosphere Clubs, Inc., 100 B.R. 670 (Bankr. S.D.N.Y. 1989) (sale of debtors' airline shuttle assets approved where representing the exercise of independent good faith and

non-coerced business judgment by the debtors, the debtors articulated a compelling business

reason for the sale and that it represented fair value).  As recognized by the Second Circuit in

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir.

1983), a court may approve a section 363 application after expressly determining from the

evidence presented at the hearing that a good business reason exists to grant such application.

52.     Bankruptcy Rule 6004(f)(1) further provides that sales of property outside

the ordinary course may be conducted by private sale or public auction.  See Fed. R. Bankr. P.

6004(f)(1).  Generally, a bankruptcy court has wide latitude in approving even a private sale of

all or substantially all estate assets not in the ordinary course of business under section 363(b) of

the Bankruptcy Code.  See In re Ancor Exploration Company, 30 B.R. 802, 808 (Bankr. N.D.

Okla. 1983).  However, each proposed sale must be examined from its own facts to determine

whether the proposed sale is justified with detailed factual findings being made in support

thereof.

*The Sale of the Debtor's Assets Represents the Debtor's
Sound Business Judgment*

53.     Under applicable law, a proposed sale must represent the reasonable

exercise of business judgment on the part of a debtor in possession to be approved under section

363(b) of the Bankruptcy Code.  See, e.g., In re Chateaugay Corp., 973 F.2d 141, 145 (2d Cir.

1992); In re Lionel Corp., 722 F.2d at 1071; see also, In re Integrated Res., Inc., 147 B.R. 650,

656 (Bankr. S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (citing Smith v. Van

Gorkom, 488 A.2d 858, 872 (D. Del. 1985).

54.     Furthermore, a chapter 11 debtor may, in some circumstances, sell all or

substantially all of their assets pursuant to section 363(b) of the Bankruptcy Code prior to

confirmation of a plan.  In re Lionel Corp., 722 F.2d at 1071.  Such a sale can even be made prior

to filing a plan of reorganization.  In re Naron & Wagner, Chartered, 88 B.R. 85 (Bankr. D. Md.

1988). However, in approving such a sale, a court must be able, based on the evidence, "…to articulate sound business justifications for [its] decisions." In re Lionel Corp., 722 F.2d at 1066. A court should consider all of the salient factors and act to further the diverse interests of the debtor, creditors and equity holders alike. Id. at 1070. See also In re Chateaugay, 973 F.2d at 145; In re Ionosphere Clubs, Inc., 100 B.R. at 675.

55.     The Second Circuit has indicated that the following factors should be considered during the sale approval process: (i) the proportionate value of the assets to the estate as a whole; (ii) the amount of elapsed time since the filing; (iii) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (iv) the effect of the proposed disposition on future plans of reorganization; (v) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property; (vi) which of the alternatives of use, sale or lease the proposal envisions; and (vii) whether the asset is increasing or decreasing in value. See Lionel, 722 F.2d at 1071. The factors highlighted by the Lionel decision are often cited and applied by other courts when determining requests to approve a sale of all or substantially all of the assets of a Debtor's estate. See, e.g., In re Naron & Wagner, 88 B.R. 85; In re Delaware & Hudson Railway Co., 124 B.R. 169 (Bankr. D. Del. 1991); In re Thomson McKinnon Securities, Inc., 120 B.R. 301 (Bankr. S.D.N.Y. 1990); In re Engineering Products Co., Inc., 121 B.R. 246 (Bankr. E.D. Wis. 1990); In re Channel One Communications Inc., 117 B.R. 493 (Bankr. E.D.Mo. 1990); In re Brethren Care of South Bend, Inc., 98 B.R. 927 (Bankr. N.D. Ind. 1989).

56.     As indicated above and in the Affidavit, the decision to sell the Acquired Assets is one of necessity and results from a lack of remaining viable alternatives. Absent a sale of the Acquired Assets, the Debtor will likely be forced to liquidate its assets on a piecemeal basis. Indeed, a prompt sale of the Acquired Assets is necessary to maximize value for all stakeholders in this Chapter 11 Case, to prevent the accrual of unnecessary and burdensome

administrative expenses to the Debtor's estate, and to stop the hemorrhaging of cash from the Debtor's operations.

57.    Currently, the Debtor's projected "cash burn" rate is approximately $105,000.00 per month.    The Debtor has extremely limited cash reserves.    Consequently, an immediate sale is necessary for the Debtor to maintain its assets and operations until a closing can occur.    Thus, a compelling business justification exists for the approval of this Motion.

58.    As contemplated, a Sale of the Acquired Assets will result in the sale of a substantial portion of the Debtor's assets outside of a chapter 11 plan. The Debtor, however, intends to propose and file a plan of liquidation as soon as practicable following the Sale.

#### Assumption of the Assigned Contracts and Assignment Procedures Should Be Approved

59.    Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  It is well established that the business judgment test is the standard applied by courts to determine whether an executory contract or unexpired lease should be assumed.    See, e.g., In re Old Carco LL (f/k/a Chrysler LLC), 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009); see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures), 4 F.3d 1095, 1099 (2d Cir. 1993); Richmond Leasing Co v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985) ("[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially").    A court should approve assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate.    See, e.g., Old Carco, 406 B.R. at 196-97; In re Child World, Inc., 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992);

In re Ionosphere Clubs, Inc., 100 B.R. at 673; see also Sharon Steel Corp v. National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989).

60.    When assuming an executory contract, section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults.  If there has been a default, the debtor must also provide adequate assurance of future performance under the contract.

61.    Assuming and assigning the Assigned Contracts to the Successful Bidder pursuant to the Assignment Procedures is an appropriate exercise of the Debtor's business judgment.  As the Debtor is selling the Acquired Assets, the Assigned Contracts will no longer have any value to the Debtor.  By assuming and assigning the Assigned Contracts to the Successful Bidder, the Debtor's estate will benefit from avoiding the damage claims that would arise from rejecting the Assigned Contracts.  In addition, the Debtor will require the Successful Bidder to have sufficient capital, financing and/or commitments to provide adequate assurance of future performance on all of the Assigned Contracts. The Debtor and the Successful Bidder will offer evidence of the same at the Sale Hearing.

62.    The Assignment Procedures proposed by the Debtor for determining Cure Amounts and providing the counter-parties to the Assigned Contracts notice and an opportunity to object to the assumption and assignment and/or the Cure Amounts are fair to all parties and satisfy the notice requirements of Bankruptcy Rule 6006(c).

63.    Because assuming and assigning the Assigned Contracts to the Successful Bidder avoids the costs of rejecting those executory contracts and unexpired leases and increases the value to be realized from the Sale of the Acquired Assets, assumption and assignment to the Successful Bidder of the Assigned Contracts is clearly an exercise of the Debtor's sound business judgment which warrants approval by this Court.

<u>The Acquired Assets Should Be Sold Free and Clear of Liens</u>

64.    Under section 363(f) of the Bankruptcy Code, a debtor may sell property under the Bankruptcy Code free and clear of liens, claims and encumbrances, provided that:  (a) applicable non-bankruptcy law permits the sale of the property free and clear of such interests; (b) the entity holding the lien, claim or encumbrance consents to the sale; (c) the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest.  11 U.S.C. § 363(f). <u>See</u> <u>In re Smart World Tech., LLC</u>, 423 F.3d 166, 169 n. 3 (2d Cir. 2005) (Section 363 permits sales of assets free and clear of claims and interests, thus allowing purchasers to acquire assets without any accompanying liabilities); <u>In re Dundee Equity Corp.</u>, No. 89-B-10233, 1992 WL 53743, at *3 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

65.    In accordance with the provisions of the Purchase Agreement and section 363(f) of the Bankruptcy Code, the Debtor requests that it be authorized to conduct the Sale free and clear of all Liens, other than Assumed Liabilities.  All parties holding liens on the Acquired Assets will be provided notice of the proposed Sale and shall be granted an opportunity to object to the relief requested in this Motion and any such entity that does not object to the sale shall be deemed to have consented.  <u>See, e.g.</u>, <u>Futuresource LLC v. Reuters, Ltd.</u>, 312 F.3d 281, 285-86 (7th Cir. 2002) (standing for the proposition that the lack of an objection to a proposed sale of assets constitutes consent); <u>Hargrave v. Township of Pemberton (In re Tabone, Inc.)</u>, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); <u>In re Elliot</u>, 94 B.R. 343, 345 (Bankr. E.D.Pa. 1988) (citing <u>In re Gabel</u>, 61 B.R. 661 (Bankr. W.D. La. 1985)).  <u>See also</u> <u>In re Enron Corp.</u>, 2003 WL

21755006 at *2 (AJG) (Bankr. S.D.N.Y 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)). Thus, to the extent any parties holding a Lien on the Acquired Assets fail to object to the relief requested in the Motion, a sale of the Acquired Assets free and clear of all Liens, with the exception of any Assumed Liabilities, satisfies section 363(f)(2) of the Bankruptcy Code.

66.    Alternatively, section 363(f)(5) of the Bankruptcy Code is also satisfied and provides adequate cause for granting authorization to conduct the Sale free and clear of Liens. Under the Purchase Agreement, any party holding a Lien may be compelled to accept a monetary satisfaction of its lien. The Purchase Agreement also provides that Liens on the Assets shall attach to the proceeds of the Sale, subject to any claims and defenses the Debtor may have with respect thereto. Therefore, it is submitted that section 363(f)(5) of the Bankruptcy Code can be deemed satisfied upon a sale of the Acquired Assets being conducted free and clear of all Liens.

67.    Accordingly, based on the foregoing, the Debtor respectfully submits that the Acquired Assets should be transferred to the Successful Bidder free and clear of all liens, claims, encumbrances and other interests.

### The Successful Bidder Should Be Afforded Protection Under Section 363(m) of the Bankruptcy Code

68.    Section 363(m) of the Bankruptcy Code affords protection to a good faith buyer in any interest in property purchased from a debtor, notwithstanding that the sale conducted was later reversed or modified on appeal. Section 363(m) provides, in pertinent part, as follows:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

69.    11 U.S.C. § 363(m).  See Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (Bankr. S.D.N.Y. 1994) (interpreting section 363(m) to "provide[] that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.")

70.    The Second Circuit has held that a party would have to show fraud or collusion between a purchaser and the debtor in possession or trustee in order to demonstrate a lack of good faith.  See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir.1978)) ("[t]ypically, the misconduct that would destroy a good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also, In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

71.    The Successful Bidder will be a good faith purchaser as required by section 363(m) of the Bankruptcy Code.  Indeed, the final terms of any Modified Purchase Agreement will be the product of extensive, good faith arm's-length negotiations between the Debtor, its advisors and the Successful Bidder and its advisors, with evidence of the same to be presented at the Sale Hearing.  Accordingly, the Debtor requests that the Court determine that the Successful Bidder be deemed as having acted in good faith (upon a showing of the same at the Sale Hearing) and entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

## Waiver of Stay Under Bankruptcy Rule 6004(h)

72.     Under Bankruptcy Rule 6004(h), all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order, unless otherwise ordered by the Court.  Fed. R. Bankr. P. 6004(h).  The stay period is intended to provide sufficient time for an objecting party to appeal before the order is implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

73.     Although little guidance is provided by either Bankruptcy Rule 6004(h) or the Advisory Committee Notes as to when a court should "order otherwise," it has been suggested that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  See 10 Collier on Bankruptcy § 6004.09 (Lawrence P. King, et al. eds., 15th ed. rev. rel. 2003).  Colliers also proposes that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay pending such appeal.  Id.  It is thus respectfully requested that the Court waive the 14 day stay period required under Bankruptcy Rule 6004(h) or, in the alternative, if an objection is filed to the proposed Sale, reduce the stay period to the minimum amount of time reasonably necessary for the objecting party to file a stay pending appeal.  This relief is both necessary and appropriate under the circumstances of this Chapter 11 Case.

## Notice

74.     Notice of this Motion has been provided either by facsimile, electronic transmission, overnight delivery, or hand delivery to:  (i) the U.S. Trustee; (ii) the United States Attorney for the Southern District of New York; (iii) the Internal Revenue Service; (iv) the New York State Department of Taxation and Finance; (v) the Securities and Exchange Commission; (vi) Lowenstein Sandler LLP, proposed counsel to the Creditors' Committee; (vii) Archer &

Greiner P.C., counsel to the Debtor's secured creditor; (viii) all counter-parties to executory contracts and unexpired leases; (ix) all parties who known to assert a Lien on the Acquired Assets; (x) all parties identified by the Debtor as potentially having an interest in acquiring the Acquired Assets; and (xi) any parties required to be served under any applicable Bankruptcy Rule or Local Rule.  The Debtor submits that, under the circumstances, no other or further notice is necessary.

## No Prior Request

75.    No previous request for the relief sought herein has been made to this or any other Court.

## No Memorandum of Law

76.    The case law cited herein provides ample authority and justification for the approval of the proposed transaction.  The facts set forth herein also support a finding in favor of an order approving the Sale.

*[Concluded on following page]*

## Conclusion

**WHEREFORE** the Debtor respectfully requests that the Court enter an order substantially similar to the proposed form order, attached hereto as Exhibit "B," granting the relief requested herein, and granting the Debtor such other and further relief as is just and proper.

Dated:  September 10, 2015
        New York, New York

GRIFFIN HAMERSKY P.C.


By: /s/ Scott A. Griffin
Scott A. Griffin
Michael D. Hamersky
485 Madison Avenue, 7th Floor
New York, New York 10022
Telephone:  (212) 710-0338
Facsimile:  (212) 710-0339

Proposed Counsel for the Debtor
and Debtor in Possession