Hearing Date and Time:  To Be Determined
Objection Date and Time:  To Be Determined

**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

*Counsel for the Official Committee of Unsecured Creditors*
*of Filmed Entertainment Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FILMED ENTERTAINMENT INC.,<br><br>　　　　　　　　　　Debtor. | Chapter 11<br><br>Case No. 15-12244 (SCC) |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
(I) TO CONVERT THE CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7 OF THE
BANKRUPTCY CODE; OR, IN THE ALTERNATIVE, (II) FOR AN ORDER
AUTHORIZING THE COMMITTEE TO PROSECUTE CERTAIN CAUSES OF
ACTION ON BEHALF OF THE DEBTOR'S ESTATE**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the bankruptcy case of the above-captioned debtor and debtor-in-possession ("**FEI**" or the "**Debtor**") submits this motion (the "**Motion**") seeking the entry of an order (i) converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or, in the alternative, (ii) authorizing the Committee to prosecute certain causes of action on behalf of the Debtor's estate. In support of this Motion, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Debtor would have us believe that the failure of its business (and its current insolvency) is entirely the result of market forces and, accordingly, unavoidable. The Debtor claims that its demise was the result of a precipitous drop in sales driven by the advent of digital music and videos; however, this explanation only tells part of the Debtor's story. The

31507/2
11/16/2015 40636170.2

Committee, through its due diligence since being appointed in this Chapter 11 Case, has discovered the other aspects of the Debtor's Catch-22. It appears that the Debtor knew, in 2011 when it ceased new member recruitment programs, that its business would begin a steady and unstoppable decline. It also appears that the Debtor's current (and prior) owners have treated the Debtor like a personal piggy bank; using its resources for their own benefit and for the benefit of the Debtor's affiliated companies, whom they also own. As a result, general unsecured creditors are left holding "the (empty) bag" despite being owed more than $7 million dollars prior to the Petition Date (defined herein). Yet, rather than pursue a course of action that would have insured an orderly liquidation and, in turn, treat all interested parties, including creditors, fairly, the Debtor's parent company and its affiliates have proceeded to extract additional value from the Debtor and its businesses, and in turn, creditors. Their efforts should not be rewarded.

2. The Committee has monitored the Sale (defined below) process. The date of the Auction (defined below) was moved several times and, currently, no Auction is scheduled to occur. To date, the Debtor received several "offers" to purchase its assets. For example, one of the bids proposes payment of a minimal cash amount (that would likely render the Debtor's estate administratively insolvent) by an affiliate of one the Insiders (defined below) in exchange for all of the Debtor's assets, including accounts receivable and customer lists, along with a global release for itself and certain other Insiders. The second bid isn't much better.

3. Given the costs associated with maintaining this case in Chapter 11, and considering the lack of benefits the Debtor's actions have generated for the estate and creditors, the Committee believes that it is in the best interest of the Debtor, its estate and all creditors for the Chapter 11 Case to be converted to a case under Chapter 7 of the Bankruptcy Code.

4. However, if the Court chooses not to convert the Chapter 11 Case, the Committee respectfully requests that, in the alternative, the Court agree to grant it standing to bring causes of action on behalf of the Debtor's estate that the Committee believes cannot and will not be brought by the Debtor based on certain inherent conflicts of interest. Specifically, while the Committee's investigation is ongoing, it has already identified numerous potential claims

against: (a) JMCK Corp. ("**JMCK**"); (b) the Najafi Companies ("**Najafi**"); (c) DVD Direct Acquisition, LLC ("**DVD Direct**"); (d) Pride Tree Holdings, Inc. ("**Pride Tree**"); (e) Bookspan, LLC ("**Bookspan**"); (f) certain members of Debtor's management, including John Lippmann the current chief executive officer of both Pride Tree and the Debtor (collectively, "**Management**"); (g) Totally Awesome Warehouse LLC ("**TAW**", together with JMCK, Najafi, DVD Direct, Pride Tree, Bookspan and Management, the "**Insiders**").

5. The Committee estimates that the combined total of claims to be asserted against the Insiders, including potential causes of action on account of fraudulent transfers, preferential payments, and other causes of action (the "**Insider Causes of Action**") is not less than $30 million dollars.

## BACKGROUND

**A.    Chapter 11 Case Background**

6. On August 10, 2015 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**"). The Debtor operates its business and manages its properties as debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. No trustee or examiner has been appointed in the Chapter 11 Case.

7. As of the Petition Date, "the Debtor has approximately $7 million in unsecured current liabilities, including trade payables and royalty licensing amounts due to movie studios, and approximately $56 million in legacy liabilities[.]" *See First Day Affidavit of Glenn Langberg Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* [Docket No. 2] (the "**First Day Affidavit**") at ¶ 24. The "Debtor also has approximately $20.1 million of long-term qualified pension liability" and "$10.2 million of long-term non-qualified pension liability." *Id.*

8. On August 18, 2015, the Office of the United States Trustee for Region 2 appointed the Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 34].

9. According to the Debtor, its assets include: (i) its "trade name which has much goodwill associated with it"; (ii) "the current member base"; (iii) the "list of prior members"; (iv) "content Licenses" (some of which have expired); and (v) an "inventory of DVDs in the warehouse" (some of which do not belong the Debtor). *Id.* at ¶ 47.

10. In addition, as of the Petition Date, the Debtor's assets also include: (i) "gross accounts receivable" of $1,782,440.21; (ii) "gross finished goods" with a value of $717,262.22; (iii) a "DVD Royalty System" with a value of $53,136.47; and (iv) various artworks and internet domain names of unknown value. *See Debtor's Schedules and Statement of Financial Affairs* (the "**Schedules**") at Exhibit B [Docket No. 65].

### B.    Debtor's Futile Sale Process

11. According to the Debtor, prior to the Petition Date, it engaged "the restructuring group of PwC to advise it with respect to a range of operational and financial initiatives." *See* First Day Affidavit at ¶ 44. The Debtor began exploring various alternatives, including the sale of its assets, in October 2014. As of the Petition Date, the Debtor "continues to actively market its assets[.]" *Id.* at ¶ 47.

12. On September 10, 2015, the Debtor filed the bid procedures motion seeking approval of, among other things, certain bid procedures governing the sale ("**Sale**") of substantially all of the Debtor's assets (the "**Bid Procedures**"). An order approving the Bid Procedures was entered on September 28, 2015 [Docket No. 101] (the "**Bid Procedures Order**"). As reflected in the Bid Procedures Order:

- the deadline to submit a bid for the Debtor's assets was October 15, 2015 (the "**Bid Deadline**");

- an auction was scheduled to commence on October 16, 2015 (the "**Auction**"); and

- a hearing to approve the sale was scheduled to take place on October 20, 2015 (the "**Sale Hearing**").

*See* Bid Procedures Order at ¶¶ 3, 6, and 7.

13. On October 14, 2015, the deadlines set forth in the Bid Procedures Order were extended to October 22, 2015 (Bid Deadline), October 26, 2015 (Auction), and October 30, 2015 (Sale Hearing). *See Notice of Adjournment of Auction and Sale Hearing* [Docket No. 111].

14. On October 22, 2015, the Bid Deadline was extended to October 26, 2015 and the Auction was rescheduled for October 28, 2015. *See Notice of Adjournment of Auction* [Docket No. 119].

15. On October 27, 2015, the Sale Hearing was adjourned to November 9, 2015 and the date of the Auction was adjourned to a date yet to be determined. *See Notice of Adjournment of Auction and Sale Hearing* [Docket No. 123].

16. On November 5, 2015, the Sale Hearing and Auction were again adjourned, however the Debtor indicated that the new dates had yet to be determined. *See Notice of Adjournment of Auction and Sale Hearing* [Docket No. 128].

17. The Committee understands that the Debtor intends to seek approval of the Sale to a purchaser who is an affiliate of the Insiders. The Committee will file an objection to the Sale at the appropriate time. However, the Committee's initial concerns with the proposed Sale are: (i) the Sale will provide negative consideration to the estate; (ii) the proposed asset purchase agreement will include provisions which will release valuable estate claims, including the Insider Causes of Action; and (iii) the value of the releases sought to be purchased in connection with the Sale will exceed the proposed Sale price by a substantial margin.

C.  **Debtor's Corporate Structure and Management**

18. In 2008, JMCK acquired Direct Brands, Inc. (FEI's predecessor).[1] JMCK is a wholly owned subsidiary of Najafi. *See* First Day Affidavit at ¶ 11.

19. In 2012, DVD Direct acquired FEI. *Id.* at ¶¶ 11-12. DVD Direct is a wholly owned subsidiary of Pride Tree. *Id.*

---

[1] *See* Jeffrey A. Trachtenberg, "Direct Brands Names Deborah Fine as CEO" Wall Street Journal, Sept. 30, 2009, http://www.wsj.com/articles/SB125423636119049509 (last accessed Nov. 14, 2015) ("Direct Brands ... is closely held by Najafi Cos., of Phoenix[.]") A copy of this, and all other articles cited in the Motion, is attached hereto as **Exhibit A**.

20. Bookspan is "indirectly owned by Pride Tree and is therefore an affiliate of the Debtor." *Id.* at ¶ 18. Upon information and belief, Najafi is also the prior owner of Bookspan.[2]

21. TAW is "indirectly owned by Pride Tree and is therefore an affiliate of the Debtor." *Id.* at ¶ 21.

22. John Lippman is the Debtor's chief executive officer. *See* First Day Affidavit at Exhibit I; *see also, NYS Department of State, Division of Corporations, Entity Information for Filmed Entertainment Inc.* dated November 2, 2015, attached hereto as **Exhibit B**.

### D. Facts Supporting Potential Causes of Action Against the Insiders to be Brought on Behalf of the Estate

23. In connection with its statutory duties, the Committee has begun investigating the Debtor's pre-petition operations and payments. However, upon information and belief, it appears that the Debtor has paid millions of dollars to its Insiders at the direction of Management from which it received no value in return.

24. For example, from August of 2008 through 2012, while the Debtor's business was deteriorating, the Debtor paid JMCK not less than $29,599,000 in dividends. Further, these payments included $14,583,000 in connection with the acquisition of SkyMall, an entity that later filed for bankruptcy in January of 2015. In addition, the Debtor also paid to JMCK not less than $6,269,000 for "management fees" during the same time period along with paying millions of dollars of other indirect costs that benefited JMCK exclusively. These costs include but are not limited to, closing costs and administrative costs related to the SkyMall acquisition. Further, in 2011, the Debtor advanced to JMCK the sum of $1,506,000 to cover certain severance obligations that JMCK was required, for some reason to guarantee. It does not appear that JMCK has repaid this advance to the Debtor. As a result, the Committee believes that these payments are fraudulent transfers under section 548 of the Bankruptcy Code and applicable state law as they were made when the Debtor was already insolvent or on the verge of insolvency, the

---

[2] *See* "Najafi Companies Sells Direct Brands" Publishers Weekly, Feb. 5, 2013, http://www.publishersweekly.com/pw/by-topic/industry-news/industry-deals/article/55832-najafi-companies-sells-direct-brands.html (last accessed Nov. 14, 2015). A copy of this article is attached hereto as Exhibit A.

Debtor did not receive reasonably equivalent value, and resulted in JMCK being unjustly enriched to the detriment of general unsecured creditors.

25.     Moreover, upon information and belief, Pride Tree, directly and through its affiliates, has received significant sums from the Debtor despite the Debtor's rapidly deteriorating financial condition. Namely, upon information and belief, the owner of Pride Tree, an entity named Treasure Island Advisors, LLC, received a management fee of $15,000 in 2012. In addition, when Pride Tree purchased the Debtor in 2012, an existing loan that the Debtor had made to an affiliate of JMCK in the amount of $14,600,000 was cancelled. It does not appear that any consideration was provided to the Debtor in return.

26.     Upon information and belief, Pride Tree used its ownership of Bookspan and TAW – entities that manage all of the Debtor's administrative functions as the Debtor has no employees – to extract additional value from the Debtor by charging grossly inflated amounts for the services that it provided. While monthly payments were much higher in past years, Bookspan currently charges the Debtor $187,500 per month. Based on the Debtor's sales receipts for September 2015 ($300,000), this results in the Debtor paying Bookspan a fee equal to more than 60% of its sales.

27.     Similarly, despite the Debtor's financial issues, the salary of Pride Tree's chief executive officer John Lippmann, also the CEO of the Debtor, was doubled in March of 2013 from $350,000 to $700,000. These payments by the Debtor were clearly fraudulent transfers under both section 548 of the Bankruptcy Code and applicable state law as the services provided to the Debtor by Bookspan, TAW and John Lippman did not constitute reasonably equivalent value for the payments made by the Debtor.

28.     Upon information and belief, Bookspan also received no less than $647,479.13 of payments during the ninety (90) day period occurring prior to the Petition Date (the "**Preference Period**"), including a $187,500 payment less than a week before the Petition Date. Further, several of these payments were made mere days after the invoice date which is entirely inconsistent with the Debtor's prior payment history. Upon information and belief, all payment

decisions during the Preference Period were made by John Lippmann, who also conveniently controls Bookspan.

29. Finally, TAW, another entity controlled by Pride Tree, received $209,183.62 of payments during the Preference Period. Like Bookspan, one of the payments in the amount of $42,020.55 was made less than a week before the Petition Date. Moreover, many of the Debtor's payments were made a few days after the invoice date, which, again, is entirely inconsistent with the Debtor's payment history prior to the Preference Period.

30. Upon information and belief, Mr. Lippmann authorized these payments to the detriment of other general unsecured creditors that did not get paid.

## RELIEF REQUESTED

31. By this Motion, the Committee requests that the Court convert the Chapter 11 Case to a case under Chapter 7. In the alternative, the Committee seeks authority to initiate and prosecute an adversary proceeding to recover various preferential payments and fraudulent transfers made to the Insiders. To the extent such challenge is resolved in favor of the Committee, the Debtor and all parties in interest in the Chapter 11 Case, including general unsecured creditors, will benefit.

## JURISDICTION AND VENUE

32. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

33. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105(a), 1103(c)(5), 1109(b) and 1112(b).

# ARGUMENT

### A.  This Chapter 11 Case Should be Converted to a Case Under Chapter 7 of the Bankruptcy Code

34. Section 1112(b) of the Bankruptcy code identifies grounds for conversion of a chapter 11 case to a case under chapter 7. *See* 11 U.S.C. § 1112(b). Upon the request of a party in interest, the Court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under chapter 11 unless it determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the debtor's estate.[3] *See* 11 U.S.C. § 1112(b)(1).

35. Section 1112(b) of the Bankruptcy Code provides examples of specific types of "cause" to convert or dismiss.[4] 11 U.S.C. § 1112(b)(4). One particular example of "cause" is particularly applicable here: the "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." *See* 11 U.S.C. § 1112(b)(4)(A). The Debtor's business has been "in decline for approximately two decades." *See* First Day Affidavit at ¶ 7. The Debtor's business remains in decline. *See* Corporate Monthly Operating Report for the reporting period August 11, 2015 through September 30, 2015 [Docket No. 117] ("**MOR**") at page 5. As reflected in the MOR, the Debtor suffered a net loss of $423,000 since the Petition Date and this is <u>without</u> payment of all administrative claims, including payments owed to the Office of the United States Trustee and professional fees. *See FRGR Managing Member*, 419 B.R. at 581 (courts have held that continuing to incur quarterly U.S. Trustee fees and legal fees may also constitute a continuing loss for purposes of this prong).

---

[3] However, the Bankruptcy Code also provides circumstances under which a Court may not convert or dismiss a case filed under chapter 11 if the Court "finds unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate[.]" *See* 11 U.S.C. § 1112(b)(2). These grounds include reasonable likelihood that a plan will be confirmed and/or reasonable justification for an act or omission by the debtor. Neither of these circumstances is present in the Chapter 11 Case.

[4] Although no longer one of the specifically enumerated examples of cause, courts have also held that cause for conversion or dismissal exists if a debtor "ostensibly filed a chapter 11 case to reorganize, 'but has no reasonable prospects of confirming a plan.'" *See In re FRGR Managing Member LLC*, 419 B.R. 576, 582 (Bankr. S.D.N.Y. 2009) (citing 7 COLLIER ON BANKRUPTCY at ¶ 1112.04[5][B]) (collecting cases)).

36. In the instant Chapter 11 Case, the net loss reported on the MOR speaks for itself. In addition, mounting professional fees and administrative expenses demonstrate that there are substantial and continuing losses to (and diminution of) the Debtor's estate. There is no reason to continue paying significant and disproportional management fees to the Debtor's affiliates controlled by certain Insiders, the propriety of which the Committee challenges herein, when the Debtor's business is hemorrhaging cash and continuing to lose both customers and an ability to purchase content to sell to its remaining customers. Moreover, there is no reason to continue to pay estate professionals as there is virtually no possibility of plan confirmation. Accordingly, it is in the best interests of the estate and the creditors that the Chapter 11 Case be converted to a chapter 7 case. *See In re Adbrite Corp.,* 290 B.R. 209, 220-221 (Bankr. S.D.N.Y. 2003) (court held that that there was cause to convert a chapter 11 case to chapter 7 case when, among other reasons, the debtor had no employees and limited assets); *see also, Moody v. Sec. Pacific Bus. Credit, Inc.*, 85 B.R. 319, 346 (W.D. Pa. 1988) (holding that the fact that a debtor is a corporate shell and without a business, will support a finding that it is unable to effectuate a plan, and conversion or dismissal is proper).

37. Courts in this district have granted motions to convert or dismiss under very similar circumstances, where the debtor has limited assets of dubious and/or speculative value. *See, e.g., In re Photo Promotion Assocs., Inc.*, 47 B.R. 454, 459 (S.D.N.Y. 1985) (granting motion to convert or dismiss because the debtor had no real assets, the debtor had neither a plan nor the wherewithal to emerge from its "dismal financial picture," and the creditors "should not be required to sustain further erosion to their prospects of some recovery in order to support the debtor's unprofitable business gamble at their expense"); *FRGR Managing Member*, 419 B.R. at 583 (granting motion to convert when debtor's only real asset was hotly-contested litigation); *AdBrite Corp.*, 290 B.R. at 219 (granting motion to convert because, *inter alia*, debtor had only one real asset—a patent—that it was unable to market or commercialize given its lack of employees and business operations). As in the above cases, the Debtor should not be permitted to park itself in Chapter 11 indefinitely with only the vaguest hope that its assets will sell.

38. As the Debtor acknowledges in the First Day Affidavit, its business has been declining for nearly two decades. In addition, based on the offers the Debtor has received for its assets to date, the asset values referenced in its Schedules are not realizable. In fact, the most compelling offer the Debtor has received is from an affiliate of one of the Insiders and is premised mainly on releasing certain of the Insider Causes of Action. Accordingly, the instant sale process, with numerous delays and a yet to be determined Auction date, demonstrates that the Debtor does not have a real exit strategy. The Debtor should not be allowed to delay this process any further especially where the estate may be administratively insolvent and there is virtually no prospect for a plan to be confirmed.

**B.    In the Alternative, the Committee Should Be Authorized to Prosecute Insider Causes of Actions on behalf of the Debtor's Estate**

39. If the Court chooses not to convert the Chapter 11 Case to Chapter 7 of the Bankruptcy Code, the Committee seeks authorization to prosecute the Insider Causes of Action on behalf of the estate as the Debtor is unable to consent to bring claims against Insiders. Moreover, the potential benefit the Insider Causes of Action will provide to the estate far outweighs any delay or cost that may occur should the Committee be permitted to prosecute them on the estate's behalf.

**1.    Authority for Derivative Standing**

40. Courts have authorized Official Committees of Unsecured Creditors to prosecute an action on behalf of a debtor's estate upon (a) consent of the debtor or when the debtor is either unable or unwilling to pursue the claim; (b) if it can demonstrate a "colorable claim"; and (c) the action is "likely to benefit the reorganization estate." *See Unsecured Creditors Committee of Debtor STN Ent., Inc. v. Noyes (In re STN Ent.)*, 779 F.2d 901, 905 (2d Cir. 1985); *Official Committee of Unsecured Creditors of Commodore Int'l Ltd. v. Gould*, (*In re Commodore Int'l Ltd.*), 262 F.3d 96, 100 (2d Cir. 2001) ("we hold that a creditors' committee may sue on behalf of the debtor, with the approval and supervision of a bankruptcy court, not

-11-

only where the debtor in possession unreasonably fails to bring suit on its claims, but also where the trustee or debtor in possession consents").

41. While the Bankruptcy Code does not expressly confer power on creditors' committees to pursue claims on behalf of a debtor's estate, the Committee has an "implied, but qualified" right under 11 U.S.C. §§ 1103(c)(5) and 1109(b) to initiate an action on behalf of the Debtor's estate upon approval of the Bankruptcy Court. *See In re Copperfield Invest., LLC*, 421 B.R. 604, 610 (Bankr. E.D.N.Y. 2010) (citing *STN*); *see also, Adelphia Communications Corp. v. Bank of America N.A. (In re Adelphia Communications Corp.)*, 330 B.R. 364, 372-73 (Bankr. S.D.N.Y. 2005) (holding that the practice of authorizing the prosecution of actions on behalf of an estate by committees is one of "long standing, and nearly universally recognized"). This authority ensures that where the debtor unreasonably fails to pursue a claim for the benefit of the estate, or cannot do so effectively because of conflicts of interest, the creditors' committee will step into its shoes and prosecute the claim as a representative of the estate. *See In re Caldor Corp.*, 303 F.3d 161, 166 n.2 (2d Cir. 2002) (citing *STN*, 779 F.2d at 904); *Commodore,* 262 F.3d at 100.[5] Thus, this Court has authority under the Bankruptcy Code (and by virtue of the foregoing caselaw) to designate the Committee as the estate representative for purposes of pursuing the Insider Causes of Action as described herein. *See STN*, 779 F.2d at 904; *see also, Cybergenics*, 330 F.3d at 566-68.

42. There is more than ample reason to delegate authority to the Committee to bring the Insider Causes of Action on behalf of the Debtor's estate. It is understood that a debtor is obligated to maximize the value of its estate for the benefit of its creditors. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) ("[t]he trustee is accountable for all property received, and has the duty to maximize the value of the estate") (internal citations and quotation omitted). Accordingly, a debtor is duty bound to pursue claims and defenses that will increase the value of its estate. *See, e.g., Commodore*, 262 F.3d at 99 ("[a debtor] has an

---

[5] *Commodore* held that a committee may bring an estate action "even where the debtor has not unjustifiably refused to do so" if the debtor consents and the action is in the best interest of bankruptcy [Unclear] "and is fair and necessary." *Commodore*, 262 F.2d at 100.

-12-

obligation to pursue all actions that are in the best interests of creditors and the estate") (citing *In re Spaulding Composites Co.*, 207 B.R. 899, 904 (B.A.P. 9th Cir. 1997)). However, if a debtor is unable to fulfill its statutory obligation to maximize the value of its estate (as in the instant Chapter 11 Case), "[t]he practice of authorizing the prosecution of actions on behalf of an estate by committees . . . upon a showing that such is in the interests of the estate, is one of long standing, and nearly universally recognized." *Adelphia*, 330 B.R. at 373. This "provides creditors and other stakeholders with the comfort that potentially valuable (and sometimes critical) claims on behalf of the estate will be prosecuted — without requiring bankruptcy judges to . . . resort[] to much more draconian or ineffective mechanisms to ensure the prosecution of those claims, with the destruction to going concern value and creditor recoveries that would frequently be the result." *Id.* Indeed, "[t]he primary purpose of the [creditors'] committee is to represent the interests of all general unsecured creditors and to maximize distribution to them." *In re Life Service Systems, Inc.*, 279 B.R. 504, 510 (Bankr. W.D. Pa. 2002), *rev'd on other grounds*, 327 B.R. 561 (W.D. Pa. 2005).

43. In the instant case, the Debtor's current chief executive officer, John Lipmann, is also the chief executive officer of Pride Tree. Moreover, the Debtor's two affiliates, Bookspan and TAW, are also owned by Pride Tree. During the Preference Period alone, the Debtor paid substantial sums to Insiders. As salaries paid to members of the Debtor's management and amounts paid to Pride Tree and certain affiliates controlled by Pride Tree are the subject of the Insider Causes of Action, it is obvious that the Debtor is unable to challenge these payments.[6] In contrast, the Committee, which represents creditors holding more than $30 million in claims[7], stands ready to protect the interests of the bankruptcy estate and, if appropriate, hold all responsible parties accountable. The failure to authorize the Committee to challenge the substantial payments made to Insiders and potentially others prior to and after the

---

[6] While the Debtor may argue that an independent director is making many decisions on behalf of the Debtor, the Debtor is still unlikely to bring any of the Insider Causes of Action.

[7] The Debtor asserts that it has approximately $800,000 of allegedly secured debt as of the Petition Date.

Petition Date, will result in an unconscionable loss to the Debtor's estate and unsecured creditors, and confer an unjust benefit on the Insiders. *See Louisiana World Expos. v. Fed. Ins. Co.,* 858 F.2d 233, 249 (5th Cir. 1988)("[i]f a valid -- and potentially profitable -- cause of action exists . . . which the debtor-in-possession may assert on behalf of the corporation, all creditors are harmed when the debtor-in-possession refuses to pursue it. The value of the estate is not maximized and the ultimate recovery of all creditors is diminished" (emphasis in original)).

44. Moreover, strong bankruptcy policies suggest that the Court should interpret the *STN* standard to permit the Committee to challenge potentially fraudulent transfers and conveyances made to the Debtor's insiders of the Debtor's property. First, section 1103(c)(2) of the Bankruptcy Code specifically charges the Committee with investigating the acts, conduct and liabilities of the Debtor and other matters. This authority would be of little value if the Committee cannot prosecute claims when the Debtor declines or is practically unable to do so. Second, the Debtor is effectively disabled from bringing the causes of action (or even consenting to the Committee's standing to do so), as the Insider Causes of Action implicate the Debtor's present management, parent company, and affiliated companies controlled by the parent company, no policy supports rewarding prospective defendants defenses or powers that they do not already have.

**2.    Colorable Claims Exist Against the Insiders**

45. Case law construing requirements for "colorable' claims" makes it clear that the required showing is a relatively easy one to satisfy. In *STN*, the Second Circuit eschewed an extensive merits review, requiring instead 'a colorable claim . . . for relief that *on appropriate proof* would support a recovery.'" *In re Adelphia Communications Corp.*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005) (quoting *STN*, 779 F.2d at 905) (emphasis in *STN*). Courts considering the issue have equated the "colorable" standard with the general standard for a pre-answer motion to dismiss for failure to state a claim. *See In re Copperfield Invest.,* 421 B.R. at 609 (citing *Official Comm. Of Unsecured Creditors of the Debtor v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999)(further citations omitted)).

Courts have also found that such authority "should be denied only if the claims are 'facially defective'[.]"  *Official Comm. of Unsecured Creditors of America's Hobby Center, Inc. v. Hudson United Bank (In re America's Hobby Center, Inc.)*, 233 B.R. 275, 288 (Bankr. S.D.N.Y. 1998)).

46. To establish that the proposed claims are "colorable" for the purpose of obtaining authority to bring an action on behalf of the Debtor's estate, the Committee need only show that relief may possibly be available in that the Insider Causes of Action are "potentially meritorious."  *See Official Committee of Unsecured Creditors v. Fishbein & Co., PC*, 1992 WL 196768, at *2 n.3 (E.D. Pa 1992); *see also STN*, 779 F.2d at 905 (the claim must be one that "on appropriate proof would support a recovery").  In other words, a committee need only provide minimal evidentiary basis for its allegations, and the court should not conduct a "mini-trial" to determine whether such a claim exists.  *See In re Copperfield Invest.,* 421 B.R. at 609 (citing *STN*, 779 F.2d at 905).  However, a court should assure itself that the delay and costs to the debtor's estate such litigation may generate are justifiable under the circumstances.  *Id.*

47. As demonstrated herein, the Insider Causes of Action are clearly colorable.  If no action is taken by the Committee, creditors will likely lose the only potential for recovery available to them in this Chapter 11 Case and the Insiders will be inappropriately enriched.

### 3. Allowing the Committee to Pursue the Insider Causes of Action will Benefit the Estate

48. The benefit of litigating the Insider Causes of Action clearly justifies the cost, and demonstrates the patent unjustness of the Debtor's inability to pursue them.  Although the Committee need not demonstrate a likelihood of success on the merits of the Insider Causes of Action at this time, *Adelphia*, 330 B.R. at 386, the Court should nevertheless consider whether permitting the Committee to assert the Insider Causes of Action is in the best interests of the estate.  *Id.* at 383 (footnote omitted); *In re Copperfield Invest.,* 421 B.R. at 609 (citing *STN*, 779 F.2d at 905).  To this end, the Court should "assure itself that there is a sufficient likelihood of

success to justify the anticipated delay and expense to the [estate] that the initiation and continuation of litigation will likely produce." *STN*, 779 F.2d at 905-06. Stated another way, asserting the Insider Causes of Action against the Insiders should be a "sensible expenditure of estate resources" that will, "if proven, provide a basis for recovery." *Adelphia*, 330 B.R. at 386.[8]

49. Courts determining whether to authorize derivative standing consider whether there is a benefit to the estate. *See Cybergenics*, 330 F.3d at 564-65; COLLIER at ¶ 1109.05[2][c]. In weighing this factor, courts ordinarily perform a cost-benefit analysis, as set forth in *STN*. If the benefit to the estate is likely to outweigh the cost of pursuing the action, the court may authorize a party in interest to pursue the claim. *STN*, 779 F.2d at 905-06. The cost-benefit analysis is not a mechanical exercise; its aim is to ascertain whether the best interests of the estate require the prosecution of claims when the debtor-in-possession is unable or unwilling to do so. There is no minimum threshold of benefit to the estate so long as colorable claims, if successful, "would provide a sufficient recovery" to justify pursuit of the action. *KDI Holdings*, 277 B.R. at 519 (finding a benefit to the bankruptcy estate without setting forth a specific amount for the potential recovery).

50. As with the determination of whether the claims are colorable, the Court should not hold a "mini-trial" on the likelihood of success of the claim. *In re Copperfield Invest.,* 421 B.R. at 609 (citing *STN*, 779 F.2d at 905-906). Rather, the Court may conduct its analysis on the basis of the Committee's allegations, and need only find a sufficient likelihood of success to justify any delay and expense to the bankruptcy estate that the initiation and continuation of the litigation may produce. *STN*, 779 F.2d at 906; *see also, KDI Holdings*, 277 B.R. at 519; *Hobby Center,* 223 B.R. at 282 (citing *Tennessee Valley Steel Corp. v. B.T. Commercial Corp. (In re Tennessee Valley Steel Corp.),* 183 B.R. 795 (Bankr.E.D.Tenn.1995)

---

[8] As was stated in *Adelphia*, the Court "must be mindful of the purposes for its inquiry. It is not for the protection of defendants sued or to be sued by a committee on behalf of an estate, whose defenses can be fully and fairly considered in the plenary litigation to be prosecuted . . . . Rather, the purpose of the bankruptcy court's gatekeeper role is to protect the *estate*, to ensure that the litigation reasonably can be expected to be a sensible expenditure of estate resources, and will not impair reorganization." *Id*. (emphasis in original).

("Determining whether the Committee has asserted colorable claims in its [complaint] is not the equivalent of determining whether the Defendants are entitled to summary judgment")).

51. The stakes in the Chapter 11 Case, by any measure, are more than sufficient to justify the relief requested herein. If the Insider Causes of Action described herein are resolved in favor of the Committee, assets available to be distributed to general unsecured creditors will be materially increased. It is beyond coincidence that the Debtor's business has been in a free fall for the last twenty years. Likewise, it is uncontroverted that the Insiders received tens of millions of dollars from the Debtor through the Petition Date. Accordingly, the Insider Causes of Action are certainly "colorable" on their face. Moreover, the Committee believes that formal discovery directed at the Insiders will further substantiate and strengthen the Insider Causes of Action and potentially demonstrate other claims against Insiders. Undoubtedly, from the facts adduced to date, the cost of pursuing this action simply does not outweigh the potential benefit to be gained by the Debtor's estate. This conclusion is bolstered by the fact that the Debtor has yet to receive a real offer for its assets.

### 4. The Debtor's Refusal to Pursue the Insider Causes of Action is Unjustifiable

52. Another inquiry in the derivative standing analysis is whether a debtor's inaction in pursuing a cause of action is "unjustifiable." *Cybergenics*, 330 F.3d at 566-67. Derivative standing should be granted where a debtor unjustifiably or unreasonably refuses to pursue claims that the Bankruptcy Court finds would benefit the estate. *See Cybergenics*, 330 F.3d at 568; *see also, In re The V Companies*, 292 B.R. 290 (B.A.P. 6th Cir. 2003); *Commodore*, 262 F.3d at 100 (holding that the debtor's refusal to pursue the claims was unjustified and unreasonable and granting a creditor derivative standing). If a debtor fails to pursue litigation that is likely to benefit its estate, such failure is unjustifiable. *See, e.g., STN*, 779 F.2d at 905. "The 'unjustifiable failure' of a debtor to bring the suit itself does not require an improper motive for the failure. Rather, a debtor's failure to bring a claim is deemed to be unjustifiable when a committee has presented a colorable claim that on appropriate proof would support recovery, and

the action is likely to benefit the reorganization estate." *Adelphia*, 330 B.R. at 374, n.19 (citing *STN*, 779 F.2d at 905). A creditor need only show that a debtor was "unable or unwilling to pursue claims" on the estate's behalf. *In re Newcorn Enterprises Ltd.*, 287 B.R. 744, 749 (Bankr. E.D. Mo. 2002) (quotation omitted). *See also, Louisiana World*, 858 F.2d at 253 ("[w]here the interests of an estate and its creditors are impaired by the refusal of a trustee or a debtor-in-possession to initiate adversary proceedings to recover property of the estate . . . that refusal [is] unjustified").

53. As set forth above, the Debtor's failure to pursue the Insider Causes of Action will cause substantial harm to the estate by potentially forfeiting, for no consideration, valuable assets that could otherwise be used to satisfy the claims of unsecured creditors. Based upon its investigation to date and the potential substantial recoveries to the Committee's constituency, the Committee would be remiss in its duties not to bring the Insider Causes of Action as it appears that: (i) millions of dollars were looted from the Debtor prior to the Petition Date by the Insiders; and (ii) funds continue to be paid to Bookspan and TAW that provide no benefit to anyone other than the Insiders.

54. Indeed, it is necessary and beneficial to the Debtor's bankruptcy estate that the Insider Causes of Action be pursued at this time to ensure that the Chapter 11 Case is fairly resolved from the standpoint of general unsecured creditors. Because the Debtor cannot willingly commit to pursuing an action against the Insiders, including one or more members of its current Management, it is necessary for the Court to authorize the Committee to pursue the Insider Causes of Action against the Insiders. The Debtor's inability to challenge payments made to Insiders mandates that the Committee be authorized to do so in order to protect the estate's interests.

## **NOTICE**

55. The Committee provided notice of this Motion to: (a) the Office of the United States Trustee; (b) Griffin Hamersky P.C.; (c) Archer & Greiner, P.C.; (d) Najafi Companies LLC; (e) Bookspan LLC; (f) Totally Awesome Warehouse LLC; (g) JMCK Corp.;

(h) DVD Direct Acquisition, LLC; (i) Pride Tree Holdings Inc.; and (j) those persons who have formally appeared and requested service in the Chapter 11 Case pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

56. In light of the nature of the relief requested, the Committee respectfully submits that no further notice is necessary.

## NO PRIOR APPLICATION

57. No prior application for the relief sought herein has been made to this or any other Court.

**WHEREFORE**, the Committee respectfully requests that the Court (i) convert the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or in the alternative, (ii) authorize and grant standing to the Committee to bring the Insider Causes of Action; and (iii) grant the Committee such other and further relief as the Court deems just and appropriate.

Dated: November 16, 2015                          **LOWENSTEIN SANDLER LLP**

                                                  By: */s/ S. Jason Teele*
                                                  S. Jason Teele, Esq.
                                                  Jeffrey J. Wild, Esq.
                                                  Cassandra M. Porter, Esq.
                                                  Eric Chafetz, Esq.
                                                  1251 Avenue of the Americas
                                                  New York, New York 10020
                                                  (212) 262-6700 (Telephone)