| | |
|---|---|
| **GRIFFIN HAMERSKY P.C.** | Hearing Date:   November 23, 2015 |
| 485 Madison Avenue, 7th Floor | Hearing Time:   11:00 a.m. (New York Time) |
| New York, New York 10022 | |
| Telephone: (212) 710-0338 | |
| Facsimile: (212) 710-0339 | |
| Scott A. Griffin | |
| Michael D. Hamersky | |

Counsel for the Debtor
and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
                                                                     :

In re:                                            :            Chapter 11
                                                              :

FILMED ENTERTAINMENT INC.,        :            Case No. 15-12244 (SCC)
                                                            :

                          Debtor.[1]                 :
                                                             :
---------------------------------------------------------------X

**DECLARATION OF GLENN LANGBERG IN SUPPORT OF AN ORDER (A)
APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN
CONNECTION WITH THE SALE, AND (C) GRANTING RELATED RELIEF**

        I, Glenn Langberg, make this Declaration under 28 U.S.C. § 1746 and state that:

        1.        I am older than 21 years of age and suffer no legal disability.

        2.        I am an independent director of Filmed Entertainment Inc., the debtor and debtor in possession (the "Debtor" or the "Seller") in the above-captioned chapter 11 case (the "Chapter 11 Case"). I have served in this capacity since November 1, 2014, and prior to becoming an independent director I had provided strategic consulting services to the Debtor commencing May 1, 2014. In these capacities, I have become generally familiar with the day-to-day operations, business and financial affairs of the Debtor.

---
[1]    The last four digits of the Debtor's federal tax identification number are 3867.

3.      Unless otherwise stated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my restructuring and bankruptcy consulting experience; and (c) information provided by the Debtor's management, Bookspan LLC ("Bookspan") personnel, and the Debtor's professionals concerning the operation and finances of the Debtor, and its outstanding and projected liabilities.  I am authorized to submit this declaration on behalf of the Debtor, and if called upon to testify, I could and would testify competently to the facts set forth herein.

**Personal Qualifications**

4.      I am the founder and Chief Executive Officer of GRL Capital Advisors, a firm providing consulting and financial services to, *inter alia*, distressed and underperforming entities. I have a Bachelor of Arts degree from Brandeis University, where I am currently a Fellow.  I have more than 25 years of experience as a corporate executive in finance and real estate and more than 16 years of specific financial restructuring experience.  I have served in a variety of capacities for troubled entities in both in-court and out-of-court scenarios, including, as chief executive officer, chief restructuring officer and director.  In certain of these roles and on behalf of such entities, I have appeared before various courts, including the United States Bankruptcy Courts for the District of Delaware and the District of New Jersey.

5.      I submit this Declaration for all permissible purposes under the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence in support of the Debtor's Motion, dated September 10, 2015 (the "Sale Motion") [Dkt. No. 80],[2] for entry of an Order (a) approving a sale of the Acquired Assets, free and clear of all

---

[2] Unless otherwise indicated, capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Sale Motion, or the Purchase Agreement (as defined below).  The definitions in the Purchase Agreement shall govern any inconsistency with the definitions in the Sale Motion.

2

liens, claims and encumbrances and other interests except as expressly assumed in the Purchase Agreement, to Edge Line Ventures LLC (the "Buyer"); (b) approving certain procedures related to the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale; and (c) related relief (collectively, the "Sale Transaction").

### The Chapter 11 Case/Entry of the Bidding Procedures Order

6.     On August 10, 2015, the Debtor's commenced a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

7.     On September 10, 2015, the Debtor filed the Sale Motion.  On September 28, 2015, the Bankruptcy Court entered the Order (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets; (B) Scheduling an Auction and a Sale Hearing Related Thereto; and (C) Approving the Form of Notice of the Auction and Sale Hearing (the "Bidding Procedures Order") [Dkt. No. 101].

8.     The Bidding Procedures Order established October 15, 2015 as the initial Bid Deadline.

### Overview of the Debtor's Business Operations

9.     The Debtor's business consists of its ownership and operation of the Columbia House DVD Club,[3] which functions under a "club model" consisting typically of three components: (a) an up-front offer for consumers to join the club (e.g., "Buy one DVD get one Free"); (b) members' participation in a "negative option cycle;" and (c) members' obligation to purchase a specified number of DVDs at full price over a certain period of time.  Club membership can be cancelled at any time after this purchase obligation is fulfilled.

---

[3]  The Debtor also operated the Columbia House CD Club before exiting the business line in 2010.

3

10. Additionally, during the time members remain active, they can purchase DVDs at their discretion from a wide selection of titles. Such purchases are commonly referred to as "positive orders," and comprise a substantial amount of the club's sales.

11. The Debtor is able to offer its movies and television series titles through licensing arrangements (the "Licenses") with major film studios and smaller independents. Under these Licenses, the Debtor was granted rights to sell the studios' existing catalog and new release titles for a specific term.

12. Significantly, however, these Licenses contain various restrictions on how and when the Debtor may sell certain titles (including a general restriction that titles may only be sold under the club model, and not at retail). Further, the Debtor's licensing rights only covered physical DVDs and do not include the rights to digital movie formats.

## The Sale Process

### *The Debtor's Marketing Efforts*

13. The Debtor, through its financial advisors, PricewaterhouseCoopers LLP ("PwC"), was persistent in its efforts to engage potential purchasers in the sale process from prior to the Petition Date up through the Bid Deadline. A detailed description of the Debtor's prepetition and postpetition marketing efforts are set forth in the Declaration of Adam Rosen in Support of the Sale [Dkt. No. 140], filed contemporaneously herewith.

14. Unfortunately, and despite PwC's best efforts, the Acquired Assets, which broadly consist; of (a) the Licenses, (b) the Debtor's inventory, and (c) good will, did not garner the acquisition interest from the market that the Debtor anticipated.

4

***Issues Concerning the Debtor's Assets***

15. <u>The Licenses</u>.  As noted above, the Licenses contain various restrictions on how and when the Debtors may sell DVDs.  Further, many of the Licenses were "non-exclusive" in nature, which, pursuant to the Bankruptcy Code, limited the Debtor's ability to freely assign various rights thereunder.  Finally, a number of the Licenses will expire in short order and contain limited renewal rights.  When taken as a whole, I believe these factors made the Licenses less attractive to potential purchasers who would effectively have to renegotiate the terms of each of the Licenses, since certain of the underlying studios refused to constructively participate in the sale process or otherwise negotiate License renewals with interested parties.

16. <u>The Debtor's Inventory</u>.  I believe under a best-case scenario, much of the inventory in the Debtor's possession could be sold to a purchaser, who could then sell such product to a consumer under the club model.  I further believe under a worst-case scenario, the Debtor's ability to market and sell its inventory would be hamstrung by the interpretation of certain studios claiming that the Debtor has no ability to do so.  Unfortunately, I believe the disputed inventory claims by certain studios have created enough uncertainty in the marketplace to scare away potential purchasers.  I believe the amounts at issue, and the position by these studios would potentially result in inefficient litigation, rendering any victory on inventory ownership disputes essentially pyrrhic in nature.

17. <u>Good Will</u>.  While Columbia House's good name remains unsullied, the playing field has not dramatically changed since this Chapter 11 Case was filed.  I believe, the devastating effect on the Debtor's business had by new e-commerce entrants, automated DVD kiosk rental providers, and digital downloading and streaming services, was perceived by many potential third-party purchasers to be too large an obstacle to overcome.

5

### *Extension of the Bid Deadline/Receipt of Bids*

18.  Significantly, the Debtor did not receive any bids for its assets prior to the October 15, 2015 Bid Deadline. Accordingly, on October 14, 2015, the Debtor filed the Notice of Adjournment of Auction and Sale Hearing [Dkt. No. 111] that, in accordance with the Bidding Procedures, (a) extended the Bid Deadline to October 22, 2015 (the "First Amended Bid Deadline"), and (b) adjourned the Sale Hearing to October 30, 2015.

19.  On October 22, 2015, the Debtor received a bid from Edge Line Ventures LLC (the "Buyer"), which it did not consider to be a Qualified Bid (as defined in the Bidding Procedures). The Buyer is an acquisition entity formed by Pride Tree Holdings, Inc., the parent entity of the Debtor, to, *inter alia*, purchase the Acquired Assets as a going concern.

20.  Since the Debtor had yet to receive a Qualified Bid by the First Amended Bid Deadline, the Debtor filed a Notice of Adjournment of Auction [Dkt. No. 119] that, in accordance with the Bidding Procedures, further extended the First Amended Bid Deadline to October 26, 2015, while it engaged with interested parties in an effort to obtain a Qualified Bid.

21.  The Debtor received an additional bid from a third-party (the "Third-Party Bidder") on October 26, 2015, which it did not consider to be a Qualified Bid. The Third-Party Bidder's bid provided consideration of $100,000 and the assumption of certain liabilities. To provide itself with additional time the Debtor filed a Notice of Adjournment of Sale Hearing [Dkt. No. 123] that, in accordance with the Bidding Procedures, adjourned the Sale Hearing to November 9, 2015.

22.  Accordingly, in an attempt to increase the value of the respective bids, I and/or the Debtor's professionals negotiated with the Buyer and the Third-Party bidder tirelessly. However, the Third-Party Bidder was unwilling to enhance its offer. Accordingly, the Debtor

6

did not qualify the Third-Party Bidder as a Qualified Bid and therefore, did not hold an Auction for the Acquired Assets.

23. On November 5, 2015, the Debtor filed the Notice of Adjournment of Sale Hearing [Dkt. No. 128] that, in accordance with the Bidding Procedures, adjourned the Sale Hearing to a date to be determined. The Debtor used the additional time afforded by this adjournment to engage in multiple rounds of negotiations with the Buyer.

24. Ultimately, for the reasons set forth herein, the Buyer proved to be the only Qualified Bidder to emerge from the lengthy bidding and negotiation process.

*Purchase Agreement – Summary of Key Terms*

25. Following several rounds of negotiations, the parties agreed to the following Sale Transaction, subject to Bankruptcy Court approval, all of which is set forth in the Asset Purchase Agreement by and between the Seller and the Buyer, dated as of November 16, 2015 (the "Purchase Agreement"):

- The Purchase Price will be $425,000 in cash consideration (an increase of $200,000 from the Buyer's original offer);

- Seller will assume and assign the Madison Avenue Lease to the Buyer. The Buyer will turn over the Designated Sublease Profits for the benefit of the Debtor's creditors in an amount not to exceed $684,061;

- Buyer will assume $475,000 in administrative expense payments due to the Debtor's affiliates, Bookspan and Totally Awesome Warehouse LLC ("TAW");

- Buyer will agree to satisfy all additional unpaid and unaccrued post-petition administrative expenses, which are estimated to be, but not limited to, $55,000;

- Buyer will agree to fund certain additional Wind-Down Costs in the amount of $116,250;

- Buyer will agree to cure monetary defaults under the Assumed Contracts, up to the aggregate amount of $78,098 (the "Cure

7

    Amounts"), which will reduce the aggregate amount of general unsecured claims by a corresponding amount;

- Buyer and Seller agree to a mutual release of all claims against each other and each of its affiliates including, but not limited to: (i) the Seller's release of any Avoidance Actions against Bookspan TAW, Books Acquisition LLC, Incredible Warehouse Holding Company LLC, DVD Direct Acquisition LLC, and Pride Tree Holdings, Inc., and each of its officers and directors (the "Released Avoidance Actions"); and (ii) the Buyer's waiver of any and all Claims in the Chapter 11 Case, including, but not limited to, the following Claims, which will be disallowed and expunged from Schedule F of the Debtor's Schedule of Assets and Liabilities [Dkt. No. 65]: (a) Claim Number 165090 in the amount of $1,214,180.72 in favor of Bookspan; and (b) Claim Number 165128 in the amount of $21,939.45 in favor of TAW.

- All other Avoidance Actions, including, but limited to, those against JMCK Corp., Najafi Companies, Bertelsmann Inc., Blackstone Group, Sony Corporation or Warner Bros. Entertainment Inc. are excluded from the Acquired Assets and are expressly preserved for the estate (the "Retained Avoidance Actions").

### *Adequate Consideration and Business Judgment*

26. In consummating the Sale Transaction, the Seller and I have relied upon the Debtor's books and records and financial projections as certified in the Declaration of Jim Cavanaugh in Support of the Sale [Dkt. No. 139], filed contemporaneously herewith, which is incorporated by reference. As noted therein, Bookspan provides all of the Debtor's accounting functions pursuant to an intercompany services agreement.

27. As set forth in the Rosen Declaration, the Debtor's books and records and financial projections were available for inspection by any interested party and were in fact shared with several.

28. Mr. Cavanaugh and the Debtor's professionals have advised me that the Sale Transaction will: (i) satisfy the Debtor's secured creditor in full; (ii) satisfy all of the current and future administrative expense claims in the Chapter 11 Case; (iii) result in recoveries in

8

excess of those that would be achieved if the Debtor was liquidated under chapter 7 of the Bankruptcy Code; and (iv) provide for a distribution to general unsecured creditors.

29. Additionally, the Debtor's professionals have conducted an analysis of the Released Avoidance Actions and have advised me that the prospect for any meaningful recovery in a timely and efficient manner is unlikely. Furthermore, the magnitude of recovery, and likelihood of success on account of the Retained Avoidance Actions, could potentially lead to additional recoveries for general unsecured creditors.

30. I believe that the Buyer's bid for the purchase of the Acquired Assets, as set forth in the Purchase Agreement is fair and reasonable and is the highest or otherwise best offer received for the Acquired Assets. Accordingly, I believe that the Debtor has reasonably exercised its sound business judgment in pursuing the Sale Transaction, which I further believe to be in the best interests of the Debtor, its estate, and creditors.

*Good Faith Seller*

31. The negotiations with the Debtor and the Buyer leading up to the execution of the Purchase Agreement involved extensive arms-length bargaining between the parties, each represented by competent legal counsel. The Debtor's professionals and I were responsible for proposing and/or negotiating the terms on behalf of the Debtor. The Debtor's efforts to market and sell the Acquired Assets have been made in good faith.

32. I am not aware of any fraud, collusion or bad faith in or relating to the negotiations leading up to the execution of Purchase Agreement, the request to consummate the Sale Transaction, or in any other matter involving the Sale Transaction.

33. I am not aware of any agreement by the Debtor, the Buyer, or any other party, pursuant to which any party has agreed to provide or receive consideration or

compensation that has not been disclosed to the Bankruptcy Court in connection with approval of the Purchase Agreement, or that would be inconsistent with a good faith finding by the Bankruptcy Court.

34. The Buyer has not made offers of employment or compensation, to the Debtor's current or former officers or board members as a condition to closing the Sale Transaction.

I declare under the penalty of perjury that the foregoing statements are true and correct.

Dated: November 17, 2015

/s/ Glenn Langberg
Glenn Langberg
Independent Director
Filmed Entertainment Inc.