Hearing Date: December 2, 2015 at 2:00 p.m. (ET)
Objection Deadline: November 24, 2015 at 5:00 p.m. (ET)

**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

*Counsel for the Official Committee of Unsecured Creditors
of Filmed Entertainment Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FILMED ENTERTAINMENT INC.,<br><br>                                    Debtor. | Chapter 11<br><br>Case No. 15-12244 (SCC) |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION AND
RESERVATION OF RIGHTS TO THE DEBTOR'S MOTION FOR ENTRY OF:
(I) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) SCHEDULING AN
AUCTION AND A SALE HEARING RELATED THERETO, AND (C) APPROVING
THE FORM OF NOTICE OF THE AUCTION AND SALE HEARING; AND (II) AN
ORDER (A) APPROVING SUCH SALE FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (B) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE, AND
(C) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 case (the "**Chapter 11 Case**") of the above-captioned debtor-in-possession (the "**Debtor**") submits this objection and reservation of rights (the "**Objection**") to *Debtor's Motion for Entry of: (i) an Order (a) Approving Bidding Procedures for the Sale of Substantially all of the Debtor's Assets, (b) Scheduling an Auction and a Sale Hearing Related Thereto, and (c) Approving the Form of Notice of the Auction and Sale Hearing; and (ii) an Order (a) Approving Such Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests, (b) Authorizing*

*the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale, and (c) Granting Related Relief* (the "**Sale Motion**")[1] [Docket No. 80]. In support of this Objection, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT

1. If the goal of selling assets in a bankruptcy proceeding is to maximize an estate's value, the proposed Sale (defined below) accomplishes just the opposite. The Debtor proposes to sell its assets (including releases of valuable causes of action) to one of its insiders, Edge Line Ventures LLC ("**Edge Line**" or the "**Buyer**"), in return for nominal consideration. For example, among the assets to be sold are the Debtor's accounts receivable, which, reduces the purchase price of $425,000 by more than seventy-five (75%) percent. Also, the Debtor is assigning a valuable real estate lease to the Buyer, but the estate is only receiving a portion of the value associated with the lease in return. In a Chapter 7 case, the entire potential value of the lease will inure to the benefit of the estate. Finally, although the Sale provides for the payment of certain wind down costs, it does not provide for the payment of all priority and administrative expenses claims, including Section 503(b)(9) claims, and/or the costs of winding down the estate. So, while the estate may be marginally solvent on an administrative basis immediately after the Sale closes, it will dive into administrative insolvency within a short period of time thereafter.

2. Moreover, the Sale provides for inappropriate releases of claims against Bookspan LLC ("**Bookspan**"), Totally Awesome Warehouse ("**TAW**"), DVD Direct Acquisition, LLC ("**DVD Direct**"), and Pride Tree Holdings, Inc. ("**Pride Tree**"), each of which are affiliates of one another and owned and controlled by Pride Tree (the Debtor's sole equity owner). *See* First Day Affidavit (defined below) at ¶ 12. Even on a conservative basis, these

---

[1] All capitalized terms used herein, but not otherwise defined, shall have the meaning ascribed to such term in the Sale Motion.

claims are worth over one million dollars. John Lippman signed the Edge Line bid on Buyer's behalf. Mr. Lippman, as the chief executive officer of the Debtor and Pride Tree, will also gain from the releases being provided to Bookspan, TAW, DVD Direct, and Pride Tree (collectively, the "**Insiders**") under the Sale.

3. It is beyond dispute that the Sale benefits only the Insiders (which will receive broad releases) and Edge Line. Finally the Sale is not an arm's length transaction and the Buyer is not a good faith purchaser. The Sale is an amalgamation of self-dealing and bad faith. The Buyer is controlled by the Debtor's chief executive officer, John Lippman, who is also a Pride Tree employee. Mr. Lippman is the Debtor's chief executive officer. *See* Debtor's petition dated August 10, 2015. Upon information and belief, Mr. Lippman received confidential Sale information before Edge Line submitted its bid. Moreover, Jim Cavanaugh, a Bookspan employee who functions as the Debtor's *de facto* chief financial officer, prepared the Debtor's cash forecasts, assets valuations and other financial information. Given the benefits of the Sale to Bookspan and TAW, and the close relationship between the Debtor, Mr. Lippman, Bookspan, TAW, and Pride Tree, none of Mr. Cavanaugh's financial analysis is credible.

4. The Committee has spent considerable time comparing the options of either the Sale or conversion of this case to chapter 7 of the Bankruptcy Code. After considering all of the circumstances surrounding the Sale, the Committee determined that converting the Debtor's case is in the best interest of all creditors. As such, the Committee is requesting that the Court deny approval of the Sale Motion and instead grant the Motion to Convert. Conversion to a case under Chapter 7 would yield significant recovery for general unsecured creditors.

## **RELEVANT BACKGROUND**

5. On August 10, 2015 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**"). The Debtor is operating its business and managing its property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. No trustee or examiner has been appointed in the Chapter 11 Case.

6. As of the Petition Date, "the Debtor ha[d] approximately $7 million in unsecured current liabilities, including trade payables and royalty licensing amounts due to movie studios, and approximately $56 million in legacy liabilities[.]" *See First Day Affidavit of Glenn Langberg Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* [Docket No. 2] (the "**First Day Affidavit**") at ¶ 24. The legacy liabilities include "approximately $20.1 million of long-term qualified pension liability" and "$10.2 million of long-term non-qualified pension liability." *Id.* The Debtor also owes approximately $725,000 on account of a secured claim. *See Declaration of Jim Cavanaugh on Behalf of the Debtor in Support of the Debtor's Motion for an Order (A) Approving Such Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale, and (C) Granting Related Relief* [Docket No. 139] (the "**Cavanaugh Declaration**") at Exhibit 1.

7. On August 18, 2015, the Office of the United States Trustee for Region 2 appointed the Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 34].

**A.    The Debtor's Sale Process**

8. According to the Debtor, prior to the Petition Date, it engaged "the restructuring group of PwC to advise it with respect to a range of operational and financial initiatives." *See*

First Day Affidavit at ¶ 44. The Debtor began exploring various alternatives, including the sale of its assets, in October 2014. As of the Petition Date, the Debtor "continue[d] to actively market its assets[.]" *Id.* at ¶ 47.

9. The Sale Motion seeking authority to sell all of the Debtor's assets ("**Sale**) was filed on September 10, 2015. An order approving the bid procedures proposed in the Sale Motion was entered on September 28, 2015 [Docket No. 101] (the "**Bid Procedures Order**"). As reflected in the Bid Procedures Order:

- the deadline to submit a bid for the Debtor's assets was October 15, 2015 (the "**Bid Deadline**");

- an auction was scheduled to commence on October 16, 2015 (the "**Auction**"); and

- a hearing to approve the sale was scheduled to take place on October 20, 2015 (the "**Sale Hearing**").

*See* Bid Procedures Order at ¶¶ 3, 6, and 7.

10. Since the Bid Procedures Order was entered, the Bid Deadline, Auction and Sale Hearing were rescheduled multiple times. *See* (i) *Notice of Adjournment of Auction and Sale Hearing* [Docket No. 111]; (ii) *Notice of Adjournment of Auction* [Docket No. 119]; (iii) *Notice of Adjournment of Auction and Sale Hearing* [Docket No. 123]; and (iv) *Notice of Adjournment of Auction and Sale Hearing* [Docket No. 128].

11. On November 16, 2015, the Debtor filed the *Notice of Sale Hearing* [Docket No. 138] ("**Sale Hearing Notice**") which fixed November 23, 2015 at 11:00 a.m. as the new date for the Sale Hearing. The Sale Hearing was subsequently adjourned again to December 2, 2015. *See Notice of Adjournment of Sale Hearing* [Docket No. 147].

12. On November 17, 2015, in addition to the Cavanaugh Declaration, the Debtor filed various declarations also in support of the Sale including the *Declaration of Adam Rosen in*

-5-

*Support (A) an Order Approving the Sale of Substantially all of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale, and (C) Granting Related Relief* [Docket No. 140] (the "**PwC Declaration**"), and the *Declaration of Glenn Langberg in Support (A) an Order Approving the Sale of Substantially all of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale, and (C) Granting Related Relief* [Docket No. 141] (the "**Langberg Declaration**").

13. On November 23, 2015, the Buyer filed the *Declaration of John Lippman on Behalf of the Buyer in Support of Finding of Good Faith and Adequate Assurance of Future Performance in Connection with Debtor's Motion for an Order (A) Approving the Sale of Substantially all of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale, and (C) Related Relief* [Docket No. 150] (the "**Lippman Declaration**"). The Lippman Declaration indicates that Edge Line has $550,000 of available funds to satisfy the cash portion of the Sale. *See* Lippman Declaration at ¶ 8. Further, Pride Tree advanced $50,000 to Edge Line to be used as its Sale deposit. *Id.*

14. Prior to the filing of the Sale Hearing Notice, the Committee filed the *Motion of the Official Committee of Unsecured Creditors (I) to Convert the Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code; or, in the Alternative, (II) for an Order Authorizing the Committee to Prosecute Certain Causes of Action on Behalf of the Debtor's Estate* (the "**Motion to Convert**") seeking either the conversion of the Debtor's case to a case under

-6-

Chapter 7 of the Bankruptcy Code or for standing to prosecute Insider Causes of Action (as defined in the Motion to Convert) on behalf of the Debtor's estate. A hearing to consider the Motion to Convert is also currently scheduled for December 2, 2015. *See* Docket No. 147.

### B. "Good Faith" Bid for Substantially All of the Debtor's Assets

15. An asset purchase agreement dated November 16, 2015 (the "**APA**") with Edge Line was annexed as an exhibit to the Sale Hearing Notice. The APA is executed on behalf of Edge Line by its "Manager" John Lippman. *See* Lippman Declaration at ¶ 2. Mr. Lippman is "also an officer of the Debtor and ... Pride Tree[.]" *Id.* at ¶ 3. According to the Debtor's petition, Mr. Lippman is more than an "officer of the Debtor" - he is the chief executive officer.[2] Upon information and belief, Mr. Lippman is also the chief executive officer of Pride Tree, the owner of Bookspan and TAW.

16. Edge Line seeks to pay $425,000 for substantially all of the Debtor's assets. *See* APA at ¶ 3.1. This amount, however, is misleading as Edge Line also seeks to purchase the Debtor's accounts receivable. Upon information and belief, the portion of the Debtor's collectible accounts receivable is approximately $345,000. Thus, if the accounts receivable are netted out against the cash purchase price, the cash portion of the Buyer's bid is $105,000. Moreover, it is unclear from the Lippman Declaration that Edge Line has sufficient liquidity to complete the Sale given that it has limited funds available (about $125,000) above the cash portion of the Sale price. However, the Buyer has identified additional cash needs such as "Wind Down Costs" of $116,250, cure costs of $78,098 and other amounts. *See* Lippman Declaration at ¶ 9.

---

[2] Mr. Lippman is also identified as the Debtor's chief executive officer in the New York Department of State, Division of Corporations, Entity Information record for Filmed Entertainment Inc., https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_nameid=3347613&p_corpid=3331714&p_entity_name=Filmed%20Entertainment&p_name_type=A&p_search_type=BEGINS&p_srch_results_page=0 (last updated Nov. 20, 2015).

17. In addition, Edge Line is seeking to share the proceeds (approximately $52,449 per month) of the Madison Avenue Sublease with the Debtor's estate. *See* APA at Definition of "Designated Net Sublease Profits" and Cavanaugh Declaration at Schedule 1. However, if the proceeds of the Madison Avenue Sublease turn out to be more than $52,449 per month, those additional amounts would go to Edge Line instead of the Debtor's estate. Finally, while Edge Line is responsible for up to $41,203 of the cure costs associated with the Madison Avenue Sublease, upon information and belief, that amount could be much higher resulting in a significant unfunded liability for the Debtor's estate. *See* APA at Definition of "Designated Net Sublease Profits" and APA at Schedule 2.3.

18. Further, Edge Line is agreeing to pay certain winddown costs, including, "Administrative Services (I/C)" in the amount of $96,250 (payable to Bookspan) and "Distribution Services (I/C)" in the amount of $20,000 (payable to TAW). *See* APA at Schedule 3.6. Both of these companies are owned by Pride Tree and controlled by John Lippman. The winddown costs, however, do not include the payment of all administrative and priority claims, including, but not limited to, any Section 503(b)(9) claims, or actual winddown costs, including the costs associated with preparing a liquidating plan and disclosure statement.

19. Also, while the Debtor notes that there is a valid $725,000 secured claim against the estate, there is no indication how that claim is being paid. *See* Cavanaugh Declaration at Schedule 1. The Debtor and Edge Line also ignore the fact that the Pension Benefit Guaranty Corporation (the "**PBGC**") is also asserting a significant secured claim against the Debtor's estate.

20. Pursuant to the APA, in return for the purchase of substantially all the Debtor's assets for nominal consideration, the Debtor is also seeking to release potentially valuable

preference and fraudulent transfer claims against the Insiders for no consideration.[3] *See* APA at Exhibit 3.4. Upon information and belief, and as described in the Motion to Convert, Bookspan and TAW collectively received no less than $840,000 of payments during the ninety day preference period prior to the Petition Date (May 12, 2015 and August 9, 2015) (the "**Preference Period**"). In addition, both Bookspan and TAW received extremely large payments ($187,500 for Bookspan and $42,020.55 for TAW) in the week prior to the Petition Date. These eve-of-bankruptcy payments were made significantly earlier than most of the Debtor's prior payments to either Bookspan or TAW made prior to the Preference Period. In addition, upon information and belief, John Lippman decided which payments the Debtor made during the Preference Period.

21. The Committee received historical data related to payments by the Debtor to Bookspan between March 6, 2014 and May 1, 2015 (the "**Bookspan Pre-Preference History**"). Based on the Committee's calculations, the average days-to-pay during the Bookspan Pre-Preference Period is 30 days-to-pay. Applying an extremely conservative +/- 15 day range off of the average, the Committee calculates that the Debtor made payments to Bookspan between 15 and 45 days after invoice date (the "**Bookspan OCB Range**") during the Bookspan Pre-Preference History. Applying the Bookspan OCB Range to the payments made during the Preference Period to Bookspan, the Committee determined that Bookspan has a minimum preference exposure of $586,103.22.[4]

---

[3] While this discussion of potential preference claims is based on the assumption that neither Bookspan nor TAW are insiders under Section 101 (31) of the Bankruptcy Code, the Committee believes that a compelling argument can be made that (i) both entities are in fact insiders and (ii) the potential claims against both Bookspan and TAW are much larger due to the one year lookback period.

[4] The Committee was not provided with subsequent new value information for Bookspan and Bookspan has yet to file a proof of claim detailing the $1,214,180.72 that it is referenced in the Debtor's schedules. *See Global Notes and Statement of Limitations, Methodology, and Disclaimer Regarding the Debtor's Schedules and Statements of Financial Affairs*, Schedule F [Docket No. 65].

22. The Committee also received historical data related to payments by the Debtor to TAW between January 28, 2014 and May 5, 2015 (the "**TAW Pre-Preference History**"). Again, applying an extremely conservative +/- 15 day range off of the average, the Committee calculates that the Debtor made payments to TAW between 9 and 39 days after the invoice date (the "**TAW OCB Range**") during the TAW Pre-Preference History. Applying the TAW OCB Range to the payments made during the Preference Period to TAW, the Committee determined that TAW has a minimum preference exposure of $167,025.30.[5]

23. Pursuant to the APA, the Debtor is also waiving, for no consideration, valuable fraudulent transfer claims against Pride Tree, TAW, and Bookspan. For example, upon information and belief, Pride Tree, directly and through its affiliates, received significant sums from the Debtor despite the Debtor's rapidly deteriorating financial condition. Namely, upon information and belief, in 2012, the Debtor paid a management fee of $15,000 to the parent entity of Pride Tree, Treasure Island Advisors, LLC. In addition, when Pride Tree purchased the Debtor in 2012, an existing loan that the Debtor had made to an affiliate of JMCK Corp. in the amount of $14,600,000 was cancelled. It does not appear that any consideration was provided to the Debtor in return.

24. Further, upon information and belief, Pride Tree used its ownership of Bookspan to extract additional value from the Debtor by charging grossly inflated amounts for the services that it provided. While monthly payments were much higher in past years, Bookspan currently charges the Debtor $187,500 per month for services. Based on the Debtor's sales receipts for September 2015 (approximately $300,000), this results in a fee equal to more than 60% of the

---

[5] The Committee was not provided with new value information for TAW, but notes that TAW is only scheduled for a claim in the amount of $21,939.45. *See Global Notes and Statement of Limitations, Methodology, and Disclaimer Regarding the Debtor's Schedules and Statements of Financial Affairs*, Schedule F [Docket No. 65]. Accordingly, any subsequent new value would be *de minimis.*

Debtor's sales. Similarly, despite the Debtor's financial issues, upon information and belief, the salary of Mr. Lippman was doubled in March of 2013 from $350,000 to $700,000. These payments by the Debtor were clearly fraudulent transfers under both section 548 of the Bankruptcy Code and applicable state law as the services provided to the Debtor by Pride Tree, Bookspan, and Mr. Lippman did not constitute reasonably equivalent value for the payments made by the Debtor.

## **OBJECTION**

25. For the Court to approve the Sale, it must be in the best interests of the Debtor's estate. *See* 11 U.S.C. § 363(b); *In re GSC, Inc.*, 453 B.R. 132, 173-74 (Bankr. S.D.N.Y. 2011). In determining whether to authorize the use, sale or lease of property of the estate outside the ordinary course of business, courts require a debtor to show that there is a sound business justification for the transaction. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)("a debtor applying under § 363(b) carries the burden of demonstrating that a use, sale or lease out of the ordinary course of business will aid the debtor's reorganization").

26. However, where, as is the case here, the proposed sale is to an insider of the Debtor, the Court <u>must</u> apply a heightened standard. *See In re Bidermann Industries U.S.A., Inc.*, 203 B.R. 547 (Bankr. S.D.N.Y. 1997). In a sale to an insider, the business judgment rule is only applied as a shield to corporate decisions when the following elements are present "(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *Id.* at 552; *see also, In re Borders Group, Inc.*, 453 B.R. 477 (Bankr. S.D.N.Y. 2011) (stating that business decisions are not afforded the same deference from the court in the presence of "self-interest"); *In re Innkeepers USA Trust*, 448 B.R. 131 (Bankr. S.D.N.Y. 2011) (the business judgment

15-12244-scc    Doc 152    Filed 11/24/15    Entered 11/24/15 14:39:03    Main Document
Pg 12 of 14

15-12244-scc    Doc 152    Filed 11/24/15    Entered 11/24/15 14:39:03    Main Document
Pg 12 of 14

presumption does not protect corporate decision makers or their decisions from judicial second-guessing in the absence of disinterestedness). In addition, as required in the Local Amended Guidelines for the Conduct of Asset Sales, "the motion must disclose what measures have been taken to ensure the fairness of the sale process and the proposed transaction." *See* Bankruptcy Court for the Southern District of New York, Amended Guidelines for the Conduct of Asset Sales, ¶ D.1.

27.  Here, the business judgment rule should not apply because it is clear that Edge Line is an insider, the Sale is not a disinterested arms-length transaction, and the APA was negotiated in bad faith. John Lippman is an officer of both the Debtor and Edge Line. Mr. Lippman is also the chief executive officer of Pride Tree, the private equity fund that owns the Debtor. Further, Pride Tree owns Bookspan and TAW, the two entities that extracted hundreds of thousands of dollars from the Debtor up until the week prior to the Petition Date and are receiving broad releases under the APA. In addition, upon information and belief, Jim Cavanaugh, the controller of Bookspan, reports to Mr. Lippman as Mr. Lippman also controls Bookspan through his ownership of Pride Tree. Thus, the information included in Mr. Cavanugh's declaration must be thoroughly vetted by the Court when determining whether the transaction contemplated in the APA is in the best interest of the Debtor's estate. Most significantly, the releases of Pride Tree, Bookspan TAW (all parties affiliated in some way with Mr. Lippman) for virtually no consideration raise numerous red flags.

28.  To satisfy the heightened standard, the Debtor must also establish the following: (i) a sound business purpose for the Sale; (ii) the proposed Sale price is fair and reasonable; (iii) the Debtors have provided adequate and reasonable notice; and (iv) the buyer has acted in good faith. *In re Boston Generating, LLC*, 440 B.R. 302, 329-30 (Bankr. S.D.N.Y. 2010). The only

one of these factors that the Debtor may potentially satisfy is the third factor. In fashioning its findings, the *Lionel* Court noted that it should not "blindly follow the hue and cry of the most vocal special interest groups" and "act to further the diverse interests of the debtor, creditors and equity holders, alike." *In re Lionel Corp.*, 722 F.2d at 1071.

29. The purchase price that Edge Line is agreeing to pay for the Debtor's assets is neither fair nor reasonable. As an initial matter, the Committee believes that general unsecured creditors would receive a greater return in a Chapter 7 liquidation. For example, while Edge Line is agreeing to pay $425,000 for the Debtor's assets, it is also purchasing approximately $345,000 of accounts receivable. *See* APA at Schedule 2.1. The accounts receivable are netted out against the cash purchase price, the actual cash portion of the bid is approximately $105,000. Likewise, Edge Line is entitled to receive any proceeds in excess of $52,449.00 per month that are generated from the Madison Avenue Sublease, where in a Chapter 7 case the estate would receive all of the potential proceeds. *See* Cavanaugh Declaration at Schedule 1 and APA at Definition of "Designated Net Sublease Profits". In addition, the cure costs associated with the Madison Avenue Sublease that Edge Line is responsible for are capped at $41,303, but upon information and belief, those costs could be much greater and also be the responsibility of the Debtor's estate. *See* APA at Schedule 2.5. Further, it is unclear how there will be sufficient funds to satisfy the $725,000 secured claim against the estate or the PBGC's secured claim. *See* Cavanaugh Declaration at Exhibit 1. Finally, the winddown costs that Edge Line is willing to pay do not include, the payment of among other items, Section 503(b)(9) claims, and the costs associated with preparing a liquidating plan and disclosure statement.

30. Most significantly, the Debtor is releasing numerous valuable preference and fraudulent transfer claims against Pride Tree, Bookspan and TAW. In return for the release of

-13-

very valuable claims, the Debtor's estate is not receiving any consideration. If a Chapter 7 trustee was appointed, the causes of action would be fully and impartially vetted and the proceeds would inure to the benefit of the Debtor's estate.

### RESERVATION OF RIGHTS

31.    The Committee reserves the right to supplement this Objection at any time. The Committee and expressly reserves its rights to raise additional or further objections to the Sale Motion and/or the APA at or prior to the Sale Hearing and at any subsequent hearing.

**WHEREFORE**, the Committee respectfully requests that the Court (i) deny the Sale Motion and instead grant the Committee's Motion to Convert, and (ii) grant the Committee such other and further relief as the Court deems just and appropriate.

Dated: November 24, 2015

**LOWENSTEIN SANDLER LLP**

By: /s/ S. Jason Teele
S. Jason Teele, Esq.
Jeffrey J. Wild, Esq.
Cassandra M. Porter, Esq.
Eric Chafetz, Esq.
1251 Avenue of the Americas
New York, New York 10020

*Counsel for the Official Committee of Unsecured Creditors of Filmed Entertainment Inc.*