Hearing Date: December 2, 2015 at 2:00 p.m. (New York Time)

**GRIFFIN HAMERSKY P.C.**
485 Madison Avenue, 7th Floor
New York, New York 10022
Telephone: (212) 710-0338
Facsimile: (212) 710-0339
Scott A. Griffin
Michael D. Hamersky

Counsel for the Debtor
and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                              :
In re:                                        :       Chapter 11
                                              :
FILMED ENTERTAINMENT INC.,                    :
                                              :       Case No. 15-12244 (SCC)
                    Debtor.[1]                :
                                              :
-------------------------------------------------------------x

## DEBTOR'S OPPOSITION TO MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (I) CONVERT THE CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE; OR, IN THE ALTERNATIVE, (II) FOR AN ORDER AUTHORIZING THE COMMITTEE TO PROSECUTE CERTAIN CAUSES OF ACTION ON BEHALF OF THE DEBTOR'S ESTATE

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

        The debtor and debtor in possession in the above-captioned case (the "Debtor") hereby files this statement in opposition (the "Objection") to the Motion of the Official Committee of Unsecured Creditors to (i) Convert the Chapter 11 Case to A Case Under Chapter 7 of the Bankruptcy Code; or, In the Alternative, (ii) for an Order Authorizing the Committee to Prosecute Certain Causes of Action on Behalf of the Debtor's Estate (the "Conversion Motion") [Dkt No. 130]. In support of this Objection, the Debtor respectfully states as follows:

---

[1]    The last four digits of the Debtor's federal tax identification number are 3867.

## I.  PRELIMINARY STATEMENT

In a veiled attempt to usurp the Debtor's business judgment for selecting the Modified Purchase Agreement,[2] in connection with the sale of substantially all of its assets, the Committee has filed the Conversion Motion.   Unable to challenge the propriety of the sale process or carry its heavy burden of demonstrating that the Debtor's business decision should be disregarded, the Committee tries a different strategy - diversion in the form of a request to convert the Chapter 11 Case to a case under chapter 7 or, *coincidentally,* derivative standing to prosecute claims that are contemplated for release under the Modified Purchase Agreement, releases that are a key component of the transaction.   Although the Committee seeks to convert the case, it is abundantly clear that its real goal is to prematurely obtain standing to commence litigation on claims of the estate, including those being released under the Modified Purchase Agreement – an end run to properly challenging the Debtor's business judgment.

Importantly, however, the Committee fails to establish the existence of either of the grounds for "cause" necessary to convert the Chapter 11 Case under section 1112(b)(4)(A) of the Bankruptcy Code.[3]   It contends that cause exists because (a) the Debtor allegedly has lost money during its mere three month stay in bankruptcy, and (b) there allegedly is no prospect for a confirmable liquidating plan in this case.   The Committee's allegations are remarkable given that it was completely aware, prior to filing the Conversion Motion, that the consideration offered under the Modified Purchase Agreement not only provides the path to a confirmable liquidating chapter 11 plan, but would also lead to unsecured creditor recoveries under such plan.

---

[2]    Capitalized terms used in this Preliminary Statement, but not otherwise defined, shall have the meanings ascribed to them below in the body of this Objection.

[3]    The Committee relies on section 1112(b)(4)(A) of the Bankruptcy Code as the statutory basis to convert the Chapter 11 Case.  *See* Conversion Motion ¶ 35.

Additionally, and inexplicably, the Committee fails to explain why the added cost and delay associated with the conversion of the case and the appointment of a chapter 7 trustee would be in the best interests of its creditors or this estate.  It has not because it cannot.

Again, the Committee's true motivation here is to override a deal with which it disagrees.  It, however, has no legal basis to do so, and should not be able to under the cloak of an improper request for derivative standing. There is simply no basis for derivative standing, and; particularly, as it relates to such standing, the Debtor is completely justified in its release of the claims specified under the Modified Purchase Agreement.

The facts are irrefutable. The Debtor has no other viable alternatives other than the Modified Purchase Agreement.  It engaged in a comprehensive sale process, reached out to a wide range of potentially interested parties, extended the deadline multiple times for various third-parties to submit bids and participate at an auction, all while continuing to assist those parties in providing additional information about the Debtor in an effort to facilitate bid submissions.  It was only after the Debtor took these steps did its Independent Director commence extensive arm's length negotiations with the Buyer, negotiations that resulted in multiple increases of consideration and numerous concessions from the initial bid submitted by the Buyer.

The Debtor's decision to select the Modified Purchase Agreement as the Successful Bid represents its selection of an offer providing ***firm consideration*** - consideration that will lead to the imminent filing of a liquidating plan upon Court approval of the sale -  and an offer that is in the best interests of all creditors of the estate.  The Debtor has no obligation to pursue speculative recoveries from litigation suggested by the Committee under released claims. For these reasons, and as discussed in further detail below, the Conversion Motion should be denied.

## II. RELEVANT FACTUAL BACKGROUND

### A. The Chapter 11 Case

1.      On August 10, 2015 (the "Petition Date"), the Debtor filed a voluntary petition (the "Chapter 11 Case") in this Court for relief under Chapter 11 of the Bankruptcy Code.[4]

2.      No trustee or examiner has been appointed in the Chapter 11 Case.

3.      The factual background regarding the Debtor, including its operations, its capital and debt structure, and the events leading to the filing of this Chapter 11 Case, is set forth in detail in the Affidavit of Glenn Langberg, filed under Local Bankruptcy Rule 1007-2 in support of the Debtor's chapter 11 petition and various first day applications and motions (the "Affidavit") [Dkt. No. 2], and is incorporated herein by reference.[5]

### B. The Creditors' Committee and Information Requests

4.      On August 18, 2015, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the official committee of unsecured creditors (the "Committee") [Dkt. No. 34].

5.      Upon its appointment, the Debtor advised the Committee of its intent to conduct an expedited sale of substantially all of its assets pursuant to section 363 of the Bankruptcy Code.  The Debtor further advised the Committee that it would provide the Committee with any information it needed in evaluating the same.

---

[4]   Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in the order approving, among other things, bidding procedures in connection with the sale of substantially all of the Debtor's assets, including all exhibits thereto (the "Bidding Procedures Order") [ Dkt. No. 101].

[5]   In support of the Sale, the Debtor filed the declarations of Jim Cavanaugh, the Controller of Bookspan, LLC (the "Cavanaugh Declaration") [Dkt. No. 139]; Adam Rosen of PricewaterhouseCoopers LLP ("PwC"), a Director of the Debtor's retained financial advisors (the "Rosen Declaration") [Dkt. No. 140]; and Glenn Langberg, the Debtor's Independent Director (the "Langberg Declaration") [Dkt. No. 141] (collectively, the "Sale Declarations"), each of which are incorporated herein by reference.

6.      On August 21, 2015, the Committee sent the Debtor a twenty-four question information request, which included inquiries relating to certain prepetition transfers. *See* Exhibit A, at A001-03[6].

7.      On September 2, 2015, the Debtor granted the Committee access to an electronic "data room," which contained documents and information responsive to its information request (the "Committee Data Room"). The Debtor updated the contents of the Committee Data Room on a rolling basis. *See* Exhibit A, at A007-08; *see* Exhibit B, at B007-08[7].

8.      On September 22, 2015, at the request of the Committee, Debtor representatives and Bookspan personnel participated in a call with the Committee's professionals, during which the Debtor discussed the payments to Bookspan and TAW and answered each of the Committee's questions regarding the same. *See* Exhibit A, at A004-05.

9.      On September 28, 2015, the Debtor received a subsequent information request from the Committee, requesting documents and information relating to certain transfers made by the Debtor to Bookspan, LLC ("Bookspan") and Totally Awesome Warehouse, LLC ("TAW"). *See* Exhibit A, at A006.

10.     On October 7, 2015, the Committee requested additional information regarding approximately $33 million in transfers (the "2012 Transfers") made to former insiders of the Debtor in 2012. *See* Exhibit A, at A009.

11.     On October 9, 2015, the Debtor uploaded documents to the Committee Data Room related to transfers made to Bookspan and TAW under their respective services

---

[6]    Attached hereto as Exhibit A are true and correct copies of communications between the Debtor's counsel and the Committee's counsel regarding the Committee's information requests and the Debtor's management of the data room.

[7]    Attached hereto as Exhibit B are true and correct copies of communications between the Debtor's counsel and the Committee's counsel regarding the Sale Motion, Bidding Procedures and Bidding Procedures Order.

agreements[8] with the Debtor, including detailed payment histories and copies of the underlying invoices satisfied by each payment. *See* Exhibit A, at A007-08.

12.     On October 19, 2015, the Debtor's professionals participated in an additional call with Committee's professionals to further discuss payments made to Bookspan and TAW.

13.     On October 22, 2015, the Debtor provided responsive information to the Committee regarding the 2012 Transfers. *See* Exhibit A, at A010.

**C. Sale Process**

i)     Filing of the Sale Motion and Entry of the Bidding Procedures Order

14.     On September 4, 2015, the Debtor conducted a call with the Committee to (a) advise it of the Debtor's intent to file a sale motion (the "Sale Motion") and (b) address any of the Committee's concerns. *See* Exhibit B, at B001. The Debtor allowed the Committee to comment on a number of the Sale pleadings, including but not limited to, the Bidding Procedures, and the Bidding Procedures Order. *See* Exhibit B at B002-008.

15.     At the hearing on September 9, 2015, the Committee advised the Court that it had been working very closely with the Debtor' with "virtually daily phone calls." Hr'g Tr. 11:13-17, Sept. 8, 2015 [Dkt. No. 112].

---

[8]     Bookspan performs the Debtor's administrative functions (including accounting, tax, treasury, legal, human resources, risk management, inventory and non-inventory purchasing), marketing functions (including creative, production, lettershop, promotional and strategic marketing, and list management), technology functions (including information technology, website and email operations and telecommunications), order processing functions (including transaction and payment processing, member account management, and invoicing) and certain other functions, pursuant to that certain Services Agreement between the Debtor and Bookspan, dated January 1, 2014, as amended from time to time (the "Bookspan Services Agreement").

TAW (i) performs the Debtor's invoicing, packing, shipping and processes returns of merchandise ordered by customers; (ii) inventory storage and maintenance; and (iii) delivers excess inventory to the Debtor's inventory liquidators for sale or as otherwise directed by the Debtor for disposal pursuant to that certain Fulfillment Services Agreement between the Debtor and TAW, dated January 1, 2015, as amended from time to time (the "TAW Services Agreement," together with the Bookspan Services Agreement, the "Intercompany Agreements").

16.     On September 10, 2015, the Debtor filed the Sale Motion [Dkt. No. 80], seeking approval to sell substantially all of its assets, and entry of an order approving the Bidding Procedures in conjunction with an Auction and Sale.

17.     On September 28, 2015, the Court entered the Bidding Procedures Order [Dkt. No. 101].

ii)     Debtor's Prepetiton Marketing Efforts

18.     Prior to the Petition Date, PwC sent "teasers" and nondisclosure agreements to 130 parties in an effort to market the Debtor's assets (the "Initial Parties"). Of the Initial Parties, approximately 20 signed nondisclosure agreements (the "Prepetition Interested Parties"). The Interested Parties were provided access to a comprehensive electronic data room (the "Sale Data Room"), containing the Debtor's key financial and operational information, and all of its relevant organizational and corporate documents. One of the Prepetition Interested Parties, engaged in specific negotiations with the Debtor regarding entering into a transaction that would include investment and a going concern acquisition of substantially all of the Debtor's assets. *See* Rosen Decl., ¶ 6.

19.     Subsequently, in late November 2014 and into 2015, the Debtor began negotiating the terms of a going concern sale with this Prepetition Interested Party, with the Debtor and the party exchanging term sheets outlining the prospective terms and conditions of an investment/acquisition. The parties, however, were unable to reach an agreement regarding a transaction. *See* Rosen Decl., ¶ 7.

iii)    Debtor's Postpetiton Marketing Efforts

20.     Continuing from the Debtor's extensive prepetition marketing efforts and subsequent to the commencement of the Debtor's Chapter 11 Case (in conjunction with the Debtor's marketing efforts under the Bidding Procedures Order), PwC re-contacted each of the 130 Initial Parties and engaged with 11 new parties (the "Postpetiton Interested Parties,"

collectively, with the "Prepetiton Interested Parties," the "Interested Parties") to determine the interest of those parties in acquiring the Debtor's assets. *See* Rosen Decl., ¶ 10. The Debtor's management and professionals also facilitated telephone conferences between certain of the Interested Parties and the Debtor's contract counterparties, including studios holding license agreements with the Debtor, to provide those Interested Parties with additional information regarding the Debtor's essential business relationships.

21.     Nine of the Postpetiton Interested Parties executed nondisclosure agreements and were granted access to the Sale Data Room. The Sale Data Room provided each of the Interested Parties equal access to the Debtor's books and records and financial projections. *See* Rosen Decl., ¶ 11.

22.     Throughout the postpetition marketing process, the Debtor and PwC actively assisted all of the Interested Parties by, *inter alia*, responding to numerous inquiries that the parties had regarding the Sale Data Room, the Acquired Assets, the Debtor's business operations, and providing additional information requested by the Interested Parties. *See* Rosen Decl., ¶ 12.

iv)     Bid Submissions

23.     The Bidding Procedures Order established (a) October 15, 2015 at 4:00 p.m. (New York Time), as the Bid Deadline; (b) October 16, 2015 at 10:00 a.m. (New York Time), as the Auction date in the event the Debtor received more than one Qualified Bid; and (c) October 20, 2015 at 10:00 a.m. (New York Time), as the Sale Hearing date.

24.     The Debtor, however, did not receive any bids prior to October 15, 2015. Langberg Decl., ¶ 18[9] The Debtor, nevertheless, remained engaged with numerous Interested Parties regarding diligence concerning the Acquired Assets and their potential submission of a bid.

---

[9] During this period, the Debtor was engaged with numerous Interested Parties regarding

25.    To allow parties additional time to submit a bid, the Debtor decided to extend the Bid Deadline from October 15, 2015 to October 22, 2015 [Dkt. No. 111]. *See* Rosen Decl., ¶ 13.

26.    On October 22, 2015, the Debtor received a bid from Edge Line Ventures LLC ("Edge Line" or the "Buyer").[10]  To that point, the Buyer had not expressed any interest in acquiring the Acquired Assets.  Upon receipt of this bid, PwC performed a thorough analysis of its financial terms, including utilizing the Debtor's financial information provided by Bookspan personnel, to assist the Debtor's Independent Director and its other professionals in determining whether the bid was a Qualified Bid. *See* Rosen Decl., ¶ 14.

27.    The Debtor did not consider the Buyer's initial bid to be a Qualified Bid and, as a result, the Independent Director negotiated vigorously and at arm's length with the Buyer to obtain an enhancement of its bid. *See* Langberg Decl., ¶ 19.

28.    The Bid Deadline was further extended to October 26, 2015 (the "Extended Bid Deadline") [Dkt. No. 119], in an effort to solicit additional bids from other third-parties and increase the value of the bid actually received from the Buyer. *See* Rosen Decl., ¶ 13.

29.    On October 26, 2015, the Debtor received a bid from a third-party (the "Third-Party Bidder"), which provided for cash consideration of $100,000 and the assumption of certain liabilities.  Upon receipt of this bid, PwC performed a thorough analysis of the bid's financial terms and worked with the Debtor's management, Bookspan personnel, and its other professionals to assist in determining whether the Third-Party Bidder's bid should be considered a Qualified Bid.  After an analysis of the bid, the Debtor determined that such bid was not a Qualified Bid. *See* Rosen Decl., ¶ 16; Langberg Decl., ¶21.

30.    The Debtor, however, remained actively engaged with the Third-Party Bidder.  Ultimately, the Third-Party Bidder was unwilling to increase its $100,000 offer, and the

---

[10]    The Buyer is an acquisition entity formed by Pride Tree Holdings, Inc., the parent entity of the Debtor.

Debtor decided that the Third-Party Bidder's bid was not a Qualified Bid under the Bidding Procedures. *See* Rosen Decl., ¶ 17; Langberg Decl., ¶ 22.

31.    Because the Debtor did not receive any Qualified Bids by the Extended Bid Deadline, it did not hold an Auction. *See* Rosen Decl., ¶ 17; Langberg Decl., ¶ 22.

32.    On November 5, 2015, the Debtor filed the Notice of Adjournment of Sale Hearing [Dkt. No. 128] adjourning the Sale Hearing to a date to be determined. The Debtor used the additional time afforded by this adjournment to engage in multiple rounds of negotiations with Edge Line. *See* Langberg Decl., ¶ 23.

a)    Edge Line Bid Negotiations

33.    Once it was determined that Edge Line was the sole serious bidder, the Debtor's Independent Director worked with PwC during multiple rounds of negotiations with the Buyer to perform a financial analysis of the bid terms and to determine whether the consideration offered under the Modified Purchase Agreement would be sufficient to provide meaningful recoveries to creditors in this Chapter 11 Case. *See* Rosen Decl., ¶ 18. PwC, specifically, advised the Debtor of the issues associated with the terms of each of the Buyer's bids and worked with the Debtor's Independent Director to obtain three different increases of consideration, and multiple concessions from the Buyer. *See* Rosen Decl., ¶ 19.

b)    Modified Purchase Agreement–Summary of Key Terms[11]

34.    Following several rounds of negotiations, the Debtor was able to increase the consideration in what would become the Successful Bid, and obtain several key concessions from Edge Line. *See* Rosen Decl., ¶ 19. With the inclusion of these key terms, the Debtor deemed Edge Line's revised bid a Qualified Bid. *See* Langberg Decl., ¶ 24.

---

[11]    The summary contained below is intended to provide the Court and parties in interest with the salient terms of the Modified Purchase Agreement, to the extent there are any inconsistencies between the summary description of the Modified Purchase Agreement and the actual agreement, the terms of the Modified Purchase Agreement shall control. Capitalized terms contained in the summary description that are not defined therein shall have the meanings ascribed to them in the Modified Purchase Agreement.

35.    The parties agreed to the following key terms, subject to Bankruptcy Court

approval, all of which are set forth in the Asset Purchase Agreement by and between the Seller

and the Buyer dated as of November 16, 2015 (the "Modified Purchase Agreement"):

(i)    A cash purchase price of $425,000 (a $200,000 increase of the cash consideration initially proposed by Buyer);

(ii)    Seller shall assume and assign the Madison Avenue Lease to the Buyer, who agrees to turn over the Designated Sublease Profits for the benefit of the Debtor's creditors in an amount not to exceed $684,061;

(iii)    Buyer agrees to assume $475,000 in administrative expense payments due to the Debtor's affiliates, Bookspan and TAW;

(iv)    Buyer agrees to satisfy all additional unpaid and unaccrued postpetition administrative expenses (except for amounts alleged to be payable to the Debtor studio vendors), which are estimated to be, but not limited to, $55,000;

(v)    Buyer agrees to fund certain additional Wind-Down Costs in the amount of $116,250;

(vi)    Buyer will agree to cure monetary defaults under the Assumed Contracts up to the aggregate amount of $78,098 (the "Cure Amounts"), which will reduce the aggregate amount of general unsecured claims by a corresponding amount;

(vii)    Buyer and Seller agree to a mutual release of all claims against each other and each of its affiliates including, but not limited to: (i) the Seller's release of any Avoidance Actions against Bookspan, TAW, Books Acquisition LLC, Incredible Warehouse Holding Company LLC, DVD Direct Acquisition LLC, and Pride Tree Holdings, Inc., and each of its officers and directors (the "Released Claims");[12] and (ii) the Buyer's waiver of any and all Claims in the Chapter 11 Case, including, but not limited to, the following Claims, which will be disallowed and expunged from Schedule F of the Debtor's Schedule of Assets and Liabilities [Dkt. No. 65]: (a) Claim Number 165090 in the amount of $1,214,180.72 in favor of Bookspan; and (b) Claim Number 165128 in the amount of $21,939.45 in favor of TAW; and

---

[12]    The Debtor's release of the Released Claims was a condition to the Buyer's entry into the Modified Purchase Agreement.

(viii)    Other Avoidance Actions, including, but not limited to, those against Bertelsmann Inc., Blackstone Group, JMCK Corp., Najafi Companies, Sony Corporation or Warner Bros. Entertainment Inc. are excluded from the Acquired Assets and are expressly preserved for the estate (the "Retained Claims").

c)    Consultation with the Creditors' Committee

36.    Throughout the sale process, the Debtor provided the Committee with contemporaneous updates, copies of every bid, including each version of Edge Line's various bids, and consulted the Committee in conjunction with the negotiated terms of the Modified Purchase Agreement.  *See* Exhibit C.[13]

37.    Nevertheless, the Committee advised the Debtor that it would object to the release of the Released Claims contemplated under the Modified Purchase Agreement.  *See* Exhibit C, at C007-09, C025-26.   Specifically, the Committee advised the Debtor that it was unwilling to accept consideration less than $7 million for the Released Claims.

38.    Prior to selecting the Modified Purchase Agreement, as the Successful Bid, the Debtor conducted an analysis of the Released Claims to determine the likelihood of success in connection with any litigation to obtain recoveries in connection with those claims.

39.    On November 13, 2015, the Debtor and Committee participated in a telephone call whereby, *inter alia*, the Debtor advised the Committee that it had analyzed the Released Claims discussed above, and determined that the avoidance of transfers made to Bookspan and TAW would likely be unsuccessful.

40.    On November 16, 2015, the Committee filed the Conversion Motion.

---

[13]    Attached hereto as Exhibit C are true and correct copies of communications between the Debtor's counsel and the Committee's counsel regarding the negotiation of bids during the auction and sale process.

### d)    Analysis of the Released Claims

41.    The Committee specifically identifies approximately $36,740,000[14] in transfers that it seeks authority to recover as preferential payments and fraudulent transfers pursuant to adversary proceedings that it would initiate.[15]  *See* Conversion Motion ¶¶ 24-29.  Of that amount, it identifies only $856,662 (plus $15,000[16]) of transfers that were made to affiliated entities, Bookspan and TAW.  *See* Conversion Motion ¶¶ 28-29.

42.    During the (90) day period occurring prior to the Petition Date (the "Preference Period"), Bookspan received $647,479.13 in payments for services rendered under the Bookspan Services Agreement.  *See* Schedule 3(b) of the Debtor's Statement of Financial Affairs [Dkt. No. 66].  The Debtor's professionals analyzed these payments, and the underlying invoices satisfied by each, and compared those payments to payments made to Bookspan for similar services in the year prior to the Preference Period.

43.    The Debtor's professionals determined that substantially all of the payments to Bookspan were consistent with the parties' pre-Preference Period payment history in both timing and manner.

44.    Additionally, a $187,500 payment made to Bookspan on August 4, 2015 was also consistent with the parties' payment history for similar services and was paid within one standard deviation (for preference purposes) of the average time the Debtor took to pay Bookspan during the one year prior to the Preference Period.

---

[14]    The Conversion Motion references a $14.6 million transfer to JMCK Corp. twice, which it characterizes as both a dividend and a loan forgiveness.  It is calculated just once in the figures discussed herein

[15]    The Conversion Motion briefly mentions the $700,000 salary of the Debtor's CEO, John Lippman, but does not identify any colorable claims to recover it. Accordingly, it is excluded from the figures discussed herein. Notably, only 20% of this amount was paid by the Debtor in connection with Mr. Lippman's employment by the Debtor.

[16]    The Conversion Motion identifies a $15,000 management fee paid to Treasure Island, LLC in 2012.  The Debtor was responsible for, and only paid, 20% of this amount.

45.     The Debtor's professionals also determined there was in excess of $450,000 in "new value" provided by Bookspan to the Debtor during the Preference Period. Accordingly, the Debtor determined that Bookspan would have a complete defense to the avoidance of the transfers it received during the Preference Period, pursuant to section 547(c) Bankruptcy Code.

46.     During the Preference Period, TAW received $209,183.62 of payments for services rendered under the TAW Services Agreement. *See* The Debtor's Schedules and Statements of Financial Affairs, Schedule 3(b), Sept. 8, 2015 [Dkt. No. 66].   The Debtor's professionals analyzed those payments, the underlying invoices satisfied by each, and compared those payments to payments for similar services made to TAW in the year prior to the Preference Period.

47.     The Debtor's professionals determined that substantially all of the payments to TAW were consistent with the parties' pre-Preference Period payment history in both timing and manner.

48.     The Debtor's professionals determined there was in excess of $150,000 in "new value" provided by TAW to the Debtor during the Preference Period.  Accordingly, the Debtor determined that TAW has strong defenses to the avoidance of the transfers it received during the Preference Period, pursuant to section 547(c) of the Bankruptcy Code.

49.     The Debtor's professionals also analyzed payments made to Bookspan and TAW under section 548 of the Bankruptcy Code to determine whether such payments could be successfully recovered as fraudulent transfers, but ultimately determined that based on the services rendered when compared with the compensation received, such payments would likely be shielded from recovery as a fraudulent transfer.

### III.   DEBTOR'S OPPOSITION

**A.  The Committee Has Failed To Establish "Cause" Exists To Convert the Chapter 11 Case Pursuant to Section 1112(b) of the Bankruptcy Code**

50.   It is well established that the conversion of a case under section 1112(b) of the Bankruptcy Code is an extraordinary measure that requires a strong evidentiary showing by the movant that such relief is clearly warranted under section 1112(b) of the Bankruptcy Code. *In re State St. Associates, L.P.*, 348 B.R. 627, 638 (Bankr. N.D.N.Y. 2006) (finding that conversion of a chapter 11 case is a drastic measure); *see In re Dark Horse Tavern*, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995) ("Conversion . . . is a drastic measure . . . the harshness of conversion . . . mandates that it result only upon a strong evidentiary showing."); *see In re McDermott,* 78 B.R. 646, 651 (Bankr. N.D.N.Y. 1985) (noting the firmly established rule that bankruptcy courts should not precipitously terminate a Chapter 11 case by prematurely converting or dismissing the case); *see also In re McInerney*, 487 B.R. 468, 479 (Bankr. E.D. Mich. 2012).

51.   Indeed, to demonstrate that conversion is warranted under 1112(b)(1), the movant bears the heavy burden of establishing "cause" exists to convert the case, with the showing of cause – or the lack of a showing – being the threshold issue.  *In re Loco Realty Corp.*, No. 09-11785, 2009 WL 2883050, at *2 (Bankr. S.D.N.Y. June 25, 2009) (noting the moving party has the burden of demonstrating cause for dismissal or conversion); *In re Lykes Bros. S.S. Co.*, 196 B.R. 586, 595 (Bankr. M.D. Fla. 1996) (finding that the moving party has the burden to prove that the debtor lacks any factual basis to support its rehabilitation); *In re Sunnyland Farms, Inc.*, 517 B.R. 263, 266 (Bankr. D.N.M. 2014) (internal citation omitted) (finding that "[w]hether 'cause' exists to convert a case is a threshold issue"); *see also In re Modanlo*, 413 B.R. 262, 271 (Bankr. D. Md. 2009) (ruling movant bears the burden of proving cause by a preponderance of the evidence).

52.    Significantly, to establish cause to convert the Chapter 11 Case under section 1112(b)(4)(A) of the Bankruptcy Code, the Committee must demonstrate **both** (i) "a substantial or continuing loss to or diminution of the estate" and (ii) "the absence of a reasonable likelihood of rehabilitation . . . ." 11 U.S.C. §1112(b); *In re MSR Hotels & Resorts, Inc.*, No. 13-11512, 2013 WL 5716897, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013) (requiring both continuing loss and inability to rehabilitate for successful motion to convert; motion denied) (citations omitted); *In re The 1031 Tax Group, LLC,* 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007) (holding it is not enough just to show continuing loss to the estate; the moving party must also show the absence of a reasonable likelihood of rehabilitation); *see In re 221-06 Merrick Blvd. Associates LLC*, No. 10-45657, 2010 WL 5018265, at *2 (Bankr. E.D.N.Y. Dec. 3, 2010) (citations omitted) (denying conversion because there was no substantial or continuing loss to or diminution of the estate coupled with the absence of a real likelihood of rehabilitation to warrant dismissal of the debtor's case, finding both elements were required to prevail); *see also Lykes Bros.*, 196 B.R. at 595 (finding that it clearly is the burden of the movant to satisfy both prongs of 1112(b)(1)(4)(A)).

53.    Unsurprisingly, the Committee has failed to establish either prong of the aforementioned test and, thus, has failed to meet its evidentiary burden.

i)    The Debtor Has A Reasonable Likelihood of Rehabilitation

54.    Notwithstanding the incontrovertible impact of the consideration being provided to the estate under the Modified Purchase Agreement – namely, the Debtor's ability to propose and confirm a liquidating chapter 11 plan that would not only satisfy allowed administrative claims and secured claims, but would also provide recoveries to unsecured creditors – the Committee, remarkably, alleges that the Debtor has no likelihood of rehabilitation.[17]

---

[17]    Prior to filing the Conversion Motion, the Committee was fully aware that the consideration proposed under the Modified Purchase Agreement would provide the cash and Retained Claims necessary to confirm a liquidating chapter 11 plan and even provide recoveries to unsecured creditors.  Specifically, the Debtor provided the

55.    Courts have routinely held that "[w]here there is a reasonable prospect of successful rehabilitation, a motion under § 1112(b) must be denied." *In re Ransom*, 191 B.R. 720, 721-22 (Bankr. N.D. Ill. 1995) (citing *In re Garland Corp., 6 B.R. 456, 460 (1st Cir. BAP 1980)); *In re W. Pac. Airlines, Inc.*, 218 B.R. 590, 595 (Bankr. D. Colo. 1998) (denying motion to convert where movant intended to perform its own liquidation); *see In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995), as amended (Nov. 28, 1995) (denying motion to convert because debtor's plans for orderly liquidation qualified as rehabilitation); *In re Alves Photo Service, Inc.,* 6 B.R. 690, 693 (Bankr. D. Mass. 1980) (denying conversion because liquidation was a valid form of rehabilitation); *In re Route 202 Corp.*, 37 B.R. 367, 373-74 (Bankr. E.D. Pa. 1984) (finding that conversion was not appropriate because debtor demonstrated progress toward a liquidating sale, which is a legitimate goal).

56.    Here, there is a very real prospect of a successful rehabilitation.   The Debtor has a firm offer from a committed buyer willing to acquire substantially all of its assets on terms, and for consideration, that would result in recoveries to unsecured creditors, with such consideration providing the vehicle for the Debtor to confirm a liquidating plan shortly after the Sale closing.

ii)    The Debtor Has Not Been In Bankruptcy for A Period
        Sufficient to Establish A Continuing Loss to the Estate

57.    Even if the Court were to find that the Committee has demonstrated that the Debtor has no likelihood of rehabilitation, which the Committee clearly has not, the Committee must also establish that there is a continuing loss to the estate.  Again, the Committee fails to meet its burden.

---

Committee with a bid analysis of the consideration being offered.  *See* Exhibit C, at C017-30.  The Committee, nevertheless, still filed the Conversion Motion alleging, *inter alia*, that the "estate may be administratively insolvent and there is virtually no prospect for a plan to be confirmed."  Conversion Motion, ¶ 38.  Given the Committee's knowledge of the financial benefits to the estate from the consideration contemplated under the Sale, its continued allegations that there is no prospect for a confirmable plan are simply disingenuous.

58.     The Chapter 11 Case is not even four months old, yet the Committee would have the Court utilize the Debtor's finances during this brief postpetition period to strip the Debtor of its right to control its orderly wind-down and liquidation.  A three-month period, however, is not enough time to establish that the estate is operating at a continuing loss, especially where a confirmable liquidating plan is imminent following the closing of the Sale.[18]

59.     Notably, courts have refused to convert a debtor's chapter 11 case where, similar to here, the case was in its early stages and there was not yet a sufficient opportunity to determine whether a plan could be confirmed.  *In re Sunnyland Farms*, 517 B.R. at 267 (rejecting creditor's motion to convert as premature since the case had only been pending for four months); *In re Simplexity LLC*, No. 14-10569, (D. Del. October 23, 2014) (Docket No. 543) (denying creditor's motion to convert where negotiated resolution and confirmable plan remains possible); *In re McIntosh & Co. Inc.*, No. 90-2155, 1991 WL 11731157, at *3-4 (Bankr. S.D. Iowa Apr. 5, 1991) (finding the case was still in the early stages and that the debtor should be afforded an opportunity to show that reorganization was possible.); *In re Fisher & Son, Inc.*, 70 B.R. 7, 9 (Bankr. S.D. Ohio 1986) ("This case is too recently initiated for this Court to find that the debtor is unable to effectuate a plan, especially when the contemplated plan will be a liquidating one."); *Route 202 Corp.*, 37 B.R. at 375 (finding conversion motion was premature because debtor's reorganization was based on a sale that had not yet been decided by the court); *In re Bonded Mailings, Inc.*, 20 B.R. 781, 785 (Bankr. E.D.N.Y. 1982).  The Debtor must be afforded sufficient time to consummate the Sale and file a plan; accordingly, the Conversion Motion is premature.

---

[18]     The Debtor and Buyer intend to close the Sale as soon as practicably possible following Court approval, and the Debtor intends to file a liquidating plan shortly after the closing.

### iii)     Conversion of the Chapter 11 Case Is Not In the Best Interests of Creditors

60.     Moreover, the appointment of a chapter 7 trustee upon conversion of the Chapter 11 Case will result in another layer of administrative costs as well as delays in recoveries, if any, to unsecured creditors. Courts will not approve a motion to convert where conversion from a case under chapter 11 to a chapter 7 case would not only be slower, but would also result in the estate's incurrence of additional administrative costs that would not occur in a liquidating chapter 11 case. *In re Fisher & Son, Inc.*, 70 B.R. at 9 (denying conversion because it would "impose substantial extra costs upon this estate without a current corresponding benefit to creditors."); *In re McDermott*, 78 B.R. at 651 ("Courts have recognized that "where liquidation would proceed more expeditiously and less expensively under the control of the debtor," conversion from Chapter 11 to Chapter 7 may not be warranted."); *see also In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 985-86 (Bankr. N.D.N.Y. 1988) (noting there are instances where liquidation under Chapter 11 is preferable to a Chapter 7 proceeding because the debtor in possession may be in a better position to dispose of the assets in a less expensive and more orderly manner than a trustee). Such additional costs and delays are clearly not in the best interests of the Debtor's estate. *See In re 1031 Tax Grp.,* 374 B.R. at 93 (denying conversion motion because movants failed to establish that "cause" and failed to show that conversion would be in the estates' or the creditors' best interest); *see also In re Acme Cake Co., Inc.*, No. 08-41965, 2010 WL 4103761, at *2 (Bankr. E.D.N.Y. Oct. 18, 2010) (finding the conversion is not appropriate if it is not in the best interests of the estate and its creditors).

61.     Accordingly, conversion of the Debtor's Chapter 11 Case, as sought by the Committee, is improper and should be denied.

### B. The Committee Should Not Be Permitted to Usurp the Debtor's Business Judgment Under the Guise of A Derivative Standing Request

62.     It is clear that the Committee's real goal here is not to convert the Chapter 11 Case, but rather disregard the Debtor's business judgment for its own.  The Committee has in no uncertain terms conveyed to the Debtor that it will not agree to the Debtor's selection of the Modified Purchase Agreement on any grounds, unless the agreement provides for cash consideration of no less than $7 million or allows the Committee to prosecute the Released Claims.  *See* Exhibit C, at C025-026 (Committee counsel stating "[w]e will review what results from your discussions, but everyone is aware of the [C]ommittee's position on the release in this deal" – that understanding being the Committee would not support *any* sale involving the Buyer that included the Released Claims or providing for consideration of less than $7 million.).

63.     However, the decision regarding the selection of the Modified Purchase Agreement falls within the sole province of the Debtor's business judgment.[19]  That decision, as this Court noted, does not belong to the Committee.  Hr'g Tr. 21:1-7, Sept. 24, 2015. ("The debtor is running the auction.  You (Committee) have consultation rights.  There's no issue.  ***You don't get to decide.***  So you . . . as counsel get to consult and the Committee members can consult ***but there's no*** . . . ***issue that you get to decide***.") (emphasis added).

64.     The Committee's attempt to override the Debtor's selection of the Modified Purchase Agreement as the Successful Bid, unless the Buyer provides at least $7 million in consideration, or the Debtor permits the Committee to prosecute the Released Claims,

---

[19]    The business judgment rule is a presumption that in making business decisions the debtor has acted in good faith, on an informed basis, and in the honest belief that the decision was in the best interests of the estate, with the validity of such decisions being accorded substantial judicial deference.  *See Genco Shipping & Trading Ltd.*, 509 B.R. at 464 (finding that the case law under "[s]ection 363 provides that [t]he business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing"); *MF Global Inc.*, 535 B.R. at 605 (citing *Borders Grp., Inc.,* 453 B.R. at 483) (finding a debtor's business judgment is entitled to great deference).  A complete discussion of the Debtor's valid business judgment in connection with it selection of the Succesful Bid will be set forth in its reply to the Committee's Objection to the Sale [Dkt. No. 152].

is nothing more than and effort to circumvent the Debtor's business judgment and dictate the deal that it believes would be best for the estate.  The Committee should not be permitted to do indirectly, under the guise of derivative standing, what it does not have a legal basis to do directly.

     i)     <u>The Committee's Request for Derivative Standing Is Improper and Should Be Denied</u>

65.     The Committee has not and cannot provide this Court with any legal authority, statutory or otherwise, that would allow it to disregard the Debtor's sound business judgment of foregoing litigation relating to the Released Claims (claims the Debtor believes have little, to no, chance of success) in favor of accepting an offer for the Acquired Assets that would result in the imminent filing of a chapter 11 plan providing recoveries to all creditors.  Further, the Debtor believes that the Retained Claims should be investigated and prosecuted at the appropriate time.

66.     In this Circuit and others, courts have held that a debtor, as a fiduciary of the estate, may in its business judgment choose to release claims rather than pursue them, and creditors should not be permitted to usurp this fiduciary role and pursue litigation when the Debtor chooses not to do so.  *See In re Smart World Techs., LLC*, 423 F.3d 166, 175 (2d Cir. 2005) (finding that a debtor owes a fiduciary duty to the estate, the fulfillment of which is subject to the business judgment test, and the debtor may properly meet its duties to the estate when it chooses to release rather than pursue claims); *see also In re Racing Servs., Inc.*, 540 F.3d 892, 899-900 (8th Cir. 2008) (quoting *In re Baltimore Emergency Servs. II, Corp.,* 432 F.3d 557, 562 (4th Cir. 2005)) (finding that creditors should not be able to "usurp the central role that the trustee or debtor-in-possession plays as the representative of the estate" by pursuing litigation when the debtor chooses not to do so).

67.     The Debtor's decision to release the Released Claims to obtain the firm consideration contemplated under the Modified Purchase Agreement is a sound exercise of the

Debtor's business judgment; and, significantly, the Committee has not offered any evidentiary support that would sustain a challenge to that decision.[20]  In fact, there is no real dispute that the Debtor has acted in good faith, on an informed basis, and in the honest belief that its decision was made in the best interests of the estate.  *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (finding that the caselaw under "[s]ection 363 provides that [t]he business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing"); *see In re MF Global Inc.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015) (citing *In re Borders Grp., Inc.,* 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011)) (finding a debtor's business judgment is entitled to great deference).

68.    The Debtor's decision to accept the Modified Purchase Agreement as the Successful Bid occurred only after (a) the Debtor extended the time on multiple occasions to give multiple third-parties time to submit Qualified Bids, (b) no Qualified Bids were submitted and the Buyer enhanced its bid, and (c) the Debtor, its independent director and professionals conducted a side-by side analysis of the consideration contemplated in each of the versions of the bid submitted by the Buyer, against the various liabilities of the Debtor (such as the Debtor's various administrative claims, cure costs, estate wind-down costs, and the Acquired Assets, including, but not limited to the Debtor's accounts receivable, its profitable real property sublease interests, and inventory).   The decision is a clear sound exercise of the Debtor's business judgment and should not be disturbed.

---

[20]    The burden falls on the party challenging a debtor's business decision to affirmatively establish that the debtor "failed to act (1) in good faith; (2) in the honest belief that the action was in the best interest of the corporation; or (3) on an informed basis."  *In re BH S & B Holdings LLC*, 420 B.R. 112, 146-47 (Bankr. S.D.N.Y. 2009) *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011) (citations omitted); *see Genco Shipping & Trading Ltd.*, 509 B.R. at 464 (finding that the movant has the burden of rebutting the business judgment presumption and that courts will not interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (noting that "[o]vercoming the presumption of the business judgment rule on the merits is a near-Herculean task").

ii)    The Debtor Is Justified In Not Commencing Litigation Relating
To the Released Claims

69.    The Committee has not satisfied the statutory grounds for derivative

standing.  To obtain derivative standing, the Committee must establish that it (i) petitioned the

Debtor to bring the Released Claims and the Debtor refused; (ii) its claims are colorable; (iii) it

sought permission from the bankruptcy court to initiate an adversary proceeding; and (iv) the

Debtor unjustifiably refused to pursue the Released Claims.[21]  *See In re STN Enterprises*, 779

F.2d 901, 904 (2d Cir. 1985) (setting for the Second Circuit rule for derivative standing); *see*

*also Racing Servs., Inc.*, 540 F.3d at 900.  Here, the key factor is whether the Debtor is justifiable

in foregoing litigation in connection with those claims.  *See Racing Servs., Inc.*, 540 F.3d at 899-

900 ("[T]he critical inquiry is whether the trustee (or debtor-in-possession) abused its discretion

by *unjustifiably* refusing to pursue the creditor's proposed claims.").

70.    Courts have found that a debtor, however, may refuse to bring litigation

for a myriad of reasons, all of which will depend on the facts and circumstances of the

bankruptcy case.  *Racing Servs., Inc.*, 540 F.3d at 900-01; *Smart World Techs., LLC*, 423 F.3d at

175 (determining that Congress vested the debtor with discretion to determine how to handle

claims belonging to the estate); *In re V. Savino Oil & Heating Co., Inc.*, 91 B.R. 655, 656-57

(Bankr. E.D.N.Y. 1988); *see In re Gen. Homes Corp.*, 134 B.R. 853, 864 (Bankr. S.D. Tex.

1991) (citations omitted) (affirming debtor's decision to grant a release to creditor rather than

---

[21]    The Committee has the burden of satisfying all of the aforementioned elements to obtain derivative standing. *See*
*Smart World Techs., LLC*, 423 F.3d at 176 (canvassing circuit court decisions where committee was required to
show the bankruptcy court that it should be allowed to bring suit); *see also Racing Servs., Inc.,* 540 F.3d at 900
("The real challenge for the creditor will be to persuade the bankruptcy court that the trustee unjustifiably
refuses to bring its claims.  To satisfy its burden, the creditor, at a minimum, must provide the bankruptcy court
with *specific* reasons why it believes the trustee's refusal is unjustified . . . The creditor, *not the bankruptcy*
*court,* has the onus of establishing the trustee unjustifiably refuses to bring the creditor's claim."); *In re*
*Copperfield Investments, LLC*, 421 B.R. 604, 609 (Bankr. E.D.N.Y. 2010) ("The party seeking derivative
standing bears the burden of establishing, by competent evidence, that the proposed claims are colorable and
that the trustee unjustifiably refused to bring suit.").

pursue cause of action in order to secure creditor's support and involvement necessary to reorganization).

72.    The facts and circumstances of this Chapter 11 Case unquestionably justify the Debtor's decision to forego litigation in favor of consummating the transactions contemplated under the Modified Purchase Agreement.  As noted herein, the only means by which the Debtor can achieve a confirmable plan in the near future is consummation of the Modified Purchase Agreement.  It has no prospects for a stand-alone reorganization and no other bidders are willing to acquire its assets on more favorable terms than those proposed by the Modified Purchase Agreement.

72.    Importantly, prior to accepting the Modified Purchase Agreement, the Debtor conducted an analysis of the merits and prospective recoveries that may be obtained from the Released Claims and the Retained Claims, as well as the cost and time that would be associated with litigation to obtain those recoveries.  *See* Langberg Decl., ¶¶ 26-30.  It was only following this analysis did the Debtor determine that the imminent consideration to the Debtor's estate offered under the Modified Purchase Agreement, versus future speculative recoveries that are unlikely to be obtained in conjunction with the various Released Claims, and the absence of any other viable sale or reorganization alternatives warranted the Debtor foregoing litigation relating to the Released Claims.

73.    Notwithstanding, the Committee's arguments, the Debtor, simply, has no obligation to forego a firm offer that would result in a meaningful chapter 11 plan, to engage in expensive and time consuming speculative litigation that has little, to no possibility of success in favor of the estate.  *See In re Gen. Motors Corp.*, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009) *aff'd sub nom. In re Motors Liquidation Co.*, 428 B.R. 43 (Bankr. S.D.N.Y. 2010) and *aff'd sub nom. In re Motors Liquidation Co.*, 430 B.R. 65, 77 (Bankr. S.D.N.Y. 2010) and *enforcement denied sub nom. In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015) (finding

that it is not appropriate for a debtor's business judgment to be usurped by creditors urging it to "risk doomsday consequences to increase their incremental recoveries," when the debtor is properly exercising business judgment to consummate a sale to the only viable bidder); *see also In re ICL Holding Co.*, 802 F.3d 547, 551 (3d Cir. 2015) (approving sale where it was the only alternative to liquidation and best opportunity to realize the full value of the debtor's assets, and where the offer accepted "was the best and only one"); *In re Reading Broad., Inc.*, 386 B.R. 562, 576 (Bankr. E.D. Pa. 2008) (rejecting creditor efforts to unravel sale based on speculation that a better alternative might exist).

74.    Notably, of the not less than $36,740,000 in transfers the Committee believes is recoverable on preferential and/or fraudulent transfer grounds, only $856,662 of transfers that were made to affiliated entities - Bookspan ($647,479.13) and TAW ($209,183.62) – are covered by the Released Claims.[22]  *See* Conversion Motion ¶¶ 24-29.  As noted above, the Debtor's professionals have analyzed these payments, and the underlying invoices satisfied by each, and compared those payments to payments made to each for similar services in the year prior to the Preference Period.  As a result, the Debtor believes these payments are subject to defense from recovery as preferences.  Additionally, the Debtor has also analyzed the services rendered under the Intercompany Services Agreement and the fees charges for such services and do not believe the payments made in connection therewith would be successfully recovered as fraudulent transfers.

75.    Significantly, under the Modified Purchase Agreement, the Debtor's has expressly preserved the Retained Claims for the estate.  By the Committee's own admission, at least approximately $35,868,000 in Retained Claims will be left behind for the benefit of the

---

[22]    The Conversion Motion briefly mentions the $700,000 salary of the Debtor's CEO, John Lippman, but does not identify any colorable claims to recover it. Accordingly, it is excluded from the figures discussed herein. Notably, only 20% of this amount was paid by the Debtor in connection with Mr. Lippman's employment by the Debtor.

estate's creditors, and potentially more given the breadth of the Retained Claims. *See* Conversion Motion, ¶¶ 24-29.  In fact, the entirety of the $35,868,000 in transfers highlighted in the Conversion Motion implicate JMCK Corp., Najafi Companies, or Bertelsmann Inc., each of whom is specifically identified in the Modified Purchase Agreement as a party to which Retained Claims may be brought against.  Accordingly, the Debtor's decision to release $856,662 in Released Claims where the prospect of recovery was determined to be very low, and preserve $35,868,000 in Retained Claims, is wholly justifiable.

## IV.    **CONCLUSION**

Based on the foregoing, the Debtor respectfully requests that the Motion be denied in its entirety.

Dated:    New York, New York
              November 24, 2015

GRIFFIN HAMERSKY P.C.

By: /s/ Scott A. Griffin
Scott A. Griffin
Michael D. Hamersky
485 Madison Avenue, 7th Floor
New York, New York 10022
Telephone: (212) 710-0338
Facsimile: (212) 710-0339

Counsel for the Debtor
and Debtor in Possession