| | |
|---|---|
| BAKER BOTTS LLP | Hearing Date: December 2, 2015 |
| 30 Rockefeller Plaza | Hearing Time: 2:00 p.m. (New York Time) |
| New York, New York 10112 | |
| (212) 408-2500 | |
| Emanuel C. Grillo | |
| Christopher Newcomb | |

*Counsel to Buyer, Edge Line Ventures LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------X
                                                            :
In re                                                       :   Chapter 11
                                                            :
FILMED ENTERTAINMENT INC.,                                  :   Case No. 15-12244 (SCC)
                                                            :
                Debtor.                                     :
                                                            :
------------------------------------------------------------X
```

**RESPONSE OF EDGE LINE VENTURES LLC TO THE OBJECTIONS
BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE
PBGC AND BANK OF NEW YORK MELLON TO DEBTOR'S MOTION
FOR AN ORDER (A) APPROVING SALE OF THEIR ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES
<u>IN CONNECTION WITH SUCH SALE, AND (C) RELATED RELIEF</u>**

Edge Line Ventures LLC ("<u>Edge Line</u>" or the "<u>Buyer</u>"), by its undersigned attorneys as and for its response (this "<u>Response</u>") to the Official Committee of Unsecured Creditors' Objection and Reservation of Rights [Dkt No. 152] (the "<u>Committee Objection</u>"), the Joinder of the Pension Benefit Guaranty Corporation (the "<u>PBGC Joinder</u>") to the Committee Objection [Dkt No. 153], and the Objection of Bank of New York Mellon [Dkt No. 158] (the "<u>BNY Mellon Objection</u>" and when taken together with the Committee Objection and the PBGC Joinder, the "<u>Objections</u>") in each case to Debtor's Motion for Entry of: (I) an Order (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (B) Scheduling an Auction

Active 22171079.4

and a Sale Hearing Related thereto, and (C) Approving the Form of Notice of the Auction and Sale Hearing; and (ii) an Order (A) Approving Such Sale Free and Clear of Liens, Claims and other Interests, (b) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale and (C) Granting Related Relief (the "<u>Sale Motion</u>")[1] and respectfully represents the following in support of its response:

### PRELIMINARY STATEMENT

In both the Committee Objection and its Motion to Convert, the Official Committee of Unsecured Creditors (the "<u>Creditors' Committee</u>" or the "<u>Committee</u>") relies on insinuations rather than evidence. Despite its rhetoric, however, the Committee does not offer any evidence to dispute the central facts of this Motion, namely:

- The sale process was conducted in an independent and robust manner and Edge Line is a good faith, arm's length bidder;

- Edge Line's offer is substantially higher than both any other offer received and the liquidation value of the Acquired Assets; and

- The gross amount of the purported claims against Edge Line's affiliates constitute less than 3% of the claims that the Creditors' Committee has identified, and such claims are subject to strong defenses that effectively render them worthless according to the Debtor's independent professionals.

First, the Debtor conducted the sale process with independence and disinterestedness. Specifically, the Debtor engaged Mr. Glenn Langberg, an individual with extensive restructuring experience and no other relationship with Debtor, its affiliates or Mr. Lippman, as its independent director (the "<u>Independent Director</u>") and vested him with authority to make

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion or the Modified Purchase Agreement as applicable.

Active 22171079.4                              2

determinations with respect to the sale. In addition, the Debtor retained PricewaterhouseCoopers ("PwC"), a nationally recognized restructuring advisor to conduct a broad marketing effort that reached approximately 130 parties, including both strategic and financial investors. Furthermore, Edge Line and Mr. Lippman: (a) did not control or interfere with the sale process; (b) only prepared and submitted its bid once it became clear no other qualified bids were forthcoming; (c) hired independent counsel to represent Edge Line; and (d) negotiated extensively with the Independent Director before gaining the Debtor's acceptance of Edge Line's bid as a Qualified Bid. The Committee does not dispute any of the foregoing.

Instead, the Committee disregards the sworn statements in the Declaration of Glenn Langberg (the "Langberg Decl."), the Declaration of Adam Rosen (the "Rosen Decl.") and the Declaration of John Lippman which establish the independence with which the sale process was conducted and its results. Accordingly, the Committee offers nothing more than conclusory statements, based solely upon the relative positions of the parties. The Committee's position effectively amounts to the conclusion that any bid by a principal, no matter with whom it is negotiated, should be precluded as a matter of law. Well-established principles of corporate governance and chapter 11 jurisprudence simply do not work as the Committee asserts.

Second, Edge Line's offer is substantially higher than all other offers and substantially higher than the liquidation value of the Acquired Assets. PwC reached out to approximately 130 parties and actively engaged with at least 11 of them as part of the sale process. The Edge Line bid was the only bid received by the extended deadline of October 22nd, and was also substantially higher than the only other third party bid received in the following weeks. Edge Line raised its initial bid three times before it was accepted as a Qualified Bid. Again, the Creditors' Committee does not dispute any of these salient facts. Furthermore, the Debtor's

independent financial advisor, Mr. Rosen of PwC, states unambiguously in his declaration that consummation of the Edge Line transaction will "result in recoveries in excess of those that would be achieved if the Debtor was liquidated under chapter 7 of the Bankruptcy Code." (Rosen Decl. at ¶22.)

The Committee sets forth only two points in response: (i) that the Edge Line transaction would potentially allow the Buyer to profit from the Madison Avenue Lease; and (ii) that the Debtor's accounts receivable are allegedly worth more than 75% of the cash consideration to be paid (allegedly $345,000 of accounts receivable compared to $425,000 of purchase price). With respect to the first point, in the last week, Edge Line has agreed to remove the cap from the Designated Net Sublease Profits payable to the Debtor's estate. Therefore, this issue can be summarily dismissed.

As for the accounts receivable, the Committee's calculation is misleading because the market value of the accounts receivable is substantially less than $345,000, and the Edge Line transaction consideration is far greater than $425,000. In fact, the transaction consideration is not less than $1.164 million[2] plus:

- the payment of certain Cure Costs in an amount up to $78,098;
- the assumption of $591,000 of administrative expenses;
- the waiver of more than $1.2 million of unsecured claims; and
- the administration of the Madison Avenue Lease and Madison Avenue Sublease for four years for no compensation.

Moreover, the purported value of the accounts receivable does not take into account the small size of the average consumer account (the median balance of which is only approximately

---

2   The $1.164 million consists of the $425,000 of cash payable at closing, plus the $684,000 of profits from the Madison Avenue Sublease, plus the $55,000 of post-petition non-intercompany accounts payable to be assumed under the Modified Purchase Agreement.

Active 22171079.4                                4

twenty-five dollars), the aging of the accounts, or the commensurate costs and risks associated with collecting on this type of portfolio. Indeed, PwC did not receive a third party offer even close to the value of the accounts receivable, and determined in any event that the Edge Line proposal provides for a higher recovery than the liquidation of the assets in a chapter 7 case.

Third, the alleged claims against the Edge Line affiliates in their gross amount, before consideration of defenses, constitute less than 3% of the claims that the Committee would like to pursue. In its pleadings, the Committee cavalierly conflates its allegedly substantial claims against former insiders with purported claims against Edge Line's affiliates. Specifically, of the approximately $37 million in transfers the Committee would like to litigate and avoid, $36 million relates to transfers, purportedly made to or for the benefit of former insiders, that occurred prior to any involvement by either Pride Tree Holdings or Mr. Lippman. The Edge Line bid expressly does not release these transactions.

Moreover, the Debtor's independent professionals have analyzed the alleged claims against Edge Line's affiliates and expressed an opinion regarding their merit, or more accurately, lack of it. By its own admission, the Committee failed to consider, among other things, potential new value defenses to the preference claims alleged, notwithstanding the fact that the Committee has had access to documents starting nearly 90 days ago and apparently elected to take no depositions during that time. The Debtor's independent professionals, on the other hand, did in fact conduct such analyses and concluded that Bookspan and TAW contributed substantial new value and were made generally consistently with prior practice. As a result, "the Debtor determined that Bookspan would have a complete defense to the avoidance of transfers it received during the Preference Period, pursuant to section 547(c) of the Bankruptcy Code." (See

Debtor's Opposition to Conversion Motion [Dkt No. 154] at ¶45.)  Similarly, "TAW has strong defenses to the avoidance of transfers it received during the Preference Period[.]"  (See id. at 48.)

More broadly, the Committee does not dispute the fact that, during the time that Mr. Lippman served as CEO of the Debtor, he has successfully reduced overhead expenses by approximately 80% in less than three years, from $24 million in 2012 (the year before Mr. Lippman joined) to a run rate of approximately $5 million in 2015.  Nor does the Committee dispute the fact that: (a) Bookspan provides to the Debtor all administrative, marketing, technology, order processing, and a significant number of other functions; and or that (b) TAW provides to the Debtor its distribution and shipping functions.[3]  In this context, and especially considering the large reduction in costs achieved under Mr. Lippman, the Committee's allegations represent nothing more than an attempt to impugn the integrity of the Chapter 11 case and the Sale Process.

As for the BNY Mellon Objection, Edge Line can demonstrate, and in fact has demonstrated, adequate assurance of future performance of the obligations under the Madison Avenue Lease.  As BNY Mellon well knows, IBM is the subtenant for the Madison Avenue Lease and is paying more than the lease obligations to the Debtor and has been doing so since before the Debtor was acquired by its current owner.  Second, Bertelsmann SE & Co., a major multinational corporation, has guaranteed the lease obligations --facts that BNY Mellon conveniently fails to disclose in the BNY Mellon Objection.  BNY Mellon also fails to disclose that its purported assumption claim of $3 million represents nine years of profit to which it has waived its right to recover many years ago.

---

3    The Committee also attempts to gloss over the fact that the terms of the 2015 services agreement between the Debtor and Bookspan were reviewed in advance by the Independent Director.

**BACKGROUND**

1. The Background is set forth in the Declarations of Mr. Glenn Langberg, Mr. Adam Rosen and Mr. John Lippman that have been filed with this Court.

**ARGUMENT**

I. The Sale Process and Approval of the Proposed Edge Line Bid by the Independent Director Evidences Good Faith and Warrants Approval Pursuant to Section 363 of the Bankruptcy Code under Any Standard.

2. The Committee claims that the sale is not an arm's length transaction and should be made subject to a heightened degree of scrutiny because Mr. Lippman is an officer of the Debtor. In support of its assertion, the Committee relies on a series of generic citations including *In re Bidermann Industries U.S.A., Inc.*, 203 B.R. 547 (Bankr. S.D.N.Y. 1997) in which the bidder/turnaround CEO/equity participant in a management LBO failed to retain an investment banker to market the assets and proposed an exorbitant break-up fee and expense reimbursement package. There was no disinterested third party bidding for the assets or examining the transaction on behalf of the estates. *Id.* at 552 to 553.

3. Unlike the case in *Bidermann Industries*, the Debtor and Mr. Lippman took every reasonable precaution to ensure the Debtor's disinterestedness with respect to the sale process and the Edge Line bid -- steps that the Committee fails to acknowledge. First, as set forth in Mr. Rosen's Declaration, his firm, PwC, engaged in an extensive sale process both before and during the Chapter 11 Case that reached approximately 130 parties, including both strategic and financial investors. The Committee simply refuses to admit that an extensive marketing for the assets took place. Nor does the Committee allege that either Mr. Lippman or any of the affiliates either interfered with the process or failed to cooperate in any way to warrant a finding of a lack of good faith. *See Licensing by Paolo, Inc. v. Sinatra (In re Paolo Gucci)*, 126 F.3d 380 (2d Cir., 1997). Furthermore, the Committee does not controvert the sworn declaration of Mr. Lippman

that Edge Line did not bid until the sale process had neared its conclusion at which point the Debtor had received no other offers; or that even after the bidding period was held open for several additional weeks, only a single additional bid for substantially less value (apparently approximately $100,000 in cash plus certain assumed liabilities of undetermined value).

4. The Committee also ignores the key role played by the Independent Director mentioning only the legal and business relationships between Mr. Lippman, Pride Tree Holdings, Inc., Bookspan LLC and Totally Awesome Warehouse, LLC -- all of which were disclosed in the *First Day Affidavit of Glenn Langberg*, filed on August 10, 2015 [Dkt No. 2] at the outset of this Chapter 11 Case. In his Declaration, Mr. Langberg described his role in the negotiations stating that he "and/or the Debtor's professionals negotiated with the Buyer [Edge Line] and the Third Party bidder tirelessly." (Langberg Decl. at ¶22.) Moreover, "[t]he Debtor used the additional time afforded by [the] adjournment [of the Sale Hearing] to engage in multiple rounds of negotiations with the Buyer." (Id. at ¶23.) The Committee does not take exception to Mr. Langberg's statements or his role because it cannot. Mr. Langberg has no prior or other affiliation with the Debtor other than his professional relationship as indicated in his First Day Affidavit and his Declaration filed with respect to the sale and has no stake in Edge Line, the Debtor or any affiliate. Mr. Langberg effectively acted as the "independent committee" or "independent person" in this case who negotiated with the assistance of court-appointed professionals opposite Edge Line and Mr. Lippman. Even in cases where the entire fairness doctrine is employed on account of transactions with insiders, the Delaware Supreme Court, which has reviewed this issue in as much detail as any other court, has determined in other insider transactions that approval by a special committee or a majority of non-controlling stockholders would shift the burden of proof to the plaintiff in this case, the Creditors'

Committee. *See, e.g., Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110 (Del. 1994). Despite its having to bear the burden of proof, the Committee has not offered a scintilla of evidence to suggest that the proposed transaction with Edge Line fails either the business judgment test or entire fairness standard.

    II.    Edge Line Has Offered to Pay Substantially More than the Market Value for the Acquired Assets.

5.    As noted earlier, PwC ran an extensive sale process that started in October 2014 that not only sought a potential buyer, but also a broader "range of operational and financial initiatives," including "minority and majority investments (via debt, equity or both); refinancing; and joint venture arrangements." (See Rosen Decl. at ¶5.) As part of that process, "the Debtor and PwC contacted approximately 130 parties" (see id.) sending them "teasers" and non-disclosure agreements to generate interest. (See id. at ¶6.) The Debtor did not reach any agreements at that time (see id.) but re-commenced a solicitation process in connection with the Chapter 11 Case. Unfortunately, no bids were received prior to the bid deadline established by this Court and only one other bid after the initial deadline -- one that was substantially lower than the Edge Line bid. (See id. at 16.)

6.    Despite the fact that no other bid was received, the Debtor, under the direction of the Independent Director did not accept the original bid submitted by Edge Line. Instead, the Independent Director continued to negotiate and to push Edge Line to raise its bid on multiple occasions, which it did. Accordingly, despite the fact that there were no other bidders, the Debtor and Edge Line did not reach agreement immediately, but only concluded negotiations when the Independent Director, on behalf of the Debtor, apparently determined that he was satisfied that the thrice-amended bid finally constituted a Qualified Bid. The Committee does not criticize the sale process itself -- only the fact that Edge Line's winning bid, which was far in

excess of the only other bid submitted, does not pay creditors in full and seeks releases as part of its deal.

7. To support its conclusion in part, the Committee states "[u]pon information and belief, the portion of the Debtor's collectible accounts receivable is approximately $345,000." (See Committee Objection at ¶16.) Both the market test as a result of the sale process and an analysis of the accounts receivable themselves indicate that the value is substantially lower. The only other party that submitted a bid, apparently did not even bid one third of that value for all of the assets, including the accounts receivable despite the fact that approximately 130 parties had been contacted. Moreover, the Edge Line consideration is substantially more than the $425,000 payable in cash at closing. In fact, it is at least $1.164 million (see footnote 2), *plus* the payment of certain Cure Costs in an amount up to $78,098, *plus* the assumption of $591,000 of administrative expenses, *plus* the waiver of affiliate unsecured claims of $1.2 million, *plus* the administration of the Madison Avenue Lease and the Madison Avenue Sublease for no remuneration.

8. As for the releases that are part of the transaction, in both its Conversion Motion (as defined herein) and the Committee Objection, the Creditors' Committee starts by conflating claims against other parties with those against the Debtor's affiliates. (See Committee Objection at ¶ 23; Motion of Official Committee of Unsecured Creditors (I) to Convert the Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code; or in the Alternative, (II) for an Order Authorizing the Committee to Prosecute Certain Causes of Action [Dkt No. 130] (the "Conversion Motion") at ¶¶4, 23-29) Of the claims purportedly identified by the Creditors' Committee, only $856,662 of approximately $36,740,000 involve the parties to be released as part of the sale. (See Debtor's Opposition to Conversion Motion Dkt No. 154 at ¶74.)

Moreover, the transfers identified by the Creditors' Committee constituting $856,662 of potential claims have been investigated by the Debtor and have been determined to have a low likelihood of success. The Committee even admits that it did not finish its analysis as to subsequent new value defenses that may exist to any such claims or the claims filed against the Debtor's estate. (See Committee Objection at fn. 4.)

9. Finally, notwithstanding the fact that no other bid was received since the Edge Line bid was approved by the Debtor, Edge Line has again agreed to modify its bid to remove the cap on Designated Net Sublease Profits (see Asset Purchase Agreement at § 1.1) so that all of the net profits, if any, will be collected for the benefit of the Debtor's estate. The Committee fails to acknowledge that in the absence of a successful assumption and assignment of the Madison Avenue Lease and Sublease, the Debtor's estate would like forfeit any income. Moreover, it will not even pay any administrative fee for this service.

III.     BNY Mellon Has Waived its Right to Recovery of any Net Profits and Has the Benefit of a Sublease with IBM Corporation, a Guaranty from Bertelsmann, Inc.as well as the Newly Capitalized Edge Line to Adequately Assure Future Performance of the Obligations under the Madison Avenue Lease.

10. BNY Mellon conveniently considers the Madison Avenue Lease in a vacuum ignoring both the existence of IBM Corporation as the subtenant and Bertelsmann SE & Co. as the guarantor -- factors which the Court is authorized to take into account. See in respect of the sublease, *In re Nalco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (holding the debtors provided adequate assurance of future performance of the lease because they satisfied the test of whether "it appears that the rent will be paid and other obligations thereunder met."); and in respect of the guarantee, *In re Great Atlantic & Pacific Tea Co., Inc.*, 472 B.R. 666 (S.D.N.Y. 2012) (citing *In re M. Fine Lumber Co.*, 383 B.R. at 573-74) (court will consider existence of guarantee among other factors); *In re Resource Technology Corp.*, 624 F.3d 376 (7th Cir. 2010)

(same); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 2003) (same); and *In re Service Merchandise Co., Inc.,* 297 B.R. 675 (Bankr. M.D. Tenn. 2002) (court took into account the financial strength of the guarantors of the lease). Notwithstanding the chapter 11 case, as a result of the Madison Avenue Sublease, the Debtor has performed all of the obligations under the Madison Avenue Lease. Indeed, BNY Mellon now seeks for the first time in many years payment of its purported profit share that it waived years earlier.

As for Edge Line, courts have found that operating strength of newly formed entities can also be taken into account. *See In re Service Merchandise Co., Inc.*, 297 B.R. 675 (Bankr. M.D. Tenn. 2002). Here Edge Line will be operated by the same senior management as the Debtor which did not default despite its financial difficulties. The balance sheet for the newly formed Edge Line will not bear the burden of the Debtor's legacy liabilities. The Court may also consider the market value of the lease as adequate assurance of future performance of the obligations thereunder. *See In re M. Fine Lumber Co., Inc.*, 383 B.R. 565 (Bankr. E.D.N.Y. 2008). When combined with Edge Line's operational experience and unlevered capital structure, the sublease with IBM Corporation and the Bertelsmann guarantee, Edge Line has demonstrated adequate assurance of performance of those obligations.

BNY Mellon cannot use the assignment process to back door its way into payment of amounts to which it had forfeited its rights years earlier.

## CONCLUSION

WHEREFORE, based on the foregoing, Edge Line respectfully requests that this Court grant the Sale Motion, deny the Objections, and grant such other and further relief as may be just and proper.

Dated:   November 30, 2015
         New York, New York

                                                  Respectfully submitted,

                                                  BAKER BOTTS L.L.P.

                                                  BY: */s/ Emanuel C. Grillo*
                                                  A Member of the Firm

                                                  30 Rockefeller Plaza
                                                  New York, New York 10112
                                                  emanuel.grillo@bakerbotts.com

                                                  *Attorneys for Edge Line Ventures LLC*