Hearing Date:  December 1, 2015 at 2:00 p.m. (New York Time)

**GRIFFIN HAMERSKY P.C.**
485 Madison Avenue, 7th Floor
New York, New York 10022
Telephone: (212) 710-0338
Facsimile: (212) 710-0339
Scott A. Griffin
Michael D. Hamersky

Counsel for the Debtor
and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                 :

In re:                     :        Chapter 11
                                 :

FILMED ENTERTAINMENT INC.,   :
                                 :        Case No. 15-12244 (SCC)

               Debtor.[1]    :
                                 :

-------------------------------------------------------------x

## NOTICE OF FILING REVISED PROPOSED SALE ORDER AND REVISED MODIFIED PURCHASE AGREEMENT

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1. On November 16, 2015, Filmed Entertainment Inc., as debtor and debtor in possession (the "Debtor"), filed its Notice of Sale Hearing, with its underlying Exhibit 1 containing copies of the revised proposed sale order (the "Sale Order") and the modified asset purchase agreement (the "Modified Purchase Agreement") [**Docket No. 138**].

2. Attached hereto as Exhibits "A" and "B," respectively, are clean and blacklined copies of the further revised Sale Order and the revised Modified Purchase Agreement.

Dated:  New York, New York
       December 1, 2015

                                GRIFFIN HAMERSKY P.C.

                                By: /s/ Scott A. Griffin
                                Scott A. Griffin
                                Michael D. Hamersky
                                485 Madison Avenue, 7th Floor
                                New York, New York 10022
                                Telephone: (212) 710-0338
                                Facsimile: (212) 710-0339

                                Counsel for the Debtor
                                and Debtor in Possession

---

[1]    The last four digits of the Debtor's federal tax identification number are 3867.

# EXHIBIT A

### *CLEAN*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                   :

In re:                                :        Chapter 11

                                  :

FILMED ENTERTAINMENT INC.,     :        Case No. 15-12244 (SCC)

                                  :

                        Debtor.[1]      :

                                  :
---------------------------------------------------------------X

### ORDER PURSUANT TO SECTIONS 105(A), 363 AND 365 OF THE BANKRUPTCY CODE APPROVING SALE OF THE ACQUIRED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS

Upon the motion (the "Motion")[2] of the Debtor for an Order pursuant to, inter alia, sections 105(a), 363, 365 and 1146(a) of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004 and 6006 approving (i) the sale of the Acquired Assets (the "Sale"), free and clear of all liens, claims, encumbrances and other interests except as otherwise expressly provided in the Modified Purchase Agreement as Exhibit "1" hereto (the "Modified Purchase Agreement"); (ii) the assumption and assignment of the Assumed Contracts pursuant to the Assignment Procedures; and (iii) for related relief, all as further set forth and defined in the Motion and the Modified Purchase Agreement; and this Court having reviewed the Motion and the Modified Purchase Agreement and upon this Court's prior order, dated September 28, 2015, approving the Bidding Procedures (the "Bidding Procedures Order") [Dkt. No. 101]; and due notice of the Motion, the Bidding Procedures Order and no Auction having been conducted under the Bidding Procedures, as the Debtor having only received one Qualified Bid, the Auction

---

[1]    The last four digits of the Debtor's federal tax identification number are 3867.

[2]    Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in the Motion.

conducted in connection therewith (the "Auction") having been given to all parties entitled thereto;

**NOW THEREFORE**, upon the entire record of the Bidding Procedures Hearing and the Sale Hearing (each as defined in the Bidding Procedures Order) and this Chapter 11 Case, and after due deliberation thereon and good cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

A.    <u>Jurisdiction and Venue</u>.  The Court has subject matter jurisdiction over the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. section 157(b)(2)(A) and (N).  Venue of this case and the Motion in this District is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    <u>Notice</u>.  Proper, timely, adequate and sufficient notice of the Motion and the relief requested therein, the Auction, the Sale Hearing, the Sale and related transactions collectively described in the Modified Purchase Agreement (all such transactions being collectively referred to as the "Sale Transaction"), has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 and in compliance with the Bidding Procedures Order, to all Notice Parties, Scheduled and Filed Creditors, and the 2002 Parties, being all of the interested persons and entities required to receive notice, as evidenced by the Affidavit of Service filed with the Court.  Such notice was good and sufficient, and appropriate under the particular circumstances.

C.    <u>Opportunity to Object and Bid</u>.  Creditors, parties in interest and other entities have been afforded a reasonable opportunity to bid for the Acquired Assets.  A

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

D.    No Auction and Selection of Successful Bidder.  The Debtor extended the adjourned Bid Deadline and/or adjourned the Auction contemplated under the Bidding Procedures by notices of adjournment filed with the Bankruptcy Court on October 14, 2015 [Dkt. No. 111], and October 22, 2015 [Dkt. No. 119], which resulted in the Debtor ultimately receiving only one Qualified Bid, the Modified Purchase Agreement, from the Buyer.[4]  Because the Debtor received only one Qualified Bid, the Debtor was not required to conduct an Auction under the Bidding Procedures.  The Buyer was selected as the Successful Bidder.  The Debtor's determination (in consultation with the Creditors' Committee) that the Modified Purchase Agreement constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtor's business judgment.

E.    Compliance with Bidding Procedures Order.  The marketing and bidding processes implemented by the Debtor, as set forth in the Motion, the Bidding Procedures Order, and supporting documentation filed in connection therewith, were fair, proper, complete, and reasonably calculated to result in the best value received for the Acquired Assets.

F.    Corporate Authority.  The Debtor has full corporate power and authority to execute the Modified Purchase Agreement and all other documents contemplated thereby, and to consummate the transactions contemplated in connection therewith.

G.    Business Justification.  The Debtor has articulated good, sufficient, and sound business reasons for consummating the Modified Purchase Agreement, and the sale of the Acquired Assets outside a plan of reorganization, and it is a reasonable exercise of the Debtor's

---

[4]    The Buyer, Edge Line Ventures LLC, is an affiliate of the Debtor.

business judgment to consummate the transactions contemplated by the Modified Purchase Agreement.

H.      Best Interests.    Approval of the Modified Purchase Agreement and the consummation of the Sale Transaction are in the best interests of the Debtor, its estate, its creditors and other parties in interest.

I.      Highest or Otherwise Best.    The Buyer's bid for the purchase of the Acquired Assets, as set forth in the Modified Purchase Agreement, is (i) fair and reasonable, and (ii) is the highest or otherwise best offer received for the Acquired Assets.

J.      Arm's-Length Transaction.    The Modified Purchase Agreement was negotiated, proposed and entered into by the Debtor and the Buyer without collusion, in good faith and from arm's-length bargaining positions.    The Buyer is not an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.    Neither the Debtor, nor the Buyer have engaged in any conduct that would cause or permit the Modified Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.    Specifically, the Buyer has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.

K.      Free and Clear.    The Debtor has complied with section 363(f) of the Bankruptcy Code because all parties with a claim or interest in the Acquired Assets consent to the sale or could be required to accept a money satisfaction of its interest.    Except as provided in the Modified Purchase Agreement, the transfer of the Acquired Assets will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Buyer with all right, title, and interest of the Debtor in and to the Acquired Assets, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, free and clear of all liens, claims, interests, obligations, rights and

4

encumbrances.  Buyer is not taking assignment of any contracts unless specifically identified in the Modified Purchase Agreement.  Except as specifically provided in the Modified Purchase Agreement, and consistent with section 363(f) of the Bankruptcy Code, the Buyer shall have no liability for any claims arising out of or related to the Sale or transfer of the Acquired Assets arising from claims against the Debtor or its estate or any liabilities or obligations of the Debtor and/or its estate, under the laws of the United States, any state, territory, or possession thereof, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability.  All persons and entities asserting or holding any claims or interests in or with respect to the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), howsoever arising, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such claims or interests against the Buyer.

L.    _Legal and Factual Bases_.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

**General Provisions**

1.    _Findings of Fact; Conclusions of Law_.  The findings of fact set forth above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed and deemed so ordered, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed and deemed so ordered.

2.      Objections.  All objections, if any, to the Motion have been withdrawn, settled or waived.

3.      Sale Approval.   The Sale, and all of the terms and conditions and transactions contemplated by the Modified Purchase Agreement are hereby authorized and approved pursuant to, inter alia, sections 105(a), 363(b) and 365(a) of the Bankruptcy Code.  The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code. Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized and directed to consummate the Sale Transaction pursuant to and in accordance with the terms and conditions of the Modified Purchase Agreement.  The Debtor is authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement the Modified Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Modified Purchase Agreement and effectuate the provisions of this Order and the transactions approved hereby.

4.      Surrender of Assets.  All entities who are presently, or who as of the Closing may be, in possession of some or all of the Acquired Assets hereby are directed to surrender possession of the Acquired Assets to the Buyer as of the Closing.

5.      Assumption and Assignment of Assumed Contracts.  Pursuant to sections 365(b), (c) and (f) of the Bankruptcy Code, the Debtor is authorized to assume and assign the Assumed Contracts designated for assignment to the Buyer pursuant to the Modified Purchase Agreement, subject to the Assignment Procedures approved in the Bidding Procedures Order; provided, however, that there shall be no assumption of any such contract absent simultaneous assignment thereof to the Buyer.  The Buyer shall be deemed to be substituted for the Debtor as a party to each of the Assumed Contracts, and pursuant to section 365(k) of the Bankruptcy Code,

6

the Debtor and its estate shall be relieved from any liability for breach of any such Assumed

Contract after assignment of such Assumed Contract to the Buyer.  In accordance with sections

365(b)(2) and (f) of the Bankruptcy Code, upon transfer of the Assumed Contracts to the Buyer,

(a) the Buyer shall have all of the rights of the Debtor thereunder and each provision of such

Assumed Contracts shall remain in full force and effect for the benefit of the Buyer

notwithstanding any provision in any such contract, lease, or in applicable law that prohibits,

restricts or limits in any way such assignment or transfer; and (b) none of the Assumed Contracts

may be terminated, or the rights of any party modified in any respect, including pursuant to any

"change of control" clause, by any other party thereto as a result of the consummation of the

transactions contemplated by the Modified Purchase Agreement.  There shall be no rent

accelerations, assignment fees, increases or any other fees charged or chargeable to the Buyer as

a result of the assumption, assignment and sale of the Assumed Contracts.  Any provision in any

Assumed Contract or Lease that prohibits or conditions the assignment of such contract or lease,

or allows the counterparty to such contract or lease to terminate, recapture, impose any penalty,

condition renewal or extension, or modify any term or condition upon the assignment of such

contract or lease, constitutes an unenforceable anti-assignment provision, and is void and of no

force and effect.  The validity of the assumption, assignment and sale of the Assumed Contracts

to the Buyer shall not be affected by any existing dispute between the Debtor and any

counterparty to an Assumed Contract.  Any party that may have had the right to consent to the

assignment of its Assumed Contract is deemed and determined to have consented to the

assignment for the purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code.

Notwithstanding anything to the contrary in this Order or otherwise, none of the agreements

("Oracle Agreements") between Oracle America, Inc. ("Oracle"), and the Debtor shall be

assumed and assigned to Buyer, absent a further order of Court or agreement between the parties. The provision of Paragraph 5 of this Order shall be inapplicable to any Oracle agreement, to the extent that the Debtor later attempts to assume and assign any Oracle Agreements.

6.    <u>Payment of Undisputed Cure Amounts</u>.    On or as promptly after the Closing as practical, the Cure Amounts to which no objections have been filed, or to which the Debtor and applicable non-debtor contract party have agreed as to the allowed Cure Amount(s), shall be paid.

7.    <u>Disputed Cure Amounts</u>.  A further hearing shall be held on [_____, 2015 at ____.m.] to consider any unresolved objections to the Cure Amounts set forth in the schedule of executory contracts pursuant to section 365 of the Bankruptcy Code and the Assignment Procedures.   With respect to Cure Amounts to which objections have been raised and not resolved, and solely relating to a proposed Cure Amount, the Debtor shall have the right to have the Assigned Contract assumed and assigned to the Successful Bidder, as applicable, with the amount asserted by the objecting party as the proper Cure Amount, or a different amount set by this Court, to be held in escrow pending further order of this Court or mutual agreement of the parties as to the proper Cure Amount for that Assigned Contract.  The Debtor shall be authorized to settle, compromise or otherwise resolve any disputed Cure Amounts without the need for further Court Order or notice to other parties, other than notice to the Creditors' Committee.  For Assumption Objections relating to proposed Cure Amounts that have not been resolved by the parties, any Cure Amounts related to such objections shall be paid by the Debtor within five (5) business days after entry of a final, non-appealable Order allowing the Cure Amounts.

8.      <u>Cure Payments</u>.  The Debtor's and/or Buyer's payment of the undisputed Cure Amounts shall be deemed to discharge all obligations of the Debtor: (a) to cure any defaults under the Assumed Contracts; and (b) compensate, or provide adequate assurance that the Buyer or the Debtor, as applicable, will promptly compensate, any non-debtor party to the Assumed Contracts for any actual pecuniary loss resulting from any default under the Assumed Contracts. Pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall have no liabilities for any claims arising or relating to or accruing post-Closing under any of the Assumed Contracts.

9.      <u>Independent Director Release</u>.  Glenn Langberg (the "Independent Director") shall be deemed released and discharged by the Debtor on behalf itself and its estate and all holders of claims or equity interests against the Debtor from any and all claims or causes of action, whether known or unknown, foreseen or unforeseen, liquidated on unliquidated, contingent or non-contingent, existing as of the Petition Date in law or at equity, whether for tort, fraud, or  contract, or otherwise arising from or related to in any way to the Sale; <u>provided</u>, <u>however</u>, the Independent Director shall not be released or discharged from any claim or causes of action resulting from such Independent Director's gross negligence or wilful misconduct arising from or related to the Sale.

10.     <u>Appointment of Consumer Privacy Ombudsman</u>.   To the extent the Modified Purchase Agreement seeks to include, as part of the Acquired Assets, information deemed to be confidential customer information, a consumer privacy ombudsman shall be appointed pursuant to sections 332 and 363 of the Bankruptcy Code.

**<u>Additional Provisions</u>**

11.     <u>Additional Documents</u>.   Prior to or upon the Closing of the Sale Transaction, the Debtor's creditors are directed to execute such documents and take all other actions as may be necessary to release their interests, if any, in the Acquired Assets as such

9

Interests, Liens, claims and/or other encumbrances may have been recorded or may otherwise exist.

12.    <u>Financing Statements</u>.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing interests with respect to the Debtor and/or the Acquired Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtor, the Acquired Assets or otherwise, then (a) the Debtor is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets; and (b) Buyer and/or the Debtor is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all interests and Liens in, against or with respect to the Debtor and/or the Acquired Assets.    This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, and local governmental agency, department, or office.

13.    <u>Modifications</u>.    The Modified Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not (a) materially change the terms of the Modified Purchase Agreement; (b) modify the express terms of this Order; and (c) have a material adverse effect on the Debtor's estate, and Debtor shall provide three (3) business days advance notice of any such modification

to counsel for the Creditors' Committee and the United States Trustee. If either the Creditors' Committee or the Office of the United States Trustee views the proposed modification, amendment, or supplement as violating items (i), (ii) or (iii) in this paragraph, such party shall be entitled to file a motion with the Court on shortened notice seeking appropriate relief.

14. <u>Automatic Stay</u>. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtor to the extent necessary, without further order of the Court to allow the Buyer to (a) give the Debtor any notice provided for in the Modified Purchase Agreement; and (b) take any and all actions permitted by the Modified Purchase Agreement and ancillary agreements in accordance with the terms and conditions thereof.

15. <u>Recording</u>. Each and every federal, state, and local governmental agency, recording office or department and all other parties, persons or entities is hereby directed to accept this Order and any and all documents and instruments necessary and appropriate for recordation as conclusive evidence of the free and clear and unencumbered transfer of title to the Acquired Assets conveyed to the Buyer.

16. <u>Bulk Sales</u>. No bulk sales law, or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Modified Purchase Agreement, the Motion and this Order.

17. <u>Successors, Assigns</u>. The terms and provisions of the Modified Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, its creditors, the Buyer, and any of such parties' respective affiliates, designees, successors, and assigns, and shall be binding in all respects upon all of the Debtor's creditors, all prospective and actual bidders for some or all of the Acquired Assets, and all

persons and entities receiving notice of the Motion, the Auction and/or the Sale Hearing notwithstanding any subsequent appointment of any trustee, examiner, or receiver under any Chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, or receiver and shall not be subject to rejection or avoidance by the Debtor, its estate, its creditors, or any trustee, examiner, or receiver.

18.     <u>Non-Severability/Failure to Specify</u>.  The provisions of this Order are non-severable and mutually dependent.  The failure specifically to include any particular provision of the Modified Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Modified Purchase Agreement be authorized and approved in its entirety.

19.     <u>Order Immediately Effective</u>.  As provided by Bankruptcy Rules 6004(h), 6006(d) and 7062, this Order shall be effective and enforceable immediately upon its entry, and the sale approved by this Order may close immediately upon entry of this Order, notwithstanding any otherwise applicable waiting periods.

20.     <u>Retention of Jurisdiction</u>.  This Court retains jurisdiction on all matters pertaining to the relief granted herein, including to interpret, implement, and enforce the terms and provisions of this Order and the Modified Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects.

Dated:    New York, New York
          _____, 2015



          _____
          UNITED STATES BANKRUPTCY JUDGE

### ***BLACKLINE***

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                          :
In re:                                    :        Chapter 11
                                          :
FILMED ENTERTAINMENT INC.,                :        Case No. 15-12244 (SCC)
                                          :
                          Debtor.[1]      :
                                          :
-------------------------------------------------------------X

### ORDER PURSUANT TO SECTIONS 105(A), 363 AND 365 OF THE BANKRUPTCY CODE APPROVING SALE OF THE ACQUIRED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS

Upon the motion (the "Motion")[2] of the Debtor for an Order pursuant to, inter alia, sections 105(a), 363, 365 and 1146(a) of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004 and 6006 approving (i) the sale of the Acquired Assets (the "Sale"), free and clear of all liens, claims, encumbrances and other interests except as otherwise expressly provided in the Modified Purchase Agreement as Exhibit "1" hereto (the "Modified Purchase Agreement"); (ii) the assumption and assignment of the Assumed Contracts pursuant to the Assignment Procedures; and (iii) for related relief, all as further set forth and defined in the Motion and the Modified Purchase Agreement; and this Court having reviewed the Motion and the Modified Purchase Agreement and upon this Court's prior order, dated September 28, 2015, approving the Bidding Procedures (the "Bidding Procedures Order") [Dkt. No. 101]; and due notice of the Motion, the Bidding Procedures Order and no Auction having been conducted under the Bidding Procedures, as the Debtor having only received one Qualified Bid, the Auction

---

[1]    The last four digits of the Debtor's federal tax identification number are 3867.

[2]    Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in the Motion.

conducted in connection therewith (the "Auction") having been given to all parties entitled thereto;

NOW THEREFORE, upon the entire record of the Bidding Procedures Hearing and the Sale Hearing (each as defined in the Bidding Procedures Order) and this Chapter 11 Case, and after due deliberation thereon and good cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    Jurisdiction and Venue.  The Court has subject matter jurisdiction over the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. section 157(b)(2)(A) and (N).  Venue of this case and the Motion in this District is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Notice.  Proper, timely, adequate and sufficient notice of the Motion and the relief requested therein, the Auction, the Sale Hearing, the Sale and related transactions collectively described in the Modified Purchase Agreement (all such transactions being collectively referred to as the "Sale Transaction"), has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 and in compliance with the Bidding Procedures Order, to all Notice Parties, Scheduled and Filed Creditors, and the 2002 Parties, being all of the interested persons and entities required to receive notice, as evidenced by the Affidavit of Service filed with the Court.  Such notice was good and sufficient, and appropriate under the particular circumstances.

C.    Opportunity to Object and Bid.  Creditors, parties in interest and other entities have been afforded a reasonable opportunity to bid for the Acquired Assets.   A

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

      D.    <u>No Auction and Selection of Successful Bidder</u>.  The Debtor extended the adjourned Bid Deadline and/or adjourned the Auction contemplated under the Bidding Procedures by notices of adjournment filed with the Bankruptcy Court on October 14, 2015 [Dkt. No. 111], and October 22, 2015 [Dkt. No. 119], which resulted in the Debtor ultimately receiving only one Qualified Bid, the Modified Purchase Agreement, from the Buyer.[4]  Because the Debtor received only one Qualified Bid, the Debtor was not required to conduct an Auction under the Bidding Procedures.  The Buyer was selected as the Successful Bidder.  The Debtor's determination (in consultation with the Creditors' Committee) that the Modified Purchase Agreement constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtor's business judgment.

      E.    <u>Compliance with Bidding Procedures Order</u>.  The marketing and bidding processes implemented by the Debtor, as set forth in the Motion, the Bidding Procedures Order, and supporting documentation filed in connection therewith, were fair, proper, complete, and reasonably calculated to result in the best value received for the Acquired Assets.

      F.    <u>Corporate Authority</u>.  The Debtor has full corporate power and authority to execute the Modified Purchase Agreement and all other documents contemplated thereby, and to consummate the transactions contemplated in connection therewith.

      G.    <u>Business Justification</u>.  The Debtor has articulated good, sufficient, and sound business reasons for consummating the Modified Purchase Agreement, and the sale of the Acquired Assets outside a plan of reorganization, and it is a reasonable exercise of the Debtor's

---

[4]    The Buyer, Edge Line Ventures LLC, is an affiliate of the Debtor.

business judgment to consummate the transactions contemplated by the Modified Purchase Agreement.

H.    Best Interests.    Approval of the Modified Purchase Agreement and the consummation of the Sale Transaction are in the best interests of the Debtor, its estate, its creditors and other parties in interest.

I.    Highest or Otherwise Best.    The Buyer's bid for the purchase of the Acquired Assets, as set forth in the Modified Purchase Agreement, is (i) fair and reasonable, and (ii) is the highest or otherwise best offer received for the Acquired Assets.

J.    Arm's-Length Transaction.    The Modified Purchase Agreement was negotiated, proposed and entered into by the Debtor and the Buyer without collusion, in good faith and from arm's-length bargaining positions.    The Buyer is not an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.    Neither the Debtor, nor the Buyer have engaged in any conduct that would cause or permit the Modified Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.    Specifically, the Buyer has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.

K.    Free and Clear.    The Debtor has complied with section 363(f) of the Bankruptcy Code because all parties with a claim or interest in the Acquired Assets consent to the sale or could be required to accept a money satisfaction of its interest.    Except as provided in the Modified Purchase Agreement, the transfer of the Acquired Assets will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Buyer with all right, title, and interest of the Debtor in and to the Acquired Assets, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, free and clear of all liens, claims, interests, obligations, rights and

encumbrances.  Buyer is not taking assignment of any contracts unless specifically identified in the Modified Purchase Agreement.  Except as specifically provided in the Modified Purchase Agreement, and consistent with section 363(f) of the Bankruptcy Code, the Buyer shall have no liability for any claims arising out of or related to the Sale or transfer of the Acquired Assets arising from claims against the Debtor or its estate or any liabilities or obligations of the Debtor and/or its estate, under the laws of the United States, any state, territory, or possession thereof, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability.  All persons and entities asserting or holding any claims or interests in or with respect to the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), howsoever arising, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such claims or interests against the Buyer.

L.    <u>Legal and Factual Bases</u>.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

**<u>General Provisions</u>**

1.    <u>Findings of Fact; Conclusions of Law</u>.  The findings of fact set forth above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed and deemed so ordered, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed and deemed so ordered.

2.      Objections.  All objections, if any, to the Motion have been withdrawn, settled or waived.

3.      Sale Approval.   The Sale, and all of the terms and conditions and transactions contemplated by the Modified Purchase Agreement are hereby authorized and approved pursuant to, inter alia, sections 105(a), 363(b) and 365(a) of the Bankruptcy Code.  The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code. Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized and directed to consummate the Sale Transaction pursuant to and in accordance with the terms and conditions of the Modified Purchase Agreement.  The Debtor is authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement the Modified Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Modified Purchase Agreement and effectuate the provisions of this Order and the transactions approved hereby.

4.      Surrender of Assets.   All entities who are presently, or who as of the Closing may be, in possession of some or all of the Acquired Assets hereby are directed to surrender possession of the Acquired Assets to the Buyer as of the Closing.

5.      Assumption and Assignment of Assumed Contracts.  Pursuant to sections 365(b), (c) and (f) of the Bankruptcy Code, the Debtor is authorized to assume and assign the Assumed Contracts designated for assignment to the Buyer pursuant to the Modified Purchase Agreement, subject to the Assignment Procedures approved in the Bidding Procedures Order; provided, however, that there shall be no assumption of any such contract absent simultaneous assignment thereof to the Buyer.  The Buyer shall be deemed to be substituted for the Debtor as a party to each of the Assumed Contracts, and pursuant to section 365(k) of the Bankruptcy Code,

6

the Debtor and its estate shall be relieved from any liability for breach of any such Assumed

Contract after assignment of such Assumed Contract to the Buyer.  In accordance with sections

365(b)(2) and (f) of the Bankruptcy Code, upon transfer of the Assumed Contracts to the Buyer,

(a) the Buyer shall have all of the rights of the Debtor thereunder and each provision of such

Assumed Contracts shall remain in full force and effect for the benefit of the Buyer

notwithstanding any provision in any such contract, lease, or in applicable law that prohibits,

restricts or limits in any way such assignment or transfer; and (b) none of the Assumed Contracts

may be terminated, or the rights of any party modified in any respect, including pursuant to any

"change of control" clause, by any other party thereto as a result of the consummation of the

transactions contemplated by the Modified Purchase Agreement.  There shall be no rent

accelerations, assignment fees, increases or any other fees charged or chargeable to the Buyer as

a result of the assumption, assignment and sale of the Assumed Contracts.  Any provision in any

Assumed Contract or Lease that prohibits or conditions the assignment of such contract or lease,

or allows the counterparty to such contract or lease to terminate, recapture, impose any penalty,

condition renewal or extension, or modify any term or condition upon the assignment of such

contract or lease, constitutes an unenforceable anti-assignment provision, and is void and of no

force and effect.  The validity of the assumption, assignment and sale of the Assumed Contracts

to the Buyer shall not be affected by any existing dispute between the Debtor and any

counterparty to an Assumed Contract.  Any party that may have had the right to consent to the

assignment of its Assumed Contract is deemed and determined to have consented to the

assignment for the purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code.

Notwithstanding anything to the contrary in this Order or otherwise, none of the agreements

("Oracle Agreements") between Oracle America, Inc. ("Oracle"), and the Debtor shall be

assumed and assigned to Buyer, absent a further order of Court or agreement between the parties. The provision of Paragraph 5 of this Order shall be inapplicable to any Oracle agreement, to the extent that the Debtor later attempts to assume and assign any Oracle Agreements.

6.    <u>Payment of Undisputed Cure Amounts</u>.    On or as promptly after the Closing as practical, the Cure Amounts to which no objections have been filed, or to which the Debtor and applicable non-debtor contract party have agreed as to the allowed Cure Amount(s), shall be paid.

7.    <u>Disputed Cure Amounts</u>.  A further hearing shall be held on [_____, 2015 at ____.m.] to consider any unresolved objections to the Cure Amounts set forth in the schedule of executory contracts pursuant to section 365 of the Bankruptcy Code and the Assignment Procedures.   With respect to Cure Amounts to which objections have been raised and not resolved, and solely relating to a proposed Cure Amount, the Debtor shall have the right to have the Assigned Contract assumed and assigned to the Successful Bidder, as applicable, with the amount asserted by the objecting party as the proper Cure Amount, or a different amount set by this Court, to be held in escrow pending further order of this Court or mutual agreement of the parties as to the proper Cure Amount for that Assigned Contract.  The Debtor shall be authorized to settle, compromise or otherwise resolve any disputed Cure Amounts without the need for further Court Order or notice to other parties, other than notice to the Creditors' Committee.  For Assumption Objections relating to proposed Cure Amounts that have not been resolved by the parties, any Cure Amounts related to such objections shall be paid by the Debtor within five (5) business days after entry of a final, non-appealable Order allowing the Cure Amounts.

8. <u>Cure Payments</u>.  The Debtor's and/or Buyer's payment of the undisputed Cure Amounts shall be deemed to discharge all obligations of the Debtor: (a) to cure any defaults under the Assumed Contracts; and (b) compensate, or provide adequate assurance that the Buyer or the Debtor, as applicable, will promptly compensate, any non-debtor party to the Assumed Contracts for any actual pecuniary loss resulting from any default under the Assumed Contracts. Pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall have no liabilities for any claims arising or relating to or accruing post-Closing under any of the Assumed Contracts.

9. <u>Independent Director Release</u>.  Glenn Langberg (the "Independent Director") shall be deemed released and discharged by the Debtor on behalf itself and its estate and all holders of claims or equity interests against the Debtor from any and all claims or causes of action, whether known or unknown, foreseen or unforeseen, liquidated on unliquidated, contingent or non-contingent, existing as of the Petition Date in law or at equity, whether for tort, fraud, or  contract, or otherwise arising from or related to in any way to the Sale; <u>provided</u>, <u>however</u>, the Independent Director shall not be released or discharged from any claim or causes of action resulting from such Independent Director's gross negligence or wilful misconduct arising from or related to the Sale.

10. <u>Appointment of Consumer Privacy Ombudsman</u>.  To the extent the Modified Purchase Agreement seeks to include, as part of the Acquired Assets, information deemed to be confidential customer information, a consumer privacy ombudsman shall be appointed pursuant to sections 332 and 363 of the Bankruptcy Code.

### **Additional Provisions**

11. <u>Additional Documents</u>.  Prior to or upon the Closing of the Sale Transaction, the Debtor's creditors are directed to execute such documents and take all other actions as may be necessary to release their interests, if any, in the Acquired Assets as such

9

Interests, Liens, claims and/or other encumbrances may have been recorded or may otherwise exist.

12.    <u>Financing Statements</u>.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing interests with respect to the Debtor and/or the Acquired Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtor, the Acquired Assets or otherwise, then (a) the Debtor is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets; and (b) Buyer and/or the Debtor is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all interests and Liens in, against or with respect to the Debtor and/or the Acquired Assets.    This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, and local governmental agency, department, or office.

13.    <u>Modifications</u>.    The Modified Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not (a) materially change the terms of the Modified Purchase Agreement; (b) modify the express terms of this Order; and (c) have a material adverse effect on the Debtor's estate, and Debtor shall provide three (3) business days advance notice of any such modification

to counsel for the Creditors' Committee and the United States Trustee.  If either the Creditors'
Committee or the Office of the United States Trustee views the proposed modification,
amendment, or supplement as violating items (i), (ii) or (iii) in this paragraph, such party shall be
entitled to file a motion with the Court on shortened notice seeking appropriate relief.

14.    <u>Automatic Stay</u>.    The automatic stay pursuant to section 362 of the
Bankruptcy Code is hereby lifted with respect to the Debtor to the extent necessary, without
further order of the Court to allow the Buyer to (a) give the Debtor any notice provided for in the
Modified Purchase Agreement; and (b) take any and all actions permitted by the Modified
Purchase Agreement and ancillary agreements in accordance with the terms and conditions
thereof.

15.    <u>Recording</u>.    Each and every federal, state, and local governmental agency,
recording office or department and all other parties, persons or entities is hereby directed to
accept this Order and any and all documents and instruments necessary and appropriate for
recordation as conclusive evidence of the free and clear and unencumbered transfer of title to the
Acquired Assets conveyed to the Buyer.

16.    <u>Bulk Sales</u>.    No bulk sales law, or similar law of any state or other
jurisdiction shall apply in any way to the transactions contemplated by the Modified Purchase
Agreement, the Motion and this Order.

17.    <u>Successors, Assigns</u>.    The terms and provisions of the Modified Purchase
Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of,
the Debtor, its estate, its creditors, the Buyer, and any of such parties' respective affiliates,
designees, successors, and assigns, and shall be binding in all respects upon all of the Debtor's
creditors, all prospective and actual bidders for some or all of the Acquired Assets, and all

persons and entities receiving notice of the Motion, the Auction and/or the Sale Hearing notwithstanding any subsequent appointment of any trustee, examiner, or receiver under any Chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, or receiver and shall not be subject to rejection or avoidance by the Debtor, its estate, its creditors, or any trustee, examiner, or receiver.

18.    <u>Non-Severability/Failure to Specify</u>.  The provisions of this Order are non-severable and mutually dependent.  The failure specifically to include any particular provision of the Modified Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Modified Purchase Agreement be authorized and approved in its entirety.

19.    <u>Order Immediately Effective</u>.  As provided by Bankruptcy Rules 6004(h), 6006(d) and 7062, this Order shall be effective and enforceable immediately upon its entry, and the sale approved by this Order may close immediately upon entry of this Order, notwithstanding any otherwise applicable waiting periods.

20.    <u>Retention of Jurisdiction</u>.  This Court retains jurisdiction on all matters pertaining to the relief granted herein, including to interpret, implement, and enforce the terms and provisions of this Order and the Modified Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects.

Dated:    New York, New York
          _____, 2015


                              _____
                              UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

## *CLEAN*

ASSET PURCHASE AGREEMENT

by and between

FILMED ENTERTAINMENT INC.

and

EDGE LINE VENTURES LLC

Dated as of November 16, 2015

# Table of Contents

**Page(s)**

ARTICLE I DEFINITIONS ................................................................................2
    1.1        Definitions.........................................................................2
    1.2        Other Definitional and Interpretative Provisions.......................6
ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ..........7
    2.1        Assets to be Sold to Buyer ................................................7
    2.2        Excluded Assets ..............................................................7
    2.3        Assumed Liabilities .........................................................8
    2.4        Excluded Liabilities .........................................................8
    2.5        Cure Amounts .................................................................8
ARTICLE III PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING...................8
    3.1        Consideration; Payment of Purchase Price .............................8
    3.2        Deposit ..........................................................................9
    3.3        Closing and Closing Date .................................................9
    3.4        Closing Deliveries...........................................................9
    3.5        Transfer Taxes ...............................................................10
    3.6        Delivery of Records and Contracts......................................10
    3.7        Further Conveyances ........................................................10
    3.8        Bulk Sales Law ...............................................................11
    3.9        Allocation of Purchase Price ..............................................11
ARTICLE IV SELLER'S REPRESENTATIONS AND WARRANTIES ...........................11
    4.1        Organization of Seller ......................................................11
    4.2        Authorization of Transaction ..............................................11
    4.3        Non-Contravention ..........................................................11
    4.4        Brokers' Fees .................................................................12
    4.5        Events Subsequent ...........................................................12
    4.6        Tax Matters ....................................................................12
    4.7        Contracts. ......................................................................13
    4.8        Seller's Consents and Approvals .........................................13
    4.9        Litigation ......................................................................13
    4.10      Full Disclosure ...............................................................13
    4.11      No Other Representations or Warranties; Schedules................14

ARTICLE V BUYER'S REPRESENTATIONS AND WARRANTIES......................................14

5.1       Organization of Buyer.........................................................................14

5.2       Authorization of Transaction ...........................................................14

5.3       Non-Contravention .............................................................................15

5.4       Brokers' Fees .......................................................................................15

5.5       Buyer's Consents and Approvals.......................................................15

5.6       Acknowledgement Regarding Condition of the Business ...............15

5.7       Financial Capability ...........................................................................16

5.8       No Other Representations or Warranties; Schedules......................16

ARTICLE VI PRE-CLOSING COVENANTS ............................................................16

6.1       General .................................................................................................16

6.2       Bankruptcy Court Approval...............................................................16

6.3       Operation of Business ........................................................................16

6.4       Access ...................................................................................................17

6.5       Notice of Developments ......................................................................17

ARTICLE VII POST-CLOSING COVENANTS .........................................................17

7.1       General .................................................................................................17

7.2       Non-Disclosure ....................................................................................17

7.3       Further Assurances.............................................................................19

7.4       Claims Reconciliation.........................................................................20

7.5       Buyer's Duties in Respect of Madison Avenue Sublease................20

ARTICLE VIII CONDITIONS TO OBLIGATION TO CLOSE ............................................20

8.1       Conditions to Buyer's Obligation .....................................................20

8.2       Conditions to Seller's Obligations ....................................................21

ARTICLE IX DISPUTE RESOLUTION.......................................................................22

9.1       Dispute Resolution..............................................................................22

ARTICLE X TERMINATION .......................................................................................22

10.1      Termination of Agreement..................................................................22

10.2      Procedure For Termination ...............................................................23

10.3      Effect of Termination..........................................................................23

ARTICLE XI MISCELLANEOUS ...............................................................................23

11.1      Survival.................................................................................................23

11.2      Press Releases and Public Announcements .....................................23

11.3      No Third-Party Beneficiaries.............................................................24

| 11.4  | Entire Agreement | 24 |
| 11.5  | Succession and Assignment | 24 |
| 11.6  | Counterparts | 24 |
| 11.7  | Headings | 24 |
| 11.8  | Notices | 24 |
| 11.9  | Governing Law; Waiver of Jury Trial | 25 |
| 11.10 | Submission to Jurisdiction; Consent to Service of Process | 25 |
| 11.11 | Amendments | 26 |
| 11.12 | Severability | 26 |
| 11.13 | Expenses | 26 |
| 11.14 | Construction | 26 |
| 11.15 | Incorporation of Schedules | 26 |
| 11.16 | No Waiver | 26 |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of November 16, 2015, (the "Execution Date") is by and between FILMED ENTERTAINMENT INC., a Delaware corporation ("FEI," "Seller" or "Debtor"), and EDGE LINE VENTURES LLC, a New York limited liability company ("Buyer"), each a "Party" and collectively the "Parties."

## RECITALS

WHEREAS, on August 10, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §101 *et seq*. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (the "Bankruptcy Case"); and

WHEREAS, on September 10, 2015, Debtor filed a motion seeking, *inter alia*, approval of the sale of certain Debtor's assets to the successful bidder (the "Successful Bidder") at an auction for the Debtor's assets or its designee; and

WHEREAS, on September 28, 2015, an order was entered by the Bankruptcy Court, approving, *inter alia*, bidding procedures (the "Bidding Procedures") for the sale, and scheduling an auction ("Auction") and sale hearing in connection therewith (the "Bidding Procedures Order"); and

WHEREAS, on October 22, 2015, Buyer paid a deposit in the amount of $50,000 (the "Deposit") to the escrow account of counsel to the Seller in accordance with the Bidding Procedures; and

WHEREAS, the Buyer was deemed the Successful Bidder in accordance with the provisions of the Bidding Procedures and Bidding Procedures Order; and

WHEREAS, on November __, 2015 an order was entered by the Bankruptcy Court, approving, *inter alia*, the sale of the Acquired Assets (defined herein) to Buyer (the "Sale Order");

WHEREAS, on November 16, 2015, the Buyer and Seller entered into the Agreement, pursuant to which (i) Buyer agreed to purchase from FEI, and FEI agreed to sell to Buyer, certain assets of FEI (the "Acquired Assets"), subject in each case to the satisfaction of certain closing conditions; and

WHEREAS, the Parties desire to enter into the Agreement on the terms set forth below.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, agreements, representations and warranties herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

# ARTICLE I
## DEFINITIONS

1.1    <u>Definitions</u>    The following terms, as used herein, have the following meanings:

"<u>Acquired Assets</u>" has the meaning set forth in the recitals and Section 2.1.

"<u>Acquired Assets Confidential Information</u>" has the meaning set forth in Section 7.2(b).

"<u>Administrative Services Company</u>" means Bookspan LLC in its capacity as servicing company pursuant to that certain Services Agreement, by and between Seller and Bookspan LLC, dated January 1, 2014.

"<u>Affiliate</u>" means any person or entity which directly or indirectly controls, is controlled by, or is under common control with, any Person.

"<u>Agreement</u>" has the meaning set forth in the preface above.

"<u>Alternative Transaction</u>" means a transaction or series of related transactions (whether by asset sale, equity purchase, merger or otherwise) pursuant to which Seller enters into an agreement to sell all or any non-*de minimis* portion of the Acquired Assets or any group of assets that includes all or any non-*de minimis* portion of the Acquired Assets, to a person other than the Buyer.

"<u>Applicable Law</u>" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise),  code, rule, regulation, guidance, order, injunction, judgment, decree, ruling, charge or other similar requirement, enacted, adopted, or promulgated by a Governmental Authority that is binding upon such Person, as amended.

"<u>Assigned Contracts</u>" means the Contracts described on <u>Schedule 2.3(a)</u>.

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in Section 3.4(a).

"<u>Assumed Liabilities</u>" has the meaning set forth Section 2.3.

"<u>Auction</u>" has the meaning set forth in the recitals.

"<u>Avoidance Actions</u>" means any claims or causes of action arising under chapter 5 of the Bankruptcy Code.

"<u>Bankruptcy Case</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Bankruptcy Case.

"Bidding Procedures Order" has the meaning set forth in the recitals.

"Board of Directors" means the governing board of an entity, including the board of directors, as applicable.

"Business" means the business operations of Seller.

"Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"Buyer" has the meaning set forth in the preface above.

"Buyer Confidential Information" has the meaning set forth in Section 7.2(c).

"Buyer's Consents and Approvals" has the meaning set forth in Section 5.5.

"Claim" has the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 3.3(a).

"Closing Date" has the meaning set forth in Section 3.3(a).

"Closing Documents" has the meaning set forth in Section 3.4(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Contemplated Transactions" has the meaning set forth in Section 2.1.

"Contract" means any legally binding written contract, lease, sublease (including, but not limited to, the Madison Avenue Sublease), license, sublicense or other agreement relating to the Acquired Assets or the operation thereof to which Seller is a party or by which any of the Acquired Assets are bound.

"Cure Amounts" has the meaning set forth in Section 2.5.

"Customer Information" means all customer lists and related customer data held by Seller, to the extent it currently exists and subject to terms of any applicable privacy policy.

"Debtor" has the meaning set forth in the recitals.

"Deposit" has the meaning set forth in Section 3.2.

"Designated Net Sublease Profits" means, in respect of the Madison Avenue Sublease, commencing January 1, 2016, the positive amount in cash equal to the difference between (A) all cash payments actually received from the sublessee in a given annual period, less for each annual period (B) (1) all cash payments made to the landlord under the Madison Avenue Lease and (2) any out-of-pocket costs, Cure Amounts, Post-Petition Accounts Payable, Wind Down Costs or other liabilities or obligations in each case solely and specifically arising from the administration

of the Madison Avenue Lease or the Madison Avenue Sublease, such payments are estimated, but not limited to, for each such year as follows:

| | |
|---|---|
| January 1, 2016 to December 31, 2016 | $195,446 |
| January 1, 2017 to December 31, 2017 | $195,446 |
| January 1, 2018 to December 31, 2018 | $195,446 |
| January 1, 2019 to June 30, 2019 | $ 97,723 |

provided, however, that if such amount is negative for any such annual period, such negative balance will roll forward and will be deducted from the amount that may otherwise be payable in the following annual period(s).

"Effective Time" has the meaning set forth in Section 3.3(b).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means every Contract of Seller that is not an Assigned Contract.

"Excluded Liabilities" has the meaning set forth Section 2.4.

"Execution Date" has the meaning set forth in the preface above.

"Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument, or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing shall have expired; *provided, however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

"Fulfillment Services Company" means Totally Awesome Warehouse LLC in its capacity as a provider of product fulfillment services pursuant to that certain Fulfillment Services Agreement, by and between Seller and Totally Awesome Warehouse LLC, dated January 1, 2015.

"Governmental Authority" means any federal, state or local governmental authority, court or any regulatory, administrative or other governmental agency.

"Insider" has the meaning ascribed to such term in section 101(31) of the Bankruptcy Code, which includes current and former majority equity holders.

"Inventory" means all products of any kind sold in conjunction with the operation of the Business as presently or historically conducted.

"Knowledge" means actual knowledge, or such knowledge that a reasonably prudent person would have after due inquiry of those officers or Representatives of Buyer or the actual knowledge of those officers of Seller as of or prior to the Closing each of which is identified in Schedule 1.1.

"FEI" has the meaning set forth in the preface above.

"Liabilities" means debts, obligations, contracts or other liabilities of any kind, character or description, accrued, absolute, contingent, determined, determinable or otherwise, whether presently in existence or arising hereafter.

"Lien" means any claim, charge, easement, encumbrance, encroachment, security interest, mortgage, lien, pledge or restriction, whether imposed by Contract, Applicable Law, equity or otherwise.

"Madison Avenue Lease" means that certain real property sublease at 63 Madison Avenue, New York, New York 10016, between the Debtor (successor to BE Music, Inc.) as sub-subtenant and Bank of New York as sub-sublandlord, dated December 19, 2002 (as amended from time to time).

"Madison Avenue Sublease" means that certain real property sublease at 63 Madison Avenue, New York, New York 10016, between the Debtor as sub-lessor and WestPoint Homes LLC as sub-lessee, dated August 22, 2006 (as amended from time to time).

"Material Adverse Effect" or "Material Adverse Change" means any fact, circumstance, event, change, effect, condition or occurrence that, individually or in the aggregate, has a material adverse effect on (a) the value of the Acquired Assets, or (b) the ability of Seller to consummate the Contemplated Transactions on a timely basis, in each case as determined by Buyer."

"Material Contracts" has the meaning set forth in Section 4.7(b).

"Parties" has the meaning set forth in the preface above.

"Party" has the meaning set forth in the preface above.

"Petition Date" has the meaning set forth in the recitals.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other business entity.

"Post-Petition Accounts Payable" means all unpaid and unaccrued postpetition accounts payable, as estimated, but not limited to, on Schedule 2.7; provided that, notwithstanding anything to the contrary, such accounts payable shall not include any post-petition royalties allegedly payable to any studio.

"Pre-Closing Tax Returns" has the meaning set forth in Section 4.6(a).

"Purchase Price" has the meaning set forth in Section 3.1.

"Representatives" means, with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, attorneys, advisors and other representatives.

"Sale Order" has the meaning set forth in the recitals.

"Seller" has the meaning set forth in the preface above.

"Seller Confidential Information" has the meaning set forth in Section 7.2(a).

"Seller's Consents and Approvals" has the meaning set forth in Section 4.8.

"Tax" or "Taxes" means any federal, state, or local income, prohibited transaction, gross receipts, license, excise,  customs duties,  personal property, sales, use, transfer, registration, value added, estimated, or other tax of any kind whatsoever related to the Acquired Assets, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Liability for Taxes of any other Person.

"Tax Return" means any return, declaration, statement, report, form, claim for refund, or similar statements or documents including information reporting forms (including Forms 941, 990, 1099 and W-2 and estimated tax returns and reports) relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Taxes" means any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges payable in connection with the Contemplated Transactions.

"Universal Side Letter" shall mean that certain side letter, dated as of the date hereof by and between Buyer and USHE related to the return of certain video devices.

"USHE" shall mean Universal Studios Home Entertainment LLC.

"Wind Down Costs" means the costs described on Schedule 2.6.

1.2    Other Definitional and Interpretative Provisions.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The captions and headings used

herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.    References to Articles, Sections, Exhibits and Schedules are to the Articles, Sections, Exhibits and Schedules, respectively, of this Agreement unless otherwise specified.    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.  The terms "Dollars," "dollars" and "$" shall mean United States dollars.  Any singular term in this Agreement shall be deemed to include the plural and any plural term the singular, and references herein to any gender shall include the other gender.  References to any Person include the successors and permitted assigns of that Person.    Any reference to a code, act, statute or regulation means that law, code, act, statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor laws, codes, acts, statutes or regulations and any reference to any law code, act or statute shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.    References to a "day" or any number of "days" (without explicit qualification by the word "Business") shall be interpreted as a reference to a calendar day or number of calendar days.  If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, the time for the giving of such notice or the performance of such act shall be extended to the next succeeding Business Day.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    Assets to be Sold to Buyer.  On the terms and subject to the conditions of this Agreement, and on the basis of the representations and warranties herein contained, Seller shall sell, transfer, convey, assign and deliver to Buyer, or to an entity or entities designated by Buyer, on the Closing Date, all of its right, title and interest in all of Seller's assets (subject to Sections 2.3, 2.4 and 2.5) including without limitation those assets described on Schedule 2.1, except for the Excluded Assets, free and clear of all Liens and Claims, other than Liens securing the Assumed Liabilities, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code ( the "Contemplated Transactions").  The Acquired Assets shall be comprised of those assets listed in Schedule 2.1.

2.2    Excluded Assets.  The following assets are not intended by the Parties to be a part of the Contemplated Transactions and are excluded from the Acquired Assets (the "Excluded Assets"):

(a)    Seller's cash, cash equivalents, bank deposits and similar instruments;

(b)    Organizational documents, corporate records and minute books of Seller;

(c)    The Excluded Contracts;

(d)    (i) All Avoidance Actions against any Insider (other than the Avoidance Actions subject to the releases by Seller to be delivered pursuant to Section 3.4(a)(vi)) and (ii) the Avoidance Actions included as part of the Acquired Assets.

(e)      All Claims or causes of action of Seller against third parties relating to the Excluded Assets; and

(f)      Rights that will accrue to Seller under this Agreement.

2.3    Assumed Liabilities.    On the terms and subject to the conditions of this Agreement, Buyer agrees that at the Closing it will assume and agree to fully pay, perform and discharge, as the case may be, when due, only the following obligations and Liabilities (collectively, the "Assumed Liabilities"):

(a)      the obligations pursuant to those contracts specifically identified by Buyer that are expressly and actually assigned by Seller to Buyer pursuant to Schedule 2.3(a) of this Agreement ("Assigned Contracts"), but only to the extent of contractual obligations and Liabilities which are to be initially performed or which accrue from and after the Closing Date and relate solely to dates of service from and after the Closing Date and subject only to the Cure Amounts set forth in clause (b) below;

(b)      the Cure Amounts expressly set forth on Schedule 2.5 for the Assigned Contracts;

(c)      the Wind Down Costs as set forth on Schedule 2.6

(d)      the Post-Petition Accounts Payable as set forth on Schedule 2.7;

2.4    Excluded Liabilities.    Notwithstanding any provision of this Agreement or any other document or instrument to the contrary, Buyer shall have the obligation to assume only the Assumed Liabilities, and Buyer shall not have any obligation with respect to any other Liabilities of Seller, regardless of whether such obligation arises before, on or after the Closing Date (all of such other Liabilities, collectively, the "Excluded Liabilities").

2.5    Cure Amounts.    At the Closing, or as soon as practicable thereafter, and pursuant to section 365 of the Bankruptcy Code, Seller shall assign to Buyer and Buyer shall assume the Assigned Contracts (if any) specifically identified and agreed upon by Buyer in writing.  The total cure amounts, if any, for each respective Assigned Contract that Buyer is prepared to pay to cure all defaults and to pay the actual or pecuniary losses that have resulted from any defaults on the part of Seller under the Assigned Contracts (the "Cure Amounts") solely as are set forth on Schedule 2.5 herein and shall be paid by Buyer in accordance with the terms of this Agreement. Buyer shall have no obligation for the payment of any costs under any Assigned Contract, any contract that Buyer does not elect to be assigned, or otherwise, except as specifically set forth on Schedule 2.5; provided, however, that the assumption and assignment of the Assigned Contracts shall be subject to the cure and assumption and assignment provisions of section 365 of the Bankruptcy Code and the Sale Order unless otherwise agreed to by all relevant parties.

ARTICLE III
PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING

3.1    Consideration; Payment of Purchase Price.    Subject to the terms and conditions hereof, the aggregate consideration for the sale, assignment, transfer, conveyance and delivery of

the Acquired Assets to Buyer (or its designee(s)) shall be (i) payable at Closing Four Hundred Twenty-Five Thousand Dollars ($425,000) payable to Seller (the "<u>Purchase Price</u>"), *less* the Deposit described in Section 3.2, *plus* (ii) payable upon the successful assumption and assignment thereof, the Cure Amounts for Assigned Contracts actually assumed and assigned to Buyer in the amounts expressly set forth in Section 2.5 above, *plus* (iii) assumption of the Wind Down Costs and Post-Petition Accounts Payable, *plus* (iv) payable on or before the 90th day after the end of each annual period from and after the Closing until the termination thereof (without regard to the basis for such termination) thereof to the Person designated by Seller, its successor or assign, the Designated Net Sublease Profits subject to Section 7.5 hereof.

3.2    <u>Deposit</u>.  The Deposit shall be applied against the Purchase Price.  Seller shall retain the Deposit as liquidated damages, as its sole remedy, if this Agreement is properly terminated by Seller pursuant to Section 10.1(c)(ii) or upon the failure of Buyer to consummate the Sale, provided that all conditions precedent to Closing have been satisfied and there shall not have been a material breach by Seller of any representation, warranty or covenant contained in this Agreement.  The Deposit shall be returned to Buyer in the event of a breach of this Agreement by Seller or upon its proper termination by Buyer in accordance with Section 10.1(a), (b) or (d).

3.3    <u>Closing and Closing Date</u>.

(a)    The closing of the Contemplated Transactions (the "<u>Closing</u>") shall take place at a location agreed upon by Buyer and Seller, within 5 Business Days after receipt of approval by the Bankruptcy Court, subject to the satisfaction or waiver of all other conditions to the obligations of Seller and Buyer, to consummate the Contemplated Transactions (other than conditions with respect to actions Seller and Buyer will take at the Closing) or such other date as Buyer and Seller may mutually agree upon in writing (the "<u>Closing Date</u>").

(b)    Unless otherwise agreed in writing by the Parties, the Contemplated Transactions shall be effective as of 12:01 a.m. on the calendar day immediately following the Closing Date (the "<u>Effective Time</u>").

3.4    <u>Closing Deliveries</u>.

(a)    Seller Deliveries.  At the Closing, contemporaneously with Buyer's delivery to Seller of all of the Closing Documents required to be delivered by Buyer hereunder, Seller shall deliver or cause to be delivered to Buyer, duly executed by Seller in recordable form, where applicable (the documents and other deliverables described in this Section 3.4 and all other documents required to be delivered hereunder are referred to collectively as the "<u>Closing Documents</u>") the following items:

(i)    a fully-executed bill of sale from Seller in a form acceptable to Buyer;

(ii)    if applicable, a fully-executed assignment and assumption agreement (the "<u>Assignment and Assumption</u>") with respect to any Assigned Contracts;

(iii)    a certificate from an officer of Seller to the effect that each of the conditions specified in 8.1(a), Section 8.1(b) and Section 8.1(c) is satisfied in all respects;

(iv)    a secretary's certificate of Seller dated as of the Closing Date that confirms the approval of Seller's Board of Directors of the Contemplated Transactions;

(v)    the closing statement showing all adjustments/credits in respect of the Purchase Price as described in Section 3.2 plus the payment of any Cure Amounts to be made at the Closing in accordance with the terms hereof, duly executed by Seller; and

(vi)    a mutual release executed by Seller and Buyer, in each case on behalf of themselves and certain affiliated Persons identified therein of any and all claims and liabilities, in the form annexed hereto as Exhibit 3.4.

(b)    <u>Buyer Deliveries</u>.    At the Closing, contemporaneously with Seller's delivery to Buyer of all of the Closing Documents required to be delivered by Seller hereunder, Buyer shall deliver or cause to be delivered to Seller the following items:

(i)    in accordance with and subject to adjustment as provided in this Agreement, the Purchase Price and any Cure Amounts;

(ii)    if applicable, a fully-executed Assignment and Assumption;

(iii)    the closing and apportionment statement showing all adjustments to the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Buyer;

(iv)    a certificate from an officer of Buyer to the effect that each of the conditions specified in Section 8.2(a) is satisfied in all respects;

(v)    a secretary's certificate of Buyer dated as of the Closing Date; that confirms the approval of Buyer's Manager of the Contemplated Transactions; and

(vi)    the Universal Side Letter.

3.5    <u>Transfer Taxes</u>.    To the extent applicable, Buyer and Seller shall each pay at the Closing any Transfer Taxes payable by it pursuant to Section 11.5.

3.6    <u>Delivery of Records and Contracts</u>.    Seller shall make available to Buyer, on the Closing Date, in a format and delivery method as mutually agreed upon, available documentation related to the Acquired Assets as set forth in Schedule 2.1 (except for organization documents which are Excluded Assets), as of the Closing Date.

3.7    <u>Further Conveyances</u>.    If Buyer or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Buyer shall promptly deliver

such Excluded Assets (or any payments or proceeds related thereto) to Seller.  If Seller retains any Acquired Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Acquired Assets (or any payments or proceeds related thereto) to Buyer.

3.8    Bulk Sales Law.    The Parties hereby waive compliance by Seller with the requirements and provisions of any Applicable Law related to "bulk-transfer" of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

3.9    Allocation of Purchase Price.    The Purchase Price shall be allocated among the Acquired Assets in accordance with the allocation protocols (and amounts determined therefrom) as determined by Buyer; *provided, however*, such allocation shall not be binding on Seller's estate in the Bankruptcy Case.

ARTICLE IV
SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE IV).

4.1    Organization of Seller.    Seller (a) is duly organized, validly existing and in good standing under the laws of the State of Delaware, the jurisdiction of its formation, (b) has full corporate power and authority to conduct its business as presently conducted.

4.2    Authorization of Transaction.    Except for such authorization as is required by the Bankruptcy Court, Seller has full corporate power and authority to execute and deliver this Agreement and, subject to such authorization as is required by the Bankruptcy Court to perform its obligations hereunder.    Without limiting the generality of the foregoing, the Board of Directors of Seller has duly authorized the execution, delivery and performance of this Agreement by Seller.  This Agreement constitutes and any and all other Closing Documents to be executed by Seller pursuant hereto, when executed, will constitute, the valid and legally binding obligation of Seller, enforceable in accordance with their terms and conditions, except as enforceability against Seller may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.3    Non-Contravention.    Subject to Bankruptcy Court approval and, where applicable the Bankruptcy Code, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transactions (including each Closing Document required to be delivered by Seller at Closing), nor the fulfillment of the terms hereof by Seller, will (i) violate or result in a breach of any of the terms and provisions of, constitute a default under, conflict with, or create in any party the right to accelerate, terminate, modify, cancel or require any notice under any agreement (including any Material Contract), (ii) constitute a violation by Seller of any Applicable Law or (iii) conflict with or violate the certificate of incorporation, bylaws or other

similar organizational documents of Seller.  Pursuant to Section 365(c)(1) of the Bankruptcy Code, all of the Assigned Contracts will be assignable to Buyer at the Closing without the consent of the counterparty, as applicable.

4.4     <u>Brokers' Fees</u>.    Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transactions for which Buyer could become liable or obligated.

4.5     <u>Events Subsequent</u>.  Except as set forth in <u>Schedule 4.5</u>, since September 30, 2015, to the Knowledge of Seller, there have not been any of the following:

(a)     Any material written modification or termination of any Material Contract;

(a)     Any entry into, termination of, or receipt of notice of termination of any Material Contract;

(b)     Any action taken, by Seller or, to the Knowledge of Seller, by another Person on behalf of Seller that will or may reasonably be expected to cause or constitute a breach of any provision of this Agreement or any Material Contract (other than non-payment of accounts payable that are included in the Cure Amounts);

(c)     Any amendment of the articles of incorporation (or similar organizational documents) or corporate structure or ownership of Seller;

(d)     Any material damage to or destruction or loss of any Acquired Assets, whether or not covered by insurance, that materially adversely affects the Acquired Assets; or

(e)     Any change in any Tax election or Tax status of Seller.

4.6     <u>Tax Matters</u>.

(a)     Except as set forth in <u>Schedule 4.6(a)</u>, all Tax Returns with respect to Seller, the Business or the Acquired Assets, to the extent required to be filed with any Governmental Authority with respect to any period prior to Closing by or on behalf of Seller (collectively, the "<u>Pre-Closing Tax Returns</u>"), have been prepared in accordance with all Applicable Laws and have been filed when due (taking into account extensions of filing due dates) in accordance with all Applicable Laws, and all such Pre-Closing Tax Returns are true, correct and complete in all material respects.

(b)     <u>Schedule 4.6(b)</u> contains a list of all jurisdictions where Seller currently files Tax Returns related to the Business.

(c)     To Seller's Knowledge, there are no Liens or Claims for Taxes upon the Acquired Assets other than statutory Liens for Taxes not yet due or payable. For the avoidance of doubt, the Pension Benefit Guaranty Corporation currently holds a statutory lien in the sale proceeds, which the Debtor believes will extinguish on its own terms on

December 31, 2015, or is otherwise subject to challenge pursuant to Chapter 5 of the Bankruptcy Code.

4.7     Contracts.

(a)     Schedule 2.3(a) sets forth a complete and correct list of the Contracts included in the Acquired Assets.

(b)     As used in this Agreement, the term "Material Contracts" means all Contracts that are material to the Acquired Assets. Except (i) as otherwise provided in the Bankruptcy Code; (ii) for events of default arising as a result of Seller's filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code; and (iii) for events of default rising from Seller's non-payment, all of the Material Contracts are in full force and effect, are valid and binding and are enforceable in accordance with their terms in favor of the Seller pursuant to the applicable provisions of the Bankruptcy Code. Except for Cure Amounts, if any, there are no material Liabilities of any party to any Material Contract arising from any breach or default of any provision thereof and no event has occurred that, with the passage of time or the giving of notice or both, would constitute a breach or default by any party thereto.

(c)     Seller has used commercially reasonable efforts to deliver to Buyer true and complete copies of each Material Contract, in each case, as amended or otherwise modified and in effect as of the Execution Date.

(d)     (i) To the extent Seller has the right to assign to Buyer each of the Material Contracts on the Closing Date under section 365 of the Bankruptcy Code and upon such assignment at Closing in the manner contemplated by this Agreement, Buyer shall have all of the rights of Seller thereunder, and (ii) no Material Contract to which Seller is a party has been, or may be, terminated by any other party thereto as a result of the Contemplated Transactions including without limitation, that certain Trademark License Agreement by and between Seller and Sony Entertainment dated June 21, 2002, which remains in full force and effect as of the Closing Date.

4.8     Seller's Consents and Approvals.  Schedule 4.8 lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made by Seller to consummate the Contemplated Transactions (including this Agreement and each other Closing Document required to be delivered by Seller at Closing) (collectively, "Seller's Consents and Approvals"), other than entry of the Sale Order.

4.9     Litigation.  Except as set forth on Schedule 4.9, (i) there is no action, suit, investigation or proceeding pending or, to Seller's Knowledge, threatened (x) against Seller with respect to the Acquired Assets before any arbitrator or Governmental Authority, and (y) that would reasonably be expected to prevent, hinder, delay or otherwise challenge the consummation of the Contemplated Transactions or that questions the validity, legality or propriety of the Contemplated Transactions.

4.10     Full Disclosure.  No representation or warranty made by Seller in this Agreement, or in any schedule, and no statement, schedule or certificate required to be furnished to Buyer

pursuant to this Agreement, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein not misleading. Each of the separate representations and warranties set forth in ARTICLE IV is intended to be, and shall be interpreted as, an independent representation and warranty as to the matters referred to therein

4.11    No Other Representations or Warranties; Schedules.    Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Acquired Assets, the Assumed Liabilities or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, its Affiliates or any of their respective officers, directors, members, employees, agents, consultants or other Representatives.    Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), Seller (a) expressly disclaims any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller or any of its Affiliates).    Seller makes no representations or warranties to Buyer regarding the probable success or profitability of the Acquired Assets.    Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Acquired Assets except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules).

ARTICLE V
BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller that the statements contained in this ARTICLE V are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE V).

5.1    Organization of Buyer.    Buyer (a) is duly organized, validly existing and in good standing under the laws of the State of New York, the jurisdiction of its formation, and (b) has full power and authority and all necessary government approvals to own, lease and operate its properties and assets and to conduct its business as presently conducted.

5.2    Authorization of Transaction.    Buyer has full power and authority to execute and deliver this Agreement and, subject to such authorizations as required by the Bankruptcy Court to perform its obligations hereunder.    The execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by all requisite action of Buyer.    This Agreement constitutes, and any and all other Closing Documents to be executed by Buyer pursuant hereto when executed will constitute, the valid and legally binding obligation of Buyer, enforceable in accordance with their terms and conditions, except as

enforceability against Buyer may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

5.3    Non-Contravention.

(a)    Subject to Bankruptcy Court approval, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing), nor the fulfillment of the terms hereof by Buyer, will (i) violate any Applicable Law to which Buyer is subject or any provision of its charter, operating agreement, or other governing documents or (ii) conflict with, violate or result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets are subject.

(b)    Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority in order for the Parties to consummate the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing), except for those required under or in relation to those required by the Bankruptcy Court.

5.4    Brokers' Fees.    Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transactions.

5.5    Buyer's Consents and Approvals.    Schedule 5.5 lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made by Buyer to consummate the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing) (collectively, "Buyer's Consents and Approvals"), other than entry of the Sale Order.

5.6    Acknowledgement Regarding Condition of the Business.    Buyer (either alone or together with its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Acquired Assets of Seller and is capable of bearing the economic risks of such investment.  Buyer is an informed and sophisticated purchaser, and, where necessary, has engaged expert advisors, experienced in the evaluation and purchase of assets such as the Acquired Assets as contemplated hereunder.  Buyer acknowledges that Seller has given Buyer access to such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement. Buyer agrees to accept the Acquired Assets of Seller in the condition they are in on the Closing Date based upon its own inspection, examination and determination with respect thereto as to all matters and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Seller, except as expressly set forth in this Agreement.  Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges that Seller is not making any representations or warranties whatsoever, whether

express or implied or written or oral, beyond those expressly given by it to Buyer in ARTICLE V (as modified by the Schedules), and Buyer agrees that, except for the representations and warranties contained therein, the Acquired Assets are being transferred to Buyer on a "WHERE IS" and, as to condition, "AS IS" basis.

5.7     Financial Capability.  Buyer has, or on the Closing Date will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder.  On the Closing Date, Buyer (or its designee) will be capable of satisfying the conditions contained in Sections 365(b)(1)(c) and 365(f) of the Bankruptcy Code regarding the Assigned Contracts, if any.

5.8     No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), neither Buyer nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Buyer or the Contemplated Transactions, and Buyer disclaims any other representations or warranties, whether made by Buyer, any Affiliate of Buyer or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives.

ARTICLE VI
PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Execution Date and the Closing:

6.1     General.  Each of the Parties will use its commercially reasonable efforts to take all actions and to do all things necessary in order to consummate and make effective the Contemplated Transactions (including satisfaction, but not waiver, of the Closing conditions set forth in ARTICLE VIII) and to ensure that Buyer is relieved of all Excluded Liabilities.

6.2     Bankruptcy Court Approval.

        (a)     If necessary, each of Buyer and Seller shall use their reasonable best efforts to comply at the earliest practicable date with any request for additional information, documents, or other materials received by each of them or any of their respective Affiliates from the Bankruptcy Court in respect of the Contemplated Transactions.

6.3     Operation of Business.  Seller will operate its business in the ordinary course with regard to the Acquired Assets through the Closing Date. Without limiting the generality of the foregoing, Seller will not, during the period between execution of this Agreement and the Closing Date, without Buyer's prior written consent (which shall not be unreasonably withheld or delayed):

        (a)     enter into or amend any Material Contract;

        (a)     terminate any Material Contract other than upon the expiration of its term or for the counterparty's breach of such Material Contract;

(b)      fail to perform when due all material obligations under any Material Contract except to the extent such performance is excused under the Bankruptcy Code or by the Bankruptcy Court;

(c)      fail to give prompt notice to Buyer of any Material Adverse Change in the Acquired Assets;

(d)      sell, transfer, or convey any Acquired Assets; or

(e)      change any of its accounting methods;

6.4      <u>Access</u>.  Seller will permit Representatives of Buyer (including its accountants) to have access upon appointment with prior notice during Seller's regular business hours, and in a manner so as not to interfere with the normal business operations of Seller, to the records (including Tax records), contracts, and documents of or pertaining to the Acquired Assets prior to the Closing.

6.5      <u>Notice of Developments</u>.

(a)      Seller shall promptly notify Buyer of any notice or other communication from any Governmental Authority in connection with the Contemplated Transactions.

(b)      Seller shall promptly notify Buyer of any written notice of any termination, default or event that, with notice or lapse of time or both, would become a default, received by Seller subsequent to the Execution Date, under any Contracts that are included in the Acquired Assets.

(c)      No notification under this Section 6.5 shall affect the representations, warranties or obligations of the Parties or the conditions to the obligations of the Parties hereunder, or limit or otherwise affect the remedies available hereunder to the Party receiving such notice.

## ARTICLE VII
## POST-CLOSING COVENANTS

Seller and Buyer agree as follows with respect to the period following the Closing:

7.1      <u>General</u>.  After the Closing, each of Buyer and Seller will cooperate in providing access to all available files, correspondence, lists, and other documents and information related to the Acquired Assets and matters covered by this Agreement as the other may reasonably request, all at the sole cost and expense of the requesting Party for a period of one (1) year after Closing.

7.2      <u>Non-Disclosure</u>.

(a)      From and after the date hereof, Buyer shall, and shall direct its Representatives, to maintain in confidence, not disclose to any third party (other than their Representatives) without the prior written consent of Seller, and not use to the

detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives.  For purposes of this Section 7.2(a), "Seller Confidential Information" means any information that is confidential or proprietary in nature that is related to the Acquired Assets, the Assumed Liabilities, the Excluded Assets, or the Excluded Liabilities, including methods of operation, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; *provided, however*, that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Buyer or any of its Representatives, (ii) becomes available to Buyer on a non-confidential basis from a source other than Seller or its Representatives, provided that such source is not known by Buyer to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Buyer from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure, or (iv) can be shown by Buyer through written documents or evidence maintained by Buyer to have been independently developed by it without the use of Seller Confidential Information; and *provided further*, that upon the Closing, the restrictions contained in this Section 7.2(a) shall not apply to confidential or proprietary information related primarily to the Acquired Assets, or the Assumed Liabilities.  Buyer may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Transactions and who are directed to keep it confidential.  Buyer shall instruct its Representatives having access to Seller Confidential Information of such obligation of confidentiality.  If Buyer or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein is required by Applicable Law to disclose any of such Confidential Information, Buyer shall, to the extent permissible by Applicable Law, provide Seller with prompt notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, or Seller waives compliance with the provisions of this Section 7.2(a), Buyer and its Representatives shall furnish only that portion of the Seller Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(b)    From and after the date hereof, Seller shall, and shall direct its Representatives to, maintain in confidence and not disclose to any third party (other than its Representatives and/or those third parties that will provide services for Buyer related to the Acquired Assets) without the prior written consent of Buyer, and not to use to the detriment of Buyer, any Acquired Assets Confidential Information, other than in connection with (i) the Excluded Assets and Excluded Liabilities or otherwise related to the operation of Seller's Business, (ii) any investigations by Governmental Authorities, (iii) any legal proceeding, (iv) enforcing any rights or other Claims of Seller under this Agreement, or (v) performing any obligations of Seller under this Agreement.  For purposes of this Section 7.2(b), "Acquired Assets Confidential Information" means any information that is confidential or proprietary in nature that is primarily related to the Acquired Assets, or the Assumed Liabilities, other than information primarily pertaining to the Excluded Assets or the Excluded Liabilities, or Seller's Business.  Seller may disclose any of the Acquired Assets Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who

are directed to keep it confidential.  Seller shall instruct its Representatives having access to Acquired Assets Confidential Information of such obligation of confidentiality.  If Seller or anyone to whom it has transmitted Acquired Assets Confidential Information subject to the confidentiality obligations herein is required by Applicable Law to disclose any of such Acquired Assets Confidential Information, Seller shall, to the extent permissible by Applicable Law, provide Buyer with prompt notice prior to making any disclosure so that Buyer may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, or Buyer waives compliance with the provisions of this Section 7.2(b), Seller and its Representatives shall furnish only that portion of the Acquired Assets Confidential Information that they are advised by counsel is required by Applicable Law to be disclosed.

(c)     It is understood by the Parties that the information, documents and instruments delivered to Seller by Buyer or its Representatives in connection with the negotiation of this Agreement  that are of a confidential and proprietary nature shall be deemed "Buyer Confidential Information".  Seller agrees that both prior and subsequent to Closing it will maintain the confidentiality of all Buyer Confidential Information and only disclose such information, documents and instruments (x) to duly authorized Representatives, (y) as necessary to comply with Applicable Law, or (z) to assist or defend Claims as provided herein.  Buyer Confidential Information does not include any information that (i) becomes generally available to the public other than as a result of a disclosure by Seller, or any of its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Buyer or its Representatives, provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Buyer, (iii) is lawfully received by Seller from a third party having the right to disseminate the Buyer Confidential Information without restriction on disclosure, or (iv) can be shown by Seller through written documents or evidence maintained by them to have been independently developed by it without the use of Buyer Confidential Information.  Seller further agrees that upon Buyer's written request, it will destroy or, or at Seller's option return to Buyer, all such documents and instruments and all copies thereof in its possession.  If Seller or anyone to whom it has transmitted Buyer Confidential Information is required by Applicable Law to disclose any of such Buyer Confidential Information, Seller shall, to the extent permissible by Applicable Law, provide Buyer with prompt notice prior to making any disclosure so that Buyer may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, or Buyer waives compliance with the provisions of this Section 7.2(c), Seller and its Representatives shall furnish only that portion of the Buyer Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(d)     The obligations contained in this Section 7.2 shall survive for one (1) year after the Closing.

7.3     Further Assurances.  Each Party agrees to use all commercially reasonable efforts to take, or cause to be taken, all actions it deems proper or advisable under Applicable Laws and regulations to effectuate the consummation of the Contemplated Transactions.

7.4    Claims Reconciliation.    Buyer shall cause its affiliated entity, Bookspan, to perform post-Closing claims reconciliation services, as reasonably requested by or on behalf of the Seller, in connection with, and until the earlier of (i) the conclusion of, the Bankruptcy Case and (ii) February 29, 2016, at no charge to the Seller or its chapter 11 estate; provided that neither Bookspan nor Buyer shall be required to assume or pay any out-of-pocket expenses or disbursements to any third parties in respect of the claims reconciliation services and Seller shall indemnify Buyer and Bookspan for any liability or other obligation of any kind in connection with any act or omission in respect of the claims reconciliation process other than any act or omission arising from Buyer's fraud, gross negligence or willful misconduct.

7.5    Buyer's Duties in Respect of Madison Avenue Lease and Madison Avenue Sublease.    Seller covenants and agrees that, upon the assumption and assignment of the Madison Avenue Lease and the Madison Avenue Sublease, (i) Buyer shall only be required to exercise commercially reasonable efforts in connection with collection and payments of the portion of the Purchase Price payable pursuant to Section 3.1(iii); (ii) nothing in this Agreement shall create any fiduciary or other duty or relationship of any kind between Seller and Buyer in respect of the Madison Avenue Sublease; and (iii) Buyer shall be entitled to exercise its good faith business judgment, without prior notice to Seller or any other Person, with respect to any and all matters in respect of the Madison Avenue Lease and Madison Avenue Sublease.    Buyer shall have no obligation or liability to Buyer in respect of the portion of the Purchase Price payable pursuant to Section 3.1(iii) of this Agreement in the event that (i) either the Madison Avenue Lease or Madison Avenue Sublease is not successfully assigned to Buyer or its designee or (ii) either the Madison Avenue Lease or Madison Avenue Sublease is terminated by any Person.    Buyer covenants and agrees to perform all of the obligations under the Madison Avenue Lease and the Madison Avenue Sublease

ARTICLE VIII
CONDITIONS TO OBLIGATION TO CLOSE

8.1    Conditions to Buyer's Obligation.    Buyer's obligation to consummate the Contemplated Transactions is subject to satisfaction of the following conditions:

(a)    The representations and warranties set forth in ARTICLE IV shall be true and correct in all material respects when made and as of the Closing Date

(b)    Seller shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing.

(c)    No material breach or default on the part of Seller shall have occurred under any covenant or agreement hereunder or any Closing Document or any other agreement of the Parties;

(d)    No Material Adverse Change shall have occurred with respect to the Acquired Assets between the execution of this Agreement and the Closing Date;

(e)    No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making

the Contemplated Transactions contemplated illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Contemplated Transactions;

(f)    No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transactions;

(g)    Seller and Buyer shall have received approval and authorization by the Bankruptcy Court for the Contemplated Transactions and Seller's assignment of any Assigned Contracts to, and the assumption thereof by, Buyer;

(h)    The Sale Order shall have become a Final Order; and

(i)    Buyer shall have received all of the Closing Documents described in Section 3.4(a).

8.2    <u>Conditions to Seller's Obligations</u>.    Seller's obligations to consummate the Contemplated Transactions are subject to satisfaction of the following conditions:    The representations and warranties set forth in ARTICLE V shall be true and correct in all material respects when made and at and as of the Closing Date;

(a)    Buyer shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing;

(b)    No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making the Contemplated Transactions illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Contemplated Transactions;

(c)    No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transactions;

(d)    Seller and Buyer shall have received approval and authorization by the Bankruptcy Court for the Contemplated Transactions and Seller's assignment of any Assigned Contracts to, and the assumption thereof by, Buyer;

(e)    The Sale Order shall have become a Final Order;

(f)    Seller shall have received all of the Closing Documents described in Section 3.4(b); and

(g)    Buyer shall have paid, or shall pay simultaneously with the Closing, or shall have made arrangements to pay as required by the Bidding Procedures Order, any and all Cure Amounts with respect to the Assigned Contracts, if any.

ARTICLE IX
DISPUTE RESOLUTION

9.1    Dispute Resolution.  The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute that arises under this Agreement.

ARTICLE X
TERMINATION

10.1    Termination of Agreement.    In respect of the Contemplated Transactions, this Agreement may be terminated prior to the Closing as follows:

(a)    Termination Due to Events in Bankruptcy Case.  Buyer may terminate this Agreement immediately upon written notice to Seller if: (i) the Bankruptcy Case is dismissed or converted to a Chapter 7 bankruptcy case under the Bankruptcy Code, or an interim or permanent trustee is appointed in the Bankruptcy Case, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in the Bankruptcy Case; (ii) relief from the automatic stay to permit foreclosure is granted or there is an exercise of other remedies on the material assets of Seller; or (iii) Seller consents to any modification of this Agreement without the prior written agreement of Buyer.

(b)    Termination by Buyer.  Prior to the Closing Date, Buyer may terminate this Agreement immediately upon written notice to Seller of the occurrence of any of the following, at which time all obligations of Buyer hereunder shall be of no further force and effect if (i) there shall be a material breach by Seller of (A) any material representation or warranty, or (B) any material covenant or agreement contained in this Agreement, which breach (1) cannot be cured or (2) has not been cured within five (5) Business Days after the giving of written notice by Buyer to Seller of such breach and such breach results in a Material Adverse Effect; or (ii) the Closing Date does not occur on or before November 30, 2015.

(c)    Termination by Seller.  Prior to the Closing Date, Seller may terminate this Agreement upon written notice to Buyer of the occurrence of any of the following, unless Seller is in material breach of this Agreement prior to the occurrence of the following, at which time all obligations of Seller hereunder shall be of no further force and effect, except for those obligations specified in this Agreement to survive termination:

(i)    if any of the conditions to the obligations of Seller to close that are set forth in Section 8.2 shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller;

(ii)    if there shall be a material breach by Buyer of any material representation or warranty, or by Buyer of any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured

within 15 Business Days after the giving of written notice by Seller to Buyer of such breach; or

(iii)     if the Closing Date does not occur on or before November 30, 2015; provided that Buyer has agreed in its sole and absolute discretion to waive the condition in Section 8.2(e) that the Sale Order becomes a Final Order.

(d)     Termination by Buyer or Seller.  (i) Subject to Bankruptcy Court approval, the Parties may terminate this Agreement by mutual written consent of Seller and Buyer prior to the Closing Date or (ii) if the Seller consummates an Alternative Transaction.

(e)     Extension of Time Periods.   The time periods for termination of this Agreement set forth in this Section 10.1 may be extended without the further approval of the Bankruptcy Court upon the written agreement of the Parties, after consultation with the Official Committee of Unsecured Creditors appointed in the Seller's Bankruptcy Case.

10.2     Procedure For Termination.  If this Agreement is terminated by Buyer or Seller, or both, pursuant to Section 10.1, written notice thereof shall promptly be given to the other Party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 10.1), the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 10.3, without further action by the Parties.

10.3     Effect of Termination.   If either Seller or Buyer terminates this Agreement pursuant to Section 10.1, except as otherwise provided herein, all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party (except for any Liability of any Party then in breach of this Agreement or as set forth in Section 3.2); *provided* that if such termination is the result of a breach or default hereunder by the non-terminating Party, then the non-breaching Party shall be entitled to seek any and all remedies available to the terminating Party at law or in equity.

ARTICLE XI
MISCELLANEOUS

11.1     Survival.   Except as set forth in Section 7.2, all representations, warranties, covenants and obligations in this Agreement and in the certificates delivered pursuant to this Agreement shall terminate as of the Closing Date and the consummation of the Contemplated Transactions.

11.2     Press Releases and Public Announcements.  For a period of thirty days after the Closing, no Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party, such approval not to be unreasonably withheld or delayed; *provided, however*, that any Party may make any public disclosure it believes in good faith is required by Applicable Law, the Bankruptcy Code or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement (in which case the disclosing Party will use its reasonable efforts consistent with such Applicable Law, Bankruptcy Code or Bankruptcy

Court requirement to advise the other Party prior to making the disclosure) and in connection with any chapter 11 plan and accompanying disclosure statement.  Upon the termination of the thirty-day period after the Closing, Seller shall not issue any press release or make any public announcement in respect of the Acquired Assets, except as required by Applicable Law, the Bankruptcy Code or the Bankruptcy Court.

11.3    No Third-Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

11.4    Entire Agreement.  This Agreement and the other Closing Documents constitute the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

11.5    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party.

11.6    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  The delivery of an executed signature page of this Agreement or any other Closing Document by fax or portable document format (.pdf) shall have the same effect as the delivery of a manually executed counterpart hereof or thereof.

11.7    Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11.8    Notices.  All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iii) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:

> Filmed Entertainment Inc.
> 2 Park Avenue, 10th Floor
> New York, NY 10016
> Attn:  Clifton B. Knight, Jr.
> Executive VP, Legal & Business Affairs

Copy to:                    Griffin Hamersky P.C.

485 Madison Avenue, 7th Floor
New York, NY 10022
Attn:  Scott A. Griffin, Esq.

If to Buyer:          Edge Line Ventures LLC
                      2 Park Avenue, 10th Floor
                      New York, NY 10016
                      Attn:  Mr. John Lippman

Copy to:              Baker Botts L.L.P
                      30 Rockefeller Plaza
                      New York, NY  10112
                      Attn:  Emanuel C. Grillo, Esq.

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

11.9    Governing Law; Waiver of Jury Trial.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

11.10    Submission to Jurisdiction; Consent to Service of Process.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 11.8 hereof; *provided, however*, that, if the Bankruptcy Case has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in Manhattan, New York or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the Parties hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 11.8.

11.11    Amendments.    No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.

11.12    Severability.    Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

11.13    Expenses.    Each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the Contemplated Transactions, including, but not limited to, Transfer Taxes.

11.14    Construction.    The Parties participated fully in the negotiation and preparation of this Agreement with full benefit of counsel.  Accordingly, this Agreement is to be construed as if the Parties drafted it jointly and is not to be more strictly construed against any Party.

11.15    Incorporation of Schedules.    The Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. The Parties acknowledge that the Schedules attached hereto may be updated after the Execution Date with Buyer's consent, which consent shall not be unreasonably withheld.

11.16    No Waiver.    The failure of any Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.  The waiver of any such right with respect to particular facts and other circumstances shall not be deemed a waiver with respect to any other facts and circumstances and each such right shall be deemed an ongoing right that may be asserted at any time and from time to time.  No right, remedy or election given by any term of this Agreement shall be deemed exclusive but shall be cumulative with all of the rights, remedies and elections available at law or in equity.

[*signature page follows*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

FILMED ENTERTAINMENT INC.


By:_____
Name: Glenn Langberg
Title:  Independent Director


EDGE LINE VENTURES LLC



By:_____
Name: John Lippman
Title:  Manager

# SCHEDULE 2.1
# ACQUIRED ASSETS

The Acquired Assets shall include, without limitation the following:

(a)      All Assigned Contracts identified by Buyer will be listed on Schedule 2.3(a) which Schedule shall be delivered in final form by Buyer to Seller prior to the Closing;

(b)      All of Seller's right to use of the COLUMBIA HOUSE trademark pursuant to the Trademark License Agreement between Seller and Sony Entertainment dated June 21, 2002 ("License Agreement");

(c)      All of Seller's right, title and interest in and to all of the domain names of Seller;

(d)      All of Seller's accounts receivable;

(e)      All of Seller's inventory (certain of which shall be subject to the Universal Side Letter);

(f)      All Customer Information that is available in accordance with applicable privacy policies and applicable laws with the format and delivery method to be mutually agreed upon;

(g)      All rights of Seller under or pursuant to all warranties and representations to the extent they are transferable to Buyer relating to any Acquired Assets, other than any warranties and representations pertaining to any Excluded Assets;

(h)      Any Avoidance Actions against CDS Global, Inc., and Mercantile Adjustment Bureau; and

(i)      Except for the Excluded Assets, all other assets of Seller.

## SCHEDULE 2.3(a)
## ASSIGNED CONTRACTS

The Assigned Contracts consist of the following:

(1)    All of Seller's right, title and interest in and to that certain Trademark License Agreement, by and between Seller and Sony Music Entertainment, Inc. dated June 21, 2002.

(2)    All of Seller's right, title and interest in and to those certain studio license agreements, including:

(a)    Seller and Anchor Bay Entertainment, LLC dated September 26, 2011 as extended by Amendment on September 17, 2014;

(b)    That certain License Agreement, by and between Seller and Sony Pictures Home Entertainment, Inc. dated July 1, 2009, as extended by Amendment on June 30, 2015;

(c)    That certain License Agreement, by and between Seller and MGM/UA Home Entertainment on July 1, 2004;

(d)    That certain License Agreement, by and between Seller and RLJ Entertainment, Inc., successor-in-interest to Image Entertainment, Inc. dated February 29, 2012, as extended by Amendment on April 29, 2015;

(e)    That certain License Agreement, by and between Seller and FUNimation Productions, Ltd. dated May 6, 2005, as extended by Amendment on October 22, 2013;

(f)    That certain License Agreement, by and between Seller and Lightyear Entertainment, L.P. dated May 4, 2005, as extended by Amendment dated September 1, 2013;

(g)    That certain License Agreement, by and between Alchemy, formerly known as Millennium Media Services, Inc. dated January 24, 2013;

(h)    That certain License Agreement, by and between Seller an MPI Media Group, Inc. dated May 11, 2010, as extended by Amendment on March 21, 2013;

(i)    That certain License Agreement, by and between Seller and Screen Media Ventures, LLC dated March 9, 2011, as extended by Amendment as of February 28, 2014; and

(3)    All of Seller's right, title and interest in and to the Madison Avenue Lease and the Madison Avenue Sublease.

(4)     All of Seller's right, title and interest in and to that certain Master Services Agreement and Statement of Work, by and between Seller and Mercantile Adjustment Bureau dated September 27, 2013 with an effective date of May 1, 2013.

**SCHEDULE 2.5**
**CURE COSTS**


       For the avoidance of doubt, Buyer's total obligation for payment of cure costs would be limited solely to amounts listed below for each respective vendor for each such contract actually and expressly assumed and assigned, subject in each instance to Buyer's written acknowledgment of the assignment of the individual corresponding agreements and cure obligations for same as follows:

| | |
|---|---:|
| Anchor Bay | $12,571 |
| Sony Pictures Home Ent. | 11,545 |
| Image Entertainment / RLJ | 3,428 |
| Millennium (Alchemy) | 3,571 |
| Screen Media | 455 |
| FUNimation | 124 |
| MPI Media Group | 4,955 |
| Light Year Entertainment | 246 |
| MGM | -0- |
| Madison Avenue Sublease | 41,203 |
| TOTAL | $78,098 |

**SCHEDULE 2.6**
**WIND DOWN COSTS**

The Wind Down Costs consist of the following:

| Schedule 2.6 - Wind Down Costs | |
|---|---|
| *$ actuals* | $ Amount |
| Administrative Services (I/C)* | $      (28,875) |
| Distribution Services (I/C)** | (6,000) |
| Other Operating Expenses | (19,830) |
| | **$      (54,705)** |

*Payable to the Administrative Services Company.
**Payable to the Fulfillment Services Company.

**SCHEDULE 2.7**
**POST-PETITION ACCOUNTS PAYABLE**

The Post-Petition Accounts Payable consist of the following:

| Schedule 2.7 - Post-Petition Accounts Payable | | |
|---|---|---|
| *$ actuals* | $ Amount | |
| Accrued & Unpaid Post-Petition I/C* | $ | $ 475,000 |
| Estimated Accrued & Unpaid A/P (non-I/C) | $ | $ 55,000 |
| **Total Post-Petition Accounts Payable** | **$** | **($530,000)** |

*Payable to the Administrative Services Company.

**EXHIBIT 3.4**

**RELEASE AND WAIVER**

**For good and valuable consideration,** on and after the date hereof, to the fullest extent permitted by applicable law, Filmed Entertainment Inc. ("Seller"), on behalf of (A) itself; and (B)(1) each of its predecessors, successors and assigns, parents, and affiliates; and (2) each such Person's current and former officers, directors, employees, agents, partners, managers, independent contractors, principals, consultants, attorneys, financial advisors, accountants, investment bankers and other representatives (collectively, the "Seller Release Parties"), on the one hand, and (X) Edge Line Ventures LLC ("Buyer"), Bookspan LLC, Totally Awesome Warehouse LLC, Books Acquisition LLC, Incredible Warehouse Holding Company LLC, DVD Direct Acquisition LLC, Pride Tree Holdings, Inc. and (Y)(1) each of their respective predecessors, successors and assigns, parents, affiliates, subsidiaries, portfolio companies, management companies, shareholders, and funds, and (2) each such Person's current and former officers, directors, employees, agents, partners, managers, independent contractors, principals, consultants, attorneys, financial advisors, accountants, investment bankers and other representatives (collectively, the "Buyer Release Parties" and when taken together with the Seller Release Parties, the "Release Parties") on the other hand, hereby, and shall be deemed to conclusively absolutely, unconditionally, irrevocably, and forever, release and discharge, in each case, the other group of Release Parties of any and all liabilities, claims, cross-claims, counterclaims, third party claims, defenses, demands, accounts, reckonings, offsets, recoupments, powers, obligations, rights, suits, damages, causes of action, remedies and judgments of any kind or nature whatsoever, including without limitation: any derivative claims asserted or assertable on behalf of a Release Party, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of securities laws or otherwise regardless of jurisdiction, including, those that any of the Release Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim against or equity interest in any other Release Party or any other Person, based on or relating to, or in any manner arising from, directly or indirectly, in whole or in part, (a) the Bankruptcy Case, (b) the negotiation, formulation, preparation or administration of the Asset Purchase Agreement by and between the Seller and Edge Line Ventures LLC or, related agreements, instruments or other documents, or (c) any transaction entered into or affecting, a Release Party, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the date hereof (all of the foregoing individually constituting a "Claim" or collectively, in whole or in part, "Claims") pertaining to the Seller, the Bankruptcy Case or the Agreement; other than Claims arising out of or relating to any act or omission of a Release Party solely to the extent such act or omission is determined by a final order of judgment of a court of competent jurisdiction to have constituted willful misconduct, gross negligence, bad faith, fraud or a criminal act.

For the avoidance of doubt, notwithstanding anything else contained herein, this Release and Waiver shall not include or apply to JMCK Corp., Najafi Companies, Bertelsmann Inc., Blackstone Group, Sony Corporation or Warner Bros. Entertainment Inc.

For the further avoidance of doubt, the Buyer Release Parties agree to waive any and all Claims

in the Bankruptcy Case, including, but not limited to, the following Claims, which will be disallowed and expunged from the Schedule F of the Debtor's Schedule of Assets and Liabilities [Dkt. No. 65]: (a) Claim Number 165090 in the amount of $1,214,180.72 in favor of Bookspan LLC; and (b) Claim Number 165128 in the amount of $21,939.45 in favor of Totally Awesome Warehouse LLC.

For the further avoidance of doubt, notwithstanding anything else contained herein, this Release and Waiver shall not apply to any liability that may arise under any section of the Employee Retirement Income Security Act of 1974, as amended, under the jurisdiction of, or related to, the Pension Benefit Guaranty Corporation.

Each Seller Release Party, on the one hand, and each Buyer Release Party, on the other hand, shall be deemed to have granted the releases and to have waived the Claims set forth herein notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle under any jurisdiction which would limit the effect of such releases to those Claims actually known or suspected to exist at the time of execution of such release.

Dated: November __, 2015

FILMED ENTERTAINMENT INC.

By:_____
Name:
Title:

STATE OF NEW YORK      )
                       )        ss.
COUNTY OF NEW YORK   )

SUBSCRIBED AND SWORN TO before me,
this _____ day of _____, 2015.

[Notary Seal]

_____
Signature

NOTARY PUBLIC

My commission expires: _____, 201_

Dated:  November __, 2015

                                    EDGE LINE VENTURES LLC


                                    By:_____
                                    Name:
                                    Title:


STATE OF NEW YORK        )
                         )      ss.
COUNTY OF NEW YORK   )


SUBSCRIBED AND SWORN TO before me,
this _____ day of _____, 2015.

[Notary Seal]


_____
Signature

NOTARY PUBLIC

My commission expires:  _____, 201_

Dated:  November __, 2015

BOOKSPAN LLC


By:_____
Name:
Title:


STATE OF NEW YORK      )
                                              )          ss.
COUNTY OF NEW YORK   )


SUBSCRIBED AND SWORN TO before me,
this ____ day of _____, 2015.

[Notary Seal]


_____
Signature

NOTARY PUBLIC

My commission expires:  _____, 201_

Dated:  November __, 2015

                              TOTALLY AWESOME WAREHOUSE LLC


                              By:_____
                              Name:
                              Title:


STATE OF NEW YORK      )
                       )      ss.
COUNTY OF NEW YORK   )


SUBSCRIBED AND SWORN TO before me,
this ____ day of _____, 2015.

[Notary Seal]


_____
Signature

NOTARY PUBLIC

My commission expires: _____, 201_

Dated:  November __, 2015

BOOKS ACQUISITION LLC

By:_____

Name:

Title:


STATE OF NEW YORK        )

                         )        ss.

COUNTY OF NEW YORK   )


SUBSCRIBED AND SWORN TO before me,
this _____ day of _____, 2015.

[Notary Seal]


_____
Signature

NOTARY PUBLIC

My commission expires: _____, 201_

Dated:  November __, 2015

INCREDIBLE    WAREHOUSE    HOLDING
COMPANY LLC


By:_____
Name:
Title:


STATE OF NEW YORK        )
                         )        ss.
COUNTY OF NEW YORK   )


SUBSCRIBED AND SWORN TO before me,
this _____ day of _____, 2015.

[Notary Seal]


_____
Signature

NOTARY PUBLIC

My commission expires:  _____, 201_

Dated:  November __, 2015

        DVD DIRECT ACQUISITION LLC


        By:_____
        Name:
        Title:


STATE OF NEW YORK  )
         )  ss.
COUNTY OF NEW YORK )


SUBSCRIBED AND SWORN TO before me,
this ____ day of _____, 2015.

[Notary Seal]


_____
Signature

NOTARY PUBLIC

My commission expires: _____, 201_

Dated:  November __, 2015

PRIDE TREE HOLDINGS, INC.

By:_____
Name:
Title:

STATE OF NEW YORK      )
                       )      ss.
COUNTY OF NEW YORK   )

SUBSCRIBED AND SWORN TO before me,
this _____ day of _____, 2015.

[Notary Seal]

_____
Signature

NOTARY PUBLIC

My commission expires:  _____, 201_

## *__BLACKLINE__*

ASSET PURCHASE AGREEMENT

by and between

FILMED ENTERTAINMENT INC.

and

EDGE LINE VENTURES LLC

Dated as of November 16, 2015

## Table of Contents

Page(s)

ARTICLE I DEFINITIONS .............................................................................................2

    1.1        Definitions....................................................................................2

    1.2        Other Definitional and Interpretative Provisions....................6

ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ............7

    2.1        Assets to be Sold to Buyer .......................................................7

    2.2        Excluded Assets ........................................................................7

    2.3        Assumed Liabilities ..................................................................8

    2.4        Excluded Liabilities .................................................................8

    2.5        Cure Amounts ...........................................................................8

ARTICLE III PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING.....................8

    3.1        Consideration; Payment of Purchase Price ............................8

    3.2        Deposit ......................................................................................9

    3.3        Closing and Closing Date .........................................................9

    3.4        Closing Deliveries.....................................................................9

    3.5        Transfer Taxes .........................................................................10

    3.6        Delivery of Records and Contracts .........................................10

    3.7        Further Conveyances ...............................................................10

    3.8        Bulk Sales Law .......................................................................11

    3.9        Allocation of Purchase Price ..................................................11

ARTICLE IV SELLER'S REPRESENTATIONS AND WARRANTIES ...............................11

    4.1        Organization of Seller ............................................................11

    4.2        Authorization of Transaction .................................................11

    4.3        Non-Contravention .................................................................11

    4.4        Brokers' Fees ..........................................................................12

    4.5        Events Subsequent ..................................................................12

    4.6        Tax Matters .............................................................................12

    4.7        Contracts. ................................................................................13

    4.8        Seller's Consents and Approvals ...........................................13

    4.9        Litigation.................................................................................13

    4.10      Full Disclosure .......................................................................13

    4.11      No Other Representations or Warranties; Schedules................14

ARTICLE V BUYER'S REPRESENTATIONS AND WARRANTIES.....................................14
    5.1        Organization of Buyer................................................................................14
    5.2        Authorization of Transaction .....................................................................14
    5.3        Non-Contravention ....................................................................................15
    5.4        Brokers' Fees .............................................................................................15
    5.5        Buyer's Consents and Approvals ...............................................................15
    5.6        Acknowledgement Regarding Condition of the Business ..........................15
    5.7        Financial Capability ..................................................................................16
    5.8        No Other Representations or Warranties; Schedules..................................16
ARTICLE VI PRE-CLOSING COVENANTS ...................................................................16
    6.1        General .......................................................................................................16
    6.2        Bankruptcy Court Approval .......................................................................16
    6.3        Operation of Business ................................................................................16
    6.4        Access ........................................................................................................17
    6.5        Notice of Developments ............................................................................17
ARTICLE VII POST-CLOSING COVENANTS .................................................................17
    7.1        General .......................................................................................................17
    7.2        Non-Disclosure .........................................................................................17
    7.3        Further Assurances.....................................................................................19
    7.4        Claims Reconciliation ...............................................................................20
    7.5        Buyer's Duties in Respect of Madison Avenue Sublease..........................20
ARTICLE VIII CONDITIONS TO OBLIGATION TO CLOSE .........................................20
    8.1        Conditions to Buyer's Obligation .............................................................20
    8.2        Conditions to Seller's Obligations ............................................................21
ARTICLE IX DISPUTE RESOLUTION ............................................................................22
    9.1        Dispute Resolution ....................................................................................22
ARTICLE X TERMINATION .............................................................................................22
    10.1       Termination of Agreement.........................................................................22
    10.2       Procedure For Termination ........................................................................23
    10.3       Effect of Termination ................................................................................23
ARTICLE XI MISCELLANEOUS ......................................................................................23
    11.1       Survival .....................................................................................................23
    11.2       Press Releases and Public Announcements ...............................................23
    11.3       No Third-Party Beneficiaries ....................................................................24

| | | |
|---|---|---|
| 11.4 | Entire Agreement | 24 |
| 11.5 | Succession and Assignment | 24 |
| 11.6 | Counterparts | 24 |
| 11.7 | Headings | 24 |
| 11.8 | Notices | 24 |
| 11.9 | Governing Law; Waiver of Jury Trial | 25 |
| 11.10 | Submission to Jurisdiction; Consent to Service of Process | 25 |
| 11.11 | Amendments | 26 |
| 11.12 | Severability | 26 |
| 11.13 | Expenses | 26 |
| 11.14 | Construction | 26 |
| 11.15 | Incorporation of Schedules | 26 |
| 11.16 | No Waiver | 26 |

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of November 16, 2015, (the "Execution Date") is by and between FILMED ENTERTAINMENT INC., a Delaware corporation ("FEI," "Seller" or "Debtor"), and EDGE LINE VENTURES LLC, a New York limited liability company ("Buyer"), each a "Party" and collectively the "Parties."

RECITALS

WHEREAS, on August 10, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (the "Bankruptcy Case"); and

WHEREAS, on September 10, 2015, Debtor filed a motion seeking, *inter alia*, approval of the sale of certain Debtor's assets to the successful bidder (the "Successful Bidder") at an auction for the Debtor's assets or its designee; and

WHEREAS, on September 28, 2015, an order was entered by the Bankruptcy Court, approving, *inter alia*, bidding procedures (the "Bidding Procedures") for the sale, and scheduling an auction ("Auction") and sale hearing in connection therewith (the "Bidding Procedures Order"); and

WHEREAS, on October 22, 2015, Buyer paid a deposit in the amount of $50,000 (the "Deposit") to the escrow account of counsel to the Seller in accordance with the Bidding Procedures; and

WHEREAS, the Buyer was deemed the Successful Bidder in accordance with the provisions of the Bidding Procedures and Bidding Procedures Order; and

WHEREAS, on November __, 2015 an order was entered by the Bankruptcy Court, approving, *inter alia*, the sale of the Acquired Assets (defined herein) to Buyer (the "Sale Order");

WHEREAS, on November 16, 2015, the Buyer and Seller entered into the Agreement, pursuant to which (i) Buyer agreed to purchase from FEI, and FEI agreed to sell to Buyer, certain assets of FEI (the "Acquired Assets"), subject in each case to the satisfaction of certain closing conditions; and

WHEREAS, the Parties desire to enter into the Agreement on the terms set forth below.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, agreements, representations and warranties herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
### DEFINITIONS

1.1    <u>Definitions</u>    The following terms, as used herein, have the following meanings:

"<u>Acquired Assets</u>" has the meaning set forth in the recitals and Section 2.1.

"<u>Acquired Assets Confidential Information</u>" has the meaning set forth in Section 7.2(b).

"<u>Administrative Services Company</u>" means Bookspan LLC in its capacity as servicing company pursuant to that certain Services Agreement, by and between Seller and Bookspan LLC, dated January 1, 2014.

"<u>Affiliate</u>" means any person or entity which directly or indirectly controls, is controlled by, or is under common control with, any Person.

"<u>Agreement</u>" has the meaning set forth in the preface above.

"<u>Alternative Transaction</u>" means a transaction or series of related transactions (whether by asset sale, equity purchase, merger or otherwise) pursuant to which Seller enters into an agreement to sell all or any non-*de minimis* portion of the Acquired Assets or any group of assets that includes all or any non-*de minimis* portion of the Acquired Assets, to a person other than the Buyer.

"<u>Applicable Law</u>" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise), code, rule, regulation, guidance, order, injunction, judgment, decree, ruling, charge or other similar requirement, enacted, adopted, or promulgated by a Governmental Authority that is binding upon such Person, as amended.

"<u>Assigned Contracts</u>" means the Contracts described on <u>Schedule 2.3(a)</u>.

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in Section 3.4(a).

"<u>Assumed Liabilities</u>" has the meaning set forth Section 2.3.

"<u>Auction</u>" has the meaning set forth in the recitals.

"<u>Avoidance Actions</u>" means any claims or causes of action arising under chapter 5 of the Bankruptcy Code.

"<u>Bankruptcy Case</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Bankruptcy Case.

"Bidding Procedures Order" has the meaning set forth in the recitals.

"Board of Directors" means the governing board of an entity, including the board of directors, as applicable.

"Business" means the business operations of Seller.

"Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"Buyer" has the meaning set forth in the preface above.

"Buyer Confidential Information" has the meaning set forth in Section 7.2(c).

"Buyer's Consents and Approvals" has the meaning set forth in Section 5.5.

"Claim" has the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 3.3(a).

"Closing Date" has the meaning set forth in Section 3.3(a).

"Closing Documents" has the meaning set forth in Section 3.4(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Contemplated Transactions" has the meaning set forth in Section 2.1.

"Contract" means any legally binding written contract, lease, sublease (including, but not limited to, the Madison Avenue Sublease), license, sublicense or other agreement relating to the Acquired Assets or the operation thereof to which Seller is a party or by which any of the Acquired Assets are bound.

"Cure Amounts" has the meaning set forth in Section 2.5.

"Customer Information" means all customer lists and related customer data held by Seller, to the extent it currently exists and subject to terms of any applicable privacy policy.

"Debtor" has the meaning set forth in the recitals.

"Deposit" has the meaning set forth in Section 3.2.

"Designated Net Sublease Profits" means, in respect of the Madison Avenue Sublease, commencing January 1, 2016, the positive amount in cash equal to the difference between (A) all cash payments actually received from the sublessee in a given annual period, less for each annual period (B) (1) all cash payments made to the landlord under the Madison Avenue Lease and (2) any out-of-pocket costs, Cure Amounts, Post-Petition Accounts Payable, Wind Down Costs or other liabilities or obligations in each case solely and specifically arising from the administration

of the Madison Avenue Lease or the Madison Avenue Sublease, such payments are estimated, but not limited to, for each such year as follows:

| | |
|---|---|
| January 1, 2016 to December 31, 2016 | $195,446 |
| January 1, 2017 to December 31, 2017 | $195,446 |
| January 1, 2018 to December 31, 2018 | $195,446 |
| January 1, 2019 to June 30, 2019 | $ 97,723 |

**Formatted:** (none)
**Formatted:** (none)
**Deleted:** exceed the annual cap

provided, however, that if such amount is negative for any such annual period, such negative balance will roll forward and will be deducted from the amount that may otherwise be payable in the following annual period(s).

"Effective Time" has the meaning set forth in Section 3.3(b).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means every Contract of Seller that is not an Assigned Contract.

"Excluded Liabilities" has the meaning set forth Section 2.4.

"Execution Date" has the meaning set forth in the preface above.

"Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument, or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing shall have expired; *provided, however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

"Fulfillment Services Company" means Totally Awesome Warehouse LLC in its capacity as a provider of product fulfillment services pursuant to that certain Fulfillment Services Agreement, by and between Seller and Totally Awesome Warehouse LLC, dated January 1, 2015.

"Governmental Authority" means any federal, state or local governmental authority, court or any regulatory, administrative or other governmental agency.

"Insider" has the meaning ascribed to such term in section 101(31) of the Bankruptcy Code, which includes current and former majority equity holders.

"Inventory" means all products of any kind sold in conjunction with the operation of the Business as presently or historically conducted.

"Knowledge" means actual knowledge, or such knowledge that a reasonably prudent person would have after due inquiry of those officers or Representatives of Buyer or the actual knowledge of those officers of Seller as of or prior to the Closing each of which is identified in Schedule 1.1.

"FEI" has the meaning set forth in the preface above.

"Liabilities" means debts, obligations, contracts or other liabilities of any kind, character or description, accrued, absolute, contingent, determined, determinable or otherwise, whether presently in existence or arising hereafter.

"Lien" means any claim, charge, easement, encumbrance, encroachment, security interest, mortgage, lien, pledge or restriction, whether imposed by Contract, Applicable Law, equity or otherwise.

"Madison Avenue Lease" means that certain real property sublease at 63 Madison Avenue, New York, New York 10016, between the Debtor (successor to BE Music, Inc.) as sub-subtenant and Bank of New York as sub-sublandlord, dated December 19, 2002 (as amended from time to time).

"Madison Avenue Sublease" means that certain real property sublease at 63 Madison Avenue, New York, New York 10016, between the Debtor as sub-lessor and WestPoint Homes LLC as sub-lessee, dated August 22, 2006 (as amended from time to time).

"Material Adverse Effect" or "Material Adverse Change" means any fact, circumstance, event, change, effect, condition or occurrence that, individually or in the aggregate, has a material adverse effect on (a) the value of the Acquired Assets, or (b) the ability of Seller to consummate the Contemplated Transactions on a timely basis, in each case as determined by Buyer."

"Material Contracts" has the meaning set forth in Section 4.7(b).

"Parties" has the meaning set forth in the preface above.

"Party" has the meaning set forth in the preface above.

"Petition Date" has the meaning set forth in the recitals.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other business entity.

"Post-Petition Accounts Payable" means all unpaid and unaccrued postpetition accounts payable, as estimated, but not limited to, on Schedule 2.7; provided that, notwithstanding anything to the contrary, such accounts payable shall not include any post-petition royalties allegedly payable to any studio.

"Pre-Closing Tax Returns" has the meaning set forth in Section 4.6(a).

"Purchase Price" has the meaning set forth in Section 3.1.

"Representatives" means, with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, attorneys, advisors and other representatives.

"Sale Order" has the meaning set forth in the recitals.

"Seller" has the meaning set forth in the preface above.

"Seller Confidential Information" has the meaning set forth in Section 7.2(a).

"Seller's Consents and Approvals" has the meaning set forth in Section 4.8.

"Tax" or "Taxes" means any federal, state, or local income, prohibited transaction, gross receipts, license, excise,  customs duties,  personal property, sales, use, transfer, registration, value added, estimated, or other tax of any kind whatsoever related to the Acquired Assets, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Liability for Taxes of any other Person.

"Tax Return" means any return, declaration, statement, report, form, claim for refund, or similar statements or documents including information reporting forms (including Forms 941, 990, 1099 and W-2 and estimated tax returns and reports) relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Taxes" means any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges payable in connection with the Contemplated Transactions.

"Universal Side Letter" shall mean that certain side letter, dated as of the date hereof by and between Buyer and USHE related to the return of certain video devices.

"USHE" shall mean Universal Studios Home Entertainment LLC.

"Wind Down Costs" means the costs described on Schedule 2.6.

1.2    Other Definitional and Interpretative Provisions.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The captions and headings used

herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.    References to Articles, Sections, Exhibits and Schedules are to the Articles, Sections, Exhibits and Schedules, respectively, of this Agreement unless otherwise specified.    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.    Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.    The terms "Dollars," "dollars" and "$" shall mean United States dollars.    Any singular term in this Agreement shall be deemed to include the plural and any plural term the singular, and references herein to any gender shall include the other gender.  References to any Person include the successors and permitted assigns of that Person.    Any reference to a code, act, statute or regulation means that law, code, act, statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor laws, codes, acts, statutes or regulations and any reference to any law code, act or statute shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.    References to a "day" or any number of "days" (without explicit qualification by the word "Business") shall be interpreted as a reference to a calendar day or number of calendar days.    If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, the time for the giving of such notice or the performance of such act shall be extended to the next succeeding Business Day.

ARTICLE II
PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    Assets to be Sold to Buyer.    On the terms and subject to the conditions of this Agreement, and on the basis of the representations and warranties herein contained, Seller shall sell, transfer, convey, assign and deliver to Buyer, or to an entity or entities designated by Buyer, on the Closing Date, all of its right, title and interest in all of Seller's assets (subject to Sections 2.3, 2.4 and 2.5) including without limitation those assets described on Schedule 2.1, except for the Excluded Assets, free and clear of all Liens and Claims, other than Liens securing the Assumed Liabilities, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code ( the "Contemplated Transactions").    The Acquired Assets shall be comprised of those assets listed in Schedule 2.1.

2.2    Excluded Assets.    The following assets are not intended by the Parties to be a part of the Contemplated Transactions and are excluded from the Acquired Assets (the "Excluded Assets"):

(a)    Seller's cash, cash equivalents, bank deposits and similar instruments;

(b)    Organizational documents, corporate records and minute books of Seller;

(c)    The Excluded Contracts;

(d)    (i) All Avoidance Actions against any Insider (other than the Avoidance Actions subject to the releases by Seller to be delivered pursuant to Section 3.4(a)(vi)) and (ii) the Avoidance Actions included as part of the Acquired Assets.

(e)    All Claims or causes of action of Seller against third parties relating to the Excluded Assets; and

(f)    Rights that will accrue to Seller under this Agreement.

2.3    <u>Assumed Liabilities</u>.    On the terms and subject to the conditions of this Agreement, Buyer agrees that at the Closing it will assume and agree to fully pay, perform and discharge, as the case may be, when due, only the following obligations and Liabilities (collectively, the "<u>Assumed Liabilities</u>"):

(a)    the obligations pursuant to those contracts specifically identified by Buyer that are expressly and actually assigned by Seller to Buyer pursuant to Schedule 2.3(a) of this Agreement ("<u>Assigned Contracts</u>"), but only to the extent of contractual obligations and Liabilities which are to be initially performed or which accrue from and after the Closing Date and relate solely to dates of service from and after the Closing Date and subject only to the Cure Amounts set forth in clause (b) below;

(b)    the Cure Amounts expressly set forth on Schedule 2.5 for the Assigned Contracts;

(c)    the Wind Down Costs as set forth on Schedule 2.6

(d)    the Post-Petition Accounts Payable as set forth on Schedule 2.7;

2.4    <u>Excluded Liabilities</u>.    Notwithstanding any provision of this Agreement or any other document or instrument to the contrary, Buyer shall have the obligation to assume only the Assumed Liabilities, and Buyer shall not have any obligation with respect to any other Liabilities of Seller, regardless of whether such obligation arises before, on or after the Closing Date (all of such other Liabilities, collectively, the "<u>Excluded Liabilities</u>").

2.5    <u>Cure Amounts</u>.    At the Closing, or as soon as practicable thereafter, and pursuant to section 365 of the Bankruptcy Code, Seller shall assign to Buyer and Buyer shall assume the Assigned Contracts (if any) specifically identified and agreed upon by Buyer in writing.    The total cure amounts, if any, for each respective Assigned Contract that Buyer is prepared to pay to cure all defaults and to pay the actual or pecuniary losses that have resulted from any defaults on the part of Seller under the Assigned Contracts (the "<u>Cure Amounts</u>") solely as are set forth on Schedule 2.5 herein and shall be paid by Buyer in accordance with the terms of this Agreement. Buyer shall have no obligation for the payment of any costs under any Assigned Contract, any contract that Buyer does not elect to be assigned, or otherwise, except as specifically set forth on Schedule 2.5; provided, however, that the assumption and assignment of the Assigned Contracts shall be subject to the cure and assumption and assignment provisions of section 365 of the Bankruptcy Code and the Sale Order unless otherwise agreed to by all relevant parties.

ARTICLE III
PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING

3.1    <u>Consideration; Payment of Purchase Price</u>.    Subject to the terms and conditions hereof, the aggregate consideration for the sale, assignment, transfer, conveyance and delivery of

the Acquired Assets to Buyer (or its designee(s)) shall be (i) payable at Closing Four Hundred Twenty-Five Thousand Dollars ($425,000) payable to Seller (the "Purchase Price"), *less* the Deposit described in Section 3.2, *plus* (ii) payable upon the successful assumption and assignment thereof, the Cure Amounts for Assigned Contracts actually assumed and assigned to Buyer in the amounts expressly set forth in Section 2.5 above, *plus* (iii) assumption of the Wind Down Costs and Post-Petition Accounts Payable, *plus* (iv) payable on or before the 90th day after the end of each annual period from and after the Closing until the termination thereof (without regard to the basis for such termination) thereof to the Person designated by Seller, its successor or assign, the Designated Net Sublease Profits subject to Section 7.5 hereof.

3.2    Deposit.   The Deposit shall be applied against the Purchase Price.   Seller shall retain the Deposit as liquidated damages, as its sole remedy, if this Agreement is properly terminated by Seller pursuant to Section 10.1(c)(ii) or upon the failure of Buyer to consummate the Sale, provided that all conditions precedent to Closing have been satisfied and there shall not have been a material breach by Seller of any representation, warranty or covenant contained in this Agreement.   The Deposit shall be returned to Buyer in the event of a breach of this Agreement by Seller or upon its proper termination by Buyer in accordance with Section 10.1(a), (b) or (d).

3.3    Closing and Closing Date.

(a)    The closing of the Contemplated Transactions (the "Closing") shall take place at a location agreed upon by Buyer and Seller, within 5 Business Days after receipt of approval by the Bankruptcy Court, subject to the satisfaction or waiver of all other conditions to the obligations of Seller and Buyer, to consummate the Contemplated Transactions (other than conditions with respect to actions Seller and Buyer will take at the Closing) or such other date as Buyer and Seller may mutually agree upon in writing (the "Closing Date").

(b)    Unless otherwise agreed in writing by the Parties, the Contemplated Transactions shall be effective as of 12:01 a.m. on the calendar day immediately following the Closing Date (the "Effective Time").

3.4    Closing Deliveries.

(a)    Seller Deliveries.   At the Closing, contemporaneously with Buyer's delivery to Seller of all of the Closing Documents required to be delivered by Buyer hereunder, Seller shall deliver or cause to be delivered to Buyer, duly executed by Seller in recordable form, where applicable (the documents and other deliverables described in this Section 3.4 and all other documents required to be delivered hereunder are referred to collectively as the "Closing Documents") the following items:

(i)    a fully-executed bill of sale from Seller in a form acceptable to Buyer;

(ii)    if applicable, a fully-executed assignment and assumption agreement (the "Assignment and Assumption") with respect to any Assigned Contracts;

(iii)    a certificate from an officer of Seller to the effect that each of the conditions specified in 8.1(a), Section 8.1(b) and Section 8.1(c) is satisfied in all respects;

(iv)    a secretary's certificate of Seller dated as of the Closing Date that confirms the approval of Seller's Board of Directors of the Contemplated Transactions;

(v)    the closing statement showing all adjustments/credits in respect of the Purchase Price as described in Section 3.2 plus the payment of any Cure Amounts to be made at the Closing in accordance with the terms hereof, duly executed by Seller; and

(vi)    a mutual release executed by Seller and Buyer, in each case on behalf of themselves and certain affiliated Persons identified therein of any and all claims and liabilities, in the form annexed hereto as Exhibit 3.4.

(b)    <u>Buyer Deliveries</u>.    At the Closing, contemporaneously with Seller's delivery to Buyer of all of the Closing Documents required to be delivered by Seller hereunder, Buyer shall deliver or cause to be delivered to Seller the following items:

(i)    in accordance with and subject to adjustment as provided in this Agreement, the Purchase Price and any Cure Amounts;

(ii)    if applicable, a fully-executed Assignment and Assumption;

(iii)    the closing and apportionment statement showing all adjustments to the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Buyer;

(iv)    a certificate from an officer of Buyer to the effect that each of the conditions specified in Section 8.2(a) is satisfied in all respects;

(v)    a secretary's certificate of Buyer dated as of the Closing Date; that confirms the approval of Buyer's Manager of the Contemplated Transactions; and

(vi)    the Universal Side Letter.

3.5    <u>Transfer Taxes</u>.    To the extent applicable, Buyer and Seller shall each pay at the Closing any Transfer Taxes payable by it pursuant to Section 11.5.

3.6    <u>Delivery of Records and Contracts</u>.    Seller shall make available to Buyer, on the Closing Date, in a format and delivery method as mutually agreed upon, available documentation related to the Acquired Assets as set forth in Schedule 2.1 (except for organization documents which are Excluded Assets), as of the Closing Date.

3.7    <u>Further Conveyances</u>.    If Buyer or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Buyer shall promptly deliver

such Excluded Assets (or any payments or proceeds related thereto) to Seller.  If Seller retains any Acquired Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Acquired Assets (or any payments or proceeds related thereto) to Buyer.

3.8    <u>Bulk Sales Law</u>.    The Parties hereby waive compliance by Seller with the requirements and provisions of any Applicable Law related to "bulk-transfer" of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

3.9    <u>Allocation of Purchase Price</u>.    The Purchase Price shall be allocated among the Acquired Assets in accordance with the allocation protocols (and amounts determined therefrom) as determined by Buyer; *provided, however*, such allocation shall not be binding on Seller's estate in the Bankruptcy Case.

ARTICLE IV
SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE IV).

4.1    <u>Organization of Seller</u>.    Seller (a) is duly organized, validly existing and in good standing under the laws of the State of Delaware, the jurisdiction of its formation, (b) has full corporate power and authority to conduct its business as presently conducted.

4.2    <u>Authorization of Transaction</u>.    Except for such authorization as is required by the Bankruptcy Court, Seller has full corporate power and authority to execute and deliver this Agreement and, subject to such authorization as is required by the Bankruptcy Court to perform its obligations hereunder.    Without limiting the generality of the foregoing, the Board of Directors of Seller has duly authorized the execution, delivery and performance of this Agreement by Seller.  This Agreement constitutes and any and all other Closing Documents to be executed by Seller pursuant hereto, when executed, will constitute, the valid and legally binding obligation of Seller, enforceable in accordance with their terms and conditions, except as enforceability against Seller may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.3    <u>Non-Contravention</u>.    Subject to Bankruptcy Court approval and, where applicable the Bankruptcy Code, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transactions (including each Closing Document required to be delivered by Seller at Closing), nor the fulfillment of the terms hereof by Seller, will (i) violate or result in a breach of any of the terms and provisions of, constitute a default under, conflict with, or create in any party the right to accelerate, terminate, modify, cancel or require any notice under any agreement (including any Material Contract), (ii) constitute a violation by Seller of any Applicable Law or (iii) conflict with or violate the certificate of incorporation, bylaws or other

similar organizational documents of Seller.  Pursuant to Section 365(c)(1) of the Bankruptcy Code, all of the Assigned Contracts will be assignable to Buyer at the Closing without the consent of the counterparty, as applicable.

4.4     Brokers' Fees.     Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transactions for which Buyer could become liable or obligated.

4.5     Events Subsequent.  Except as set forth in Schedule 4.5, since September 30, 2015, to the Knowledge of Seller, there have not been any of the following:

(a)     Any material written modification or termination of any Material Contract;

(a)     Any entry into, termination of, or receipt of notice of termination of any Material Contract;

(b)     Any action taken, by Seller or, to the Knowledge of Seller, by another Person on behalf of Seller that will or may reasonably be expected to cause or constitute a breach of any provision of this Agreement or any Material Contract (other than non-payment of accounts payable that are included in the Cure Amounts);

(c)     Any amendment of the articles of incorporation (or similar organizational documents) or corporate structure or ownership of Seller;

(d)     Any material damage to or destruction or loss of any Acquired Assets, whether or not covered by insurance, that materially adversely affects the Acquired Assets; or

(e)     Any change in any Tax election or Tax status of Seller.

4.6     Tax Matters.

(a)     Except as set forth in Schedule 4.6(a), all Tax Returns with respect to Seller, the Business or the Acquired Assets, to the extent required to be filed with any Governmental Authority with respect to any period prior to Closing by or on behalf of Seller (collectively, the "Pre-Closing Tax Returns"), have been prepared in accordance with all Applicable Laws and have been filed when due (taking into account extensions of filing due dates) in accordance with all Applicable Laws, and all such Pre-Closing Tax Returns are true, correct and complete in all material respects.

(b)     Schedule 4.6(b) contains a list of all jurisdictions where Seller currently files Tax Returns related to the Business.

(c)     To Seller's Knowledge, there are no Liens or Claims for Taxes upon the Acquired Assets other than statutory Liens for Taxes not yet due or payable.  For the avoidance of doubt, the Pension Benefit Guaranty Corporation currently holds a statutory lien in the sale proceeds, which the Debtor believes will extinguish on its own terms on

**Formatted:** (none)

December 31, 2015, or is otherwise subject to challenge pursuant to Chapter 5 of the Bankruptcy Code.

4.7     Contracts.

(a)     Schedule 2.3(a) sets forth a complete and correct list of the Contracts included in the Acquired Assets.

(b)     As used in this Agreement, the term "Material Contracts" means all Contracts that are material to the Acquired Assets.  Except (i) as otherwise provided in the Bankruptcy Code; (ii) for events of default arising as a result of Seller's filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code; and (iii) for events of default rising from Seller's non-payment, all of the Material Contracts are in full force and effect, are valid and binding and are enforceable in accordance with their terms in favor of the Seller pursuant to the applicable provisions of the Bankruptcy Code.  Except for Cure Amounts, if any, there are no material Liabilities of any party to any Material Contract arising from any breach or default of any provision thereof and no event has occurred that, with the passage of time or the giving of notice or both, would constitute a breach or default by any party thereto.

(c)     Seller has used commercially reasonable efforts to deliver to Buyer true and complete copies of each Material Contract, in each case, as amended or otherwise modified and in effect as of the Execution Date.

(d)     (i) To the extent Seller has the right to assign to Buyer each of the Material Contracts on the Closing Date under section 365 of the Bankruptcy Code and upon such assignment at Closing in the manner contemplated by this Agreement, Buyer shall have all of the rights of Seller thereunder, and (ii) no Material Contract to which Seller is a party has been, or may be, terminated by any other party thereto as a result of the Contemplated Transactions including without limitation, that certain Trademark License Agreement by and between Seller and Sony Entertainment dated June 21, 2002, which remains in full force and effect as of the Closing Date.

4.8     Seller's Consents and Approvals.  Schedule 4.8 lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made by Seller to consummate the Contemplated Transactions (including this Agreement and each other Closing Document required to be delivered by Seller at Closing) (collectively, "Seller's Consents and Approvals"), other than entry of the Sale Order.

4.9     Litigation.  Except as set forth on Schedule 4.9, (i) there is no action, suit, investigation or proceeding pending or, to Seller's Knowledge, threatened (x) against Seller with respect to the Acquired Assets before any arbitrator or Governmental Authority, and (y) that would reasonably be expected to prevent, hinder, delay or otherwise challenge the consummation of the Contemplated Transactions or that questions the validity, legality or propriety of the Contemplated Transactions.

4.10     Full Disclosure.  No representation or warranty made by Seller in this Agreement, or in any schedule, and no statement, schedule or certificate required to be furnished to Buyer

pursuant to this Agreement, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein not misleading. Each of the separate representations and warranties set forth in ARTICLE IV is intended to be, and shall be interpreted as, an independent representation and warranty as to the matters referred to therein

4.11    <u>No Other Representations or Warranties; Schedules</u>.    Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Acquired Assets, the Assumed Liabilities or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, its Affiliates or any of their respective officers, directors, members, employees, agents, consultants or other Representatives.    Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), Seller (a) expressly disclaims any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller or any of its Affiliates).    Seller makes no representations or warranties to Buyer regarding the probable success or profitability of the Acquired Assets.    Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Acquired Assets except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules).

ARTICLE V
BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller that the statements contained in this ARTICLE V are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE V).

5.1    <u>Organization of Buyer</u>.    Buyer (a) is duly organized, validly existing and in good standing under the laws of the State of New York, the jurisdiction of its formation, and (b) has full power and authority and all necessary government approvals to own, lease and operate its properties and assets and to conduct its business as presently conducted.

5.2    <u>Authorization of Transaction</u>.    Buyer has full power and authority to execute and deliver this Agreement and, subject to such authorizations as required by the Bankruptcy Court to perform its obligations hereunder.    The execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by all requisite action of Buyer.    This Agreement constitutes, and any and all other Closing Documents to be executed by Buyer pursuant hereto when executed will constitute, the valid and legally binding obligation of Buyer, enforceable in accordance with their terms and conditions, except as

enforceability against Buyer may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

5.3     Non-Contravention.

(a)     Subject to Bankruptcy Court approval, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing), nor the fulfillment of the terms hereof by Buyer, will (i) violate any Applicable Law to which Buyer is subject or any provision of its charter, operating agreement, or other governing documents or (ii) conflict with, violate or result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets are subject.

(b)     Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority in order for the Parties to consummate the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing), except for those required under or in relation to those required by the Bankruptcy Court.

5.4     Brokers' Fees.    Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transactions.

5.5     Buyer's Consents and Approvals.    Schedule 5.5 lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made by Buyer to consummate the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing) (collectively, "Buyer's Consents and Approvals"), other than entry of the Sale Order.

5.6     Acknowledgement Regarding Condition of the Business.    Buyer (either alone or together with its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Acquired Assets of Seller and is capable of bearing the economic risks of such investment.    Buyer is an informed and sophisticated purchaser, and, where necessary, has engaged expert advisors, experienced in the evaluation and purchase of assets such as the Acquired Assets as contemplated hereunder.    Buyer acknowledges that Seller has given Buyer access to such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement. Buyer agrees to accept the Acquired Assets of Seller in the condition they are in on the Closing Date based upon its own inspection, examination and determination with respect thereto as to all matters and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Seller, except as expressly set forth in this Agreement.    Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges that Seller is not making any representations or warranties whatsoever, whether

express or implied or written or oral, beyond those expressly given by it to Buyer in ARTICLE V (as modified by the Schedules), and Buyer agrees that, except for the representations and warranties contained therein, the Acquired Assets are being transferred to Buyer on a "WHERE IS" and, as to condition, "AS IS" basis.

5.7    <u>Financial Capability</u>.  Buyer has, or on the Closing Date will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder.  On the Closing Date, Buyer (or its designee) will be capable of satisfying the conditions contained in Sections 365(b)(1)(c) and 365(f) of the Bankruptcy Code regarding the Assigned Contracts, if any.

5.8    <u>No Other Representations or Warranties; Schedules</u>.    Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), neither Buyer nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Buyer or the Contemplated Transactions, and Buyer disclaims any other representations or warranties, whether made by Buyer, any Affiliate of Buyer or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives.

ARTICLE VI
PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Execution Date and the Closing:

6.1    <u>General</u>.  Each of the Parties will use its commercially reasonable efforts to take all actions and to do all things necessary in order to consummate and make effective the Contemplated Transactions (including satisfaction, but not waiver, of the Closing conditions set forth in ARTICLE VIII) and to ensure that Buyer is relieved of all Excluded Liabilities.

6.2    <u>Bankruptcy Court Approval</u>.

(a)    If necessary, each of Buyer and Seller shall use their reasonable best efforts to comply at the earliest practicable date with any request for additional information, documents, or other materials received by each of them or any of their respective Affiliates from the Bankruptcy Court in respect of the Contemplated Transactions.

6.3    <u>Operation of Business</u>.  Seller will operate its business in the ordinary course with regard to the Acquired Assets through the Closing Date. Without limiting the generality of the foregoing, Seller will not, during the period between execution of this Agreement and the Closing Date, without Buyer's prior written consent (which shall not be unreasonably withheld or delayed):

(a)    enter into or amend any Material Contract;

(a)    terminate any Material Contract other than upon the expiration of its term or for the counterparty's breach of such Material Contract;

(b)    fail to perform when due all material obligations under any Material Contract except to the extent such performance is excused under the Bankruptcy Code or by the Bankruptcy Court;

(c)    fail to give prompt notice to Buyer of any Material Adverse Change in the Acquired Assets;

(d)    sell, transfer, or convey any Acquired Assets; or

(e)    change any of its accounting methods;

6.4    Access.  Seller will permit Representatives of Buyer (including its accountants) to have access upon appointment with prior notice during Seller's regular business hours, and in a manner so as not to interfere with the normal business operations of Seller, to the records (including Tax records), contracts, and documents of or pertaining to the Acquired Assets prior to the Closing.

6.5    Notice of Developments.

(a)    Seller shall promptly notify Buyer of any notice or other communication from any Governmental Authority in connection with the Contemplated Transactions.

(b)    Seller shall promptly notify Buyer of any written notice of any termination, default or event that, with notice or lapse of time or both, would become a default, received by Seller subsequent to the Execution Date, under any Contracts that are included in the Acquired Assets.

(c)    No notification under this Section 6.5 shall affect the representations, warranties or obligations of the Parties or the conditions to the obligations of the Parties hereunder, or limit or otherwise affect the remedies available hereunder to the Party receiving such notice.

ARTICLE VII
POST-CLOSING COVENANTS

Seller and Buyer agree as follows with respect to the period following the Closing:

7.1    General.  After the Closing, each of Buyer and Seller will cooperate in providing access to all available files, correspondence, lists, and other documents and information related to the Acquired Assets and matters covered by this Agreement as the other may reasonably request, all at the sole cost and expense of the requesting Party for a period of one (1) year after Closing.

7.2    Non-Disclosure.

(a)    From and after the date hereof, Buyer shall, and shall direct its Representatives, to maintain in confidence, not disclose to any third party (other than their Representatives) without the prior written consent of Seller, and not use to the

detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives. For purposes of this Section 7.2(a), "Seller Confidential Information" means any information that is confidential or proprietary in nature that is related to the Acquired Assets, the Assumed Liabilities, the Excluded Assets, or the Excluded Liabilities, including methods of operation, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; *provided, however*, that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Buyer or any of its Representatives, (ii) becomes available to Buyer on a non-confidential basis from a source other than Seller or its Representatives, provided that such source is not known by Buyer to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Buyer from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure, or (iv) can be shown by Buyer through written documents or evidence maintained by Buyer to have been independently developed by it without the use of Seller Confidential Information; and *provided further*, that upon the Closing, the restrictions contained in this Section 7.2(a) shall not apply to confidential or proprietary information related primarily to the Acquired Assets, or the Assumed Liabilities. Buyer may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Transactions and who are directed to keep it confidential. Buyer shall instruct its Representatives having access to Seller Confidential Information of such obligation of confidentiality. If Buyer or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein is required by Applicable Law to disclose any of such Confidential Information, Buyer shall, to the extent permissible by Applicable Law, provide Seller with prompt notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Seller waives compliance with the provisions of this Section 7.2(a), Buyer and its Representatives shall furnish only that portion of the Seller Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(b)    From and after the date hereof, Seller shall, and shall direct its Representatives to, maintain in confidence and not disclose to any third party (other than its Representatives and/or those third parties that will provide services for Buyer related to the Acquired Assets) without the prior written consent of Buyer, and not to use to the detriment of Buyer, any Acquired Assets Confidential Information, other than in connection with (i) the Excluded Assets and Excluded Liabilities or otherwise related to the operation of Seller's Business, (ii) any investigations by Governmental Authorities, (iii) any legal proceeding, (iv) enforcing any rights or other Claims of Seller under this Agreement, or (v) performing any obligations of Seller under this Agreement. For purposes of this Section 7.2(b), "Acquired Assets Confidential Information" means any information that is confidential or proprietary in nature that is primarily related to the Acquired Assets, or the Assumed Liabilities, other than information primarily pertaining to the Excluded Assets or the Excluded Liabilities, or Seller's Business. Seller may disclose any of the Acquired Assets Confidential Information to its Representatives who need to know it for the purpose of effectuating the Contemplated Transactions and who

are directed to keep it confidential.  Seller shall instruct its Representatives having access to Acquired Assets Confidential Information of such obligation of confidentiality.  If Seller or anyone to whom it has transmitted Acquired Assets Confidential Information subject to the confidentiality obligations herein is required by Applicable Law to disclose any of such Acquired Assets Confidential Information, Seller shall, to the extent permissible by Applicable Law, provide Buyer with prompt notice prior to making any disclosure so that Buyer may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, or Buyer waives compliance with the provisions of this Section 7.2(b), Seller and its Representatives shall furnish only that portion of the Acquired Assets Confidential Information that they are advised by counsel is required by Applicable Law to be disclosed.

(c)    It is understood by the Parties that the information, documents and instruments delivered to Seller by Buyer or its Representatives in connection with the negotiation of this Agreement  that are of a confidential and proprietary nature shall be deemed "Buyer Confidential Information".  Seller agrees that both prior and subsequent to Closing it will maintain the confidentiality of all Buyer Confidential Information and only disclose such information, documents and instruments (x) to duly authorized Representatives, (y) as necessary to comply with Applicable Law, or (z) to assist or defend Claims as provided herein.  Buyer Confidential Information does not include any information that (i) becomes generally available to the public other than as a result of a disclosure by Seller, or any of its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Buyer or its Representatives, provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Buyer, (iii) is lawfully received by Seller from a third party having the right to disseminate the Buyer Confidential Information without restriction on disclosure, or (iv) can be shown by Seller through written documents or evidence maintained by them to have been independently developed by it without the use of Buyer Confidential Information.  Seller further agrees that upon Buyer's written request, it will destroy or, or at Seller's option return to Buyer, all such documents and instruments and all copies thereof in its possession.  If Seller or anyone to whom it has transmitted Buyer Confidential Information is required by Applicable Law to disclose any of such Buyer Confidential Information, Seller shall, to the extent permissible by Applicable Law, provide Buyer with prompt notice prior to making any disclosure so that Buyer may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, or Buyer waives compliance with the provisions of this Section 7.2(c), Seller and its Representatives shall furnish only that portion of the Buyer Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(d)    The obligations contained in this Section 7.2 shall survive for one (1) year after the Closing.

7.3    Further Assurances.  Each Party agrees to use all commercially reasonable efforts to take, or cause to be taken, all actions it deems proper or advisable under Applicable Laws and regulations to effectuate the consummation of the Contemplated Transactions.

7.4    Claims Reconciliation.    Buyer shall cause its affiliated entity, Bookspan, to perform post-Closing claims reconciliation services, as reasonably requested by or on behalf of the Seller, in connection with, and until the earlier of (i) the conclusion of, the Bankruptcy Case and (ii) February 29, 2016, at no charge to the Seller or its chapter 11 estate; provided that neither Bookspan nor Buyer shall be required to assume or pay any out-of-pocket expenses or disbursements to any third parties in respect of the claims reconciliation services and Seller shall indemnify Buyer and Bookspan for any liability or other obligation of any kind in connection with any act or omission in respect of the claims reconciliation process other than any act or omission arising from Buyer's fraud, gross negligence or willful misconduct.

7.5    Buyer's Duties in Respect of Madison Avenue Lease and Madison Avenue Sublease.    Seller covenants and agrees that, upon the assumption and assignment of the Madison Avenue Lease and the Madison Avenue Sublease, (i) Buyer shall only be required to exercise commercially reasonable efforts in connection with collection and payments of the portion of the Purchase Price payable pursuant to Section 3.1(iii); (ii) nothing in this Agreement shall create any fiduciary or other duty or relationship of any kind between Seller and Buyer in respect of the Madison Avenue Sublease; and (iii) Buyer shall be entitled to exercise its good faith business judgment, without prior notice to Seller or any other Person, with respect to any and all matters in respect of the Madison Avenue Lease and Madison Avenue Sublease.    Buyer shall have no obligation or liability to Buyer in respect of the portion of the Purchase Price payable pursuant to Section 3.1(iii) of this Agreement in the event that (i) either the Madison Avenue Lease or Madison Avenue Sublease is not successfully assigned to Buyer or its designee or (ii) either the Madison Avenue Lease or Madison Avenue Sublease is terminated by any Person.    Buyer covenants and agrees to perform all of the obligations under the Madison Avenue Lease and the Madison Avenue Sublease

ARTICLE VIII
CONDITIONS TO OBLIGATION TO CLOSE

8.1    Conditions to Buyer's Obligation.    Buyer's obligation to consummate the Contemplated Transactions is subject to satisfaction of the following conditions:

(a)    The representations and warranties set forth in ARTICLE IV shall be true and correct in all material respects when made and as of the Closing Date

(b)    Seller shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing.

(c)    No material breach or default on the part of Seller shall have occurred under any covenant or agreement hereunder or any Closing Document or any other agreement of the Parties;

(d)    No Material Adverse Change shall have occurred with respect to the Acquired Assets between the execution of this Agreement and the Closing Date;

(e)    No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making

the Contemplated Transactions contemplated illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Contemplated Transactions;

(f)    No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transactions;

(g)    Seller and Buyer shall have received approval and authorization by the Bankruptcy Court for the Contemplated Transactions and Seller's assignment of any Assigned Contracts to, and the assumption thereof by, Buyer;

(h)    The Sale Order shall have become a Final Order; and

(i)    Buyer shall have received all of the Closing Documents described in Section 3.4(a).

8.2    <u>Conditions to Seller's Obligations</u>.    Seller's obligations to consummate the Contemplated Transactions are subject to satisfaction of the following conditions:    The representations and warranties set forth in ARTICLE V shall be true and correct in all material respects when made and at and as of the Closing Date;

(a)    Buyer shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing;

(b)    No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making the Contemplated Transactions illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Contemplated Transactions;

(c)    No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transactions;

(d)    Seller and Buyer shall have received approval and authorization by the Bankruptcy Court for the Contemplated Transactions and Seller's assignment of any Assigned Contracts to, and the assumption thereof by, Buyer;

(e)    The Sale Order shall have become a Final Order;

(f)    Seller shall have received all of the Closing Documents described in Section 3.4(b); and

(g)    Buyer shall have paid, or shall pay simultaneously with the Closing, or shall have made arrangements to pay as required by the Bidding Procedures Order, any and all Cure Amounts with respect to the Assigned Contracts, if any.

ARTICLE IX
DISPUTE RESOLUTION

9.1    <u>Dispute Resolution</u>.    The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute that arises under this Agreement.

ARTICLE X
TERMINATION

10.1    <u>Termination of Agreement</u>.    In respect of the Contemplated Transactions, this Agreement may be terminated prior to the Closing as follows:

(a)    <u>Termination Due to Events in Bankruptcy Case</u>.    Buyer may terminate this Agreement immediately upon written notice to Seller if: (i) the Bankruptcy Case is dismissed or converted to a Chapter 7 bankruptcy case under the Bankruptcy Code, or an interim or permanent trustee is appointed in the Bankruptcy Case, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in the Bankruptcy Case; (ii) relief from the automatic stay to permit foreclosure is granted or there is an exercise of other remedies on the material assets of Seller; or (iii) Seller consents to any modification of this Agreement without the prior written agreement of Buyer.

(b)    <u>Termination by Buyer</u>.    Prior to the Closing Date, Buyer may terminate this Agreement immediately upon written notice to Seller of the occurrence of any of the following, at which time all obligations of Buyer hereunder shall be of no further force and effect if (i) there shall be a material breach by Seller of (A) any material representation or warranty, or (B) any material covenant or agreement contained in this Agreement, which breach (1) cannot be cured or (2) has not been cured within five (5) Business Days after the giving of written notice by Buyer to Seller of such breach and such breach results in a Material Adverse Effect; or (ii) the Closing Date does not occur on or before November 30, 2015.

(c)    <u>Termination by Seller</u>.    Prior to the Closing Date, Seller may terminate this Agreement upon written notice to Buyer of the occurrence of any of the following, unless Seller is in material breach of this Agreement prior to the occurrence of the following, at which time all obligations of Seller hereunder shall be of no further force and effect, except for those obligations specified in this Agreement to survive termination:

(i)    if any of the conditions to the obligations of Seller to close that are set forth in Section 8.2 shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller;

(ii)    if there shall be a material breach by Buyer of any material representation or warranty, or by Buyer of any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured

within 15 Business Days after the giving of written notice by Seller to Buyer of such breach; or

(iii)    if the Closing Date does not occur on or before November 30, 2015; provided that Buyer has agreed in its sole and absolute discretion to waive the condition in Section 8.2(e) that the Sale Order becomes a Final Order.

(d)    Termination by Buyer or Seller.  (i) Subject to Bankruptcy Court approval, the Parties may terminate this Agreement by mutual written consent of Seller and Buyer prior to the Closing Date or (ii) if the Seller consummates an Alternative Transaction.

(e)    Extension of Time Periods.  The time periods for termination of this Agreement set forth in this Section 10.1 may be extended without the further approval of the Bankruptcy Court upon the written agreement of the Parties, after consultation with the Official Committee of Unsecured Creditors appointed in the Seller's Bankruptcy Case.

10.2    Procedure For Termination.  If this Agreement is terminated by Buyer or Seller, or both, pursuant to Section 10.1, written notice thereof shall promptly be given to the other Party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 10.1), the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 10.3, without further action by the Parties.

10.3    Effect of Termination.  If either Seller or Buyer terminates this Agreement pursuant to Section 10.1, except as otherwise provided herein, all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party (except for any Liability of any Party then in breach of this Agreement or as set forth in Section 3.2); *provided* that if such termination is the result of a breach or default hereunder by the non-terminating Party, then the non-breaching Party shall be entitled to seek any and all remedies available to the terminating Party at law or in equity.

ARTICLE XI
MISCELLANEOUS

11.1    Survival.  Except as set forth in Section 7.2, all representations, warranties, covenants and obligations in this Agreement and in the certificates delivered pursuant to this Agreement shall terminate as of the Closing Date and the consummation of the Contemplated Transactions.

11.2    Press Releases and Public Announcements.  For a period of thirty days after the Closing, no Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party, such approval not to be unreasonably withheld or delayed; *provided, however*, that any Party may make any public disclosure it believes in good faith is required by Applicable Law, the Bankruptcy Code or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement (in which case the disclosing Party will use its reasonable efforts consistent with such Applicable Law, Bankruptcy Code or Bankruptcy

Court requirement to advise the other Party prior to making the disclosure) and in connection with any chapter 11 plan and accompanying disclosure statement.  Upon the termination of the thirty-day period after the Closing, Seller shall not issue any press release or make any public announcement in respect of the Acquired Assets, except as required by Applicable Law, the Bankruptcy Code or the Bankruptcy Court.

11.3    No Third-Party Beneficiaries.    This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

11.4    Entire Agreement.    This Agreement and the other Closing Documents constitute the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

11.5    Succession and Assignment.    This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party.

11.6    Counterparts.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  The delivery of an executed signature page of this Agreement or any other Closing Document by fax or portable document format (.pdf) shall have the same effect as the delivery of a manually executed counterpart hereof or thereof.

11.7    Headings.    The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11.8    Notices.    All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iii) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:

        Filmed Entertainment Inc.
        2 Park Avenue, 10th Floor
        New York, NY 10016
        Attn:  Clifton B. Knight, Jr.
        Executive VP, Legal & Business Affairs

Copy to:        Griffin Hamersky P.C.

> 485 Madison Avenue, 7th Floor
> New York, NY 10022
> Attn: Scott A. Griffin, Esq.

If to Buyer:  Edge Line Ventures LLC
> 2 Park Avenue, 10th Floor
> New York, NY 10016
> Attn: Mr. John Lippman

Copy to:  Baker Botts L.L.P
> 30 Rockefeller Plaza
> New York, NY  10112
> Attn: Emanuel C. Grillo, Esq.

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

11.9    Governing Law; Waiver of Jury Trial.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

11.10    Submission to Jurisdiction; Consent to Service of Process.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 11.8 hereof; *provided, however*, that, if the Bankruptcy Case has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in Manhattan, New York or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the Parties hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 11.8.

11.11   Amendments.   No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.

11.12   Severability.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

11.13   Expenses.   Each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the Contemplated Transactions, including, but not limited to, Transfer Taxes.

11.14   Construction.   The Parties participated fully in the negotiation and preparation of this Agreement with full benefit of counsel.  Accordingly, this Agreement is to be construed as if the Parties drafted it jointly and is not to be more strictly construed against any Party.

11.15   Incorporation of Schedules.   The Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. The Parties acknowledge that the Schedules attached hereto may be updated after the Execution Date with Buyer's consent, which consent shall not be unreasonably withheld.

11.16   No Waiver.   The failure of any Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.   The waiver of any such right with respect to particular facts and other circumstances shall not be deemed a waiver with respect to any other facts and circumstances and each such right shall be deemed an ongoing right that may be asserted at any time and from time to time.   No right, remedy or election given by any term of this Agreement shall be deemed exclusive but shall be cumulative with all of the rights, remedies and elections available at law or in equity.

*[signature page follows]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

FILMED ENTERTAINMENT INC.


By:_____
Name: Glenn Langberg
Title:   Independent Director


EDGE LINE VENTURES LLC



By:_____
Name: John Lippman
Title:   Manager

**SCHEDULE 2.1**
**ACQUIRED ASSETS**

The Acquired Assets shall include, without limitation the following:

(a)     All Assigned Contracts identified by Buyer will be listed on <u>Schedule 2.3(a)</u> which Schedule shall be delivered in final form by Buyer to Seller prior to the Closing;

(b)     All of Seller's right to use of the COLUMBIA HOUSE trademark pursuant to the Trademark License Agreement between Seller and Sony Entertainment dated June 21, 2002 ("License Agreement");

(c)     All of Seller's right, title and interest in and to all of the domain names of Seller;

(d)     All of Seller's accounts receivable;

(e)     All of Seller's inventory (certain of which shall be subject to the Universal Side Letter);

(f)     All Customer Information that is available in accordance with applicable privacy policies and applicable laws with the format and delivery method to be mutually agreed upon;

(g)     All rights of Seller under or pursuant to all warranties and representations to the extent they are transferable to Buyer relating to any Acquired Assets, other than any warranties and representations pertaining to any Excluded Assets;

(h)     Any Avoidance Actions against CDS Global, Inc., and Mercantile Adjustment Bureau; and

(i)     Except for the Excluded Assets, all other assets of Seller.

**SCHEDULE 2.3(a)**
**ASSIGNED CONTRACTS**

The Assigned Contracts consist of the following:

(1)    All of Seller's right, title and interest in and to that certain Trademark License Agreement, by and between Seller and Sony Music Entertainment, Inc. dated June 21, 2002.

(2)    All of Seller's right, title and interest in and to those certain studio license agreements, including:

       (a)    Seller and Anchor Bay Entertainment, LLC dated September 26, 2011 as extended by Amendment on September 17, 2014;

       (b)    That certain License Agreement, by and between Seller and Sony Pictures Home Entertainment, Inc. dated July 1, 2009, as extended by Amendment on June 30, 2015;

       (c)    That certain License Agreement, by and between Seller and MGM/UA Home Entertainment on July 1, 2004;

       (d)    That certain License Agreement, by and between Seller and RLJ Entertainment, Inc., successor-in-interest to Image Entertainment, Inc. dated February 29, 2012, as extended by Amendment on April 29, 2015;

       (e)    That certain License Agreement, by and between Seller and FUNimation Productions, Ltd. dated May 6, 2005, as extended by Amendment on October 22, 2013;

       (f)    That certain License Agreement, by and between Seller and Lightyear Entertainment, L.P. dated May 4, 2005, as extended by Amendment dated September 1, 2013;

       (g)    That certain License Agreement, by and between Alchemy, formerly known as Millennium Media Services, Inc. dated January 24, 2013;

       (h)    That certain License Agreement, by and between Seller an MPI Media Group, Inc. dated May 11, 2010, as extended by Amendment on March 21, 2013;

       (i)    That certain License Agreement, by and between Seller and Screen Media Ventures, LLC dated March 9, 2011, as extended by Amendment as of February 28, 2014; and

(3)    All of Seller's right, title and interest in and to the Madison Avenue Lease and the Madison Avenue Sublease.

(4)    All of Seller's right, title and interest in and to that certain Master Services Agreement and Statement of Work, by and between Seller and Mercantile Adjustment Bureau dated September 27, 2013 with an effective date of May 1, 2013.

**SCHEDULE 2.5**
**CURE COSTS**

For the avoidance of doubt, Buyer's total obligation for payment of cure costs would be limited solely to amounts listed below for each respective vendor for each such contract actually and expressly assumed and assigned, subject in each instance to Buyer's written acknowledgment of the assignment of the individual corresponding agreements and cure obligations for same as follows:

| | |
|---|---|
| Anchor Bay | $12,571 |
| Sony Pictures Home Ent. | 11,545 |
| Image Entertainment / RLJ | 3,428 |
| Millennium (Alchemy) | 3,571 |
| Screen Media | 455 |
| FUNimation | 124 |
| MPI Media Group | 4,955 |
| Light Year Entertainment | 246 |
| MGM | -0- |
| Madison Avenue Sublease | 41,203 |
| TOTAL | $78,098 |

**SCHEDULE 2.6**
**WIND DOWN COSTS**

The Wind Down Costs consist of the following:

| Schedule 2.6 - Wind Down Costs | |
|---|---|
| *$ actuals* | $ Amount |
| Administrative Services (I/C)* | $    (28,875) |
| Distribution Services (I/C)** | (6,000) |
| Other Operating Expenses | (19,830) |
| | $    (54,705) |

**Deleted:** 96,250

**Deleted:** (20

**Deleted: Total Wind Down Costs**

**Deleted: 116,250**

*Payable to the Administrative Services Company.
**Payable to the Fulfillment Services Company.

**SCHEDULE 2.7**
**POST-PETITION ACCOUNTS PAYABLE**

The Post-Petition Accounts Payable consist of the following:

| Schedule 2.7 - Post-Petition Accounts Payable | | |
|---|---|---|
| *$ actuals* | $ Amount | |
| Accrued & Unpaid Post-Petition I/C* | $ | $ 475,000 |
| Estimated Accrued & Unpaid A/P (non-I/C) | $ | $ 55,000 |
| **Total Post-Petition Accounts Payable** | **$** | **($530,000)** |

*Payable to the Administrative Services Company.

**EXHIBIT 3.4**

<u>RELEASE AND WAIVER</u>

**For good and valuable consideration,** on and after the date hereof, to the fullest extent permitted by applicable law, Filmed Entertainment Inc. ("<u>Seller</u>"), on behalf of (A) itself; and (B)(1) each of its predecessors, successors and assigns, parents, and affiliates; and (2) each such Person's current and former officers, directors, employees, agents, partners, managers, independent contractors, principals, consultants, attorneys, financial advisors, accountants, investment bankers and other representatives (collectively, the "<u>Seller Release Parties</u>"), on the one hand, and (X) Edge Line Ventures LLC ("<u>Buyer</u>"), Bookspan LLC, Totally Awesome Warehouse LLC, Books Acquisition LLC, Incredible Warehouse Holding Company LLC, DVD Direct Acquisition LLC, Pride Tree Holdings, Inc. and (Y)(1) each of their respective predecessors, successors and assigns, parents, affiliates, subsidiaries, portfolio companies, management companies, shareholders, and funds, and (2) each such Person's current and former officers, directors, employees, agents, partners, managers, independent contractors, principals, consultants, attorneys, financial advisors, accountants, investment bankers and other representatives (collectively, the "<u>Buyer Release Parties</u>" and when taken together with the Seller Release Parties, the "<u>Release Parties</u>") on the other hand, hereby, and shall be deemed to conclusively absolutely, unconditionally, irrevocably, and forever, release and discharge, in each case, the other group of Release Parties of any and all liabilities, claims, cross-claims, counterclaims, third party claims, defenses, demands, accounts, reckonings, offsets, recoupments, powers, obligations, rights, suits, damages, causes of action, remedies and judgments of any kind or nature whatsoever, including without limitation: any derivative claims asserted or assertable on behalf of a Release Party, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of securities laws or otherwise regardless of jurisdiction, including, those that any of the Release Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim against or equity interest in any other Release Party or any other Person, based on or relating to, or in any manner arising from, directly or indirectly, in whole or in part, (a) the Bankruptcy Case, (b) the negotiation, formulation, preparation or administration of the Asset Purchase Agreement by and between the Seller and Edge Line Ventures LLC or, related agreements, instruments or other documents, or (c) any transaction entered into or affecting, a Release Party, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the date hereof (all of the foregoing individually constituting a "Claim" or collectively, in whole or in part, "<u>Claims</u>") pertaining to the Seller, the Bankruptcy Case or the Agreement; other than Claims arising out of or relating to any act or omission of a Release Party solely to the extent such act or omission is determined by a final order of judgment of a court of competent jurisdiction to have constituted willful misconduct, gross negligence, bad faith, fraud or a criminal act.

For the avoidance of doubt, notwithstanding anything else contained herein, this Release and Waiver shall not include or apply to JMCK Corp., Najafi Companies, Bertelsmann Inc., Blackstone Group, Sony Corporation or Warner Bros. Entertainment Inc.

For the further avoidance of doubt, the Buyer Release Parties agree to waive any and all Claims

in the Bankruptcy Case, including, but not limited to, the following Claims, which will be disallowed and expunged from the Schedule F of the Debtor's Schedule of Assets and Liabilities [Dkt. No. 65]: (a) Claim Number 165090 in the amount of $1,214,180.72 in favor of Bookspan LLC; and (b) Claim Number 165128 in the amount of $21,939.45 in favor of Totally Awesome Warehouse LLC.

For the further avoidance of doubt, notwithstanding anything else contained herein, this Release and Waiver shall not apply to any liability that may arise under any section of the Employee Retirement Income Security Act of 1974, as amended, under the jurisdiction of, or related to, the Pension Benefit Guaranty Corporation.

> **Formatted:** Normal, No widow/orphan control, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

Each Seller Release Party, on the one hand, and each Buyer Release Party, on the other hand, shall be deemed to have granted the releases and to have waived the Claims set forth herein notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle under any jurisdiction which would limit the effect of such releases to those Claims actually known or suspected to exist at the time of execution of such release.

Dated:  November ___, 2015

FILMED ENTERTAINMENT INC.

By:_____
Name:
Title:

STATE OF NEW YORK          )
                           )      ss.
COUNTY OF NEW YORK    )

SUBSCRIBED AND SWORN TO before me,
this _____ day of _____, 2015.

[Notary Seal]

_____
Signature

NOTARY PUBLIC

My commission expires:  _____, 201_

Dated:  November __, 2015

EDGE LINE VENTURES LLC

By:_____
Name:
Title:


STATE OF NEW YORK        )
                         )          ss.
COUNTY OF NEW YORK  )


SUBSCRIBED AND SWORN TO before me,
this _____ day of _____, 2015.

[Notary Seal]


_____
Signature

NOTARY PUBLIC

My commission expires:  _____, 201_

Dated:  November __, 2015

                              BOOKSPAN LLC

                              By:_____
                              Name:
                              Title:


STATE OF NEW YORK        )
                         )        ss.
COUNTY OF NEW YORK  )


SUBSCRIBED AND SWORN TO before me,
this _____ day of _____, 2015.

[Notary Seal]


_____
Signature

NOTARY PUBLIC

My commission expires:  _____, 201_

Dated:  November __, 2015

TOTALLY AWESOME WAREHOUSE LLC

By:_____
Name:
Title:

STATE OF NEW YORK        )
                         )        ss.
COUNTY OF NEW YORK   )

SUBSCRIBED AND SWORN TO before me,
this _____ day of _____, 2015.

[Notary Seal]


_____
Signature

NOTARY PUBLIC

My commission expires:  _____, 201_

Dated:  November __, 2015

BOOKS ACQUISITION LLC

By:_____

Name:

Title:

STATE OF NEW YORK          )

                                               )          ss.

COUNTY OF NEW YORK    )

SUBSCRIBED AND SWORN TO before me,
this _____ day of _____, 2015.

[Notary Seal]

_____

Signature

NOTARY PUBLIC

My commission expires:  _____, 201_

Dated:  November ___, 2015

INCREDIBLE    WAREHOUSE    HOLDING
COMPANY LLC

By:_____
Name:
Title:

STATE OF NEW YORK      )
                       )          ss.
COUNTY OF NEW YORK  )

SUBSCRIBED AND SWORN TO before me,
this _____ day of _____, 2015.

[Notary Seal]

_____
Signature

NOTARY PUBLIC

My commission expires:  _____, 201_

Dated:  November __, 2015

DVD DIRECT ACQUISITION LLC

By:_____
Name:
Title:


STATE OF NEW YORK        )
                         )          ss.
COUNTY OF NEW YORK   )


SUBSCRIBED AND SWORN TO before me,
this _____ day of _____, 2015.

[Notary Seal]


_____
Signature

NOTARY PUBLIC

My commission expires:  _____, 201_

Dated:  November ___, 2015

PRIDE TREE HOLDINGS, INC.

By:_____
Name:
Title:

STATE OF NEW YORK        )
                         )        ss.
COUNTY OF NEW YORK  )

SUBSCRIBED AND SWORN TO before me,
this _____ day of _____, 2015.

[Notary Seal]

_____
Signature

NOTARY PUBLIC

My commission expires:  _____, 201_